**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| COBB COUNTY, DEKALB COUNTY, and FULTON COUNTY, GEORGIA, | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | CIVIL ACTION NO.:_____ |
| BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., COUNTRYWIDE  FINANCIAL CORPORATION, COUNTRYWIDE HOME LOANS, INC., COUNTRYWIDE BANK, FSB, COUNTRYWIDE WAREHOUSE LENDING, LLC, BAC HOME LOANS SERVICING, LP, MERRILL LYNCH & CO., INC., MERRILL LYNCH MORTGAGE CAPITAL INC., and MERRILL LYNCH MORTGAGE LENDING, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) | **COMPLAINT** |
| Defendants. | ) | |

Table of Contents

I.   INTRODUCTION ................................................................................ 1

II.  JURISDICTION & VENUE ................................................................ 8

III. PARTIES ............................................................................................. 8

IV.  BACKGROUND FACTS ................................................................... 17

    A.  The Federal Government Found Pervasive Discrimination During the Non-prime Mortgage Lending Boom of 2003-2008 ................................... 17

B.  Congress Has Found That Predatory and Discriminatory Lending Caused the Foreclosure Crisis .................................................................27

C.  The Predatory, Subprime and High Cost, Mortgage Lending and Securitization Activities of Defendants and Other Industry Participants Caused the U.S. Financial Crisis and the Subsequent Economic Collapse ......36

D.  The Foreclosure Crisis Has Disparately Impacted Minorities Nationwide.................................................................................................43

V.  DEFENDANTS' DISCRIMINATORY ACTIONS AND OTHER WRONGFUL CONDUCT ..........................................................................48

A.  Defendants Knew, or Were Grossly Negligent or Reckless in Not Knowing, of the Predatory and Discriminatory Nature of Their Conduct........52

B.  Defendants Are Financially Motivated to Engage in the Predatory and Discriminatory Actions Alleged........................................................................60

1.  The Predatory Nature of Defendants' Non-prime Mortgage Loan Products .........................................................................................71

2.  The Relevance of Defendants' Securitization Activities ...................76

3.  The Importance of Defendants' Mortgage Loan Servicing Activities and Their Continuing Nature.................................................................81

C.  Defendants' Targeting of Minorities For Predatory Mortgage Loans .....92

1.  Countrywide Directly Targeted Minorities for Non-prime Mortgage Loans ...............................................................................................96

2.  Defendant Bank of America Directly Targeted Minorities for Non-prime Mortgage Loans ...................................................................108

3.  Defendant Merrill Lynch Funded Other Mortgage Lenders That Targeted Minorities for Non-prime Mortgage Loans ...........................116

D.   Defendants' Discriminatory Mortgage Pricing, Steering, Compensation & Underwriting Policies and Practices in Originating and Funding Predatory Non-prime Mortgage Loans to FHA Protected Minority Borrowers..............122

   1.  Defendants' Discretionary Pricing and Compensation Policies Resulted in Predatory Mortgage Lending on a Discriminatory Basis ...124

   2.  Defendants' Predatorily and Discriminatorily Lowered and Circumvented Their Underwriting Standards and Ignored or Fostered Fraudulent Inflation of Property Appraisals..........................................135

      a.  Countrywide Loosened Underwriting Standards and Abused Its Appraisal Process ...................................................................140

      b.  Merrill Lynch Abandoned Its Underwriting Guidelines and Inflated Appraisals .................................................................152

      c.  Bank of America Abandoned Its Underwriting Guidelines and Encouraged Inflated Appraisals ............................................159

   3.  Defendants' Discretionary Pricing Policies, Financial Incentives, Loosened Underwriting, and Inflated Appraisals Caused Discriminatory and Predatory Lending .........................................................................170

E.   Defendants' Mortgage Servicing & Foreclosure Practices Are Predatory & Discriminatory...........................................................................175

F.   Empirical Data Evidences Defendants' Intentional Targeting of, and the Discriminatory Impact on, Minority Borrowers in Plaintiffs' Communities..................................................................................195

   1.  Defendants' Discrimination is Evidenced by Their Lending & Funding Activities on Mortgages to Minority Borrowers in Plaintiffs' Neighborhoods & Communities ............................................197

      a.  Defendants' Minority Lending & Funding Activity in Cobb County.........................................................................199

      b.  Defendants' Minority Lending & Funding Activity in DeKalb County.........................................................................205

c. Defendants' Minority Lending & Funding Activity in Fulton County ............................................................................... 211

2. Defendants' Discrimination is Evidenced by the Concentration of Their Lending & Funding Activities in Plaintiffs' Neighborhoods With the Highest Foreclosure Risk ("HFR") – Plaintiffs' Higher Minority Neighborhoods ........................................................................... 217

a. Defendants' Lending & Funding Activities in Cobb County's HFR Areas.................................................................................. 219

b. Defendants' Lending & Funding Activities in DeKalb County's HFR Areas .................................................................... 225

c. Defendants' Lending & Funding Activities in Fulton County's HFR Areas .................................................................... 231

3. Defendants' Discrimination is Evidenced by Their Foreclosure Activity ............................................................................ 236

a. Defendants' Foreclosures in Cobb County ..................... 242

b. Defendants' Foreclosures in DeKalb County ................. 247

c. Defendants' Foreclosures in Fulton County .................. 252

G. The Full Extent of Defendants' Discriminatory Housing Practices are Concealed Through Defendants' Underreporting of Minority Status in HMDA Data, Manipulation of Reporting Entities, and Through MERS ....... 257

VI. DEFENDANTS' PREDATORY & DISCRIMINATORY MORTGAGE LENDING, SERVICING AND FORECLOSURE PRACTICES HAVE HARMED PLAINTIFFS.................................................................. 266

VII. BANK OF AMERICA DEFENDANTS ARE LIABLE FOR, AND SUCCESSORS IN INTEREST TO, COUNTRYWIDE AND MERRILL LYNCH ................................................................................... 288

VIII. CAUSE OF ACTION ................................................................. 297

iv

IX. DEMAND FOR JURY TRIAL......................................................................301

X.  PRAYER FOR RELIEF.............................................................................301

## I.    INTRODUCTION

1.      Plaintiffs Cobb County, DeKalb County, and Fulton County, Georgia (which embody all the communities, neighborhoods, and residents they collectively represent), are "aggrieved persons" under the Fair Housing Act, 42 U.S.C. § 3601 *et seq*. ("FHA").   Plaintiffs have been directly injured by Defendants' discriminatory housing practices alleged herein and believe that they will continue to be injured by such practices that are about to occur.   Plaintiffs bring this action as aggrieved persons in their own right pursuant to the private persons civil enforcement provisions of 42 U.S.C. §3613(a) for their own damages and for their organizational injuries arising from Defendants' violation of the FHA.

2.      The FHA, which has a broad remedial purpose, prohibits discrimination in the terms and conditions of residential real-estate related transactions, including mortgage loan transactions.   To effectuate its broad remedial purpose the FHA provides a wide range of remedies including injunctive relief, actual damages, and punitive damages when a court finds that an "aggrieved person" has been injured by a discriminatory housing practice that has "occurred or is about to occur."

3.      The ongoing foreclosure crisis in Plaintiffs' communities (and across the nation) was the foreseeable and inevitable, if not intended, result of

Defendants' (and other industry participants') ongoing discriminatory housing practice of "equity stripping." Equity stripping is an abusive form of "asset based lending" – e.g., the making of expensive mortgage loans with onerous terms, based on the value of the borrower's home but made in disregard of the borrower's ability to repay the loan. Such mortgage loans are designed to, did and continue to maximize lender profits through loan pre-payment penalties, higher loan interest rates, increased mortgage servicing charges over the life of the loan and, most importantly, expensive added fees and increased interest rates charged to late-paying or defaulting borrowers. This ongoing activity has enabled Defendants to continue to earn enormous financial rewards prior to obtaining and reselling borrower homes in foreclosure.

4.    By its very nature, Defendants' equity stripping occurs over the entire life of each mortgage loan made pursuant to the scheme, continuing until those loans are either paid off (or refinanced with a non-predatory loan) or until the borrowers default and the underlying assets are foreclosed upon. These processes strip equity from the borrowers' home:

- at loan origination (when Defendants impose higher interest rates, higher origination costs, and improper fees);

2

- upon each monthly payment when Defendants service the loan because a borrower makes a higher payment due to an inflated interest rate;

- upon payment of a pre-payment penalty when a borrower attempts to refinance or pay off the loan;

- following and during default because Defendants subject the borrower to additional improper predatory and discriminatory fees and costs; and

- upon foreclosure when Defendants take away the borrower's home, thereby removing any remaining equity and eliminating the borrower's ability to generate future equity through home value appreciation or loan principal pay down.

5.      There are three interrelated components to Defendants' discriminatory housing practice of equity stripping: a loan-making component, a securitization component, and a mortgage loan servicing and foreclosure component.  The loan-making component involves Defendants' initial practices of loan origination of (and/or funding brokers to originate) "high cost," higher cost, higher-leveraged, near prime, "subprime," non-prime, ALT-A, and certain other conforming or non-conforming first and second lien home purchase, home equity, and mortgage refinance loans (hereafter, collectively described as "non-prime" loans), and any subsequent continuing refusal to modify such loans upon the request of eligible borrowers.

3

6.      The initial loan making component occurred through a combination of Defendants' (and/or their affiliates') individual predatory mortgage lending policies and practices designed to originate as many such non-prime loans as possible by:

- steering mortgage borrowers, and directly targeting minority African American and Latino mortgage borrowers,[1] for such loans;

- offering and making such loans regardless of the borrower's best interests or inability to repay them;

- granting employees, brokers, and managers the discretion both to steer minority borrowers into more costly loans and to set loan pricing above published rate sheets (to maximize yield spreads);

- enabling the approval of such loans by lowering or waiving published underwriting standards and guidelines; and

- compensating employees and brokers to do this.

As used herein, the term "predatory lending" collectively describes this conduct and is not limited just to loan making activities.

7.      The second component of Defendants' discriminatory housing practice of equity stripping involved Defendants' pooling, securitization, and sale

---

[1] The term "minority" as used hereafter includes racial/ethnic minorities and women.

4

of the non-prime mortgage loans it generated (or funded and purchased from brokers) as residential mortgage-backed securities.  This process sought to pass the risk of loss of the mortgage loans onto third parties, return Defendants' invested capital so they could make and fund more such loans, and generate tremendous future income from Defendants' mortgage servicing, mortgage default servicing and mortgage foreclosure activities.

8.     Defendants' continuing actions of servicing and/or foreclosing on each of the predatory and discriminatory non-prime mortgage loans they made (and/or refusal to modify each such loan when a qualifying borrower requests it) forms the third component of Defendants' discriminatory housing practice of equity stripping.  Defendants' continued monthly servicing of each mortgage loan (e.g., the collection of each monthly mortgage payment, along with the increased interest rates and fees charged) reaffirms and continues the predatory and discriminatory nature of the equity stripping mortgage loans. Thus, Defendants' equity stripping practice continues until the last mortgage loan is fully repaid, or the borrower defaults and is foreclosed upon.  Defendants' act of foreclosure itself is the ultimate denial of housing.

9.     Defendants' equity stripping schemes in violation of the FHA continue to this very day and have not terminated because Defendants continue to

service and foreclose on (or refuse to modify) the predatory and discriminatory non-prime loans for which they are originally responsible. Furthermore, Defendants' foreclosures themselves are conducted in a discriminatory manner and are not simply a downstream effect of the original terms of the predatory and discriminatory non-prime loans themselves. Thus, Defendants' activities have established and/or perpetuate unfair terms and/or conditions in residential real-estate related finance transactions and have made (and will continue to make) housing unavailable to FHA protected minorities in Plaintiffs' communities. Such activities also have disparately impacted, and continue to disparately impact minority homeowners in violation of the FHA.

10.  Plaintiffs seek injunctive relief as a remedial measure, and monetary damages for, Defendants' discriminatory housing practices that have resulted in - and will continue to cause in the future - unprecedented numbers of mortgage loan delinquencies, defaults, foreclosures, and/or home vacancies, many of which are concentrated in Plaintiffs' communities and neighborhoods with increased percentages of racial/ethnic minority homeowners.

11.  Defendants' actions have caused, and will continue to cause: (1) a reduction in the rate of minority homeownership in Plaintiffs' communities and neighborhoods, robbing those communities of their integrated racial character and

injuring Plaintiffs through the ***segregative effect*** of Defendants' actions leading to urban blight; (2) ***organizational harm*** to Plaintiffs' departments and authorities because Defendants' conduct forced and continues to force reallocation of Plaintiffs' limited financial and human resources to address the harms Defendants' actions have caused; and (3) ***direct and indirect financial harm*** to Plaintiffs. This financial harm includes the erosion of Plaintiff's tax base, the loss of property tax revenue, out-of-pocket costs relating to abandoned or vacant properties, the loss of certain intangible property recording fee income, and other financial harm due to urban blight.

12.    Because of the deliberate, egregious and widespread nature of Defendants' predatory and discriminatory mortgage lending and servicing practices and policies, Plaintiffs also seek imposition of punitive and/or exemplary damages. In addition, Defendants' efforts to obfuscate their liability, and Defendants' callous disregard for the impact of their actions on Plaintiffs' communities, neighborhoods, and residents require Plaintiffs to seek punitive and/or exemplary damages.

13.    As Plaintiffs further allege herein, Defendants have been sued by and settled with United States Department of Justice, federal regulators--including the Federal Reserve Board, the Office of the Controller of the Currency, and the

7

Federal Housing Finance Agency--various State Attorneys General, and FHA protected minority borrower class action plaintiffs, among others, for virtually all of Defendants' actions Plaintiffs allege in this complaint.  By virtue of Defendants' numerous cash settlements, and entry into consent orders to change their policies and business practices, and acknowledgements of the facts alleged against them, Defendants have effectively conceded their liability for the matters Plaintiffs allege herein.  Notwithstanding those settlements and agreements, Defendants' discriminatory equity stripping practices continue to this day.

## II.    JURISDICTION & VENUE

14.    This is an action for violation of 42 U.S.C. § 3601 et seq. (Fair Housing Act).  This Court has original jurisdiction over this action pursuant to 42 U.S.C. § 3613 and 28 U.S.C. §§ 1331 and 1343 because the claims alleged herein arise under the laws of the United States.

15.    Venue is proper in this district under 28 U.S.C. § 1391 because each Defendant is a corporation subject to personal jurisdiction in this district, has transacted business in this district and a substantial part of the events and omissions giving rise to the claims occurred in this district.

## III.    PARTIES

16.    Plaintiff, the County of Cobb, Georgia, including its affiliated departments and authorities, is a governmental entity within the State of Georgia organized pursuant to the Georgia Constitution.  Cobb County consists of various communities, neighborhoods and cities such as Acworth, Austell, Kennesaw, Marietta, Powder Springs, and Smyrna.  Cobb County is an aggrieved person within the meaning of 42 U.S.C. § 3602(i).

17.    Plaintiff, the County of DeKalb, Georgia, including its affiliated departments and authorities, is a governmental entity within the State of Georgia organized pursuant to the Georgia Constitution.  DeKalb County is Georgia's third largest county with more than 700,000 residents. DeKalb County consists of various communities, neighborhoods and cities such as Avondale Estates, Chamblee, Clarkston, Decatur, Doraville, Dunwoody, Lithonia, Pine Lake, Stone Mountain, and Tucker, several unincorporated areas, and a portion of the City of Atlanta.  DeKalb County is an aggrieved person within the meaning of 42 U.S.C. § 3602(i).

18.    Plaintiff, the County of Fulton, Georgia, including its affiliated departments and authorities, is a governmental entity within the State of Georgia organized pursuant to the Georgia Constitution.  Fulton County is Georgia's most populated county with more than 920,000 residents. Fulton County consists of

9

various communities, neighborhoods and cities such as Alpharetta, Chattahoochee Hills, College Park, East Point, Fairburn, Hapeville, Johns Creek, Milton, Mountain Park, Palmetto, Roswell, Sandy Springs, and Union City, several unincorporated areas, and a portion of the City of Atlanta. Fulton County is an aggrieved person within the meaning of 42 U.S.C. § 3602(i).

19.     Defendant Bank of America Corporation ("Bank of America") is a corporation organized under the laws of Delaware, with its principal place of business in Charlotte, North Carolina. It is a diversified global financial services company and a bank holding company. It has transacted business in this district.

20.     Defendant Bank of America, N.A. is a national banking association headquartered in Charlotte, North Carolina. It has transacted business in this district.

21.     Defendant Bank of America, as the corporate parent of the various Bank of America subsidiaries involved in the wrongful activities alleged herein, including the named Bank of America entities, and other mortgage lending and servicing entities identified herein, had the practical ability to direct and control the actions and operations of each of its subsidiaries and, in fact, did so through a variety of centralized functions, coordinated practices, and centralized policy and price setting mechanisms.

22.    Bank of America Corporation and Bank of America, N.A. (collectively "Bank of America" or the "Bank of America Defendants") operated as a common enterprise with each other while engaging in the unlawful acts and practices alleged below prior to Bank of America's acquisitions of Countrywide and Merrill.   Because the Bank of America Defendants operated as a common enterprise, each of them also is jointly and severally liable for the acts and practices alleged against them.

23.    Defendant Countrywide Financial Corporation ("Countrywide") is a financial, federal savings and loan, holding company organized under the laws of Delaware with a principal place of business in Calabasas, California.   It has transacted business in this district.    It created, authorized, and/or ratified the various policies and practices at issue in this complaint that its divisions and subsidiaries implemented, maintained, and enforced. At its height, Countrywide had $200 billion in assets and 62,000 employees, and it issued more than $400 billion in residential mortgages annually.  By March 31, 2008, Countrywide was the largest originator and servicer of residential mortgage loans in the country. Subsequent to its acquisition by Defendant Bank of America on July 1, 2008, Countrywide (along with its own subsidiaries) remains a wholly owned subsidiary of Bank of America.

24.     Defendant Countrywide Home Loans, Inc. is a corporation organized under the laws of New York with a principal place of business in Calabasas, California.  It has transacted business in this district.  Prior to 2008, it funded the majority of Countrywide's nationwide residential mortgage lending activity and was a wholly owned subsidiary of Countrywide.  As a result of Defendant Bank of America's July 1, 2008, acquisition of Countrywide it is an indirect subsidiary of Bank of America.

25.     Defendant Countrywide Bank, FSB was both a chartered national bank and a federal savings and loan association at various times during the relevant period, having changed its charter twice.  Since 2008 it has funded Countrywide's nationwide residential mortgage lending activity.   It also provided certain warehouse lending operations to Countrywide at issue herein.  It has transacted business in this district.  On April 27, 2009, it converted its charter back to that of a national bank and merged into Defendant Bank of America, N.A., which is the surviving institution.  Thus, Bank of America, N.A. is the successor in interest to Countrywide Bank, FSB.

26.     Defendant Countrywide Warehouse Lending, LLC is a limited liability company with a principal place of business in Calabasas, California.  It has transacted business in this district.  It also provided Countrywide's warehouse

lending operations at issue herein.  As a result of Defendant Bank of America's July 1, 2008, acquisition of Countrywide it is an indirect subsidiary of Bank of America.

27.    Defendant BAC Home Loans Servicing, LP (f/k/a/ Countrywide Home Loans Servicing, LP) was a Texas limited partnership with a principal place of business in Plano, Texas.  For a time, it was a wholly owned subsidiary of Bank of America, N.A. It has transacted business in this district, providing mortgage servicing on Bank of America, Merrill Lynch, and Countrywide mortgage loans. In July 2011, it merged into Bank of America N.A.

28.    Defendant Countrywide, as the corporate parent of the various Countrywide subsidiaries involved in the wrongful activities alleged herein, including the named Countrywide entities, its Full Spectrum lending division, and other mortgage lending and servicing entities identified herein, had the practical ability to direct and control the actions and operations of each of its subsidiaries and, in fact, did so through a variety of centralized functions, coordinated practices, and centralized policy and price setting mechanisms.

29.    Countrywide Financial Corporation, Countrywide Home Loans, Inc., Countrywide Bank, FSB, Countrywide Warehouse Lending, LLC, and BAC Home Loans Servicing, LP (f/k/a Countrywide Home Loans Servicing, LP) (collectively

13

"Countrywide" or the "Countrywide Defendants") operated as a common enterprise with each other while engaging in the unlawful acts and practices alleged below prior to Countrywide's acquisition by Bank of America. Because the Countrywide Defendants operated as a common enterprise, each of them also is jointly and severally liable for the acts and practices alleged against them.

30.   Defendant Bank of America is liable for, and the successor in interest to, all of the Countrywide Defendants as a result of Bank of America's acquisition of Countrywide in 2008. Upon its acquisition by Bank of America, Countrywide became part of Bank of America's common enterprise involving the unlawful acts and practices alleged below.

31.   Defendant Merrill Lynch & Co., Inc. ("Merrill") is a corporation organized under the laws of Delaware, with its headquarters in the State of New York. On September 15, 2008, Bank of America agreed to acquire Merrill in a $50 billion all-stock transaction in which 0.8595 shares of Bank of America common stock were exchanged for each Merrill common share held as of October 10, 2008. On January 1, 2009, Bank of America announced that it completed its purchase of Merrill. Merrill is now wholly-owned by Bank of America. Prior to its acquisition, through its direct subsidiaries and affiliates, Merrill provided broker-dealer, investment banking, financing, wealth management, advisory, asset management,

14

insurance, lending and related products and services on a global basis.  Merrill has transacted business in this district.

32.    Defendant Merrill Lynch Mortgage Capital Inc. ("MLMCI"), which is a corporation organized under the laws of Delaware, with its headquarters in the State of New York, served as a dealer in whole loan mortgages, mortgage loan participations, mortgage servicing, and syndicated commercial loans. MLMCI, through its CMO Passport® service, provides dealers and investors with general indicative information and analytic capability with respect to collateralized mortgage obligations, mortgage pass-through certificates, and asset-backed securities. As an integral part of its business, MLMCI enters into repurchase agreements whereby it obtains funds by pledging its own whole loans as collateral. The repurchase agreements provide financing for MLMCI's inventory and serve as short-term investments for MLMCI's customers. MLMCI also enters into reverse repurchase agreements through which it provides funds to customers collateralized by whole loan mortgages, thereby providing them with temporary liquidity. MLMCI has transacted business in this district.

33.    Defendant Merrill Lynch Mortgage Lending, Inc. ("MLML") served as a commercial mortgage conduit that makes, and purchases from lenders, both commercial and multi-family mortgage loans and then securitizes these loans for

15

sale to investors. MLML purchases subprime residential mortgage loans from originators of these loans and aggregates these loans for sale in the securitization market. MLML has transacted business in this district.  In January 2004, Merrill Lynch purchased Wilshire Credit Corporation, one of the leading companies in the subprime, nonperforming and underperforming residential mortgage special servicing markets, which operated as a subsidiary of MLMCI.

34.    Defendant Merrill, as the corporate parent of the various Merrill subsidiaries involved in the wrongful activities alleged herein, including the named Merrill entities, First Franklin Financial, Ownit and other mortgage lending and servicing entities identified herein, had the practical ability to direct and control the actions and operations of each of its subsidiaries and, in fact, did so through a variety of centralized functions, coordinated practices, and centralized policy and price setting mechanisms.

35.    Merrill Lynch & Co., Inc., Merrill Lynch Mortgage Capital Inc., and Merrill Lynch Mortgage Lending, Inc. (collectively "Merrill" or the "Merrill Defendants") operated as a common enterprise with each other while engaging in the unlawful acts and practices alleged below prior to Merrill's acquisition by Bank of America.  Because the Merrill Defendants operated as a common

enterprise, each of them also is jointly and severally liable for the acts and practices alleged against them.

36.     Defendant Bank of America is liable for and the successor in interest to all of the Merrill Lynch Defendants via its acquisition of Merrill Lynch in 2008. Upon its acquisition by Bank of America, Merrill became part of Bank of America's common enterprise involving the unlawful acts and practices Plaintiffs allege below.

37.     Defendants BAC Corps. 1-50 are affiliates or subsidiaries of Defendants here that may be responsible for the conduct alleged herein.  Defendant established and/or maintained hundreds of subsidiary and affiliate entities throughout the United States, as well as foreign affiliates.  Such parties are named in "John Doe" capacity pending discovery in this case.

### IV.   BACKGROUND FACTS

**A.**   **The Federal Government Found Pervasive Discrimination During the Non-prime Mortgage Lending Boom of 2003-2008**

38.     In 1975 Congress passed the Home Mortgage Disclosure Act ("HMDA"), implemented under the Federal Reserve Board's Regulation C, requiring all mortgage lenders, including the Defendants here, to compile by census tract and report to the Federal Reserve their mortgage loan origination and

purchase information, which includes borrower race, ethnicity and gender.  One of the primary purposes of HMDA reporting is to enable federal regulators to identify discriminatory lending patterns, such as those that violate the Fair Housing Act. HMDA data is the only readily available information, absent review of Defendants' actual loan level mortgage lending data, from which to demonstrate (using empirical data) Defendants' discriminatory housing practices.

39.    Concerned with potential discrimination in loan pricing, and recognizing that racial or other types of discrimination can occur when loan officers and mortgage brokers have latitude in setting interest rates, in 2004 the Federal Reserve began requiring lenders to identify loans originated as "high cost" or "rate spread" loans where the annual percentage rate cost of borrowing on such loans, including up-front points and fees, exceeds 3 percentage points above reported yields for U.S Treasury securities of comparable maturities for first mortgage liens and 5 percentage points for subordinate mortgage liens.[2]

---

[2] "High cost" mortgage loans, as reported by Defendants in their HMDA data, have been required to be designated as such pursuant to the Home Ownership and Equity Protection Act ("HOEPA") and its implementing regulations. HOEPA was enacted by Congress in 1994 in response to concerns over reverse redlining and targeting minorities for credit on unfair terms and created the HMDA reporting mechanism to track such loans.  However, until HOEPA was amended in 2010 by

40.    At that time, mortgage lending industry groups successfully thwarted consumer lending groups' efforts to require lenders to include borrower credit score and other objective credit risk information in their HMDA reporting.  Thus, HMDA data is the only readily available information, absent review of Defendants' actual mortgage lending data, from which to demonstrate empirically Defendants' discriminatory lending activity.   Regardless, Defendants and other industry participants still collect and maintain borrower credit score and other objective credit risk information for each mortgage loan in connection with their internal and external operations, including for analytical and risk evaluation

---

the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank") following the subprime mortgage lending crisis (coinciding with Defendants' boom period of non-prime mortgage lending between 2003 to 2008), HOEPA interest rate, points and fee triggers were very high and key mortgage loans types (*i.e.*, purchase money mortgages and open-ended home equity lines of credit) were entirely excluded.  Thus, HOEPA trigger levels acted as a de facto ceiling on predatory loan terms and Defendants avoided making loans that would be HOEPA reportable to avoid regulatory scrutiny.  Partially in recognition of the fact that most higher cost, *e.g.*, non-prime, mortgage loans did not meet HOEPA trigger levels, that such loans were and still are discriminatorily and/or disproportionately made to minorities (particularly so during the subprime crisis), Dodd-Frank lowered HOEPA interest rate, points and fees triggers, added loan types including home equity lines of credit and purchase money loans, and added loans that included prepayment penalties.  In no way, however, are Plaintiffs' claims limited solely to those "high cost" loans that would trigger HOEPA reporting requirements.

purposes, the sale and securitization of such mortgage loans, and loan servicing and foreclosure operations.

41.   Based on its own review of all HMDA data, the Federal Reserve Board confirmed that on a national basis African American and Latino borrowers were more likely to pay higher prices for mortgage loans than Caucasian borrowers during much of the excessive mortgage lending and refinance activity at issue here. For example, the Federal Reserve's analysis of 2004 and 2005 HMDA data revealed that "Blacks and Hispanics were more likely ... to have received higher-priced loans than non-Hispanic whites .... [which has] increased concern about the fairness of the lending process." Robert B. Avery, Kenneth P. Brevoort and Glenn B. Canner, "Higher-Priced Home Lending and the 2005 HMDA Data," Federal Reserve Bulletin, A124, A159 (revised Sept. 18, 2006).   The Federal Deposit Insurance Corporation ("FDIC") echoed such findings.  Martin J. Gruenberg, FDIC Vice Chairman, observed that "previous studies have suggested higher-priced, subprime lenders are more active in lower income, urban areas and that minority access to credit is dominated by higher cost lenders." Martin J. Gruenberg, *Address to the Conference on Hispanic Immigration to the United States: Banking the Unbanked Initiatives in the U.S.* (Oct. 18, 2006).

42.     Even after accounting for the differences in borrowers' income, credit scores, property location, and loan amounts in the 2004 HMDA data, a Federal Reserve report found that on average African-American borrowers were 3.1 times more likely than Caucasian borrowers to receive a higher-rate home loan and Latino borrowers were 1.9 times more likely to receive a higher rate loan than Caucasian borrowers. *See* Congressional Testimony of Keith S. Ernst, Senior Policy Counsel, Center for Responsible Lending, before the Subcommittee on Financial Institutions and Consumer Credit (June 13, 2006) at 2.  Reporting on the Center for Responsible Lending's study of the HMDA data (the Center is a non-profit research organization) Ernst testified:

> Our findings were striking. We found that race and ethnicity—two factors that should play no role in pricing—are significant predictors of whether a subprime loan falls into the higher-rate portion of the market. Race and ethnicity remained significant predictors even after we accounted for the major factors that lenders list on rate sheets to determine loan pricing.
>
> In other words, even after controlling for legitimate loan risk factors, including borrowers' credit score, loan-to-value ratio, and ability to document income, race and ethnicity matter. African American and Latino borrowers continue to face a much greater likelihood of receiving the most expensive subprime loans—even with the same loan type and the same qualifications as their white counterparts. Across a variety of different loan types, African American and Latino borrowers were 30% more likely to receive a higher-rate loan than white borrowers.

*Id.* at 3.

43.     Similarly, HMDA data for 2005 evidences that "for conventional home-purchase loans, the gross mean incidence of higher-priced lending was 54.7 percent for blacks and 17.2 percent for non-Hispanic whites, a difference of 37.5 percentage points." Avery, Brevoort, and Canner, Federal Reserve Bulletin, at A159. Similar average discriminatory patterns exist on loan refinancing for the same period, where African Americans were 28.3 percent more likely than similarly situated Caucasians to receive higher priced loans. *See id.* at A124, A159. Indeed, a study commissioned by the Wall Street Journal found that in 2005 and 2006, 55% and 61% respectively of borrowers who received subprime mortgages could have qualified for traditional mortgages at the lower rates offered to prime borrowers.   "*Subprime Debacle Traps Even Very Creditworthy*," *Wall Street Journal*, December 3, 2007.

44.     The U.S. Department of Housing and Urban Development (HUD) found that in neighborhoods where at least 80% of the population is African American, borrowers were 2.2 times as likely as borrowers in the nation as a whole to refinance with a subprime lender and even higher-income borrowers living in predominantly African American neighborhoods were twice as likely as lower-income Caucasian borrowers to have subprime loans. *See* U.S. Department of

Housing and Urban Development, Office of Policy Development and Research, "All Other Things Being Equal: A Paired Testing Study of Mortgage Lending Institutions" (2002).

45.     In 2006 the Center for Responsible Lending uncovered "large and statistically significant" differences between the rates of mortgage loans offered to African Americans and Caucasians, even when income and credit risk were taken into consideration. Compared to their otherwise similarly-situated Caucasian counterparts, African Americans were 31-34% more likely to receive higher rate fixed-rate loans and 6-15% more likely to receive adjustable-rate loans." Gruenstein, Bocian, Ernst and Li, "Unfair Lending: The Effect of Race and Ethnicity on the Price of Subprime Mortgages" (May 31, 2006).

46.     Similarly, HMDA Data for 2006 through 2007 evidences that African American and Hispanic borrowers continued to be much more likely to obtain higher-priced loans than Caucasian borrowers with the same qualifications.

47.     In December 2006 the Consumer Federation of America ("CFA") revealed the results of its extensive study of gender disparity in subprime lending, and their conclusions are evident from the title of their report.  *See* Allen J. Fishbein & Patrick Woodall, "Women are Prime Targets for Subprime Lending:

Women are Disproportionately Represented in High-Cost Mortgage Market," (December 2006) (hereafter, "Women are Prime Targets").[3] As the CFA found:

> Women are more likely to receive subprime mortgages than men. These gender disparities exist across mortgage product lines. Women with the highest incomes have the highest disparities relative to men with similar incomes than women at lower income levels. The gap is especially pronounced for women of color. African American and Latino women have the highest rates of subprime lending. Moreover, African American and Latino women with the highest incomes have much higher rates of subprime lending than white men with similar incomes. The Consumer Federation of America (CFA) study found these patterns of subprime gender disparity exist for home purchase, refinance and home improvement lending.

Thus, the CFA concluded, among other things, that "[t]he prevalence of subprime loans among women borrowers diminishes their ability to fully utilize homeownership as a pathway to build wealth." *Id.* at 3.

48.   The CFA's key findings, which findings Plaintiffs specifically incorporate and allege here, include:

- Women are more likely to receive subprime and higher-cost mortgages: About a third (32.0 percent) of women borrowers receive subprime mortgage loans of all types compared to about a quarter (24.2 percent) of male borrowers – making women 32 percent more likely to receive subprime mortgages than men. More than one in ten (10.9 percent) women received high-cost subprime mortgages compared to about one in thirteen (7.7 percent) men – making women 41 percent more likely to receive higher-cost

---

[3] A copy of this report is publicly available at http://www.consumerfed.org/pdfs/WomenPrimeTargetsStudy120606.pdf

subprime loans with interest rates more than 5 percentage points higher than comparable Treasury notes.

• Women are significantly over-represented in the pool of subprime mortgages. Although women make up 30.0 percent of borrowers for mortgages of all types, they make up 38.8 percent of subprime borrowers – a 29.1 percent over-representation. This over-representation of women in the subprime mortgage pool exists for all types of mortgages but is especially true of refinance and home improvement loans which are more likely to be subprime and predatory mortgages.

• Women are more likely to receive subprime mortgages of all types regardless of income, and disparity between men and women increases as incomes rise. For purchase mortgages, women earning double the median income are 46.4 percent more likely to receive subprime mortgages than men with similar incomes. In contrast, women earning below the area median income are 3.3 percent more likely to receive subprime mortgages. Women earning between the median and twice the median income are 28.1 percent more likely to receive subprime purchase mortgages than men.

• Women of color are the most likely to receive subprime loans and white men are the least likely to receive subprime loans at every income level and the gap grows with income. African American women earning below the area median income are nearly two and a half times more likely to receive a subprime purchase mortgage than white men and Latino women earning below the area median are nearly twice as likely to receive subprime purchase mortgages as white men. The gap is much higher at incomes above twice the area median income. Upper income African American women are nearly five times more likely to receive subprime purchase mortgages than upper income white men and upper income Latino women are nearly four times more likely to receive subprime loans than upper income white men.

• Women are more likely to receive subprime mortgages than men of the same race and women of color are much more likely to receive subprime mortgages than white men. For purchase mortgages, African American women were 5.7 percent more likely than African American men to receive subprime mortgages; Latino women were 12.7 percent more likely than

Latino men to receive subprime mortgages; and white women were 25.8 percent more likely to receive subprime purchase mortgages than white men. African American women were 256.1 percent more likely to receive subprime purchase mortgages than white men and Latino women were 177.4 percent more likely to receive subprime mortgages than white men.

49.   As Plaintiffs further allege below, and consistent with the generalized findings of the federal government and industry watch-dog groups, the HMDA data that Defendants here reported to the federal government reveals profound loan pricing disparities between FHA protected minority borrowers and similarly-situated Caucasian borrowers, even after controlling for borrowers' income, credit scores, property location, and loan amount. Thus, Defendants' own reported HMDA data evidences their discrimination in their mortgage lending activity among minority borrowers who reside in Plaintiffs' communities and neighborhoods. This data evidences that Defendants have preyed upon and illegally steered minority borrowers into nonconforming or conforming "high cost," higher cost, higher leveraged, "subprime," and non-prime loans (collectively, "non-prime" loans), as well as improperly approved minority borrowers for loans or approved such borrowers for inflated loan amounts, all of which increase the likelihood of loan delinquencies, defaults, home vacancies, and eventual foreclosures.

**B.    Congress Has Found That Predatory and Discriminatory Lending Caused the Foreclosure Crisis**

50.    According to Congressional findings, the foreclosure crisis throughout the United States, and within Plaintiffs' neighborhoods and communities leading up to the current period, resulted from the predatory lending activities of the mortgage industry, particularly including the predatory and discriminatory lending activities of Defendants that Plaintiffs allege here.  *Report to Congress on the Root Causes of the Foreclosure Crisis,* Report of Department of Housing and Urban Development (January 2010) (hereafter, the "*Root Causes Report*").

51.    As the *Root Causes Report* explains, housing prices escalated after 2003 and "lenders began offering new mortgage products intended to stretch borrowers' ability to afford ever more expensive homes as a means of keeping loan origination volumes high." *Root Causes Report, Executive Summary* at ix.

52.    "The leading cause of the problem was the characteristics of the market and mortgage products sold, rather than the characteristics of the borrowers who received those products." Congressional Testimony of Keith S. Ernst, Center for Responsible Lending, "Current Trends in Foreclosure and What More Can be

Done to Prevent Them" at 2 (July 28, 2009) ("*Ernst Testimony*") (Joint Congressional Economic Committee).[4]

53.    The foreclosure crisis was "driven by the very design of the loans at issue. The loan products at the heart of the crisis were structured in a way that made widespread failure virtually inevitable." E. Harnick, *The Crisis In Housing and Housing Finance: What Caused It? What Didn't? What's Next?,* 31 Western New England L. Rev. 625, 628 (2009).

54.    Nationwide, between 2001 and 2006:

- Adjustable rate mortgages as a share of total subprime loans originated increased from about 73 percent to more than 91 percent;

- The share of loans originated for borrowers unable to verify information about employment, income or other credit-related information ("low-documentation" or "no- documentation" loans) jumped from more than 28 percent to more than 50 percent; and

- The share of ARM originations on which borrowers paid interest only, with nothing going to repay principal, increased from zero to more than 22 percent.

---

[4]    Available    at    http://www.jec.senate.gov/public/?a=Files.Serve&File_id=36d87b93-a0a6-47b4-96ad-1475c70dc9ce).

*See*, *Economic Impact on Wealth, Property Values and Tax Revenues, and How We Got Here*, Report & Recommendations by Majority Staff of Joint Economic Committee (October 25, 2007).

55.   The Government Accountability Office ("GAO") has reported that "[m]ortgages originated from 2004 through 2007 accounted for the majority of troubled loans." Statement of William B. Shear, Director Financial Markets and Community Investment, Testimony Before the Joint Economic Committee U.S. Congress, "*HOME MORTGAGES Recent Performance of Nonprime Loans Highlights the Potential for Additional Foreclosures*" at 5, GAO-09-922T (July 28, 2009):

Of the active subprime loans originated from 2000 through 2007, 92 percent of those that were seriously delinquent as of March 31, 2009, were from those four cohorts [year-groups]. Furthermore, loans from those cohorts made up 71 percent of the subprime mortgages that had completed the foreclosure process. This pattern was even more pronounced in the Alt-A market. Among active Alt-A loans, almost all (98 percent) of the loans that were seriously delinquent as of March 31, 2009, were from the 2004 through 2007 cohorts. Likewise, 93 percent of the loans that had completed the foreclosure process as of that date were from those cohorts.

Cumulative foreclosure rates show that the percentage of mortgages completing the foreclosure process increased for each successive loan cohort (see fig. 3). Within 2 years of loan origination, 2 percent of the subprime loans originated in 2004 had completed the foreclosure process, compared with 3 percent of the 2005 cohort, 6 percent of the 2006 cohort, and 8 percent of the 2007 cohort. Within 3 years of loan origination, 5 percent of the 2004 cohort had completed the foreclosure process, compared with 8

29

percent and 16 percent of the 2005 and 2006 cohorts, respectively. The trend was similar for Alt-A loans, although Alt-A loans foreclosed at a slower rate than subprime loans. For example, within 3 years of origination, 1 percent of Alt-A loans originated in 2004 had completed the foreclosure process, compared with 2 percent of the loans originated in 2005, and 8 percent of the loans originated in 2006.

56.     The Office of the Comptroller of the Currency ("OCC") reported that as of June 30, 2011, 28.1% of subprime and high cost loans nationwide were seriously delinquent or in foreclosure as compared to only 5.5% of prime loans. Thus, these loans were more than 5 times more likely to be seriously delinquent or in foreclosure than prime loans.  The OCC subsequently reported in June 2013 that while only 2.5% of prime mortgages were considered seriously delinquent, 8.9% and 15.4% of ALT-A and subprime mortgages loans, respectively, were considered seriously delinquent, reflecting a continuing, massive disparity in such delinquency rates.

57.     Defendants were the largest originators and/or purchasers, funders and securitizers of ARM loans and other predatory subprime and high cost mortgage loan products in the United States.

58.     Defendants knew of, or at least could foresee, the foreclosure crisis because of the increased risk of default inherent in the predatory, non-prime mortgage loan products they originated, funded, and/or securitized.  *See Ernst*

*Testimony*.  In particular, these products included the ALT-A and other non-prime, conforming, loan products with predatory or higher cost features (such as prepayment penalties and adjustable interest rates) that Defendants discriminatorily sold to minority borrowers and that are at issue here.

59.    Defendants further increased the likelihood of delinquencies, defaults, vacancies, and eventual foreclosures on all their non-prime mortgage loan products they sold to minority borrowers – "high cost," higher cost, higher leveraged, subprime, conforming, and non-conforming ALT-A mortgage loans – by steering borrowers to "low-doc" or "no-doc" loans (no verification of employment, income or other credit-related information) and "interest only" ARM products, which eventually accounted for more than 50% and 22%, respectively, of all subprime ARM originations by 2006.

60.    The intentional predatory, equity stripping lending activity at issue -- targeting minority borrowers and/or steering them into higher cost/higher leveraged loans, approving minority borrowers for loans that are not otherwise qualified to obtain, inflating the loan costs and amounts to minority borrowers, and the application of willfully lax underwriting standards – in and of themselves dramatically increased the likelihood of mortgage loan delinquencies, defaults, foreclosures, and/or home vacancies because they undermined the ability of the

31

borrower to repay the loan in the first place, creating a self-destructive lending cycle.

61.     As noted in one recent study of mortgage loan originations between 2004 and 2008, "*Lost Ground, 2011: Disparities in Mortgage Lending And Foreclosures*," D. Gruenstein, Bocian, W. Li, C. Reid & R. Quercia (November 2011), issued by the Center for Responsible Lending (hereafter the "*Lost Ground Report*"), "[l]oan characteristics and foreclosures are strongly linked. . . . Loans originated by brokers, hybrid adjustable-rate mortgages ("ARMs," such as 2/28s), option ARMs, loans with prepayment penalties, and loans with high interest rates (a proxy for subprime mortgages) all have much higher rates of completed foreclosures and are more likely to be seriously delinquent." Congress has determined that "the incidence of early payment defaults among these loans suggests that much of their poor performance may be related to lax underwriting that allowed borrowers to take on monthly payments that were unaffordable even before interest rate resets occurred." *Root Causes Report* at 9.

62.     Defendants and other industry participants knew full well of the likely outcome of their predatory lending activity, particularly as a result of the terms of their loan products combined with lax underwriting.  During the 2004-2006 period when more than 8 million adjustable rate mortgage loans ("ARMs") were

originated, the subprime mortgage industry (including Defendants) knew that "[t]ypical subprime borrower had a housing-payment-to-gross-income ratio of 40 percent" and upon initial reset of the ARM, 39% of borrowers would face a payment increase of between 25 and 50 percent, 10% of borrowers would face a payment increase of 51 to 99 percent, and15% of borrowers would face a payment increase of 100 percent or more. *See Root Causes Report* at 29. Defendants also knew that upon the initial interest rate adjustment in the ARM products, many typical borrowers would face payment shock and be unable to make their mortgage payments.

63.    Congress also has found that the foreclosure crisis was "unusual in that general economic weakness did not play a significant role in producing delinquencies and foreclosures in most market areas—at least not initially." *Root Causes Report* at 29. Instead, as Plaintiffs further allege below, it was the predatory lending practices of Defendants and other industry participants – combined with the related credit risk, deteriorating performance, and lack of transparency in these mortgage loan assets pooled in mortgage backed securities – that foreseeably de-stabilized U.S and global credit markets and, in turn, brought down the economy. This in turn led to foreseeably higher unemployment and therefore more mortgage loan delinquencies, defaults, foreclosures, and vacancies.

33

64.    Economists at the University of Michigan and elsewhere have found that a deterioration in Defendants' and other lender's credit characteristics caused the high rates of early delinquency and default, which led to the housing market crash.

65.    Nor did borrower behavior or Community Reinvestment Act ("CRA") lending cause the foreclosure crisis.   Congress enacted the Community Reinvestment Act ("CRA"), 12 U.S.C. § 2901, in 1977 to incentivize federally-regulated banks and savings and loan institutions to make residential mortgage loans, consumer loans, and commercial loans into predominantly minority communities to help overcome the historical reluctance of traditional lenders to make such loans (i.e., "redlining").   CRA mortgage loans typically have much lower default rates than non-prime loans, and certainly predatory loans, because such loans are low cost, kept on a lender's books and properly underwritten. While CRA lending helped make safe credit available to minority communities, mortgage lending deregulation in the 1980's set the stage for a boom in predatory, non-prime mortgage lending in minority communities, which, historically, were in need of credit.

66.    As explained in a study of mortgage loans originated between 2004 and 2008 issued by the Center for Responsible Lending, "*Lost Ground, 2011:*

34

*Disparities in Mortgage Lending And Foreclosures*," D. Gruenstein, Bocian, W. Li, C. Reid & R. Quercia at 6 (November 2011) (hereafter the "*Lost Ground Report*"):

> Our study provides further support for the key role played by loan products in driving foreclosures. Specific populations that received higher-risk products—regardless of income and credit status—were more likely to lose their homes. While some blame the subprime disaster on policies designed to expand access to mortgage credit, such as the Community Reinvestment Act (CRA) and the affordable housing goals of Fannie Mae and Freddie Mac (the government-sponsored enterprises, or GSEs), the facts undercut these claims. Rather, dangerous products, aggressive marketing, and poor loan underwriting were major drivers of foreclosures in the subprime market.

Simply put, mortgage loans made to minorities pursuant to the CRA and the affordable housing goals of Fannie Mae and Freddie Mac were not a cause of the foreclosure crisis. *See Lost Ground Report*.

67. Concentrations of the type of higher cost, higher leveraged, non-prime loans at issue in this litigation, which Defendants (among other industry participants) disproportionately made in minority communities, have, however, been a foreseeable factor to the foreclosure crisis, and have been the contributing factor with the highest correlation of foreclosures among other major contributing factors, *see* Jacob S. Rugh and Douglas S. Massey, *Racial Segregation and the*

*America Foreclosure Crisis*, 75(5) AM. SOCIOL. REV. 629 (2010),[5] including the drop in real estate prices and economic collapse, both of which Plaintiffs allege Defendants' discriminatory and predatory equity stripping, loan making, and loan servicing practices foreseeably caused in the first place.

**C.    The Predatory, Subprime and High Cost, Mortgage Lending and Securitization Activities of Defendants and Other Industry Participants Caused the U.S. Financial Crisis and the Subsequent Economic Collapse**

68.    The predatory nature of the terms of the high cost and subprime mortgage loans themselves, the concealment of the associated and known risk of default on those loan products, and the passing of that risk through the securitization process, all as Plaintiffs allege herein against these Defendants for their own actions (as well as the actions of other industry participants), foreseeably caused the U.S. liquidity crisis, the U.S. financial crisis, and the subsequent economic crisis that have further exacerbated the foreclosure crisis, which their predatory mortgage loan products foreseeably caused in the first instance.

69.    Although Defendants (and other industry participants) previously knew of, or reasonably could have foreseen, the default risk inherent in the non-

---

[5]Available at
http://www.asanet.org/images/journals/docs/pdf/asr/Oct10ASRFeature.pdf

prime mortgage loan products Defendants (and other industry participants) originated and/or funded, that risk clearly began to materialize in the first half of 2006 when delinquency rates on such products began increasing rapidly, particularly for borrowers of adjustable rate products (the overwhelming majority of mortgage loan products at issue here that were originated during the relevant time period) who began facing "payment shock" due to higher monthly payments as the interest rates adjusted pursuant to the loan terms. At this point in time, U.S. unemployment rates were low and home values were near their highest levels.

70.     As loan portfolio delinquencies escalated, third party residential mortgage backed securities investors began demanding that non-performing subprime and higher cost non-prime mortgage loans be repurchased by the financial institutions, such as Defendants here, that pooled, securitized, and sold them. Between the first and third quarters of 2006, demands for loan repurchases tripled within the industry, including the demands that Defendants repurchase the non-performing loans they securitized. Rapidly increasing loan delinquency rates, repurchase demands, and the associated risk at financial institutions, including Defendants, set in motion the financial crisis.

71.     By the end of 2006, Defendant Countrywide clearly knew of the extreme and mounting risks resulting from its "supermarket" strategy, which

widened its underwriting guidelines to match any non-prime mortgage loan product its competitors offered and to which guidelines Countrywide increasingly granted exceptions, notwithstanding the higher rates of default Countrywide was experiencing on those loans. Indeed, the risk was so great that in October through December 2006 Countrywide's top executives illegally sold hundreds of millions of dollars of their stock in the company, having concealed from stock market investors Countrywide's deteriorated financial condition and the rapidly escalating delinquency rates in its securitized RMBS loan portfolios.

72. Defendant Merrill also was aware of the increasing risk and default rates as reflected in its late 2006 decision to cut off its wholesale mortgage lending operations that funded mortgage originations by their partners and joint ventures. As a direct result of Defendant Merrill cutting off funding, Merrill's joint venture partner Ownit shuttered its doors in early December 2006, citing a lack of cash and Merrill's unwillingness to continue providing funding. Ownit filed for bankruptcy later that month.

73. By February 2007, industry-wide increases in subprime defaults had become widely known and the cost of insuring pools of mortgages – particularly home equity loans - began increasing. Through the second quarter of 2007 delinquency rates were exploding beyond anything the mortgage lending industry

had ever experienced in its history, causing the demand for securitizations and related structured finance products to dry up.  Simultaneously, unfavorable news of large losses, margin calls, and downgrades at financial institutions related to subprime and high cost lending occurred.

74.    By the summer of 2007, banking regulators and investors understood that the amount of risk in residential mortgage backed securities and other structured finance products comprised of non-prime mortgage loan products issued by Defendants (and other industry participants) was far greater than the market had previously been led to believe. This directly led to three distinct illiquidity waves – *i.e.* the underlying cause of the financial crisis and the resulting economic crisis.

75.    The first illiquidity wave began on August 9, 2007 when LIBOR rates spiked, as liquidity and default risk of financial institutions rose because of concerns over large financial institutions' exposure to both counterparty credit risk and their own lending risk with respect to both their securitizations and the high risk mortgage loans underlying them.

76.    In mid-August 2007 Defendant Countrywide had to tap an $11.5 billion loan facility from 40 banks, drawing down the entire loan facility to stave off a run on its bank assets.  Around the same time, several other high profile mortgage lenders shuttered their doors, including Accredited Home Lenders and

American Home Mortgage.  Bank of America subsequently invested $2 billion in Countrywide on or about August 23, 2007.

77.    Despite knowledge of the extreme risk in funding subprime and high cost mortgage loan products and the foreseeable damage the practice was already causing, Defendant Bank of America nevertheless continued its wholesale funding operations until October 2007 when it ceased funding its wholesale lenders.

78.    Throughout this period mortgage delinquency rates continued to increase rapidly as funding for mortgage lending activity dried up and shut down, driving home prices lower.  As home prices fell, much of the remaining equity borrowers had was eliminated when loan amounts exceeded actual home values. These elements – which were the foreseeable *result* of Defendants' predatory and discriminatory activities in the first place -- continued to combine to create a downward spiral in home prices and a more rapid increase in loan delinquencies.

79.    In January and February 2008 large financial institutions reported numerous asset write-downs relating to their subprime losses incurred during 2007. Throughout the spring and summer of 2008, the mounting losses at financial institutions led to a full blown liquidity crisis in which financial institutions would not lend funds to each other for fear of the unknown levels of loss exposure with any counterparties.

80.     In the fall of 2008 the U.S. and global credit markets froze – leading to a much greater financial crisis. Specifically, regulators, investors and other market participants realized that the full extent of the credit losses, counterparty risk, and default risk on subprime and high cost mortgage loans underlying RMBS and other securitized debt instruments were unknown and that such unknown levels of risk had infected a wide swath of other investment market segments and U.S and global financial institutions.

81.     It was not until June of 2008 that unemployment levels in the U.S. first began to rise even as foreclosure rates began to explode.  Consequently, an increase in unemployment rates did not cause the foreclosure crisis.  Instead, increasing unemployment occurred as a foreseeable result of the financial and economic crisis, which Defendants' (and other industry participants') predatory and discriminatory lending and securitization activities caused.  That economic crisis, and the increase in unemployment, further exacerbated the foreclosure crisis that the predatory, higher cost and higher leveraged terms and willfully shoddy underwriting of the mortgage loan products themselves directly caused.

82.     The Senate Permanent Subcommittee on Investigations ("SPSI") found that financial institutions like Defendants "were not the victims of the financial crisis." *Wall Street And The Financial Crisis: Anatomy of a Financial*

*Collapse*, Majority and Minority Staff Report (April 13, 2011) at 4.  Instead, the "billions of dollars in high risk, poor quality home loans" that they originated, sold, and securitized and their  "unacceptable lending and securitization practices"  were "the fuel that ignited the financial crisis." *Id.*

83.    According to a report from the Financial Crisis Inquiry Commission ("FCIC"), "[s]ecuritization and subprime originations grew hand in hand" as "[t]he nonprime mortgage securitization process created a pipeline through which risky mortgages were conveyed and sold throughout the financial system.  This pipeline was essential to the origination of the burgeoning numbers of high-risk mortgages."   The Financial Crisis Inquiry Commission, *Final Report of the National Commission on the Causes of the Financial and Economic Crisis in the United States* (January 2011) ("FCIC Report") at 70, 125.[6]  The FCIC concluded that "firms securitizing mortgages failed to perform adequate due diligence on the mortgages they purchased and at times knowingly waived compliance with underwriting standards. . . .  These problems appear to have been significant." (FCIC Report at 187).

---

[6] A copy of the FCIC Report is publicly available at
http://www.gpo.gov/fdsys/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf.

84.    In sum Defendants' predatory subprime mortgage lending (as well as the predatory lending of other industry participants), along with their attempt to conceal and shift the risk of their activities, ultimately caused the financial crisis, economic downturn, and increased unemployment rates.   All of these factors, which were the foreseeable result of Defendants' (and other industry participants') original predatory mortgage lending activities, further exacerbated both the foreclosure crisis and the resulting, foreseeable injuries to Plaintiffs.   Thus, Defendants cannot rely on general claims of economic downturn or borrower job losses as intervening causes of the defaults and foreclosures occurring in Plaintiffs' communities on predatory and discriminatory mortgage loans for which Defendants are responsible.

**D.    The Foreclosure Crisis Has Disparately Impacted Minorities Nationwide**

85.    As the direct result of the terms of the mortgage loan products Defendants (and other industry participants) disproportionately sold to them, minority borrowers nationwide (and those who reside in Plaintiffs' communities and neighborhoods) paid materially higher monthly mortgage payments, on higher loan balances, than similarly situated Caucasian borrowers, and face higher rates of mortgage loan delinquencies, defaults, foreclosures, and/or home vacancies on

loans for which Defendants are responsible.   For example, minority borrowers steered into or receiving a higher cost/higher leveraged loan may pay hundreds of dollars more each month in mortgage payments than a similarly situated borrower who has obtained a conforming loan at market interest rates. Thus, minority borrowers also face higher foreclosure rates. *See Lost Ground Report*.   As also found in the *Lost Ground Report*, which findings Plaintiffs specifically incorporate and allege herein:

- "African-American and Latino borrowers are almost twice as likely to have been impacted by the crisis. Approximately one quarter of all Latino and African-American borrowers have lost their home to foreclosure or are seriously delinquent, compared to just under 12 percent for white borrowers."

- "Racial and ethnic differences in foreclosure rates persist even after accounting for differences in borrower incomes. Racial and ethnic disparities in foreclosure rates cannot be explained by income, since disparities persist even among higher-income groups. For example, approximately 10 percent of higher-income African-American borrowers and 15 percent of higher-income Latino borrowers have lost their home to foreclosure, compared with 4.6 percent of higher income non-Hispanic white borrowers. Overall, low- and moderate-income African Americans and middle- and higher-income Latinos have experienced the highest foreclosure rates."

- "Loan type and race and ethnicity are strongly linked. African Americans and Latinos were much more likely to receive high interest rate (subprime) loans and loans with features that are associated with higher foreclosures, specifically prepayment penalties and hybrid or option ARMs. These disparities were evident even comparing borrowers within the same credit score ranges. In fact, the disparities were especially pronounced for borrowers with higher credit scores. For example, among borrowers with a

FICO score of over 660 (indicating good credit), African Americans and Latinos received a high interest rate loan more than three times as often as white borrowers."

• "Impacts vary by neighborhood. Low- and moderate-income neighborhoods and neighborhoods with high concentrations of minority residents have been hit especially hard by the foreclosure crisis. Nearly 25 percent of loans in low-income neighborhoods and 20 percent of loans in high-minority neighborhoods have been foreclosed upon or are seriously delinquent, with significant implications for the long-term economic viability of these communities."

• "Foreclosures have ramifications that extend beyond the families who lose their homes. Communities with high concentrations of foreclosures lose tax revenue and incur the financial and non-financial costs of abandoned properties and neighborhood blight. . . ."

• "[L]ow-income neighborhoods in other cities. . . have completed foreclosure rates of over 20 percent. Such high levels of concentrated foreclosures will place a significant burden on these neighborhoods and also the wider communities, which, without substantial interventions, will almost certainly suffer reduced revenues for vital city services, higher rates of crime, and myriad other adverse effects."

86.    Numerous publicly available studies by reputable industry watchdog groups have found that the foreclosure crisis has hit African-American and Hispanic neighborhoods and home owners across the country disproportionately harder than non-minority Caucasian homeowners and that this is the result of predatory lending activity.    Moreover, the correlation between high foreclosure rates and communities with higher percentages of minority homeowner borrowers

has been empirically demonstrated. *See, e.g., Racial Segregation and the American Foreclosure Crisis*, 75 AM. SOCIOL. REV. 629.

87.     The percentage share of delinquent loans, loans in the foreclosure process, and loans already foreclosed on increases in direct relationship to increased concentrations of minorities in neighborhoods within Plaintiffs' communities.   According to the *Lost Ground Report*, although 51.3% of loan originations within the Atlanta metropolitan statistical area ("MSA") between 2004 and 2008 were to Caucasian borrowers (25% were made to African Americans and 4.7% to Latinos), Caucasian borrowers faced only 6.5% of the total number of completed foreclosures and the total number of seriously delinquent loans (i.e., *future* foreclosures at the time).   In stark contrast, African American and Latino borrowers in the Atlanta MSA disproportionately incurred 14.6% and 14.7%, respectively, of all completed foreclosures and 15.8%, and 13.4%, respectively, of all seriously delinquent loans.

88.     Similarly, other recent studies have found that women have been adversely impacted by the foreclosure crisis as they have received a disproportionate number of subprime loans as compared to men:

> ***Single women, particularly women of color, represent one of the largest groups of homeowners affected by mortgage strain***. Single women experience higher rates of subprime lending than their male peers, even

when controlling for risk factors such as credit, income, and neighborhood location.  Despite having higher credit scores, single female homeowners are overrepresented among subprime mortgage holders by 29.1 percent, and African American women in particular are 256 percent more likely to have a subprime mortgage than a white man with the same financial profile. ***The overrepresentation of single women in the subprime lending pool cannot be explained by assets, property location, or market conditions.  Rather, they were targeted.***

Amy Castro Baker, *Eroding the Wealth of Women: Gender and the Subprime Foreclosure Crisis*, 88 SOCIAL SERVICE REV. 1, pp. 59-91 (Chicago Univ. Press, March 2014), (internal citations removed, emphasis added).[7]  The reasons for, and impact of, this discrimination are further explained as follows:

Several dynamics drove the likeliness that women, particularly women of color, would end up in the subprime pool. First, the overtly racist redlining practices during era I [1930s-1970s] contributed to the development of highly segregated neighborhoods that were entirely locked out of home ownership and upward mobility. This accumulated disadvantage severely inhibited the accrual of assets among people of color, whose households are predominately headed by women. Second, the ***deregulation of markets and the associated development of securitization flipped the profit motivator for brokers, who could shift the risk of a subprime mortgage onto the borrower and into the secondary mortgage market. Since originators no longer held the mortgages and instead acted as middlemen between investors and borrowers, they could legally extract wealth and equity out of borrowers with little to no consequence***. . . .  Simultaneously, many middle- and low-income Americans, particularly women, have been relying on debt to finance everyday consumption as incomes have not kept pace

---

[7] A copy of the article is publicly available at http://amycastrobaker.files. wordpress.com/ 2014/01/675391-3.pdf.

with the costs of living. . . . In short, the lending disparities of the past situated women and people of color at risk for dangerous products in the present. Subprime loans were once lauded as a new vehicle for upward mobility among women, people of color, and previously redlined neighborhoods. Instead, they ***extracted wealth from vulnerable populations into the secondary mortgage market, benefiting investors at the expense of borrowers and effectively stifling progress toward gender equity***.

*Id*. at 82-83 (emphasis added).

## V.   DEFENDANTS' DISCRIMINATORY ACTIONS AND OTHER WRONGFUL CONDUCT

89.   Through their ongoing, vertically- integrated corporate policies and practices that Plaintiffs further allege below, Defendants are presently engaging in a nationwide, continuing discriminatory housing practice of equity stripping. That practice has occurred and is continuing to occur in Plaintiffs' communities and neighborhoods.

90.   Defendants' pattern and practice of equity stripping is not the result of random or non-discriminatory factors.   Rather, it is the direct, if not intended, result of Defendants' respective mortgage banking business models, Defendants' intent to maximize corporate profits pursuant to those business models, and Defendants' specific predatory and discriminatory corporate policies and practices that effectuate those business models.   This is grounded in Defendants' placement

of their own financial interests above the best interests of their mortgage loan borrowers.

91.   Equity stripping continues by its very nature, extracting value and perpetuating the scheme at each step in the life of a predatory mortgage loan, *e.g.*: at loan origination (when excessive costs are imposed on the borrower); upon each monthly loan payment while the loan is being serviced (the borrower pays extra cost due to the inflated interest rate); upon borrower payment of a pre-payment penalty when refinancing or paying off a loan; following default on the loan (when the servicer imposes additional costs); and upon foreclosure when the home is taken away, ultimately stripping from the borrower every last bit of equity existing in the home or that the borrower may earn through future home value appreciation and loan principal pay-down.

92.   Thus, Defendants' practice of equity stripping involves a variety of Defendants' mortgage banking business operations that are necessarily interrelated. These operations: (i) originate, purchase or otherwise acquire non-prime mortgage loans, particularly those made to FHA protected borrowers on a discriminatory basis, *i.e.*, on terms more unfavorable than loans made to similarly situated non-minority borrowers; (ii) pool, securitize, sell, and retain certain interests in such loans through residential mortgage backed securities; and (iii) service such loans in

a predatory manner and/or until they default, whereby Defendants foreclose on such loans on a discriminatory basis.

93.   Individually, several of these interrelated practices are discriminatory themselves and/or continue to be conducted in a discriminatory manner in violation of the FHA.   In addition, such practices collectively constitute the continuing discriminatory housing practice of equity stripping.   As Plaintiffs further allege below, Defendants' specific discriminatory mortgage loan marketing and lending practices and policies (including "reverse redlining," "targeting," "steering" and discretionary mortgage pricing), combined with Defendants' discretionary loan pricing, employee compensation, warehouse mortgage lending operations, and relaxed underwriting policies and practices, have resulted in FHA protected minority borrowers paying higher interest rates, costs, and fees, and/or receiving mortgage loans on predatory or other more unfavorable terms, such as including prepayment penalties.   This has generated mortgage loans that borrowers cannot sustain, but which are destined to fail through default and foreclosure.

94.   In this manner Defendants have striped equity on each predatory and discriminatory mortgage loan at issue here, and will continue to do so as part of their nationwide practice through servicing each outstanding predatory and discriminatory mortgage loan for which Defendants are responsible, until the last

such loan has been repaid and closed or has been foreclosed upon.  FHA protected minority borrowers experience higher loan default and foreclosure rates than similarly situated non-minority borrowers because Defendants have been making, and continue to make such loans, on a discriminatory basis, and because Defendants continue to service and foreclose on such loans in a discriminatory manner.

95.    Defendants' predatory and discriminatory loans at issue will continue to become delinquent and be defaulted on for at least several more years into the future, leading to further property vacancies and foreclosures.  Because Defendants continue to service the predatory and discriminatory loans they made, and because the last act in Defendants' equity stripping practice is the foreclosure itself, Defendants' discriminatory housing practice continues, by its very nature, until the last predatory and discriminatory mortgage loan Defendants originate, purchase or otherwise acquire, and/or service is either repaid, refinanced with a non-predatory and non-discriminatory loan, or defaults and is then foreclosed upon.    Thus, Defendants discriminatory housing practices in violation of the FHA continue to this day and have not yet terminated such that the statute of limitations on Defendants' discriminatory housing practice has not yet begun to run.

A.    **Defendants Knew, or Were Grossly Negligent or Reckless in Not Knowing, of the Predatory and Discriminatory Nature of Their Conduct**

96.    At all times relevant, the highest levels of Defendants' executive management, and their boards of directors, have been required to know through Defendants' own risk monitoring and control efforts, and either knew or are reckless in not knowing, that Defendants' mortgage banking business models involving non-prime mortgage lending are engaged in equity stripping in violation of the Fair Housing Act.  This is because federal banking laws and regulations require Defendants' management and board to know of the nature of the risks, the relative amounts of risk, their ability to control such risks, and their exposure to the risks from their non-prime mortgage lending activities, including Defendants' compliance with federal fair lending laws and the Fair Housing Act.

97.    The "Interagency Guidance on Subprime Lending," jointly issued on March 1, 1999 ("*Interagency Guidance*") by the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Office of the Comptroller of the Currency and the Office of Thrift Supervision (Defendants' federal banking regulators), succinctly explains the underlying business rationale for lenders such as Defendants to engage in the non-prime mortgage lending activities underlying their equity stripping activities at issue:

52

Due to their higher risk, subprime loans command higher interest rates and loan fees than those offered to standard risk borrowers. These loans can be profitable, provided the price charged by the lender is sufficient to cover higher loan loss rates and overhead costs related to underwriting, servicing, and collecting the loans. Moreover, the ability to securitize and sell subprime portfolios at a profit while retaining the servicing rights has made subprime lending attractive to a larger number of institutions, further increasing the number of subprime lenders and loans.

98.    Each Defendant knew, or was grossly negligent or reckless in not knowing, the position of their banking regulators as set forth in the *Interagency Guidance,* which clearly warns against the predatory lending practices Defendants committed here:

Institutions that originate or purchase subprime loans must take special care to avoid violating fair lending and consumer protection laws and regulations. Higher fees and interest rates combined with compensation incentives can foster predatory pricing or discriminatory 'steering' of borrowers to subprime products for reasons other than the borrower's underlying creditworthiness.

Because of the inherent risk to the safety and soundness of regulated banking institutions, the *Interagency Guidance* further explains that:

Institutions that engage in subprime lending in any significant way should have board-approved policies and procedures, as well as internal controls that identify, measure, monitor, and control these additional risks. . . .   If the risks associated with this activity are not properly controlled, the agencies consider subprime lending a high-risk activity that is unsafe and unsound.

99.    Thus, at all times relevant, federal banking regulators required Defendants to have "board-approved policies and procedures, as well as internal

53

controls that identify, measure, monitor, and control" the risks associated with their non-prime and higher cost/higher leveraged lending activities, including compliance with fair lending laws and the FHA. Defendants' holding companies, and their operating subsidiaries, were similarly required to maintain appropriate policies and procedures to ensure that they identified, measured and controlled such risks.

100. Defendants knew, or were grossly negligent or reckless in not knowing, from the *Interagency Guidance* that an appropriate risk management program required them to "take special care to avoid violating fair lending and consumer protection laws and regulations" because "higher fees and interest rates combined with compensation incentives [could] foster predatory pricing or discriminatory 'steering' of borrowers to subprime products for reasons other than the borrower's underlying creditworthiness."

101. Defendants knew, or were grossly negligent or reckless in not knowing, from the *Interagency Guidance* that their U.S. banking regulators, primarily concerned with bank safety and soundness issues, considered the avoidance of predatory and discriminatory lending practices (particularly including violations of the FHA) to be an "essential component of a well-structured risk management program for subprime lenders," such as Defendants here, given the

54

operating, compliance, and legal risks involved.  Indeed, at that time U.S. banking regulators were focused on the risks of abusive lending practices such as equity stripping, incorporating pricing terms that far exceeded the true risk of the loan, loan flipping, and one-way referral practices within a multi-subsidiary organization.

102.   By virtue of the loan level information that Defendants are required by law to collect and maintain in their Loan Application Registry ("LAR") and report to the federal government, pursuant to the Home Mortgage Disclosure Act ("HMDA"), 12 U.S.C. §2801 *et seq., and implemented by* 12 C.F.R. §203*, et seq.,* all Defendants knew, or were grossly negligent or reckless in not knowing, that the mortgage loan products they originated or funded, securitized, and serviced contained predatory terms, were underwritten in a predatory manner, and were targeted to and/or disproportionately impacted FHA protected minority borrowers. Such data includes loan pricing data, location of property (by MSA, State, County, and census tract), borrower race and ethnicity, gender, borrower income, borrower credit score, borrower debt to income ratio, loan to value ratio, and various loan terms and features (including interest rates, adjustment periods, index rates, and penalties).  In addition, Defendants also are required to collect and maintain other specific and necessary lending and loan underwriting data in their LAR including,

but not limited to, borrower name, the specific street-level property addresses, and the type of documentation of borrower income provided (*e.g.*, Full Documentation, Low Documentation, or No Documentation).

103.   Defendants did collect, and have maintained and reported to their federal regulators on Form FR HMDA-LAR, certain of this and other mortgage loan level information covering all of the mortgage loans Defendants have made during the relevant period at issue here.

104.   As 12 C.F.R. §203.1 explains, the purpose of reporting the HMDA information that Defendants must collect and maintain is "to provide the public with loan data that can be used," among other things "[t]o assist in identifying possible discriminatory lending patterns and enforcing antidiscrimination statutes."

105.   In addition to the HMDA required data, each Defendant creates, electronically maintains, and utilizes other additional information on each mortgage loan applied for and/or which Defendants purchased, sold, securitized into mortgage backed securities, maintained, and/or serviced at any time, all in connection with Defendants' loan application, loan pricing, loan underwriting, and loan servicing activities.   This data includes loan payment history, among other things, and is maintained in electronic form in Defendants' system of records, particularly including Defendants' LAR and mortgage servicing platforms.

106.   All of the foregoing loan level and loan servicing data that Defendants (and all other banking institutions) collect and maintain in electronic form is critical to Defendants' day-to-day business operations in recording, tracking, and monitoring each of the mortgage loans they make, fund, purchase, and/or service, the disposition of those loans, and Defendants' monitoring, evaluation, and financial analysis of Defendants' entire mortgage lending and servicing operations including through their respective:

- legally required Management Information Systems, risk management and control functions, internal control and compliance functions, and related board level reporting activities; and

- analytical decisions, and analytical decision making tools, applications, models and data regarding, among other things

  o mortgage loan marketing (originations and wholesale);
  o credit risk scoring and risk scoring overrides;
  o override monitoring;
  o mortgage loan pricing;
  o mortgage loan underwriting;
  o mortgage loan performance, prepayment, delinquency, and loss severity rates
  o asset valuation;
  o compliance with covenants in securitization transactions; and
  o related management compensation decisions.

107.  Each Defendant created, maintained, and utilized such data in connection with their analytical decision making tools, applications, and models regarding mortgage loan marketing (originations and wholesale), credit risk

57

scoring, credit risk scoring overrides, override monitoring, mortgage loan pricing, mortgage loan underwriting, and related management compensation decisions.

108.   Each Defendant created, maintained, and utilized such data in connection with their mortgage servicing operations.

109.   Each Defendant created, maintained, and utilized such data in connection with their analytical decision making tools, applications, and models regarding mortgage loan performance, prepayment rates, delinquency rates, loss severity rates, asset valuation, compliance with covenants in securitization transactions, and related management compensation decisions.

110.   Each Defendant created, maintained, and utilized such data in connection with their legally required Management Information Systems, risk management and control functions, internal control and compliance functions, and related board level reporting activities.

111.   For the non-prime mortgage loans Defendants funded, purchased, or otherwise acquired from their affiliated brokers and correspondent lenders through their institutional and wholesale business lines, and any other mortgage loans that Defendants securitized and acquired MSRs on, Defendants were provided and have maintained all such loan level and loan servicing data in electronic form.  Like the data Defendants created and maintained through their own mortgage origination

activities, the data from wholesale lenders included information about the underlying mortgage loans that had been originated, including loan terms, underwriting characteristics, and borrower race, ethnicity, and gender information.

112. Thus, Defendants knew, or were grossly negligent or reckless in not knowing, of the predatory and discriminatory nature of the non-prime mortgage loans Defendants were purchasing, securitizing, and generating MSRs from. This is particularly the case where such loans followed Defendants' own mortgage loan pricing and underwriting policies and standards further alleged below.

113. Indeed, each of the Defendants created, distributed to, and incentivized their employees and correspondent lenders to follow each of the predatory and discriminatory mortgage pricing, underwriting, and loan servicing policies and practices as further alleged herein. As such, Defendants knew, or were grossly negligent or reckless in not knowing, the predatory and discriminatory contents or those policies and practices, the predatory and discriminatory manner in which they were implemented, and the discriminatory effect they had on FHA protected minority borrowers in Plaintiffs' communities.

114. As a result of their federally required risk management and control functions, internal control and compliance functions, corporate policies, and all the data they collected, maintained, utilized, and reported to federal regulators, each of

the Defendants knew, or was grossly negligent or reckless in not knowing, that the mortgage loan products they originated, funded, purchased, and/or serviced contained predatory terms, were underwritten in a predatory manner, and were targeted to and/or disproportionately made to FHA protected minority borrowers.

**B.**   **Defendants Are Financially Motivated to Engage in the Predatory and Discriminatory Actions Alleged**

115.   Notwithstanding Defendants' knowledge regarding the predatory and discriminatory nature of their mortgage loan products and lending practices, the illegality of those practices, the risk to the safety and soundness of their federally insured banking operations, and the regulatory guidance warning against such activity, Defendants nevertheless engaged in their discriminatory equity stripping schemes through their interrelated predatory and discriminatory mortgage lending, securitization, and loan servicing activities Plaintiffs allege herein, including:

- targeted marketing of non-prime mortgage loans on unfavorable terms to vulnerable minority borrowers who were unsophisticated or without access to traditional credit sources;

- steering credit worthy minority borrowers to more costly mortgage loans;

- incorporating into mortgage loans to minority borrowers unreasonable terms, excessive fees, pre-payment penalties, and/or yield spread premiums to the loan broker (*i.e.* kick-backs) that are not related to borrower creditworthiness or other objective lending criteria;

- Including prepayment penalties in minority borrower mortgage loans that inhibit the borrower's ability to refinance;

- basing loan values on inflated or fraudulent appraisals of minority borrowers' property;

- repeated refinancing of loans to minority borrowers that does not benefit the borrower and often jeopardizes the property (loan flipping);

- lending to minority borrowers based on the value of the real estate asset collateralizing the loan, not the borrowers' ability to repay (*e.g.*, "equity-stripping"); and/or

- including other terms and conditions in loans to minority borrowers that make it difficult or impossible for a borrower to reduce their indebtedness (such as credit life or other forced insurance policies).

116.   Defendants' primary financial incentive to engage in the discriminatory housing practices Plaintiffs allege herein are: (1) the revenue and profits from the mortgage loan origination fees borrowers pay up front, including on mortgage refinance loans that immediately reduce borrowers' available equity in their homes; (2) revenue earned capital redeployment from securitizing and selling such loan assets; and (3) enormous fees earned from servicing the loans over their life, as well as the creation and maximization of Defendants' mortgage servicing rights ("MSR") assets created in the process.

117.   Defendants' respective mortgage banking business models that have engaged in the predatory and discriminatory non-prime mortgage lending at issue

are unlike more traditional mortgage lenders, such as savings and loan institutions or community banks.  Traditional mortgage lenders typically earn income from the difference (the spread) in their own cost of borrowing money (money they, in turn, lend for prime or conforming mortgage loans) and the interest rate borrowers pay on such loans over the life of the loans.  Because traditional mortgage lenders typically hold the mortgage loans they originate, they are more concerned with proper loan underwriting, properly supported asset values, and borrowers' demonstrated ability to repay loans over the entire life of the loans.

118.   In contrast, Defendants' non-prime residential mortgage banking business models intentionally developed and originated, or funded and purchased, much riskier mortgage loan products that generate more fee income than prime and conforming mortgage loans.  Because such non-prime loans are inherently more risky due to the loan terms themselves, and more profitable due to the higher interest rates and costs associated with them, RMBS securitized with such loans generated higher coupon interest rates than other comparably rated securities and therefore investors were willing to pay a higher price for them.  By maximizing the volume of these non-prime mortgage loans they originated or otherwise acquired, maximizing the face amount of such loans, and maximizing the interest rates and

other fees charged on such loans, Defendants have maximized the amount of income they receive from their non-prime mortgage banking operations.

119.   Thus, the mortgage banking operations of Countrywide, Merrill, and Bank of America were designed to profit at every level of the process, with Defendants vertically-integrated to act as originators, underwriters, sponsors, sellers, depositors, trustees, and/or servicers of predatory non-prime mortgage loan products, which provided them with actual knowledge of the abuses at each level of the process.   Defendants' predatory and discriminatory practices generate financial gains for Defendants through each step of their mortgage banking process:

- Originating on a discriminatory basis high cost, higher cost, higher leveraged, near-prime, subprime, ALT-A, and other conforming and nonconforming mortgage loans in a predatory manner or with predatory terms that are more profitable than prime loans (thereby increasing assets, revenue, and income);

- Funding, purchasing, and/or acquiring such discriminatory and predatory loans through their wholesale lending and affiliated broker and correspondent lender networks (increasing assets, revenue, and income);

- Pooling and securitizing such originated and acquired loans for sale as residential mortgage backed securities (also increasing assets, revenue, and fee income, but more importantly transferring the credit risk of such loans onto third party RMBS purchasers);

- Creating through origination, retaining from securitizations, and purchasing lucrative mortgage servicing rights ("MSRs") on such loans (generating substantial assets); and

- Servicing such loans pursuant to its MSRs (generating tremendous revenue and fee income), including initiating and completing foreclosures on such loans that have defaulted (generating more income through late charges and ancillary fees and ultimately stripping any existing equity as well as the borrower's future equity from home price appreciation in the foreclosure process).

120. To maximize the revenue and profit from each of these sources, Defendants' mortgage banking operations focused on originating or otherwise acquiring as many non-prime mortgage loans as possible, as quickly as possible, and with the largest interest rate spread, up front origination fees, and maximum loan values possible. Defendants accomplish this through a wide range of predatory non-prime mortgage loan product offerings, their securitization activities, and the discriminatory lending practices Plaintiffs allege below. Defendants are further increasing their revenues and profits from their interrelated mortgage servicing and foreclosure operations, which, as Plaintiffs also allege below, Defendants continue to conduct in a predatory and discriminatory manner.

121. Defendants' discriminatory housing practices of equity stripping, and the underlying discriminatory and predatory mortgage lending, servicing, and foreclosure practices enabling or perpetuating Defendants' equity stripping, have

been financially rewarding to Defendants, particularly Countrywide and Bank of America, adding to the tremendous growth these entities have experienced since the early 2000s.

122.   As of December 31, 2003, Countrywide had an 11.4% share of the U.S. mortgage origination market.  Over the next four years, Countrywide's market share grew nearly 38%, to constitute approximately 15.5% of the U.S. market by year-end 2007.  There is no doubt that Countrywide's non-prime mortgage lending and securitization activities fueled its growth and revenues.[8]  As Countrywide

---

[8] Countrywide's SEC filings describe its lending product segments of "prime" and "non-prime" mortgage loans. However, those descriptions do not equate to Plaintiffs' usage here, or the mortgage industry's common usage, of the terms prime and non-prime.  In fact, many of Countrywide's "prime" mortgage loans were actually non-prime, non-conforming, mortgage loans as those terms are used and accepted in the mortgage banking industry.  As described by the SEC in its June 4, 2009 press release announcing securities fraud charges against Countrywide CEO Mozilo and two other former Countrywide executives:

> "This is the tale of two companies," said Robert Khuzami, Director of the SEC's Division of Enforcement. "Countrywide portrayed itself as underwriting mainly prime quality mortgages using high underwriting standards. But concealed from shareholders was the true Countrywide, an increasingly reckless lender assuming greater and greater risk. Angelo Mozilo privately described one Countrywide product as 'toxic,' and said another's performance was so uncertain that Countrywide was 'flying blind.'"

reported in its Form 10-K filed with the SEC for the year ending December 31, 2007, it was the largest residential wholesale mortgage lender, the largest correspondent mortgage lender, and the third largest retail mortgage lender in the United States. Indeed, Countrywide reported tremendous gains on its sales of its mortgage loans and securities in the amounts of approximately $5.8 billion, $4.8 billion, $4.9 billion, $5.7 billion in 2003, 2004, 2005 and 2006, respectively.

123. This growth also led to the growth in Countrywide's mortgage servicing operations, which, as Countrywide also reported in its 2007 Form 10-K, was then the largest in the nation, with a servicing portfolio of approximately $1.5 trillion in mortgages. Countrywide disclosed in the 2007 10-K that it valued its mortgage servicing rights, at a then current fair value, of over $18.9 billion. This reflected over $12 billion in growth of Countrywide's MSRs since just year-end 2003, when its MSRs were valued at about $6.9 billion.

124. Similarly, Countrywide further reported net loan servicing fees and other income from MSRs and retained interests of approximately $1 billion, $1.3

---

A copy of the press release is publicly available at
http://www.sec.gov/news/press/2009/2009-129.htm.

billion, $1.5 billion, $0.5 billion, and negative $.5 billion, respectively in 2007, 2006, 2005, 2004 and 2003.

125.   During 2003 through 2006 the price of Countrywide's common stock rose accordingly, from $25.28 on December 31, 2003 to $42.45 on December 29, 2006.   Countrywide tremendously rewarded a few of its top executives for this growth, awarding them $262,220,940 in compensation between 2004 and 2007 and enabling them to obtain hundreds of millions of dollars in profits from their sale of Countrywide's stock.   At $123,051,536, Mozilo's compensation alone accounted for nearly half of the compensation amount paid to Countrywide's top executives during that same period.

126.   Bank of America's efforts to maximize revenue, profits, and MSR assets from its non-prime mortgage lending, securitization, and mortgage servicing operations were clearly successful.   Indeed, the rapid growth in the income Defendants received from their mortgage servicing activities also tracked the growth in their non-prime lending between 2000 through 2008 and their acquisition of MSR assets.

127.   According to its annual financial reports filed with the SEC on Form 10-K, between 2000 and 2007, Bank of America's mortgage product revenue increased from $51.8 billion (over half was generated through its Correspondent

and Wholesale Channels) to $76.7 billion and its mortgage servicing fee income grew from approximately $350 million per year to approximately $900 million per year.  Similarly, the fair value of Bank of America's MSR assets grew substantially between 2001 and 2007, with a low of about $2.1 billion to a high of about $3.9 billion.

128.   After acquiring Countrywide in mid-2008, Bank of America disclosed in its SEC filings that its servicing fees tripled, generating approximately $3.5 billion in income, while the fair value of its MSR assets grew to $12.7 billion at year-end 2008 (representing a 400% increase over its average $3 billion MSR fair value between 2005 and 2007).

129.   After acquiring Merrill Lynch on December 31, 2008, Bank of America disclosed in its 2009 Form 10-K that its mortgage servicing fees nearly doubled again in 2009 to $6.2 billion as its MSR assets leaped to a fair value of about $19.5 billion as of year-end 2009.

130.   Bank of America's non-prime mortgage lending operations clearly contributed substantially to its financial success and the commensurate increase in the price of Bank of America's common stock over the same period.  This is reflected in the increase in its year-end 1999 common stock closing price of $25.09 per share to its year-end 2007 common stock closing price of $41.26 per share.

131.   Bank of America highly rewarded its top executives for this growth. Executive compensation at Bank of America began to take off just as the company's subprime and high cost lending operations ramped up.  In 2000, then-CEO Kenneth D. Lewis earned $2,623,804 in total compensation.   In 2001 his compensation nearly tripled to $7,436,064 and just one year later it more than doubled, reaching $18,762,549 in 2002.  From there, Mr. Lewis's compensation continued to climb: in 2003 he earned $20,217,981; in 2004, $22,724,058; in 2005, $22,027,984; in 2006, $27,873,348; and in 2007, $23,646,455.  Thus, in just seven years' time, Bank of America's CEO saw a nearly ten-fold increase in his annual compensation at the same time Bank of America was exploiting FHA protected borrowers.  Mr. Lewis's compensation during this time even outstripped his well-paid banking executive contemporaries, whose median annual compensation was $5 million.   Moreover, Mr. Lewis also cashed out $180,188,642 in Bank of America stock in 2006 alone, just as the impending subprime crisis began to appear.

132.  Mr. Lewis was not the only Bank of America executive to benefit from Bank of America's predatory subprime and high cost mortgage lending, funding, securitization, and servicing operations.  From 2003 through 2011, Bank

of America's top few executives raked in a total of over ***one half of a billion dollars*** in compensation.

133.   Merrill's subprime and high cost mortgage lending and servicing strategy also was very successful.   Based upon its focus on courting subprime originators, by 2005 — a year in which Merrill purchased and securitized approximately $30 billion in subprime mortgages — the Company had grown to become the seventh largest issuer of subprime RMBS.

134.   As Merrill reported in its Forms 10-K filed with the SEC, Merrill's net earnings more than doubled from $1.7 billion in 2002 to $3.8 billion in 2003. By year-end 2004, Merrill's net income increased to over $4.4 billion, reflecting a $600 million (15.6%) increase over its 2003 net income.   By year-end 2005, Merrill's net income increased to over $5.1 billion, reflecting nearly a $700 million increase over its 2004 net income. And, in 2006, Merrill reported nearly $7.5 billion in net income.

135.   Merrill's cash inflows from securitization of residential mortgage loans played a substantial part in these financial results.   As Merrill reported in its 2004 and 2007 Forms 10-K filed with the SEC, respectively, its cash inflows from securitizations increased from $43.7 billion for the year ending 2003 to $100.2 billion for the year ending in 2007.

136.   Merrill's mortgage servicing rights also played an important role it its financial results.  For example, as of year-end 2007, Merrill reported in its Form 10-K filed with the SEC that the fair value of its mortgage servicing rights was approximately $476 million.   Merrill also disclosed that it received revenue of $341 million in servicing fees and another $63 million from ancillary and late fees relating to its servicing rights.

137.   In short, between 2003 and 2006, Merrill's operating profit averaged $5.2 billion per year, more than double the $2.1 billion it averaged in the preceding five year period.   Consequently, Merrill's executives took home an astounding $676,300,702 in compensation over the four years from 2003 to 2007.   And, as the price of Merrill's common stock rose during the period, its executives cashed in by selling their stock.   For example, Merrill CEO, O'Neal, pocketed $30,044,749 selling his Merrill Lynch stock in 2006 and 2007.

## 1.   **The Predatory Nature of Defendants' Non-prime Mortgage Loan Products**

138.   Over the relevant period Defendants have originated, funded, or purchased virtually every type of non-prime mortgage loan product available in the residential mortgage lending market, including "high cost," higher cost, higher leveraged, near-prime, subprime, ALT-A, and other conforming and non-

conforming residential first and second lien home mortgage loans.   As further alleged below, these mortgage products were targeted to, or disparately impacted, FHA-protected minority borrowers.

139.   This was a result of Defendants' competitive efforts to make as many non-prime mortgage loans possible and have the largest market share possible. Countrywide's "mortgage supermarket" approach, in particular, was to ensure that everyone who applied for a mortgage loan was able to get a mortgage loan, regardless of risk.   Thus, Defendants also developed, sold, and/or funded exotic loan products, including, among others, hybrid adjustable rate mortgages, interest only mortgage loans, and pay option mortgage loans that also were targeted to, or disparately impacted, FHA-protected minority borrowers.

140.   For example, a tremendous majority of the Countrywide Defendants' loan product offerings were adjustable rate mortgage loans ("ARMs"), which have a low initial fixed interest rate for a short-term period (a "teaser rate"), followed by substantial interest rate increases in subsequent years, *e.g.*, two-year fixed rate/twenty-eight year adjustable loans that were referred to as "2/28 loans," or three-year fixed rate/twenty-seven year adjustable loans that were referred to as "3/27 loans."   Defendants also offered a plethora of other predatory non-prime mortgage loan products to FHA protected borrowers, including high loan-to value

(up to 100%) financing, and low-documentation and no-documentation loans, all of which Defendants knew posed serious and increased risk of borrower default.

141.   Defendants' non-prime mortgage loan products have contained predatory terms or features.  For example, Defendants' non-prime mortgage loans have: (1) loan application requirements, underwriting requirements, or repayment terms (*e.g.*, interest-only loan terms, reduced documentation requirements, higher leverage levels, or balloon payments) that are less restrictive than traditional "prime" or conforming loans; (2) terms not permitted in prime or conforming loans (*e.g.*, prepayment penalties or forced placed insurance); and/or (3) have higher costs, fees, and interests rates than prime loans.  Indeed, many such loans with prepayment and early repayment penalties cost borrowers an average of approximately $5,000 more per loan, making it prohibitively costly for borrowers to refinance their loans with another lender.

142.   One of the most egregious examples of predatory mortgage loan products was the Pay Option Arm offered by Countrywide.  A Pay Option ARM's interest rate adjusts every month based on the fluctuations of the corresponding index used to calculate the interest rate.   Although a Pay Option ARM's introductory interest rate ended after a very short period of time, the borrower's payments did not immediately change to reflect the new interest rate.  Rather, the

borrower was given four payment options each month: (1) a minimum payment that covers none of the principal and only a part of the interest due that month; (2) an interest-only payment; (3) a payment that is amortized to pay off the loan in 30 years; and (4) a payment that is amortized to pay off the loan in 15 years.  Each time a borrower made only the minimum monthly payment, which, consistent with Defendants' sales strategy, borrowers routinely did, the principal loan balance increased, as did the interest payments next due.  This further increased the amount of the payments that the loan required for repayment.

143.   At the time they originated such loan products, funded others to make them, and/or purchased or funded such loans through their broker and wholesale lending channels to be pooled and resold into securitizations, Defendants knew, or were reckless in not knowing, that borrower "payment shock" -- a large increase in borrowers' monthly mortgage payments – would foreseeably result from the scheduled increases to the interest rate and, in the case of Pay Option ARMS, were further magnified by negative amortization. This was made worse in many cases because Defendants often originated or otherwise acquiring non-prime mortgage loans at maximum loan to value ratios, minimum income to debt ratios, unverified income levels, and/or by qualifying borrowers based on their ability to make

74

payments based only on the initial teaser interest rates, all in complete disregard for borrowers' ability to repay the loan.

144.   The results of such reckless, if not willful, predatory lending behavior is reflected in the unprecedented, but nonetheless foreseeable, default rates on all of Defendants' ARM products.   For example, by October of 2009 *74% of borrowers* in Countrywide's active two-year hybrid ARMS were in delinquency or default, and approximately **51% of *borrowers*** in Countrywide's active three-year hybrid ARMs were in delinquency or default.   These exorbitant default rates contrast sharply with the delinquency or default rate of only 13% for borrowers with fixed rate mortgage loans during the same time period.

145.  As a result of the predatory nature of Defendants' non-prime mortgage loan products, Defendants knew or were reckless in not knowing that such loans were destined to fail – *i.e.*, were more likely to result in default and foreclosure.

146.  More importantly, however, as Plaintiffs further allege below, Defendants knew or were reckless in not knowing that their own (and their correspondent lenders') targeted minority marketing practices, combined with their discretionary mortgage pricing policies, employee compensation policies, and

relaxed underwriting practices, all allowed and encouraged such predatory loans to be made on a discriminatory basis.

## 2.    The Relevance of Defendants' Securitization Activities

147.   By pooling, securitizing, and selling to investors as residential mortgage backed securities (RMBS) many of the non-prime mortgage loan products they generated, Defendants were able to re-employ their capital quickly and repeatedly (enabling them to make and securitize many more loans); pass the risk of loss of such loans onto investors; generate large revenues and income from securitization sales; and create valuable mortgage servicing rights assets ("MSRs") that Defendants retained to generate additional future revenue streams from their servicing and foreclosure activities.

148.   Under the securitization model Defendants utilized, after originating a mortgage loan either directly, or through a broker or correspondent lender, or after purchasing such a loan from other third party subprime originators, Defendants often assigned a tracking number from the Mortgage Electronic Registration Systems ("MERS") so that the loan easily could be pooled with other loans, packaged, securitized, sold and resold, without ever filing mortgage lien assignments with public recording entities, including Plaintiffs.  In many instances,

Defendants' use of MERS tracking numbers has concealed the identity of the mortgage originating and the mortgage foreclosing entities involved.

149.   Defendants' typical securitization transactions involved the establishment of a special purpose vehicle (SPV) of Variable Interest Entity (VIE) such as a trust.  When Defendants, or their brokers or correspondent lenders make mortgage loans, the loans become negotiable instruments and, when assigned to a trust (or other SPV or VIE), the trust becomes a holder in due course under the Uniform Commercial Code.

150.   This enables the assignee of the loan (*e.g.* the trust and trustee) to hold the note and enforce it without facing many of the defenses the borrower would have had against the original lender, effectively cleansing the loan note of direct predatory lending claims and obfuscating ownership of the loan.  At the same time, the risk of loss on the underlying mortgage loans passes to the trust -- and ultimately onto its private or public investors who purchase the residential mortgage backed securities ("RMBS") the trust issues.

151.   Because mortgage borrowers effectively lose their rights with the holder in due course to raise the initial act of the loan originator's predatory or discriminatory lending as a defense to foreclosure, Defendants and other industry participants were able to lend with deliberate indifference as to legality or

propriety of the underlying loan origination and in fact were further incentivized to engage in such misconduct through the securitization process.

152.   Defendants adopted multiple strategies to gain control of, and maximize profits from, the securitization process, including:

- Acquisition of financial and ownership interests in loan originators to ensure a steady supply of predatory, high cost, subprime loans to securitize;

- Development of investment banking arms to package and sell their own RMBS;

- Engagement in warehouse lending, whereby the Defendants would extend a line of credit to a third party loan originator to fund mortgage loans, which would then be pooled and securitized; and

- Entry into purchase agreements with third party originators to buy batches of mortgages to securitize.

153.   By controlling affiliated and correspondent lenders, each Defendant was able to dictate the underwriting standards at the loan origination level. Because Defendants needed a high volume of loans to support their securitization operations, Defendants had every incentive, and as Plaintiffs allege below in fact did, lower or grant exceptions to their underwriting standards at the loan origination level.

154.   Defendants' securitization activities were very substantial and grew rapidly during the boom years of their subprime lending activities.  Thus, between

2003 and 2007 Defendants securitized more than *$777.5 billion* of first and second lien mortgages as follows:

| (in Billions) | 2003 | 2004 | 2005 | 2006 | 2007 | Total |
|---|---|---|---|---|---|---|
| **Countrywide** | $58.5 | $116.2 | $163.6 | $141.2 | $80.4 | $560.0 |
| **Merrill** | $13.5 | $13.3 | $20.3 | $16.6 | $28.6 | $92.3 |
| **Bank of America** | $26.4 | $27.5 | $29.5 | $24.4 | $17.4 | $125.2 |

155.   As sponsors of securitizations, and in control of virtually the entire process, Defendants knew the predatory and discriminatory nature of the non-prime mortgage loans underlying their securitizations because they had access to the loan files themselves and made representations and warranties in their securitizations with respect to such loans.

156.   Defendants' correspondent lenders provided Defendants with the data and information about the underlying mortgage loans, including loan terms, borrower ethnicity, and loan performance characteristics.  Defendants also applied their own underwriting standards to the loans they purchased and conducted due diligence on those loans when purchasing them.  Moreover, as originators (or as the controlling entity of an originator), Defendants knew their own lending

practices and the predatory and discriminatory nature of the loans those practices generated.

157.   On or about August 21, 2014, Bank of America agreed to pay an unprecedented $16.65 billion to settle claims brought by the DOJ and pending investigations relating to Defendants' non-prime mortgage securitization and sales activities leading up to and during the Financial Crisis, including Defendants' underwriting and origination of mortgage loans.

158.   The August 2014 Settlement Agreement includes a Statement of Facts (a copy of which is attached here as Exhibit C and incorporated herein), regarding Defendants' actions, that Bank of America explicitly "acknowledges" in consideration of the settlement.

159.   Among other things, Bank of America conceded, i.e., acknowledged, in the August 2014 Settlement Agreement that:

- it, Countrywide, Merrill Lynch, and their affiliates knowingly originated, purchased, or otherwise acquired from brokers risky and defective mortgage loans by ignoring or overriding their own underwriting criteria or failing to conduct adequate due diligence on purchased loans;

- that a significant number of loans it securitized were wholesale mortgages issued through mortgage brokers and that based on internal reporting, such loans were experiencing a marked increase in underwriting defects and a noticeable decrease in performance (all as alleged a complaint filed against it in August 2013 by the U.S.

Attorney's Office for the Western District of North Carolina which was resolved by the August 2014 Settlement);

- Countrywide knew that certain borrowers had a high probability of defaulting on their loans and used "shadow guidelines" that permitted loans to riskier borrowers than Countrywide's own underwriting guidelines would otherwise permit;

- Countrywide's origination arm was motivated by the "saleability" of loans and was willing to originate "exception loans" so long as the loans, and the attendant risk, could be passed off on investors, and that this led Countrywide to expand its loan offerings to include "Extreme Alt-A" loans, which one Countrywide executive described as a "hazardous product"; and

- Merrill Lynch knew that a significant number of loans it purchased, pooled and securitized had material underwriting and compliance defects, disregarded its own due diligence and due diligence performed by its vendors, rarely reviewed unsampled loans to ensure that the defects observed in the samples were not present throughout the remainder of the pools, and nevertheless securitized these loans anyway.

In short, the Settlement resolved the underlying basis for the DOJ's complaint -- that fraud pervaded every level of the RMBS industry and that Defendants had put profits ahead of their own customers.

### 3. **The Importance of Defendants' Mortgage Loan Servicing Activities and Their Continuing Nature**

160. Defendants' continuing servicing and foreclosure activities on the predatory and discriminatory mortgage loans for which they are responsible are inherently interrelated to Defendants' discriminatory housing practice of equity

stripping.  This is because, as alleged above, equity stripping continues, through each step in the life of the loan, including upon each payment a borrower makes when the loan is being serviced, and it only concludes when the loan is either repaid (without an additional pre-payment penalty causing more equity stripping) or upon foreclosure when the home is taken away.

161.  As Plaintiffs further allege below, Defendants' loan servicing and foreclosure activities in and of themselves are predatory, discriminatory, and continuing, but they also further and perpetuate Defendants' discriminatory housing practice of equity stripping.

162.  Defendants are actively involved in, and control, their mortgage servicing and foreclosure processes, and generate substantial revenue and income from such continuing activities.  Defendants, however, have exercised this control in a manner that furthers their own financial interests and have conducted their foreclosure activities in a predatory and discriminatory manner to do so.

163.  Mortgage loan servicers, like Defendants, receive a percentage of each mortgage payment a borrower makes as compensation for handling the various administrative aspects of the mortgage loan payment process including, but not limited to, collecting mortgage payments, crediting those payments to the borrowers' loan balance, assessing late charges, establishing escrow accounts for

the payment of taxes and insurance, making such payments when due, collecting and making the payments to private mortgage insurance and tax collectors, and making distributions of principal and interest to the special purpose vehicles ("SPVs"), variable interest entities ("VIEs"), or other investors who have purchased interests in such loans through securitizations and/or RMBS.

164.   Although the monthly servicing fees relating to individual mortgage loans are relatively small - typically 0.25% of the outstanding principal balance on prime loans and 0.5% on non-prime loans - when added across the millions of mortgage loans Defendants service, the associated total servicing fee revenue is enormous.   Mortgage servicers like Defendants also earn interest income on the float between the time of receipt and remittance of borrower mortgage payments, as well as late payment fees and other fees.

165.   As mortgage loan servicers, Defendants manage loss mitigation when borrowers become delinquent (*e.g.*, through collection and work out activities) or when borrowers default on their loans.   Upon default, Defendants may conduct evictions, foreclosures, and management of vacant or foreclosed properties, including property maintenance and repairs.   Defendants receive significant ancillary fees to provide these loss mitigation services, particularly foreclosures.

166.   As part of their servicing activities, and because Defendants retained the mortgage servicing rights (MSRs) on the mortgage loans underlying their loan originations and purchases, Defendants are actively involved in the entire mortgage servicing and foreclosure process and have a continuing source of revenue and income from such activities.   As Plaintiffs allege herein, Defendants' assets, revenue and income from such MSRs are very substantial.

167.   Defendants manage their foreclosure practices in a way to maximize their own financial interests regardless of the best interests of their borrowers. Thus, Defendants' foreclosure practices often depend on housing prices.

168.   When home prices are low, as they have been following the housing market crash, the borrower may be in default and simply vacate the property, leaving it uncared for, unprotected, and vulnerable to vandalism and/or criminal activity, all of which increase the harm to Plaintiffs.  On higher valued properties with home mortgage loans where Defendants hold an interest in the underlying note in addition to mortgage servicing rights, Defendants may have an incentive not to foreclose when home prices are low in order to avoid a write down of the value of the asset, avoid the higher costs of ownership, maintenance, marketing, and property taxes on owned real estate, or speculate on the real estate by using their financial leverage and "staying power" to wait until housing prices improve.

169.  Thus, when home prices have been low, Defendants and other industry participants have become increasingly willing to walk away from foreclosure – refusing to take ownership and possession – where the costs associated with the foreclosure and maintenance of the property outweigh the financial recovery Defendants can obtain from the foreclosure and resale.  All of this has led to the "shadow inventory" of vacant homes that have not yet been foreclosed upon and that have increased Plaintiffs' damages alleged below.

170.  When home prices rise, Defendants may have an incentive to initiate foreclosures on higher valued homes with defaulted loans to acquire the asset for a price less than or equal to the loan value and, preferably for Defendants, less than its potential resale value.  This enables Defendants to potentially profit on the resale or minimize losses on the underlying mortgage.

171.  Conversely, on lower valued properties where Defendants are less likely to profit on the resale of the property, such as those homes more typically in higher minority concentrated neighborhoods, Defendants have an incentive to increase the numbers of foreclosures to generate more late fees and costs and attempt to write-off such loans from their books. To the extent such properties are not purchased by others during the foreclosure process and must be acquired as

owned real estate, Defendants then have a disincentive to adequately maintain or repair such properties to minimize the costs associated with them.

172.   According to a September 25, 2012 federal housing discrimination complaint filed with HUD by the National Fair Housing Alliance ("NFHA"), and amended as recently as September 2014, Bank of America Corporation, Bank of America, N.A., and BAC Home Loan Servicing, LP, are engaging in a systemic, nationwide, ongoing, discriminatory housing practice relating to their foreclosed, bank-owned properties (Real Estate Owned or "REO" properties), particularly including REO properties in the Atlanta metropolitan area within the Plaintiff Counties. In short, these entities discriminatorily maintain and market their foreclosed REO homes in White neighborhoods in a much better manner than in African-American and Latino minority neighborhoods.

173.   Notwithstanding its obligations to maintain and repair its REO foreclosed properties adequately in both White and minority neighborhoods, Bank of America has had a practice and/or policy of maintaining and marketing its REO properties in predominantly White communities in a superior manner than in communities of color, where many such properties are left in a state of disrepair. For example, according to the NFHA, forty percent of Bank of America's REO properties in Atlanta's communities of color have more than 10 maintenance or

marketing problems, compared to none in White communities.  These deficiencies include broken windows and doors, water damage, overgrown lawns, no "for sale" sign, trash on the property, and other problems.  Also according to NFHA, 80 percent of Bank of America's REO properties in communities of color in the Atlanta area were missing a "for sale" sign.  Without "for sale" signs, potential homebuyers and neighbors are not likely to know that the home is available and neighbors have no one to call to resolve maintenance or trespassing issues.

174.  According to NFHA, Bank of America typically boards windows in communities of color rather than installing clear boarding or fixing the windows. This is less expensive for Bank of America, but creates a stigma and implies that the neighborhood is not safe or desirable.

175.  Bank of America's deteriorating REO properties - many of which were owned by minority borrowers that had received higher cost, predatory, non-prime loans from Defendants or their affiliates – exacerbates damage to the same minority communities by further depressing neighborhood home values, further reducing borrower home equity, increasing blight, and contributing to the overall loss of wealth for the residents and the Plaintiff Counties.

176.  For loans they service but do not hold on their books, loan servicers such as Defendants may have a financial incentive to cause borrower

delinquencies, defaults, home vacancies, or foreclosures because Defendants may make more net income from the foreclosure related fees they charge the sooner that the foreclosure occurs. This is because servicers, like Bank of America, are reimbursed for their servicing fees before any money passes to investors in securitizations as a result of a foreclosure.

177. To maximize their servicing fee income Defendants have routinely added upcharges and marked-up their fees to minority borrowers through various means, including in connection with repayment plans, reinstatements, payoffs, bankruptcy plans, and foreclosures. For example, Countrywide Field Services Corporation ("CFSC"), now doing business as BAC Field Services Corporation, was one of the subsidiaries Defendants used to service minority borrowers' mortgage loans. As an intermediary to services obtained from third-party vendors, CFSC routinely marked up vendor service charges, in numerous instances by 100% or more, before "charging" them to Defendants. Defendants then up-charged minority borrowers for those services.

178. Similarly, Defendants obtained and upcharged minority borrowers for services through other subsidiaries, including LandSafe Default, Inc., also known as LandSafe National Default, ("LandSafe") and ReconTrust Company, N.A. ("ReconTrust"). Defendants also charged minority borrowers with default-related

fees that they were not legally authorized to assess or collect pursuant to the mortgage agreements with such borrowers, or have made misrepresentations about those fees and borrower obligations to pay them.

179. Indeed, Countrywide's President, David Sambol, admitted in an October 2007 Earnings Call, that the company's strategy was to profit from default-related services in down times such as the current mortgage crisis:

> Now, we are frequently asked what the impact of our servicing costs and earnings will be from increased delinquencies and [loss] mitigation efforts, and what happens to costs. And what we point out is, as I will now, is that increased operating expenses in times like this tend to be fully offset by increases in ancillary income in our servicing operation, greater fee income from items like late charges, and importantly from in-sourced vendor functions that represent part of our diversification strategy, a counter-cyclical diversification strategy such as our businesses involved in foreclosure trustee and default title services and property inspection services.

180. Defendants maximized their mortgage servicing fee income by retaining the mortgage loan servicing rights ("MSRs") on virtually every discriminatory mortgage loan they originated or purchased and either kept on their own books or securitized and sold.  As Plaintiffs allege above, the growth in Defendants' holdings of these MSR assets and the growth in Defendants' income from their mortgage servicing operations tracked their non-prime lending activities, particularly during the boom in non-prime lending that occurred between 2003 through 2008.

181.   Bank of America continues to hold tremendous MSR assets derived from its discriminatory equity stripping practices, including its non-prime mortgage lending, purchasing, funding, servicing, and foreclosure operations, as well as such operations of Countrywide and Merrill Lynch that Bank of America acquired.   Bank of America's disclosed MSR value totaled approximately $5 billion as of year-end 2013.   Although its MSR value declined in recent years for a variety of reasons, it appears to be increasing again and nevertheless reflects that Bank of America's mortgage servicing and foreclosure activities that perpetuate its discriminatory housing practice of equity stripping are ongoing and have tremendous present and future value to Bank of America.

182.   Similarly, Bank of America continues to earn tremendous mortgage servicing fee income from its continuing servicing and foreclosure operations, including the operations of Countrywide and Merrill Lynch that were consolidated into it.  Bank of America's mortgage servicing fees were approximately $3 billion in 2013, reflecting that Bank of America is still generating tremendous annual income from its predatory and discriminatory mortgage servicing and foreclosure activities that perpetuate its discriminatory housing practice of equity stripping.

183.   As a result of its various mergers, acquisitions and business line consolidations, Bank of America is now responsible for servicing the active

residential first and second lien mortgage loans to which it, Countrywide and Merrill Lynch have retained servicing rights.

184.   Bank of America segmented its residential mortgage loan servicing portfolio into legacy asset servicing and home loan servicing in 2010.   Bank of America's legacy portfolio consists primarily of delinquent and distressed subprime mortgage loans and is handled by approximately 5,700 staff for early stage mitigation efforts and another 13,000 staff in late stage collection efforts.

185.   Collectively, Bank of America has servicing operations in at least 33 U.S. locations, including major service platforms in Simi Valley, Calif., the Dallas area (including Plano, Fort Worth, and Richardson, Texas), Charlotte, N.C., and Buffalo, N.Y., employing approximately 36,000 additional staff members, and also utilizes the outside services of four domestic vendors and five offshore owned sites.   Bank of America's primary system of record for home loan servicing is IBM's iSeries LS, which is supported by Bank of America's other enterprise applications and systems.

186.   In short, Defendants continue to engage in the discriminatory housing practice of equity stripping, including through their discriminatory mortgage servicing and foreclosure operations, despite both regulatory guidance warning against the underlying activity and their own knowledge that it is occurring.

**C.**   **Defendants' Targeting of Minorities For Predatory Mortgage Loans**

187.   Each of the Defendants bears responsibility for policies of targeting FHA protected minorities for predatory non-prime mortgage loans through their own, and their agents': (1) written solicitations, including home loan pre-approval letters, after identifying individual prospective minority borrowers in Plaintiffs' communities and neighborhoods; (2) bilingual marketing campaigns, including providing Spanish-language internet websites and publications; and/or (3) localized community-based marketing techniques, including hiring minority employees or utilizing minority brokers to market mortgage loan products in minority neighborhoods.

188.   These minority borrower targeting policies or practices resulted in African-American and Latino borrowers in Plaintiffs' communities and neighborhoods, and across the nation, to receive non-prime mortgage loans to a greater extent, and with worse terms, than non-minority borrowers with similar credit qualifications.  As a result, such minority borrowers disproportionately paid or will pay, on average, tens of thousands of dollars more for a loan, and are disproportionately subject to pre-payment penalties, increased credit problems, defaults, and foreclosures.

189.   As Plaintiffs further allege below that the Countrywide and Bank of America Defendants admittedly directly targeted FHA protected minority borrowers for non-prime loans.   The reason, which Defendants knew, is interrelated with the goal of Defendants' entire non-prime mortgage banking business model: African America and Latino minority borrowers provided the quickest and easiest path – *i.e.*, the path of least resistance – for Defendants to obtain as rapidly as possible the most borrowers who were most likely to accept the higher cost and other predatory terms of Defendants' non-prime mortgage loan products.   Indeed, in the early 2000s, Bank of America and Countrywide dramatically increased their targeted marketing to African American and Hispanic borrowers.

190.   African American and Hispanic borrowers are most susceptible to Defendants' predatory lending and targeted marketing because, as known to Defendants, such borrowers traditionally: (a) lacked access to low cost credit; (b) lacked strong relationships with depository institutions; and/or (c) lacked adequate financial acumen, education, comparative financial information, or access to such information (particularly in the case of minorities whose first language is not English or have not achieved a high level of education), such that they could not adequately evaluate the higher costs, more onerous terms and conditions, or the

higher risks of the non-prime and non-conforming mortgage loan agreements into which they were entering.

191.   Because historical housing patterns and segregation had created concentrations of high minority populations in Plaintiffs' communities and neighborhoods, and across the nation, those communities and neighborhoods provided an efficient means – through "reverse redlining" and other localized minority community marketing tactics – for Defendants to target, directly, potential minority borrowers seeking to obtain mortgages for home purchases, refinances of existing loans, or cash out refinances or equity loans to fund consumer spending.

192.   And, because technology had greatly improved by the time of the non-prime lending boom, Defendants have been able to target minorities very precisely with direct mortgage pre-approval solicitation offers through data mining techniques and consumer behavior prediction analytics, as well as Defendants' access to enormous amounts of borrower-specific credit and financial information, spending patterns, ethnicity, and other personalized information obtained from various marketing sources (*e.g.,* magazines to which a particular minority borrower subscribes or websites a particular minority borrower visits).

193.  These targeting techniques have enabled Defendants: (1) to know ahead of time – *i.e.*, before sending a solicitation offer –the likelihood of a potential borrower's response to that offer and (2) to tailor their offer and marketing message to the specific potential borrower (*e.g.,* including as to a borrower's current mortgage payments, credit rating, or consumer debt levels, written in a foreign language such as Spanish, or featuring images of similar-appearing minority or ethnic borrowers).  These techniques are some of the more modern ways in which improper targeting of minorities occurs.

194. Each of the Defendants' targeting (directly and/or through their agents) of FHA protected minorities for predatory, "high cost," higher cost, higher leveraged, and other non-prime mortgage loans have made and/or continue to make housing unavailable on the basis of race, color, national origin or sex.

195. Each of the Defendants' targeting (directly and/or through their agents) of FHA protected minorities for predatory, "high cost," higher cost, higher leveraged, and other non-prime mortgage loans have provided and/or continue to provide different terms, conditions, and privileges of sale of housing, as well as different services and facilities in connection therewith, on the basis of race, color, national origin or sex.

196. Each of the Defendants' targeting (directly and/or through their agents) of FHA protected minorities for predatory, "high cost," higher cost, higher leveraged, and other non-prime mortgage loans have provided and/or continue to provide different terms, conditions and privileges on the basis of race, color, national origin or sex in connection with the making of residential real estate-related transactions.

197. Each of the Defendants' (and their agents') published policies and statements relating to their targeting of FHA protected minorities for predatory, "high cost," higher cost, higher leveraged, and other non-prime mortgage loans have expressed and/or continue to express a preference on the basis of race, color, national origin or sex.

**1. Countrywide Directly Targeted Minorities For Non-prime Mortgage Loans**

198. Countrywide has admitted directly targeting FHA protected borrowers for non-prime mortgage loans.

199. In a presentation to Harvard University on February 4, 2003, Countrywide's CEO, Angelo Mozilo, publicly touted Countrywide's intention to exploit minority mortgage lending markets to drive Countrywide's growth. Referring to the large gap in homeownership rates in the U.S. between white

Americans (approximately 75%) and Hispanic and African Americans (less than 50%) at the time, Mozilo identified several causes for the gap and, thus, Countrywide's opportunity to exploit those causes to further its own profit motive under the pretext of "how Countrywide is trying to address it." A copy is attached hereto as Exhibit A.

200. Incredibly, Mozilo's patronizing comments simultaneously encapsulated the stereotypes of minority borrowers and the structural opportunities within the entire lending process that Countrywide was able to, and did, take advantage of:

> ***The Money Gap*** is the obvious barrier created by the fact that ***there are those who have capital and access to credit, and those who don't***. On the capital side, the down payment and closing costs remain, perhaps, the greatest barriers to homeownership. And simply put, but not surprising, ***minority and low-income families often lack the accumulated wealth and/or income to make these down payments and cover other closing fees***. . . .

> When it comes to credit, there is a double-edge, as well. On one side is the fact ***that lenders are difficult to access because mainstream and reputable financial institutions are not always conveniently located near potential low-income and minority homebuyers. On the other side is the fact that many potential low-income and minority homeowners have questionable credit histories – at least as measured by the standard underwriting models available today – or no measurable credit history at all.*** Thus, even if they can access a lender, that lender can't or won't help

> A report done for the Local Initiatives Support Corporation, otherwise known as LISC, found that over 40 percent of African American renters

whose *income* was under $40,000 did not have banking relationships of any kind. *If these families want to become homeowners, they are often rejected by traditional lenders in the loan process; and if that is the case, they frequently become easy prey for predatory and unscrupulous lenders*.

*One of the more obvious resolutions to the Money Gap is the elimination of down payment requirements for low-income and minority borrowers.* Current down payment requirements of 10 percent or less add absolutely no value to the quality of the loan. It is the willingness and the ability of a borrower to make monthly payments that are the determinants of loan quality. . . .

Over the past 50 years, I have personally interviewed thousands of potential *homebuyers* and in the vast majority of cases, the barrier standing in between them and the house of their dreams was the down payment. *That barrier must be eliminated by offering customized programs to those borrowers who cannot meet the current down payment requirements.*

That brings me to the second issue that contributes to the overall homeownership gap – namely, *the Education Gap*.

*There is a truth in our industry that determining who gets a mortgage and at what interest rate is often more an art than it is a science. Put another way – understanding the home-buying process can be complicated and confusing, especially for low-income and minority families.* Not only are there dozens of documents to review and sign, but there are income ratios and a variety of loan options that a borrower must wade through. In addition, borrowers are faced with the complexity of understanding credit scores, commonly known as FICO, and the issue of how to improve these scores and ensure that the data contained by the credit repositories is accurate.

We must make the process not just easier, but easier to comprehend. *We must get information to potential homeowners in a manner and language that they can understand. We must educate the low-income and minority sector about their rights and the responsibilities of homeownership*. Equally important, we must reduce the documentation required to make any and all loans; *we should be able to approve loans in minutes, rather than*

98

*days, and close loans in days, rather than weeks*. Furthermore, we should streamline the title insurance process and *we should replace the public recording of documents with book entry* as is done with stocks and bonds. This will substantially reduce costs and improve affordability.

If we fail to seek paradigms to simplify the process, accelerate the timing and reduce the cost of obtaining a mortgage, we will be left with two scenarios. One is that potential buyers will be too intimidated by the *very* process of buying a home to even attempt to move forward. The other is that for those who do have the fortitude to proceed, they can easily fall prey to the slick marketing schemes of predatory lenders promising an effortless process. *All of the technology is in place today to both simplify and accelerate the process* and the only issue standing in the way of change, unfortunately, is the "fear" of change.

[Emphasis added].

201.   Touting Countrywide's already explosive success exploiting this

lending sector between 2001 and 2003, Mozilo emphasized Countrywide's plan to

multiply its efforts *six-fold* over the next few years:

Just over ten years ago, we launched our formal affordable lending program called *House America*. Our hope was that with flexible underwriting guidelines, we would enable more people to qualify for home loans, and by having fewer credit and employment constraints, more families would achieve their American Dream.

Back in 1992, we started with a $1.25 billion commitment to *House America*. In 2001, as part of our *House America* campaign to provide residential financing in under-served communities, we increased our commitment to $100 billion with a goal of obtaining that objective by 2005. I'm proud to say that in just 22 months, and not five years as originally planned, we have reached that goal. So I'd like to use this forum this evening to say that Countrywide is once again re-dedicating itself to expanding the dream of homeownership. Tonight, I am announcing the

extension and expansion of our current 5-year, $100 billion challenge through the year 2010, with the commitment to fund a total of $600 billion in home loans for previously underserved Americans in this decade.

Countrywide is proud to make this commitment. We're excited about our new goal. We're eager to reach that goal. And, I can assure you that we will reach that goal.

202. In his presentation, Mozilo brazenly cloaked Countrywide's intentionally targeted, exploitative, discriminatory marketing and lending practices specifically identified in the body of the presentation itself, under a paternalistic veil of "educating" minorities and expanding minority homeownership:

As we had envisioned in 1992, *House America* offers **unique loan products that have been specifically designed to meet the needs of minority and low-to moderate- income borrowers**. But it also does more. It has become not just a lending program, but a more comprehensive effort that devotes considerable intellectual and financial resources to increasing homeownership among minority and low- to moderate-income individuals and families.

It is an effort that includes a counseling center which provides free services by phone in a comfortable, no obligation environment where people can obtain information about the home-buying process. ***It is an effort that, in addition to providing loan products with flexible underwriting criteria such as home rehab loans, also specializes in being able to layer financing programs*** through participation in hundreds of down payment and closing cost assistance programs. *House America* also offers other tools to ensure that we are doing everything in our power to expand the opportunities for home ownership. ***It is an effort absolutely committed to education and outreach, both in English and Spanish, both online and in local communities, both at local home-buyer fairs and at lending workshops, and with our many partners, like Fannie Mae, Freddie Mac, FHA, the***

***Congressional Black Caucus, the National Council of La Raza, AFL-CIO, and faith-based groups across the Country***, just to name a few.

In 1993, Countrywide opened four dedicated *House America* retail branches, and now we have 23 staffed with local and diverse professionals in major metropolitan areas all across the Country.

It is an effort that has enabled Countrywide to become the number one lender to Hispanics for the last 6 years and the number one lender to African Americans for the past 3 years. It is an effort that is helping create, if you will allow me to paraphrase, a Field of American Dreams. "If you build it, and build it right, they will come." Finally, *House America* is an effort that, as you can tell, makes all of us at Countrywide extremely proud. I could talk about it all night, but I won't.

But I want to make the point that this outreach effort is imperative. Fortunately Countrywide isn't alone – there are other mortgage lenders and financial institutions that are all making positive contributions. And the lesson we can take away from this is the following: for a long time, when it came to increasing low-income and minority home ownership, the message has always been "we should," or "we must." But the fact is, "we can," and "we are."

[Emphasis added].

203.    According to Mozilo, implementing Countrywide's goals required resolution of "three structural obstacles: namely, the Underwriting Process, which I feel is driven by an antiquated credit scoring matrix; Predatory Mania; and, a Lack of Proper Perspective."  As to the Underwriting Process structural obstacle, Mozilo explained:

I have two issues with our industry's current underwriting methodology. The first is that the automated underwriting systems kick far too many applicants

down to the manual underwriting process, thereby implying these borrowers are not creditworthy; and the second issue is that once arriving in the hands of a manual underwriter, the applicant is subject to basic human judgment that can be influenced by the level of a borrower's credit score.

. . . .

Thus, the current protocol intentionally creates an environment where borrowers with lower FICO scores are subject to being disproportionately affected by the manual underwriting process. I say we need to amend these systems to do more than just approve the "cream of the crop," by creating a system that says "no" only to those deemed unwilling to make their mortgage payments.

204.    Mozilo's proposed fix to this Underwriting Process structural obstacle was explained in his presentation: "To resolve this ***the credit score*** bar dividing creditworthy from high-risk borrowers, ***must be substantially lowered*** by the GSEs, the secondary market in general, and with bank regulators. The GSEs have made good progress over the last few years in expanding their credit criteria, but I encourage them to become ***much more aggressive in this regard***." [Emphasis added]. As Plaintiffs further allege below, Countrywide's implementation of this directive was the hallmark of its reduced underwriting standards.

205.    Mozilo revealed to the Harvard presentation attendees the true corporate tone he had set from the top of Countrywide as to predatory lending: "The next structural obstacle I would like to address is predatory mania, or to be more exact, the predatory lending legislation that is causing regulatory mania."

102

After deriding "predatory lending laws . . . as a *cause celebre* with ambitious politicians at all levels," Mozilo offered that:

> a clear example of this counterproductive phenomenon is the State of Georgia. The anti-predatory lending measure that became law in Georgia last October is so complex, and the consequences of a violation – intended or otherwise – are so severe, that lenders and the secondary market have been forced to stop making or buying so-called high - cost loans. As a result, the availability of credit to many families has been curtailed out of the fear of possible lawsuits or other intended or unintended consequences.

206. What Mozilo did not explain, however, is that the true reason for the curtailment of non-prime mortgage loans was because credit agencies placed restrictions on their ratings for pools of mortgages originating from the states with predatory lending laws, making it more difficult for lenders like Countrywide to resell such mortgage loans in the secondary market because such loans are more likely, by their nature, to violate predatory lending laws. Nor did Mozilo reveal the extensive ongoing lobbying efforts of Countrywide and other industry players that resulted in federal preemption of state anti-predatory lending laws by early 2004 and state lobbying efforts, including in Georgia, resulting in exceptions being granted to mortgage lenders.

207. Addressing his "Proper Perspective" structural obstacle, Mozilo revealed Countrywide's misguided and cavalier attitude toward the causes of delinquencies and foreclosures of high cost loans, noting "that most families only

go delinquent when faced with a devastating event – such as loss of health, loss of job or loss of marriage. The primary drivers of default are no different in the sub-prime market than they are in the prime sector."  With respect to the predatory, high cost loan products at issue here that Defendants originated, sold, securitized, and serviced, and as Plaintiffs further allege below, nothing could be further from the truth.

208.   Finally, Mozilo also revealed in his presentation Countrywide's direct plan to grow based on its predatory and discriminatory mortgage lending practices:

> we must all lean on the side of looking for every reason to approve applicants rather than the reasons to reject them. We must focus on the majority that succeed, rather than be obsessed with the few that fail. If we maintain this perspective, we will be influenced to take greater risk in assuring that we create parity in homeownership. Clearly, for our industry, the minority and low-income sectors are the "emerging markets" that we can and must develop. The indications – whether they be an increase in immigration, education levels, income, or the fact that the sub-prime market is still in its infancy – all point to growth.

209.   Countrywide in fact increased their marketing efforts and lending penetration into high minority communities across the United States, including in Plaintiffs' communities, where home values were relatively lower, home prices had not appreciated as rapidly as in other market segments, and such homes had available untapped equity.  By focusing on non-prime predatory and discriminatory mortgage lending from 2003 to 2008, Countrywide dramatically increased its

origination of non-prime mortgage loans to minorities and its overall market share, even as it faced fierce competition from other high cost mortgage lenders. To do so, as Mozilo essentially admitted in his Harvard presentation, Countrywide systemically departed from its underwriting standards, resulting in a "culture change" that began in 2003.

210.   According to a former employee of Countrywide who later joined Bank of America when Bank of America acquired Countrywide ("CW1"), Countrywide's marketing to the Hispanic community was "sophisticated."   He stated that Countrywide marketed to the Hispanic community in at least four different ways: (1) Countrywide board member Henry Cisneros was on the board of directors at Univision, and the two companies had a co-branding agreement, which included Countrywide advertising on the Univision website; (2) Countrywide partnered with community-based real estate agents because one of the most effective ways of reaching Hispanic borrowers was by forging relationships with the real estate agents Hispanic borrowers trusted; (3) Countrywide used its call centers and Acxiom to profile Hispanic borrowers based on surnames; and (4) Countrywide targeted the Hispanic community through a regularly-updated and fully-functional Spanish language website.

211. According to a former branch manager who was employed with Countrywide from 1995 through 2005 ("CW2"), Countrywide also hired African American and Latino account executives intending that these account executives would market and sell Countrywide loans to African American and Latino borrowers in their communities. Indeed, according to CW2 Countrywide management made a "big push" to sell ARMs so that Countrywide could get in with a low interest rate, knowing that those borrowers would soon return for new loans when the rates adjusted and the borrower experienced payment shock. CW2 stated that borrowers qualified on ARMS when "they were tight on qualifying" because the borrower's income could support the initial lower payments, even though they could not have qualified for the same dollar amount loan with a fixed interest rate. CW2 often heard loan officers advising borrowers that they could refinance when their loan adjusted and their interest rate increased. According to CW2, Countrywide management was well aware of these tactics. Management, however, assumed the buyer would refinance or sell before the interest rate reset or simply did not care what happened to the borrower or the loan, presumably because by then Countrywide would have passed the risk of default on to investors either by selling or securitizing the loan.

212.   Another former Countrywide loan officer who was employed with Countrywide from 2006 and later employed by Bank of America following its acquisition of Countrywide ("CW3") has stated that Countrywide targeted Hispanic borrowers by creating a Spanish-speaking department that Spanish-speaking borrowers could contact directly for mortgage loans.

213.   Furthermore, according to a former employee who was employed from 2004-2005 at a division of Countrywide known as Full Spectrum Lending ("CW4"), Countrywide targeted for refinances current Countrywide mortgage holders who had missed payments.  Countrywide, through Full Spectrum, would contact these borrowers to inquire as to why they had missed payments and to ask about the challenges they were facing, particularly whether they were having trouble making their mortgage payments because of their credit card payments. Full Spectrum would then offer these borrowers a new mortgage with cash back to pay off their credit cards.  This repaid to the lenders the borrower's unsecured personal debt, converted it to secured debt, and thereby stripped the borrowers' home equity.  Such conduct typifies the discriminatory housing practice of equity stripping, which, according to CW4, "was rampant in the subprime industry."

214.   Another former Countrywide employee who was employed with Countrywide from 2005-2006 ("CW5") confirmed that Countrywide targeted

borrowers to convert their unsecured credit card debt into debt secured by their homes.  According to CW5, Countrywide sent targeted advertisements for home equity lines of credit ("HELOC") to CapitalOne credit card holders.  CW5 was told to inform these potential borrowers that they could convert their high interest credit card debt into secured debt at a lower interest rate with a Countrywide HELOC. These new HELOC loans were offered to borrowers with a low introductory rate for just six months that automatically escalated at the end of the introductory period.

215.  In cases where Countrywide refinanced the unsecured debt into secured debt, the costs associated with the refinancing, which were higher with Countrywide than with many other lenders, were added to the borrower's loan. This further stripped the equity that the borrowers had in their homes.

## 2. Defendant Bank of America Directly Targeted Minorities for Non-prime Mortgage Loans

216.  Defendant Bank of America deliberately engaged in higher cost non-prime mortgage lending, directly targeting minority borrowers for such loans.

217.  A study that analysts with Bank of America's Community Development Banking division published in 2000, titled "*Using Data Mining Technology to Identify and Prioritize Emerging Opportunities for Mortgage*

*Lending to Homeownership-Deficient Communities*" ("*Using Data Mining*"), revealed Bank of America's intent and methodology to exploit minority communities under cover of its Community Reinvestment Act programs, touting its high tech data mining methodology "to identify communities where [it] could achieve the greatest success originating mortgage loans." A copy of *Using Data Mining* is attached hereto as Exhibit B.

218.  *Using Data Mining* describes how Bank of America utilized a variety of data sources (with the assistance of SAS Enterprise Miner software), including prospective borrower credit information, to conduct data mining and other sophisticated predictive behavior modeling and regression analysis techniques, to identify potential minority borrowers and communities where Bank of America could maximize its non-prime mortgage loan originations.

219.  Bank of America also partnered with Epsilon, which aggregated consumer credit score data and other data for Bank of America to use in its targeted marketing strategies.  Bank of America eventually became Epsilon's largest database and marketing services client.

220.  *Using Data Mining* even pitches that "Bank of America has a staff of specialists and mortgage loan programs especially geared towards assisting applicants who are oftentimes constrained by a variety of circumstances.  Bank of

America remains committed to finding solutions to make the dream of homeownership become a reality for residents in all of the communities that it serves."

221.   In April of 2002, Bank of America announced that it was quadrupling its "multicultural" marketing budget to more than $40 million annually.   An article quoting John Villanueva, Bank of America's multicultural brand and communications manager, covered this announcement extensively and published Bank of America's admissions of targeting. *See* http://adage/com/article/hispanic-marketing/bank-america-quadruples-ethnic-ad-budget/34216/   (April 15, 2002). For example, the article identifies each of the minority groups that Bank of America targeted, Bank of America's internal structure devoted to such targeting activities, and the intentional focus of that targeting on mortgage lending:

> Rather than taking a single multicultural approach . . . the country's No. 3 bank **developed significantly different messages for the Hispanic, Asian and African-American markets**, based on customer research and close attention to cultural nuances.
>
> **Spanish-language print and five commercials** focus on helping Hispanics fulfill their dreams, Mr. Villanueva said. Ads end with "We believe in you." Print ads feature individuals talking about what they believe in.
>
> . . . .
>
> [O]ne of the Hispanic spots opens on an exaggerated stack of mortgage-related paperwork the size of a house and details how Bank of America can reduce it by 80%.

110

The ads will run in the appropriate Spanish [language] . . . *to target consumers who prefer to communicate in their native language*. . . .

*For the African-American market*, the brand platform is 'helping African-Americans realize their financial destinies' and *includes tips to simplify the financial process*, such as 'Start today' and, for mortgages, 'Own it.'

For each ethnic group, ads cover branding two products: mortgages and checking accounts.  Bank of America works with Hispanic agency Lopez Negrete Communications, Houston, and WPP Group-backed Kang & Lee Advertising, New York, and UniWorld, New York, for Asian And African-American ads, respectively.

Their work is very different from the general marketing campaign . . . .

Mr. Villaneuva said spending on the multicultural effort would be additional to the general market push.

*In addition to advertising, the multicultural budget covers a 'soup-to-nuts'* range *of activities from in-language brochures to sales and fulfillment, with bilingual staff for offices and phone lines*, Mr. Villanueva said.

[Emphasis added].

222.  Bank of America also had an internal "Fair Lending Group" that targeted African American and Hispanic borrowers with loan products, including mortgages, according to CW1.  Contrary to its name, the group was not concerned with ensuring "fair lending" practices, but instead sought to increase marketing, loan originations, and penetration into minority communities.

223.  Bank of America continued and expanded its targeting focus on minorities throughout the subprime lending bubble.  This is reflected both in the

sheer size of its entire minority marketing campaign of over $420 million in 2007 alone and in Bank of America's continuing focus on minorities through 2008. For example, a Hispanic advertising market circular describes Bank of America as the largest advertiser within the banking category for Hispanic newspapers and magazines during the first quarter 2008. *See* www.portada-online.com/2008/04/23/bank-of-america-leads-within-the-banking-category. And, from January to December 2008, Bank of America was ranked among the top 25 of all Hispanic advertisers. *See* www.media-economics.com/news/HWM/HWMNews2009-02-09.html.

224. Bank of America directly originated many predatory and discriminatory non-prime mortgage loans under the purported cover of its Community Reinvestment Act ("CRA") lending program.

225. Publicly stated CRA lending commitments were particularly important to lenders like Bank of America during the relevant time period because Bank of America was in the process of tremendous growth and expansion through acquisition of existing bank charters, opening new charters, and/or expanding their charter through new branch openings. Bank of America's regulators were required, as part of the approval process for such expansion, to review and consider Bank of America's compliance with the CRA and to consider public commentary regarding

such compliance.  Thus, to satisfy consumer lending and minority advocacy groups in connection with Bank of America's planned acquisition of Fleet Boston in January 2005, Bank of America touted its commitment to make ***$750 billion*** in CRA loans.

226.   In its January 2005 press release announcing the $750 billion CRA commitment, Bank of America proclaimed: "We are determined to be the number one community development lender and the bank of choice in our growing ethnically and culturally diverse markets."   This statement reflected Bank of America's intent to target minorities for sale of its mortgage loan products, with its CRA commitment serving as a smoke screen for any improper loan origination activities.

227.   Many of the mortgage loan products Bank of America originated or funded and improperly credited to its CRA lending commitment under "community development" and pro home ownership rhetoric were not, however, CRA compliant, were predatory in nature and consequently defaulted at high rates, and were not retained by Bank of America, which had profiteered from them through its securitization activities.

228.   As disclosed to the FCIC in June 2010, almost 17 percent of the low- and moderate-income loans Bank of America originated between 2004 and 2007

were delinquent at some point for 90 days or more, and it had retained only about fifty percent of those loans on its balance sheet, having either sold or securitized the rest.

229.   In the third quarter of 2008 Bank of America tried to pin blame for the higher losses it had sustained in its residential mortgage portfolio on its CRA borrowers, stating that while its CRA loans constituted only 7 percent of its owned residential-mortgage portfolio, they represented 29 percent of that portfolio's net losses.   This apparent blame-shifting tactic is disingenuous considering that Bank of America's compliant CRA loans were typically made at low, unprofitable, interest rates and were properly underwritten from the outset  -- precisely the type of loans that are highly unlikely to default -- so that Bank of America could obtain favorable CRA review ratings from its regulators.

230.   According to the then-Comptroller of the Currency in 2008, John C. Dugan, CRA loans were "not the culprit behind the subprime mortgage lending abuses, or the broader credit quality issues in the marketplace." Indeed, an extensive study of the CRA conducted for the Federal Reserve showed that CRA did not exacerbate the foreclosure crisis in any meaningful way.

231. Bank of America also exploited the non-prime mortgage lending market through its Correspondent and Warehouse lending channels – *i.e.*, funding

114

other mortgage loan originators -- and purchasing those loans. This ensured that Bank of America had access to a steady stream of mortgage loans to securitize and sell to investors, by pooling them into Bank of America's RMBS offerings.

232. To do so, Bank of America directly funded the top four predatory subprime (and discriminatory) mortgage originators in the United States, including Defendant Countrywide (the country's then-number 1 subprime lender), Ameriquest (the number 2 subprime lender), New Century Financial Corporation (the number 3 subprime lender), and First Franklin (the number 4 subprime lender, which Defendant Merrill subsequently acquired).

233. Bank of America also aggressively pursued other known predatory subprime mortgage originators, including OptionOne, Accredited Home Lenders, and GMAC Mortgage, to fund and purchase their originated non-prime mortgage loans. Bank of America offered to pay more to purchase their mortgages than other competing Wall Street banks paid and offered to perform less due diligence on the loans than Bank of America's competitors performed. Thus, Bank of America paid more money for poorer quality subprime mortgage loans and would not diligently review those loans when purchasing them.

234.   Not surprisingly, Bank of America became the leading participant in the wholesale/correspondent lending channel, holding approximately 26 percent of the entire U.S. subprime mortgage market.

235.   At the time, Bank of America knew that the originating banks were churning out risky loans with high likelihood of default.  As Ken Lewis, then-CEO of Bank of America admitted in Bank of America's second quarter 2007 earnings release investor conference call: "Broker [loans] tends to be toxic waste."

### 3.   Defendant Merrill Lynch Funded Other Mortgage Lenders That Targeted Minorities for Non-prime Mortgage Loans

236.   Through acting primarily as an investment bank, and not a retail mortgage lender, Defendant Merrill Lynch fostered predatory lending among its brokers and other agents to minority borrowers to increase the volume of residential mortgage loans Merrill could obtain, securitize, and sell.

237.   Merrill Lynch ensured a steady stream of such loans by: (i) engaging in warehouse lending; (ii) departing from its own underwriting standards in its securitizations; (iii) tacitly and/or explicitly encouraging retail mortgage loan underwriters with whom it had warehouse funding relationships to depart from their own underwriting standards; and (iv) acquiring predatory retail mortgage lenders.

238.   When the mortgage securitization business began to take off in the early 2000s, Merrill Lynch was not initially a dominant market player.  Through its two subsidiary defendants, Merrill Lynch Mortgage Capital Inc. ("MLMCI") and Merrill Lynch Mortgage Lending, Inc. ("MLML"), Merrill entered and operated within the mortgage market.

239.   In 2003 Merrill began taking aggressive action through its Global Markets and Investment Banking Group to increase its market share in generating and selling asset-backed securities, particularly residential mortgage backed securities ("RMBS").   Led by its then-CEO, E. Stanley O'Neal, Merrill revamped its operations by hiring new people, including George Davies, a trader tasked with increasing the volume of mortgage loans coming into Merrill's trading desks.

240.  In January 2004, Merrill agreed to purchase Wilshire Credit Corporation, one of the then-leading companies in the subprime, nonperforming and underperforming residential mortgage special servicing markets.  Merrill then began buying up immense volumes of subprime mortgage loans, paying more for such loans than every other firm on Wall Street, and using its other operations to entice subprime lenders to sell their loans to Merrill.  Merrill also ramped up its warehouse financing operations to other subprime lenders, offering financing at very little or no cost so long as the lender continued to sell Merrill the subprime loans it

originated.    Thus, Merrill operated its warehouse lending business in a manner designed to increase its share of the securitization business.

241.   At the same time, Merrill adopted liberal standards as to what mortgage loans it was prepared to acquire and routinely purchased loans that did not comply with the underwriting standards it was disclosing to investors.  And, responding to fierce competition from an increasing number of market players, Merrill continued to loosen its underwriting guidelines and ignored the results of its due diligence on purchased loans.

242.   According to a recent report from the Financial Crisis Inquiry Commission ("FCIC"), Merrill knew from its third party loan reviewers such as Clayton Holdings LLC ("Clayton"), that approximately 23% of the loans that Merrill was looking to acquire were improperly underwritten, but Merrill nevertheless proceeded to include such loans in securitization pools to increase its RMBS production volume and market share.

243.   To further its strategy, in September 2005, Merrill purchased a 20 percent stake in subprime wholesale mortgage lender Ownit Mortgage Solutions, Inc. ("Ownit").  Between just September and December 2005, Ownit originated and sold to Merrill approximately $6 billion dollars of non-prime mortgage loans

— 2/3 of Ownit's total originations for 2005  --  providing Merrill a steady supply of loans to package, pool, securitize, and sell.

244.   For its part, Ownit, began operations in 2003 and became one of the 15 largest subprime lenders in the United States thanks to funding by Defendant Merrill.   Until it ceased operations in December 2006 and filed for bankruptcy protection, Ownit focused its lending on "mass nonaffluents," a term used by Ownit's founder (who previously founded First Franklin) to refer to his target market of mortgage borrowers – those who earned less than $100,000 per year and had less than $100,000 in assets.

245.   A former corporate underwriter at Ownit from 2004 to 2006, who was previously identified in American International Group's complaint against Bank of America in the action styled *American Int'l Group, et. al v. Bank of America Corp., et. al*, Index No. 652199/2011, Supreme Court of the State of New York, County of New York ("AIG Complaint") and who sat in on product development meetings with Ownit's top executives, explained that Ownit's goal was to be "a non-mainstream" lender that would do "loans no one else would do."

246.   On December 30, 2006 Merrill acquired the First Franklin Mortgage Corporation ("First Franklin") and related servicing platform from National City Corporation for $1.3 billion. First Franklin originated residential mortgage loans

119

through a wholesale network and retail channel.  As former Merrill CEO O'Neal explained in a recently-disclosed September 2010 interview with the FCIC, Merrill purchased First Franklin "to control our [own] source of origination," echoing the interviewer's comment that Merrill made the purchase "to vertically integrate." (O'Neal Tr. 87:5-21, Sept. 16, 2010.) .

247.   According to a former First Franklin Account Executive ("CW6"), First Franklin brokers targeted FHA protected borrowers for non-prime mortgage loans.  As a general matter, First Franklin brokers pursued members of their own communities. For example, Spanish-speaking brokers targeted Hispanic borrowers, Polish brokers sold to Polish borrowers, and Russian Jewish brokers sold to Russian Jewish borrowers.

248.   A former Underwriter at Countrywide from 2005 to 2006 and later a Senior Subprime Underwriter at First Franklin employed during the relevant time period ("CW7"), and another former Sales Manager with First Franklin ("CW8") both related that marketing materials, loan applications, and good faith estimates were produced in borrowers' native languages, but the final loan documentation was not produced in the native language for these same borrowers. For example, such materials would be created in Spanish for the Latino market, but the loan and other closing documents themselves were written in English.

249. As Merrill sought to expand its market share in its securitization operations, it also encouraged its subprime lenders—including First Franklin and Ownit—to originate more low- and no-documentation loans. Incredibly, to increase loan volumes, Merrill paid more money to First Franklin, Ownit, and other subprime lenders to generate no-income-verification loans than for originating full-documentation loans from qualified borrowers – as much as 105 cents on the dollar.

250. Merrill knew, should have known, or was reckless in not knowing from its experience with loan securitization that such loans had high default rates. Merrill, however, was not sufficiently concerned that the loans were risky and non-conforming because it transferred the risk of loss onto its RMBS investors.

251. Merrill also enticed non-depository originators to sell their subprime mortgages to Merrill by offering low-cost warehouse lines of credit, which allowed those originators to generate even more product to sell to Merrill. For example, Merrill obtained a substantial portion of the residential mortgages that it securitized by purchasing billons of dollars of these loans from non-depository originators such as ResMAE, Option One, and Mortgage Lenders Network USA, Inc., to which Merrill also advanced warehouse lines of credit at low rates.

**D.** **Defendants' Discriminatory Mortgage Pricing, Steering, Compensation & Underwriting Policies and Practices in Originating and Funding Predatory Non-prime Mortgage Loans to FHA Protected Minority Borrowers**

252.   While the terms of the non-prime mortgage loan products Defendants directly originated or funded at issue here made those loans predatory in and of themselves, Defendants' (and their correspondent lenders') mortgage pricing, steering, compensation, underwriting, and appraisal practices and policies caused their employees, and encouraged their brokers, to make such loans in a discriminatory and predatory manner to minority borrowers, including those minority borrowers Defendants or their brokers already had targeted through marketing activities.

253. Thus, after identifying and targeting FHA protected minority borrowers using advanced data mining techniques and predictive analysis methodologies, Defendants' various mortgage origination, securitization, and servicing policies and practices allowed or encouraged: (a) unchecked or improper credit approval decisions for minority borrowers, resulting in borrowers being approved for and receiving purchase money, refinance, and home equity loans they could not afford, and consequently were likely to become delinquent and/or default on; (b) subjective surcharges on minority borrowers of additional points, fees, and

other credit and servicing costs over and above an otherwise objective risk-based financing rate for such loan products, increasing the likelihood of delinquencies and/or defaults on such loans; (c) minority borrowers to be steered into higher cost/higher leveraged loan products, also increasing the likelihood of delinquencies and/or defaults on such loans; and (d) undisclosed inflation of appraisal values of minority residences to support inflated loan amounts to minority borrowers, further increasing the likelihood of delinquencies and/or defaults on such loans.

254.    To the extent any of the Defendants had written policies purporting to preclude any of this discriminatory or predatory activity that Plaintiffs allege in further detail below, such policies were either not enforced or intentionally avoided, including through sales training sessions on how to avoid such policies. Defendants' corporate culture, actual operating practices, and compensation structure all ran counter to any purported compliance training for its loan officers, loan processors, underwriters, managers, and correspondent lenders such that Defendants rendered any such training irrelevant.  Thus, Defendants cannot rely on any written compliance training and related policies as a basis to avoid liability for their willful discriminatory and predatory lending at issue here.

255.    These actions individually, and collectively with Defendants' (and their agents') predatory and discriminatory mortgage servicing and foreclosure

practices Plaintiffs also allege, have further led to disproportionate rates of delinquencies, defaults, home vacancies, and/or foreclosures among FHA protected minority borrowers on non-prime mortgage loans originated, purchased, and/or serviced by Defendants.

    **1.**    **Defendants' Discretionary Pricing and Compensation Policies Resulted in Predatory Mortgage Lending on a Discriminatory Basis**

256.   The Countrywide Defendants, Bank of America Defendants (directly and through its correspondent lenders Countrywide, Ameriquest, New Century, and First Franklin), and the Merrill Defendants (through its correspondent lenders First Franklin and Ownit) at their respective corporate levels each routinely set and published interest rates, fees, and terms on non-prime mortgage loans and regularly distributed them on "rate sheets" provided to Defendants' employees, branch managers, and network of brokers and correspondent lenders.

257.   Through a two-step process, Defendants' discretionary pricing policies expressly authorized and encouraged discretionary finance charges, including higher fees at closing, additional or add-on fees, higher interest rates, and/or other discretionary charges that maximized their profits, placing their interests ahead of their borrowers.

258. Once a loan applicant provided credit information through a loan officer, mortgage broker, or correspondent lender, Defendants performed an initial objective credit analysis. At this point, Defendants evaluated various traditional, objective, risk-related credit variables relating to the prospective borrower, including the borrower's debt-to-income ratios, the borrower's home's loan-to-value ratios, the borrower's credit bureau histories, FICO scores, debt ratios, bankruptcies, automobile repossessions, prior foreclosures, and payment histories, among other things. From these objective factors Defendants derived a risk-based financing rate referred to in the mortgage industry as the "par rate," which they regularly communicated to their loan officers, branch managers, and correspondent lenders.

259. Via the centrally established par rates, and centrally disseminated rate sheets and other written communications made in conjunction with the par rates, Defendants regularly and systemically communicated with, simultaneously encouraged, and automatically authorized their loan officers, branch managers, and correspondent lenders to mark up the par rate and impose additional subjective charges, yield spread premiums, and other discretionary fees and costs on mortgage loans offered to FHA protected minority borrowers that were not based on any particular or appropriate credit risk factor – *i.e.*, "overages."

125

260. Defendants knew of these overages and tracked them for employee compensation and review purposes. For example, Countrywide regularly calculated a "Net Price Exception" ("NPE") for each retail loan that it funded, subsequent to origination, which approximates the amount by which the total cost of the actual loan differs from the total cost of the loan on the par rate sheet.

261. When mortgage loans made to FHA protected borrowers contained such marked up interest rates that resulted in a yield spread premium payment to Defendants, Defendants received additional income because the yield spread premium-affected borrower is locked into a higher interest rate going forward on their mortgage loan than they would otherwise pay if they had been placed in a par rate loan without an additional rate mark up. These additional discretionary charges were collected at the time the loans were originated and continue to be collected during the servicing of such loans.

262. In addition, Defendants included pre-payment penalties in many of their subprime mortgage loan products either to control the borrowers' refinance of the loan or to generate additional fee income when borrowers refinanced their loans with other lenders. And, Defendants routinely tacked on additional ancillary fees and surcharges.

263. For instance, CW4 recounted that Countrywide charged as much as $10,000 in title fees, an amount that greatly exceeded what typical title fees would be. According to CW4, one borrower with Countrywide who refinanced her mortgage three times with Countrywide and who never took an equity cash-out payment for herself, ultimately owed $50,000 more after the refinancing strictly because of the exorbitant fees Countrywide tacked on for the refinancing.

264. CW7 also recalled instances in which brokers increased the borrower's loan amount and fees immediately prior to the scheduled closing. In such instances, borrowers did not have sufficient time to review the fees assessed in conjunction with their loans.

265. As numerous former employees of Defendants have related, employee and broker compensation was directly tied to the profitability of the loans issued. The more expensive the loan was for the borrower and the less documentation the loan had, the more profitable it was for the Defendant originator resulting in more compensation for the employee or broker who made it.

266. For example, according to CW5, institutions, including Countrywide, were offering zero-doc, pay option loans with four points on the back-end. Thus, a broker would earn a commission equal to four percent of the loan just for getting a borrower to accept one of these dangerous, predatory loans. According to CW5

and CW7, if the broker enticed a borrower to accept a loan with origination points or a rate higher than the par rate or a loan with pre-payment penalties, the broker's compensation also increased.

267.   CW8 has related that brokers who submitted loans to First Franklin would ask the underwriters to ensure the loans would be structured with the "maximum points RESPA [Real Estate Settlement Procedures Act] would allow" to increase the broker's own compensation.

268.   Furthermore, according to CW7, brokers also earned additional fees by regularly refinancing customers.  Countrywide did not require that there be a net tangible benefit to refinancing borrowers in the form of a reduction in interest rate or payment.  As such, brokers were able to reap a substantial benefit in terms of fees by refinancing borrowers without any benefit whatsoever to the borrower.

269.   According to a former Mortgage Loan Officer employed by Bank of America during the relevant period ("CW9"), Bank of America also rewarded brokers with yield spread premiums for placing borrowers in higher interest rate loans.  This practice created a tremendous financial incentive for Bank of America mortgage brokers to steer borrowers into such higher cost mortgage loans, which were not in the borrowers' best interests.

270.  According to CW6, Merrill Lynch, through First Franklin, followed a similar model whereby First Franklin provided tiered rate sheets to its brokers and encouraged them to sell higher interest rate loans to borrowers by awarding yield spread premiums to brokers who did so.  This practice encouraged brokers at First Franklin to lead borrowers into accepting loans with higher interest rates.  One of these incentives was designed to generate loans earlier in the month in order to keep the pipeline full, additional incentives were paid through the yield spread premium to brokers who brought First Franklin more expensive, or higher cost, loans.

271.  A former loan account manager with First Franklin ("CW10") added that brokers were not eligible for yield spread premiums if they allowed borrowers to buy-out of the pre-payment penalties that were built into the loan programs that First Franklin offered to brokers. Thus, First Franklin's employees and brokers also were encouraged to sell higher-priced loans in conflict with the borrowers' best interests.

272.  According to CW8, many of the minority borrowers who received loans from brokers who originated loans on behalf of First Franklin were nudged into stated income loans, even when the borrower could have qualified for less expensive full documentation loans, because brokers typically made more money

on stated income loans.  Some brokers, according to CW8, never even learned how to do full documentation loans.

273.  CW8 stated that First Franklin account executives' compensation structure motivated them to seek the business of larger brokers, or brokers with high loan volume, and many of these brokers were engaging in predatory lending.

274.  Because Defendants systematically authorized and encouraged employee and broker loan pricing discretion, such discretion was implemented in a common discriminatory manner.

275.  As alleged in a recently settled (for $335 million) complaint filed by the Department of Justice against Countrywide, *United States v. Countrywide Financial Corporation, Countrywide Home Loans and Countrywide Bank,* No. 11-cv-10540-PSG  (C.D. Cal.), Countrywide had engaged in a pattern or practice of discrimination (through its own origination activity and through its correspondent lenders) in violation of the FHA for discriminatorily originating high cost and subprime mortgage loans to minorities.  Countrywide settled the Department of Justice's claims that it charged more than 200,000 African American and Hispanic borrowers higher fees and interest rates than non-Hispanic borrowers in both its retail and wholesale lending. According to the complaint, the DOJ's analysis of Countrywide's HMDA data demonstrated statistically significant discriminatory

pricing disparities in Countrywide's retail mortgage loans generated between 2004 and 2008 on both a national and local level in numerous geographic markets across the United States.

276. The DOJ complaint alleged that Countrywide charged Hispanic and African America borrowers significantly more in pricing adjustments not based on credit risk factors than it charged to White borrowers. Based on the loans examined, for Hispanic borrowers the statistically significant annual NPE difference ranged between 15 and 28 basis points and for African American borrowers the difference ranged between 13 and 24 basis points. The DOJ complaint also alleged that for loans sourced through Countrywide's mortgage brokers, African-American and Hispanic borrowers were more than "twice as likely to be placed in subprime loans than non-Hispanic White [] borrowers who had similar credit qualifications." This occurred, according to the DOJ Complaint, because Countrywide's business practices allowed its loan officers and mortgage brokers to vary a loan's interest rate and other fees from the price it set based on the borrower's objective credit-related factors.

277. The DOJ complaint further alleged that Countrywide steered thousands of African American and Hispanic borrowers into subprime mortgages when non-Hispanic white borrowers with similar credit profiles received prime

loans.   According to the DOJ Complaint, this steering occurred because it was Countrywide's business practice to allow mortgage brokers and employees to place a loan applicant in a subprime loan even when the applicant qualified for a prime loan.   In addition, Countrywide gave mortgage brokers discretion to request exceptions to the underwriting guidelines, and Countrywide's employees had discretion to grant these exceptions.  The DOJ Complaint alleged that Countrywide was aware that the fees and interest rates it was charging discriminated against African-American and Hispanic borrowers, but failed to impose meaningful limits or guidelines to stop it.  And according to CW4, Countrywide had no real policy in place to prevent FHA protected borrowers from paying higher prices for mortgage loans.   Thus, "people in minority neighborhoods [paid] higher prices" for Countrywide mortgage loans than in non-minority neighborhoods.

278.   Defendants took no precautions to avoid this result and instead acted at all times with reckless disregard of it.   Similarly, neither Bank of America, Merrill Lynch, nor their correspondent lenders and brokers, implemented policies specifically designed to prevent FHA protected minority borrowers from paying higher prices for mortgage loans.

279.   According to CW8, First Franklin also had no policies in place to prohibit account executives from working with brokers who were engaging in

predatory lending, nor did First Franklin train account executives to identify and avoid predatory lending.

280.   Application of the Defendants' (and their agents) discretionary pricing, steering, and compensation policies and practices, and the accompanying impact on minority borrowers, was not a sporadic, isolated practice, but rather occurred systemically and every day that loans were extended, renewed, or continued during the relevant period, particularly on non-prime mortgage loans made to FHA protected minorities in Plaintiffs' communities and neighborhoods.

281.   The discretionary pricing, steering, and compensation policies and practices described herein constitute patterns or practices of discrimination because, as an integral part of the Defendants' business models, it was the standard operating practices of Defendants (and their agents) that disparately treated and impacted minority borrowers.

282.   But for Defendants' (and their agents) discretionary pricing, steering, and compensation policies and practices, minority borrowers in Plaintiffs' communities would have received fewer discriminatory and predatory non-prime mortgage loans, would have more available home equity, and the default, vacancy, and foreclosure rates among such borrowers would have been lower.

283.  Each of the Defendants' (directly and/or through their agents')
discriminatory, non-prime mortgage pricing, steering, and/or compensation
policies, practices, and/or procedures have made and/or continue to make housing
unavailable on the basis of race, color, national origin or sex.

284.  Each of the Defendants' (directly and/or through their agents')
discriminatory, non-prime mortgage pricing, steering, and/or compensation
policies, practices, and/or procedures have provided and/or continue to provide
different terms, conditions, and privileges of sale of housing, as well as different
services and facilities in connection therewith, on the basis of race, color, national
origin or sex.

285.  Each of the Defendants' (directly and/or through their agents')
discriminatory, non-prime mortgage pricing, steering, and/or compensation
policies, practices, and/or procedures have provided and/or continue to provide
different terms, conditions and privileges on the basis of race, color, national origin
or sex in connection with the making of residential real estate-related transactions.

286.  Each of the Defendants' (and their agents') published policies and
statements relating to their discriminatory, non-prime mortgage pricing, steering,
and/or compensation policies, practices, and/or procedures alleged above have

expressed and/or continue to express a preference on the basis of race, color, national origin or sex.

287. The HMDA data Plaintiffs further allege below relating to Defendants' lending reflects that minority borrowers in Plaintiffs' communities have been substantially more likely than similarly situated non-minorities to receive higher cost or higher leveraged non-prime mortgage loans having higher rates of default and foreclosure.

## 2. Defendants Predatorily and Discriminatorily Lowered and Circumvented Their Underwriting Standards and Ignored or Fostered Fraudulent Inflation of Property Appraisals

288. Well before the conduct at issue here, Defendants had established at the corporate level, and had maintained, uniform mortgage loan underwriting standards (generally in line with the standards established by GSEs, Fannie Mae and Freddie Mac) that were distributed to and utilized by their underwriters, employees, managers, brokers, and correspondent lenders.

289. To increase their production of equity stripping non-prime, higher cost, higher leveraged mortgage loans to maximize profits (both in origination and securitization activities) while home prices remained at historical highs, beginning no later than 2003 and escalating through 2007, Defendants reduced their

underwriting standards or engaged in various practices to circumvent or override them.

290.   Defendants successfully designed the changes to their underwriting policies to authorize and encourage Defendants' underwriters, loan officers, and branch managers (and brokers and correspondent lenders) to approve mortgage loans or improperly increase loan amounts to under-qualified or unqualified FHA protected minority borrowers, to approve as many higher risk mortgage loans possible, at the highest possible loan amounts, and with the largest yield spreads and fees possible.

291.   Defendants disseminated these reduced underwriting standards to their own employees, including underwriters, loan officers, branch managers, and correspondent lenders, in written form and in oral communications. Defendants also disseminated reduced underwriting criteria to their correspondent lenders and brokers who would apply such criteria to their mortgage loan marketing, application, and origination processes.  In that way, Defendants' underwriters and brokers acted as Defendants' agents, even beyond the extent they already otherwise were Defendants' agents.   This enabled Defendants to review and underwrite more readily the loans generated by their correspondent lenders and brokers before purchasing them.

292. Defendants also performed due diligence on the loans that their brokers and correspondent lenders originated before Defendants purchased such loans. This included a review of their brokers' marketing materials. Thus, Defendants are liable for the loans they purchased or funded and acquired through their brokers and correspondent lending channels because those loans were made pursuant to Defendants' own underwriting guidelines, and Defendants had the opportunity, and did, review those loans when purchasing them.

293. For example, according to CW6, other First Franklin employees reviewed the marketing materials of brokers who originated loans on behalf of First Franklin. First Franklin employees were not allowed to generate and use their own marketing materials without approval from First Franklin attorneys. And, according to CW6, loan products were offered to brokers based on investor guidelines, including guidelines promulgated by Defendant Merrill Lynch.

294. Critical to the underwriting process is the establishment of the value of the underlying real estate asset through property appraisals. Like their underwriting policies, Defendants' standards for property appraisals became increasingly lax, if not willfully fraudulent, during the relevant period to maximize loan amounts and/or establish adequate loan to value ratios (LTV) to meet even relaxed underwriting guidelines.

137

295.   Thus, Defendants utilized appraisers who often asked the lending staff "what they were looking for" in terms of appraisal value to complete the transaction and then did what they could to derive an appraisal value that met the expectations of Defendants' lending staff.  Defendants were well aware that the appraisals were "coming in high."

296.   As described by Patricia Lindsay, a former wholesale lender who testified before the FCIC in April 2010, appraisers "fear[ed]" for their "livelihoods," and therefore cherry-picked data "that would help support the needed value rather than finding the best comparables to come up with the most accurate value." *See* Written Testimony of Patricia Lindsay to the FCIC, April 7, 2010, at 5.

297.   Likewise, Jim Amorin, President of the Appraisal Institute, confirmed in his testimony to the FCIC that "[i]n many cases, appraisers are ordered or severely pressured to doctor their reports and to convey a particular, higher value for a property, or else never see work from those parties again …. [T]oo often state licensed and certified appraisers are forced into making a Hobson's Choice.'" *See* Testimony of Jim Amorin to the FCIC, available at www.appraisalinstitute.org/newsadvocacy/downloads/ltrs_tstmny/2009/AI-ASA-ASFMRANAIFATestimonyonMortgageReform042309final.pdf.

138

298.   In fact, a 2007 survey of 1,200 appraisers conducted by October Research Corp.—a firm in Richfield, Ohio that published *Valuation Review*—found that 90% of appraisers reported that mortgage brokers and others pressured them to raise property valuations to enable deals to go through.  The same study found that 75% of appraisers reported "negative ramifications" if they did not cooperate, alter their appraisal, and provide a higher valuation.  This pressure succeeded in generating artificially inflated appraisals.

299.   Faced with this choice, appraisers systematically abandoned applicable guidelines and over-valued properties to facilitate the issuance of mortgages that could then be collateralized into mortgage-backed securitizations.

300.   Defendants knew that appraisers often "pushed the value" of the properties they appraised, effectively becoming advocates for higher loan values for the brokers who had referred them the business instead of objective appraisers of the true fair market value of the properties.

301.   Defendants have been sued by American International Group, as well as GSEs Fannie Mae and Freddie Mac, as well as other third parties that have purchased or insured pools of mortgage loans originated, funded, purchased, and/or securitized by Defendants.  Those complaints allege that Defendants either knew

of, or were complicit in, inflated appraisals underlying the individual mortgage loans in the loan pools they purchased or insured.

302. Defendants' employees frequently also made "business decisions" to override Defendants' underwriters to approve the loans particularly when such loans originated from brokers that were responsible for a significant amount of business.

### a. Countrywide Loosened Underwriting Standards and Abused Its Appraisal Process

303. Countrywide used an automated underwriting system known as "CLUES" to underwrite loans. The CLUES system applied the principles and variables set forth in the Countrywide underwriting manuals and its loan program guide. CLUES applied an "underwriting scorecard," which assessed borrower credit quality by analyzing several variables, such as FICO scores, loan to value ratios, documentation type (*e.g.*, full, reduced, stated), and debt-to-income ratios. These variables were weighted differently within the scorecard, depending upon their perceived strength in predicting credit performance. In underwriting a loan, Countrywide loan officers entered an applicant's information into CLUES, which would (1) approve the loan; (2) approve the loan with caveats; or (3) "refer" the loan to a loan officer for further consideration and/or manual underwriting.

304.   Instead of rejecting a loan if it failed to meet a requirement of Countrywide's guidelines or if CLUES calculated that the loan presented an excessive layering of risk, CLUES "referred" the loan to a loan officer for manual approval. The loan officer would request an "exception" from the guidelines from more senior underwriters at Countrywide's structured lending desk ("SLD"). Countrywide's level of exceptions was higher than that of other mortgage lenders. The elevated number of exceptions resulted largely from Countrywide's use of exceptions as part of its matching strategy to introduce new guidelines and product changes.

305.   In practice, this meant that Countrywide virtually abandoned underwriting in any meaningful way.  Contrary to its public assurances otherwise, Countrywide CEO Mozilo's mandate of a 30% market share required Countrywide to depart systemically from its underwriting standards, and this resulted in a "culture change" starting in 2003. A former senior regional vice president was quoted in a January 17, 2008 *Business Week* article stating, "Programs like 'Fast and Easy' where the income and assets were stated, not verified, were open to abuse and misuse.  The fiduciary responsibility of making sure whether the loan should be done was not as important as getting the deal done."

141

306.   Countrywide's "supermarket" or "matching" strategy -- whereby it would offer any product offered by a competitor -- was a key driver of the company's aggressive weakening of underwriting guidelines. For example, if Countrywide's minimum FICO score for a product was 600, but a competitor's minimum score was 560, the production division invoked the matching strategy to reduce the minimum required FICO score at Countrywide to 560.

307.   Countrywide's matching policy did not, however, end with the particular mortgage products offered on the market.  Instead, Countrywide mixed and matched the individual terms offered by multiple lenders, taking the worst of each.  The resulting composite offering was thus even more aggressive than that of any one competitor who had a particular feature matched.  Countrywide's aggressive mortgage products resulted in "layered" risks created by its undisclosed "matching" philosophy.

308.   Countrywide deployed its matching strategy by expanding the number of employees who could grant exceptions throughout the underwriting process.  A wide range of employees received authority to grant exceptions and to change the terms of a loan, including underwriters, their superiors, branch managers, and regional vice presidents.  In this way, even if Countrywide's computer system

recommended denying a loan, an underwriter could override that denial by obtaining permission from his or her supervisor.

309.   Countrywide routinely approved "exception" loans that did not satisfy even Countrywide's weakened "theoretical" underwriting criteria through a high-volume computer system called the Exception Processing System—but only after Countrywide charged these high risk borrowers extra points and fees.  Countrywide made enormous profits from these higher fees.  The Exception Processing System was known to approve virtually every borrower and loan profile with a pricing add-on when necessary, and was known within Countrywide as the "Price Any Loan" system.

310.   According to the SEC, in mid-2006 attendees at an internal Countrywide credit meeting were informed that one-third of the loans referred out of Countrywide's automated underwriting system violated "major" underwriting guidelines, 23% of the subprime first-lien loans were generated as "exceptions," and that "exception" loans were performing 2.8 times worse than loans written within guidelines.  That the loans approved by exceptions were performing so much worse than other similar loans is itself strong evidence that the "exceptions" were not being granted based on any purported countervailing circumstances in the borrowers' credit profile.

311.   Ultimately, Countrywide designed its exception policy to ensure that all loans were approved even if the borrower could never hope to repay the loan. For example, in an April 14, 2005 e-mail chain, various managing directors were discussing what FICO scores Countrywide would accept.  One Managing Director wrote that the "spirit" of the exception policy was to "provide flexibility and authority to attempt to approve all loans submitted."  Thus, according to CW7, Countrywide approved many borrowers with low credit scores.

312.  An internal Countrywide document described the objectives of Countrywide's Exception Processing System to include "[a]pprov[ing] virtually every borrower and loan profile," with "pricing add on" (*i.e.*, additional fees) if necessary to offset the risk.  The objectives also included providing "[p]rocess and price exceptions on standard products for high risk borrowers."  In his testimony to the SEC, former Countrywide President David Sambol identified a February 13, 2005 e-mail he wrote that similarly said that the "purpose of the [Structured Loan Desk] and our pricing philosophy" should be expanded to so that "we should be willing to price virtually any loan that we reasonably believe we can sell/securitize without losing money, even if other lenders can't or won't do the deal."

313.  According to CW1, Countrywide also referred targeted borrowers who did not meet Countrywide's already lax credit profile to its Full Spectrum Lending unit so that Full Spectrum Lending could issue the loan.

314.  Another way Countrywide found to get around its "theoretical" underwriting policies was through the systematic abuse of no- and low-documentation loan processes.  With these types of loan products, the borrower is not required to provide the normal confirmations and details for credit criteria such as annual income or current assets.  Low-documentation mortgages were originally designed for professionals and business owners with high credit scores, who preferred not to disclose their confidential financial information.  Traditionally, these loans also required low loan-to-value ratios.  According to CW7, however, there were many loans submitted by brokers and closed at Countrywide "that did not make sense," *i.e.*, there was "no way the borrower made the amount of money" stated in the loan file.

315.  When a Countrywide loan officer knew an application would not be approved on the basis of the applicant's actual financial condition, the officer often steered applicants into low-documentation products or "liar loans."  Once in those programs, Countrywide coached borrowers on how to falsify the application to

ensure it would be approved and in some instances would even fill out the required misrepresentations without the borrower's knowledge.

316.   One Countrywide employee cited in the AIG Complaint estimated that approximately 90% of all reduced-documentation loans sold out of his office had inflated incomes.   Furthermore, the AIG Complaint alleges that one of Countrywide's mortgage brokers, One Source Mortgage Inc., routinely doubled the amount of the potential borrower's income on stated income mortgage applications. In addition to outright fabrication of information, Countrywide also failed to confirm that the information being provided to it by loan applicants was accurate. For full-documentation loans, Countrywide failed to verify that asset and income information borrowers were providing was accurate, as those programs required.

317.   Perhaps even worse, according to CW7, there were times when a borrower's employment information was traced back to a company owned by the broker that submitted the loan to Countrywide.  It was obvious according to CW7 that the borrower's stated place of employment was "fake" or a shell company of some sort.  These loans were nonetheless closed and funded.  In fact, CW7 stated that sales personnel had instructed him and others to "go easy" on the review of loans submitted by certain brokers who generated a substantial amount of business for Countrywide.

146

318.   CW3 essentially confirmed that Countrywide's employees enabled fraud in mortgage applications that Countrywide underwrote.  CW3 recalled an incident in approximately July of 2007 in which a borrower originally indicated that he earned $60,000 annually.  During the course of conversations with the borrower, CW3 learned that the borrower only earned half that amount and was therefore unable to afford the loan the borrower was seeking.  CW3 declined to underwrite the loan, even after his superior instructed him to complete the loan.  When CW3 refused to do so, the loan was assigned to another loan officer to be completed with the inflated stated income of $60,000.  In another instance, CW3 related that a borrower seeking to refinance a loan experienced his loan being converted from an FHA loan to a conventional loan despite the borrower having never signed any documentation to support the change.  CW7 witnessed similar perpetrations of fraud in stated income loans.  For example, CW7 recalled seeing the same income amount for multiple borrowers from the same broker because that amount would allow the borrowers to qualify for the loans they wanted, even though their actual incomes were much lower.

319.   CW5 has similarly related that, while working as a mortgage broker who sold mortgages to Countrywide, his Countrywide account representative expressly told him that if borrowers could not qualify for the desired loan amount

based on their actual income, CW5 should "take them no doc" because Countrywide did not want to see "low income" on applications.

320. According to the California Attorney General's complaint against Countrywide and Mozilo, a former supervising underwriter at Countrywide explained that the company declined to check bank balances for applicants who provided account information when applying for stated-income, stated-asset loans. Countrywide also had the right to verify the income stated on a loan application by use of Internal Revenue Service data, but only 3% to 5% of the loans that Countrywide issued by 2006 were ever checked.

321. For stated-income loans, where Countrywide promised that it would exercise discretion, during the 2005-2006 period the company directed loan officers to support their assessments by referring to the website www.salary.com. The website did not provide specific salary information for any particular borrower, but provided a range of salaries for particular job titles based upon the borrower's zip code. And even when the stated salaries were outside the ranges, Countrywide did not require its employees to follow-up with the borrower. This practice was reported by former employees cited in a complaint against Countrywide brought by the Illinois Attorney General.

322. Countrywide's senior management imposed intense pressure on underwriters to approve mortgage loans, in some instances requiring underwriters to process 60 to 70 mortgage loan applications in a single day and to justify any rejections they made. This created an incentive not to review loans thoroughly but instead simply to rubber-stamp them "approved." That pressure even came from the most senior levels of management. According to the *Wall Street Journal*, a former executive reported that Sambol was "livid" at a 2005 meeting because call-center employees were not selling enough adjustable-rate mortgages, which were highly profitable for Countrywide.

323. Countrywide also abused its appraisal process to approve as many high cost and subprime loans as possible, particularly to FHA protected minority borrowers.

324. In September 2006, Mark Zachary (former Regional Vice President of Countrywide), informed Countrywide executives that there was a problem with appraisals performed on KB Home properties borrowers were purchasing with mortgage loans Countrywide originated. According to Zachary, Countrywide executives knew that appraisers were strongly encouraged to inflate appraisal values by as much as 6% to allow homeowners to "roll up" all closing costs. According to Zachary, this practice resulted in borrowers being "duped" as to the

true values of their homes.  This also made loans more risky because when values were falsely increased, loan-to-value ratios calculated with these phony numbers were necessarily incorrect.

325.  According to Capitol West Appraisals, LLC, a company that has provided real estate appraisals to mortgage brokers and lenders since 2005, and is a "review appraiser" for Wells Fargo, Washington Mutual and other lenders, Countrywide engaged in a pattern and practice of pressuring even non-affiliated real estate appraisers to increase appraisal values artificially for properties subject to Countrywide mortgages.  From at least 2004 and continuing through at least 2007 Countrywide maintained a database titled the "Field Review List" containing the names of appraisers whose reports Countrywide would not accept unless the mortgage broker also submitted a report from a second appraiser.  No mortgage broker would hire an appraiser appearing on the Field Review List to appraise real estate for which Countrywide would be the lender because neither the broker nor the borrower wanted to pay to have two appraisals done.  Instead, the broker would simply retain another appraiser who was not on the Field Review List.

326.  Because Countrywide was one of the nation's largest mortgage lenders, a substantial portion of any mortgage broker's loans was submitted to Countrywide.  A broker therefore could not rule out that Countrywide would be the

ultimate lender, and because mortgage brokers knew from the blacklist that a field review would be required if a blacklisted appraiser were chosen, with the likely result that a mortgage would not be issued with that appraisal, and that its mortgage applicant would have to incur the cost of retaining another appraiser, such a broker had a strong incentive to refrain from using a blacklisted appraiser.  By these means, Countrywide systematically and deliberately enlisted appraisers in its scheme to inflate appraisals and issue low quality, extremely risky loans.

327.  Capitol West stated that Countrywide officers sought to pressure Capitol West to increase appraisal values for three separate loan transactions. When Capitol West refused to inflate the appraisal values of properties from what it independently determined was appropriate, Countrywide retaliated by placing it on the Field Review List.

328.  According to Capitol West, Countrywide also created certain procedures to enforce its blacklisting of uncooperative appraisers like Capitol West. Specifically, if a mortgage broker were to hire an appraiser that happened to be on the Field Review List, Countrywide's computer systems automatically flagged the underlying property for a "field review" of the appraisal by LandSafe, Inc., a wholly owned subsidiary of Countrywide Financial.

329. LandSafe would then issue another appraisal for the subject property that, without exception, would be designed to "shoot holes" in the appraisal that the blacklisted appraiser had performed, such that the mortgage transaction could not close based on that appraisal. Indeed, according to Capital West, in every instance, LandSafe would find defects in the appraisal from the blacklisted appraiser, even if another, non-blacklisted appraiser had arrived at the same value for the underlying property and the non-blacklisted appraiser's appraisal was accepted. According to Capitol West, this exact set of facts happened with respect to an appraisal it submitted after it was placed on the Field Review List.

330. Several claims have been filed against Countrywide and related entities that describe individual homeowners' experiences with inflated property appraisals in obtaining mortgages from Countrywide. Such lawsuits include two class actions brought by homebuyers against KB Home, a building company that used Countrywide as its exclusive lender. Countrywide and its appraisal subsidiary, LandSafe, have also been sued by Fannie Mae and Freddie Mac investors for damages arising from inflated appraisals for property underlying mortgage packages sold to both Fannie Mae and Freddie Mac.

      **b.**    **Merrill Lynch Abandoned Its Underwriting Guidelines and Inflated Appraisals**

331.   To increase loan volumes available for securitizations, and therefore its profits, Merrill also caused the lenders in its correspondent and wholesale channels to abandon their underwriting guidelines.  Merrill also inflated its appraisals.

332.   Former employees of Merrill's origination arms Ownit and First Franklin have confirmed that both Ownit and First Franklin abandoned their stated underwriting guidelines.  For example, a former director at Ownit who is cited in the AIG Complaint stated that, during the relevant timeframe, there was such a strong demand for mortgage loans from Merrill that "there was more a quest for volume than for quality."  Similarly, a former regional vice president at Ownit also cited in the AIG Complaint indicated that the pressure to deliver volumes of loans was so great that Merrill was essentially "screaming at [Ownit] to deliver product."

333.   Former employees also confirmed that banks like Merrill were fully involved with and informed about the nature and quality of the loans being acquired from Ownit.  Indeed, a former Ownit director identified in the AIG Complaint stated: "Someone from the [bank] buying [the loan pool] was always sitting in on the closing of the pools."  Typically, the bank representative came from "credit risk side of the firm" and was involved "all the way through" the evaluation and purchase of Ownit's loans.

334.   According to a May 8, 2007 article appearing in The New York Times, to increase its production of non-prime loans further, Merrill instructed Ownit to increase its loan volume by weakening its underwriting guidelines to originate more "liar" loans for which no documentation was requested or required to substantiate the borrowers' oral representations of their annual earnings.  Prior to Merrill's investment in Ownit in 2005, approximately 90% of Ownit's loans were fully documented. After Merrill asked for more stated income loans, the number of stated income loans climbed from almost zero to over 30%.

335.   Based upon Merrill's request, Ownit also lowered the credit scores it required of its non-prime borrowers.  Thus, Ownit's average new borrower FICO score dropped from 690 to approximately 630. In comparison, the Federal Deposit Insurance Corporation defines a "subprime" loan as one for which the borrower has a FICO score of 660 or below.  Merrill's instructions for Ownit to weaken its underwriting standards intentionally had an immediate and direct impact upon the performance of Ownit's loans.  From December 2005 through May 2006, Ownit began to experience first payment default rates and early payment default rates (missing one of the first 3 payments) of 1% to 3%.

336.   Another former employee of Ownit, a senior underwriter responsible for originating loans between September 2004 and July 2006 who is cited in the

AIG Complaint, revealed that Ownit loan officers were falsely inflating incomes on stated income loans and "fudging the numbers" to get the loans approved. A former loan funder with Ownit from December 2004 to December 2006, who was responsible for actually disbursing the funds to borrowers once a loan was approved, was also cited in the AIG Complaint as having personally observed stated income loan applications with questionable claimed incomes. For example, this former employee observed one loan application where a self-employed gardener claimed to be making $20,000 a month. When she brought this and other related issues to her supervisors, she was told to "mind her own business" and to fund the loans that had already been approved.

337. Merrill Lynch correspondent lender First Franklin offered loan products based on investor guidelines, including guidelines Merrill Lynch set, according to CW6. These guidelines permitted stated income loans, no money down loans, and loans to borrowers with FICO scores as low as 580. In fact, First Franklin offered a 100% stated income loan, but there was a requirement to document assets, although the assets did not have to be verified for seasoning or source. True no documentation loans with no asset information had a 95% loan-to-value limit.

338.   The AIG Complaint also cites a former senior underwriter with First Franklin until 2005 who disclosed that her branch manager would often override her decisions not to fund loans because First Franklin audited only about 5% of its closed loans, and the branch manager felt the odds of identification of problematic loans he approved were low.   For example, this former employee recalled one instance where a borrower who worked as a cocktail waitress at a restaurant called Blueberry Hill (which she likened to the International House of Pancakes) claimed on her loan application to earn $5,000 a month.   This former employee rejected the loan because she did not believe the claimed income was accurate.   Another time, this former employee recalled a borrower who had an auto-detailing business who claimed to make $7,500 a month.   Her branch manager ultimately overrode her initial rejection of these loans and they received approval.

339.   A former mortgage funder with First Franklin from 2005 to 2007 ("CW11") stated that First Franklin specialized in no income, no asset loans and applied very lax underwriting standards.   For example, CW11 witnessed loans go through without required signatures or needed follow-up on inspection reports. According to CW11 account executives with First Franklin pressured mortgage funders to overlook common requirements so that a loan could proceed as quickly and with as few questions as possible.

156

340.  The former senior underwriter of Ownit identified in the AIG Complaint also disclosed that, at Ownit, the appraisal process was "owned by the loan officers" who enjoyed "a cozy relationship" with the appraisers.  She stated that "excessive adjustments" were made to inflate appraisals and these adjustments were never challenged.  As a result, Merrill could not and did not genuinely believe the appraisal values used to calculate LTV and CLTV statistics because it knew that property values were being purposefully and baselessly inflated to increase the amount of money that could be given to a borrower.

341.  The AIG Complaint also details a former employee at First Franklin revealing that if an underwriter rejected a loan because it did not meet underwriting criteria, her manager would re-direct the loan application to a certain loan processor who would "sign behind your back."  This former employee also recalled an instance where she was "one thousand percent convinced" that the income verifications submitted along with a loan were fraudulent, as the borrower's payroll deductions for Social Security and Medicare fell below the acceptable ranges for such deductions, resulting in an inflated net "take-home" pay for the borrower.  She presented this evidence to her manager, who rejected her concerns.  The loan was approved even though this former employee believed the deductions were illegitimate and the paystub was fraudulent.

157

342.   A former underwriter with First Franklin from 2005 to 2007 cited in the AIG Complaint noted that similar problems plagued First Franklin's lending operation.  Indeed, this former employee said that some of the lending practices at First Franklin were "basically criminal" and that First Franklin required its underwriters to depart from stated underwriting guidelines in a way "that we did not agree with, but had to do" in order to keep their jobs.  With respect to the appraisal process, this former employee divulged that  her managers would call appraisers directly if "they didn't get exactly what they wanted" and request a re-appraisal until the appraiser returned a satisfactory number to make the loan.  When she and another former underwriter "spoke out" about the problematic lending practices taking place at First Franklin, they were both fired for attempting to "blow the whistle" on the First Franklin's problematic lending practices.

343.  CW10 also revealed that, although comparable properties in an appraisal were supposed to be within one mile of the property at issue, appraisers would inflate values by using comparable properties further than a mile away from the subject property, even when homes within a one mile radius had recently sold for a more reasonable price and should have been used as comparables.  Yet another former employee with First Franklin cited in the AIG Complaint also stated that her branch instructed appraisers to change their appraisals and omit certain key

details.  This former employee also revealed that her branch manager would pick certain appraisers because he knew they would return with favorable (and overstated) appraisals  Finally, this former employee revealed that First Franklin's bonus structure motivated underwriters to close and fund as many loans as possible. For her part, this former employee received $50 for every loan she closed and funded, ultimately making over $150,000 a year while at First Franklin, although her base salary was $55,000.

### c.    Bank of America Abandoned Its Underwriting Guidelines and Encouraged Inflated Appraisals

344.  Like Countrywide and Merrill Lynch, Bank of America schemed to increase the volume of its high cost and subprime loans it originated between 2004 and 2007.  To keep pace with the market and to provide mortgage loans for its own securitizations, Bank of America departed from its own underwriting standards and encouraged inflated appraisals.

345.  The FCIC reports that, in 2005, examiners from the Federal Reserve and other agencies conducted a confidential "peer group" study of mortgage practices at six companies, including Bank of America.  According to Sabeth Siddique, then head of credit risk at the Federal Reserve Board's Division of Banking Supervision and Regulation, the study "showed a very rapid increase in

the volume of these irresponsible loans, very risky loans. A large percentage of their loans issued were subprime and Alt-A mortgages, and the underwriting standards for these products had deteriorated." (FCIC Report, at 172.)

346. At the same time, Bank of America was providing mortgage loans to a class of risky borrowers who demonstrated a credit profile with an increased likelihood of default. As disclosed to the FCIC in June 2010, almost 17% of the low to moderate income ("LMI") loans Bank of America originated between 2004 and 2007 were delinquent at some point for 90 days or more. (6/16/10 BoA letter to FCIC, Schedule 2.5.) Bank of America, however, retained only about 50% of those LMI loans on its balance sheet and either sold or securitized the rest. (*Id.*)

347. According to confidential witnesses interviewed in another lawsuit against Bank of America, Bank of America failed to adhere to sound underwriting practices and guidelines during the relevant time period. Like Countrywide, Bank of America employed a multiple step process for loan approval to increase the chances that a loan would be approved. In the first instance, borrower information was entered into Bank of America's "Desktop Underwriting" system. If this automated system rejected a loan, the loan would then be referred to a junior underwriter for manual underwriting. If a junior underwriter was unable to approve

the loan, the application would be escalated to a more senior underwriter with greater "exception" authority.

348.   Bank of America granted "exceptions" to stated underwriting criteria without evaluating a borrower's repayment capabilities or considering countervailing compensating factors.  Indeed, one former Loan Processor/Junior Underwriter, who worked for Bank of America from early 2006 to 2008 and who is cited in the AIG Complaint, revealed that Bank of America used exceptions to stated underwriting guidelines to approve loans "quite a bit."  That same former employee noted that whether an exception was used to approve a loan was not always noted in the loan file.

349.   Another former Loan Processor/Junior Underwriter, who worked for Bank of America from 2003 to 2008 and who was also cited in the AIG Complaint, disclosed that loans were approved even when it was clear that the borrower lacked the ability to repay.   For example, she recalled that many times loans were approved where the borrower was left with only $500 in monthly income after the borrower paid his or her monthly mortgage expenses.

350.   Another former Loan Processor/Junior Underwriter, who worked for Bank of America in 2005 and who is also cited in the AIG Complaint, revealed that loan officers would submit a loan application for one type of loan product and, if the

application was rejected, the loan officer would submit the same application for a different product, which might also be rejected, only to be re- submitted yet again for another product until the loan was ultimately approved.

351.   In the words of a former Mortgage Underwriter with Bank of America from 2005 to 2006 who is cited in the AIG Complaint, Bank of America and its employees would do "whatever they could do to make loans"—loans that Bank of America would then securitize and sell to investors.

352.   Indeed, also similar to Countrywide, Bank of America maintained an entire division dedicated to approving problem loans that were unable to be funded through the more routine—but already permissive—underwriting procedures described above.

353.   Severely credit-blemished loans were diverted to Bank of America's so-called "Plan C" group, which employed alternative underwriting criteria to approve and fund loans. Similar to Countrywide's exception-based Structured Loan Desk, Bank of America's "Plan C" group had even greater exception authority than senior underwriters, and the group's mandate was to find ways to fund loans that were rejected under Bank of America's stated underwriting guidelines— loans that one former Bank of America employee cited in the AIG Complaint believed "should not have been funded under any circumstances."

354.   According to another former employee responsible for originating loans between 2005 and 2006 who is cited in the AIG Complaint, Bank of America's rationale for approving such loans was simply "if we didn't do it, someone else would," demonstrating that Bank of America also competed in the race to the bottom, abandoning its stated underwriting guidelines along the way.

355.   Numerous former employees have also revealed that Bank of America knew that borrowers were lying about their income to procure loans through the stated income loan programs.   In fact, several former employees recounted instances in which they had actual knowledge that the income borrowers reported on their loan applications was false, but were told by their superiors to approve the loans anyway.   In addition, former employees revealed that Bank of America loan officers themselves often inflated borrower income and "doctored the numbers" to get loans approved.

356.   Even worse, brokers who originated loans for Bank of America were not held to the same loose underwriting standards as Bank of America's retail loan officers, according to CW9.   Whereas retail loan officers were required at least to attend compliance training, (while simultaneously encouraged by others to ignore such training), brokers were not even required to attend training.   Brokers and their

sales personnel were able to target borrowers in any manner that they saw fit resulting in substantial risk in Bank of America's wholesale operations.

357.   Former employees with Bank of America have revealed that Bank of America also pressured appraisers to inflate appraisals on mortgaged properties, which allowed borrowers to take out the loans for which they applied.

358.   According to a former employee with Bank of America from 2003 to 2008 who is cited in the AIG Complaint, it was common knowledge and widely understood that some Bank of America loan officers had "close relationships" with appraisers that allowed them to obtain inflated valuations.  Bank of America loan officers would often call appraisers and tell them "I need you to come in at this amount."  The appraisers would then return with the requested valuation, allowing the loans to be approved.  As a result, Bank of America knew that property values were being purposefully and baselessly inflated to increase the amount of money that could be loaned to a borrower.

359.   Bank of America also enforced a 30-day rule, under which loan officers were required to collect all necessary documentation to close and fund a loan within thirty days.   If required documentation was not collected within the thirty days, however, loan officers were often directed to approve the loan anyway.  Indeed, a former Loan Processor/Junior Underwriter with Bank of America from

early 2006 to 2008 who is cited in the AIG Complaint noted several occasions where managers directed her to close and fund a loan after thirty days despite the fact that the loan was missing key supporting documentation.

360.   Bank of America also clearly knew that many of the subprime and high cost loans it funded or purchased through its correspondent and wholesale lending channels did not meet its underwriting guidelines, but Bank of America purchased them nevertheless.

361.   According to an internal report prepared by Clayton (a third-party due diligence firm Bank of America used to review loan-level data on pools of mortgages it was considering purchasing) titled "Trending Report," 30% of the loans it reviewed "failed to meet guidelines." The report included a finding that these loans had been granted despite the lack of any purported compensating factors justifying an exception to the underwriting standards.   To create the report, Clayton analyzed about 10,200 loans originated for Bank of America between the second quarter of 2006 and the first quarter of 2007.

362.   A former senior project lead at Clayton from 2004 to 2009 who is cited in the AIG Complaint revealed that Bank of America was not actually interested in the fundamental credit quality of the loans reviewed during Bank of America's due diligence process.   Indeed, this former Clayton employee revealed

that a Vice President of Structured Products at Bank of America specifically told him that he "didn't give a flying f*** about DTI" and other credit characteristics of the loans being reviewed. The Bank of America VP told this former Clayton employee that he did not care about elements of the loans like appraisals, DTI, or credit because, "we [Bank of America] can sell them [the loans] to whoever" and "we [Bank of America] can sell it [the loans] down the line."

363. A review of just 100 sample loan files from Bank of America conducted by a plaintiff in a separate securities fraud action against Bank of America revealed violations of underwriting guidelines in 82% of the loans, including blatant misrepresentations of income, employment, and owner-occupancy. Representative examples included:

- ***Misrepresentation of Employment***. The borrower stated on the loan application that she was self-employed as a builder for 25 years, earning $35,000 per month, and the co-borrower stated that he was also self- employed as a builder earning $30,000 per month. The borrower also listed on the application that she had been the owner of her building/construction business for 25 years; however, her year of birth was 1971, which would have made the borrower ***10 years old*** when she became the owner of the business. Additionally, the loan file contained letters of incorporation for both the borrower and co-borrower's businesses with inception dates of 9/28/1993 and 2/26/2002, respectively. A reasonably prudent underwriter should have noticed that the age discrepancy was a red flag and questioned the validity of the information contained on the loan application. The loan defaulted.

- ***Misrepresentation of Income***.  The borrower stated on the application that she was self-employed as a personal chef with a monthly income of $10,166.67, or $122,000.00 annually.  The borrower's tax returns, ***contained in the loan file***, showed a gross income for the entire year of 2007 of $3,126.00 for services as a personal chef, and $27,225 as a self- employed personal assistant.  The borrower earned monthly income that was $675 less than the amount of the subject loan mortgage payment in the year following the mortgage closing.  The borrower made only one payment on the mortgage, and defaulted.

- ***Misrepresentation of Debt Obligations***.  The application failed to disclose that the borrower simultaneously closed on a second mortgage, originated by the ***same lender***, in the ***same condominium*** complex.  Public records showed that the Borrower acquired a mortgage on the same day as the subject loan for $414,000 with a monthly payment of $4,995 for a property located in Dallas, TX.  The origination underwriter failed to include the monthly payment in the borrower's debt-to-income ratio ("DTI") for the subject loan, resulting in an imprudent underwriting decision.  A recalculation of DTI based on the borrower's undisclosed debt, and recalculated income of $1,200 per month, yields a DTI of ***1,129.08%***, which exceeds the guideline maximum allowable DTI of 55%. In the same file, the borrower stated on her loan application that she was an owner of a liquor store for 13 years, and stated her monthly income as $23,000 a month. $23,000 a month for an owner of a liquor store is unreasonable and should have put the underwriter on notice for potential misrepresentation.  The borrower filed a Chapter 13 bankruptcy with the Central District of California Bankruptcy Court in October 2008.  Per the Statement of Financial Affairs, the borrower reported that she was retired and earned income of $14,400 annual or $1,200 per month for the year of 2006.  The loan defaulted.

- ***Excessive DTI***.  The lender's guidelines permitted a maximum allowable DTI of 55% for a stated income loan when the subject property was an investment property.  The DTI was not accurate because the borrower's income for the year of the subject loan closing of 2006 was a ***loss*** of $200,684, or a monthly loss of $16,724 per

month, and the borrower's total monthly debt was $7,878, meaning that the DTI could not be calculated because the income was *negative*. The loan defaulted.

- ***Underwriting Guidelines Breach***.  The lender's guidelines prohibited a loan amount greater than $400,000 for loans approved with a C or CC risk grade.  The subject loan was approved as a C risk grade with a 5 x 30 rating due to unsatisfactory mortgage payments in the last 12 months on the borrower's secondary mortgage.  Despite this requirement, the subject loan closed in the amount of $740,000, which exceeds the guideline maximum of $400,000.  The loan defaulted.

364.  Application of the Defendants' (and their agents') predatory underwriting and appraisal policies and practices, and the accompanying impact on minority borrowers, was not a sporadic, isolated practice, but rather occurred systemically and every day that loans were extended, renewed, or continued during the relevant period, particularly on non-prime mortgage loans made to FHA protected minorities in Plaintiffs' communities and neighborhoods.

365.  The predatory underwriting and appraisal policies and practices described herein constitute patterns or practices of discrimination because, as an integral part of the Defendants' business models, it was the standard operating practices of Defendants (and their agents) that had a disparate impact on minority borrowers.

366.  But for Defendants' (and their agents') predatory underwriting and appraisal policies and practices, minority borrowers in Plaintiffs' communities

would have received fewer discriminatory and predatory non-prime mortgage loans, would have more available home equity, and the default, vacancy, and foreclosure rates among such borrowers would have been lower.

367.  Each of the Defendants' (directly and/or through their agents') predatory underwriting and appraisal policies, practices, and/or procedures have made and/or continue to make housing unavailable on the basis of race, color, national origin or sex.

368.  Each of the Defendants' (directly and/or through their agents') predatory underwriting and appraisal policies, practices, and/or procedures have provided and/or continue to provide different terms, conditions, and privileges of sale of housing, as well as different services and facilities in connection therewith, on the basis of race, color, national origin or sex.

369.  Each of the Defendants' (directly and/or through their agents') predatory underwriting and appraisal policies, practices, and/or procedures have provided and/or continue to provide different terms, conditions and privileges on the basis of race, color, national origin or sex in connection with the making of residential real estate-related transactions.

370.  Each of the Defendants' (and their agents') published policies and statements relating to their predatory underwriting and appraisal policies, practices,

and/or procedures alleged above have expressed and/or continue to express a preference on the basis of race, color, national origin or sex.

**3.   Defendants' Discretionary Pricing Policies, Financial Incentives, Loosened Underwriting, and Inflated Appraisals Caused Discriminatory and Predatory Lending**

371. Defendants' carried out their predatory and discriminatory equity stripping scheme through the combination of Defendants' discretionary pricing policies, lowered underwriting standards, inflated appraisal practices, and override policies. All of these policies and practices were communicated throughout Defendants' operations and were enabled through the loan-related forms and agreements, including loan contracts, loan applications, and instructions on completing loan applications and contracts, which Defendants routinely disseminated to their employees, managers, and correspondent lenders.

372. Importantly, however, Defendants financially incentivized and encouraged their employees, branch managers, and correspondent lenders to approve as many high cost and subprime mortgage loans as possible, particularly to FHA protected minority borrowers, through compensation schemes rewarding fee generation, loan volumes, and overages, while ignoring risk.

373. Thus, to drive the volume growth of non-prime mortgage loan business – and make more money - Defendants financially incentivized their

170

employees, management, and correspondent lenders to override and/or circumvent prudent underwriting practices, and place their own financial interests ahead of Defendants' borrowers. The direct consequence of this is that Defendants and their correspondent lenders:

- intentionally steered FHA protected minority borrowers into higher cost, and/or higher leveraged, non-prime mortgage loan products through various practices including failing to advise such borrowers of lower cost alternatives or advising such borrowers not to submit proof of income;

- intentionally originated to FHA protected minority borrowers higher cost, and/or higher leveraged, non-prime mortgage loan products while knowing the increased likelihood of delinquencies, default, foreclosures, and home vacancies on such loan products;

- intentionally originated to FHA protected minority borrowers higher cost and/or higher leveraged, non-prime mortgage loans on terms more unfavorable than loans made to non-minority borrowers who were similarly situated under traditional lending criteria;

- intentionally underwrote and originated to FHA protected minority borrowers higher cost and/or higher leveraged, non-prime mortgage loan products at borrowers' maximum income/debt ratios while knowing the increased likelihood of delinquencies, default, foreclosures, and home vacancies on such loan products;

- intentionally underwrote and originated to FHA protected minority borrowers higher cost and/or higher leveraged, non-prime mortgage loan products for which they would not otherwise qualify, and were unable to meet payment obligations, while knowing the increased likelihood of delinquencies, default, foreclosures, and home vacancies on such loan products;

- intentionally underwrote and originated to FHA protected minority borrowers higher cost and/or higher leveraged, non-prime ARM loan products at borrowers' maximum income/debt ratios but at the teaser interest rates rather than the minimum anticipated adjusted rate after the initial teaser rate period expires while knowing the increased likelihood of delinquencies, default, foreclosures, and home vacancies on such loan products;

- intentionally underwrote and originated to FHA protected minority borrowers higher cost and/or higher leveraged, non-prime mortgage loans, including loans backed by Government sponsored enterprises (*i.e.*, the Federal National Mortgage Association ("FNMA"), the Federal Home Loan Mortgage Corporation ("FHLMC"), and the Government National Mortgage Association ("GNMA") (collectively, the "GSEs") at inflated amounts beyond the fair value of their homes and based on inflated appraisals while knowing the increased likelihood of delinquencies, default, foreclosures, and home vacancies on such loan products;  and

- included pre-payment penalties in the higher cost and/or higher leveraged, non-prime mortgage loan products issued to FHA protected minority borrowers.

374.   Because of the higher profits obtained with respect to such non-prime loan products and the demand for such products in Defendants' securitization operations, employees and independent mortgage brokers were paid more when they originated such higher risk loans than when they originated conforming, prime mortgage loans.

375.   For example, Countrywide paid its employees who originated loans in part based on the volume and dollar value of the loans they approved.  A substantial portion of the salary of Countrywide's sales employees was based on commissions,

172

which gave the employees a strong incentive to maximize sales volume and close the maximum number of mortgage loans regardless of quality. Countrywide's wholesale account executives, the employees who dealt with brokers, were paid only on commission—they had no base salary.

376.   Adding a three-year prepayment penalty to a mortgage loan would generate an extra commission for the Countrywide employee of 1% of the loan's value.   Persuading someone to add a home equity line of credit to a loan carried an extra commission of 0.25%.

377.   Countrywide also systematically incentivized its brokers to sell riskier products.  A former Countrywide employee provided documents to the *New York Times* indicating that Countrywide's profit margins ranged from three to five percent on regular non-prime loans, but on loans that included heavy burdens on borrowers, such as high prepayment penalties that persisted for three years, Countrywide's profit margins could reach as high as fifteen percent of the loan.

378.   Former Countrywide mortgage brokers reported that brokers received commissions of 0.50% of the loan's value for originating non-prime loans, while their commission was only 0.20% for less-risky conventional loans.

379.   Former Merrill executives have publicly acknowledged that Merrill's willful compensation and underwriting practices relating to its non-prime lending and

securitization business – that rewarded originators solely on volume, while disregarding borrower ability to repay – were flawed.

380.   As former Merrill CEO John Thain commented in a September 2010 interview with the FCIC: "[W]hen you have a system where you pay someone for originating mortgages simply on volume and nothing happens to them if the credit quality is bad, and nothing happens to them if the borrower is fraudulent on his loan application, and nothing happens to him if the appraisal's fraudulent, then that's probably not a very smart system." (Thain Tr. 98:7-14, Sept. 17, 2010.)

381.   A former First Franklin underwriter cited in the AIG Complaint revealed, for example, that certain fellow underwriters "would approve anything" because First Franklin's compensation structure "created an incentive" to close risky loans and depart from stated underwriting practices.  This former employee emphasized that the bonus structure was not based on the total number of loans reviewed within a month, which would include loans that were approved as well as loans that were rejected, but only on the number of loans that the underwriter actually funded and closed.  She stated that the monthly bonuses for meeting volume targets were as much as $2,000 - $3,000 per underwriter, in addition to base salary.

382. The combination of such financial incentives with Defendants' targeting of minorities, discretionary pricing policies, willfully lax underwriting, and inflated appraisal practices created a *fait accompli* of predatory and discriminatory lending to FHA protected minority borrowers. This caused FHA protected minority borrowers in Plaintiffs' communities and neighborhoods to receive disproportionately greater numbers of higher cost, and/or higher leveraged, non-prime mortgage loans that they could not repay and that exceeded the values of their homes, ultimately stripping away their home equity.

383. As a result, and as Plaintiffs further allege below, Plaintiffs' communities and neighborhoods with higher percentages of FHA protected minority borrowers have experienced a greater rate of mortgage delinquencies, defaults, and home foreclosures on mortgage loans for which Defendants are responsible. This, in turn, has further driven the downward spiral of additional mortgage delinquencies, defaults, and home foreclosures in Plaintiffs' communities and neighborhoods.

**E.     Defendants' Mortgage Servicing & Foreclosure Practices Are Predatory & Discriminatory**

384. Defendants are among the largest mortgage loan servicers in the United States. By virtue of its acquisitions of Countrywide and Merrill Lynch,

Bank of America now holds Countrywide's and Merrill's MSRs and services their prior pools of mortgage loans.

385.   Defendants have engaged in predatory and discriminatory mortgage loan servicing, loan modification, and foreclosure activities that are part and parcel of their discriminatory housing practice of equity stripping.  Indeed, the continuing nature of such activities enable Defendants to continue to generate income until the last discriminatory and predatory loan is either repaid or foreclosed upon.  This has further increased the number of FHA protected minority borrowers' mortgage delinquencies, defaults, and ultimately home vacancies and foreclosures on loans for which Defendants are responsible.

386.   Defendants' predatory and discriminatory mortgage loan servicing, loan modification, and foreclosure activities have included and/or continue to include (but are not limited to):

• Continuing to service until default, each predatory mortgage loan that was made on a discriminatory basis and that has not been repaid and closed (or modified or refinanced in a non-predatory manner), and then foreclose upon the home securing such loan;

• Failing properly and/or timely to respond to, process, or mitigate borrower delinquencies or defaults, including failure to apply payments made by borrowers and failing to maintain accurate account statements in a timely and accurate fashion;

- Failing to respond to, process, and/or underwrite borrower efforts to modify or refinance predatory mortgage loans in a timely and accurate manner;

- Wrongfully denying loan modification applications;

- Force placing mortgage insurance at predatory rates;

- Providing false or misleading information to borrowers while referring loans to foreclosure during the loan modification application process, while initiating foreclosures where the borrower was in good faith actively pursuing a loss mitigation alternative Defendants offered, and or while scheduling and conducting foreclosure sales during the loan modification application process and during trial loan modification periods;

- Failing to respond in a sufficient and timely manner to the increased level of loss mitigation activities by increasing management and staffing levels to ensure timely, effective, and efficient communication with borrowers with respect to loss mitigation activities and foreclosure activities and full exploration of loss mitigation options or programs prior to completion of foreclosure activities;

- Falsifying or manufacturing, and filing, documents during the mortgage servicing and foreclosure process that falsely or recklessly asserted ownership, amounts due, and fees and expenses chargeable to the borrower;

- Charging excessive or improper fees for default-related services and foreclosures, including in connection with repayment plans, reinstatements, payoffs, bankruptcy plans, and foreclosures; and

- Preparing, executing, notarizing, or presenting (either directly or through third parties and agents) false and misleading documents, filing false and misleading documents with courts and government agencies, or otherwise using false or misleading documents as part of the foreclosure process including, but not limited to, affidavits, declarations, certifications, substitutions of trustees, and assignments that falsely represented they were made pursuant to personal knowledge when they were not (otherwise known as the "robo-signing" scandal), including those activities Defendants conducted pursuant to any

internal manuals designed to enable Defendants to foreclose on properties quickly.

387.   Further demonstrating the lack of "an effective control environment," CW1 has detailed severe problems in the execution of servicing defaulted loans at Bank of America.   For instance, a borrower in foreclosure might receive a call from one division of Bank of America indicating that the borrower was approved for a loan modification only to be the recipient of efforts to evict the borrower on the very same day.   According to CW1, Bank of America has been "incompetent" in servicing loans in default and foreclosure.

388.   Defendants' above-noted practices have been the subject of investigations and civil lawsuits by the Department of Justice, State Attorneys General, and Defendants' federal banking regulators.

389.   For example, in June 2010, the Federal Trade Commission ("FTC") filed suit against Countrywide Home Loans, Inc. and BAC Home Loans Servicing, LP in connection with their predatory mortgage loan servicing activities, including some of those alleged above.   Bank of America almost immediately entered into a consent judgment and order with the FTC, whereby Bank of America agreed to pay $108,000,000 in settlement and make various changes to its mortgage servicing operations ("June 2010 FTC Consent Order").   However, Bank of

America did not timely make its promised changes to its mortgage servicing and foreclosure activities.

390.   On April 13, 2011 Defendant Bank of America, N.A. entered into a Consent Judgment with the Office of the Comptroller of the Currency, concerning Bank of America's "unsafe or unsound practices with respect to manner in which the Bank handled various foreclosure and related activities" – *i.e.*, Defendants' "robo-signing" foreclosure activities.  As an example of such unsafe and unsound practices, the Consent Order listed that Bank of America and its subsidiaries had:

(a) filed or caused to be filed in state and federal courts affidavits executed by its employees or employees of third-party service providers making various assertions, such as ownership of the mortgage note and mortgage, the amount of the principal and interest due, and the fees and expenses chargeable to the borrower, in which the affiant represented that the assertions in the affidavit were made based on personal knowledge or based on a review by the affiant of the relevant books and records, when, in many cases, they were not based on such personal knowledge or review of the relevant books and records; (b) filed or caused to be filed in state and federal courts, or in local land records offices, numerous affidavits or other mortgage-related documents that were not properly notarized, including those not signed or affirmed in the presence of a notary; (c) litigated foreclosure proceedings and initiated non-judicial foreclosure proceedings without always ensuring that either the promissory note or the mortgage document were properly endorsed or assigned and, if necessary, in the possession of the appropriate party at the appropriate time; (d) failed to devote sufficient financial, staffing and managerial resources to ensure proper administration of its foreclosure processes; (e) failed to devote to its foreclosure processes adequate oversight, internal controls, policies, and procedures, compliance risk management, internal audit, third party management, and training; and (f) failed to sufficiently oversee outside

179

counsel and other third-party providers handling foreclosure-related services.

391. The OCC Consent Order required BAC "to submit to the Deputy Comptroller and the Examiner-in-Charge an acceptable compliance program to ensure that the mortgage servicing and foreclosure operations, including Loss Mitigation and loan modification, comply with all applicable Legal Requirements, OCC supervisory guidance, and the requirements of this Order and are conducted in a safe and sound manner ("Compliance Program")."

392. On March 12, 2012, the Inspector General of Housing and Urban Development published a report detailing its investigation of Bank of America's foreclosure processes and Bank of America's FHA claims submitted to HUD between October 1, 2008, and September 30, 2010 (the "HUD Report").

393. Among other things, the HUD Report expressly emphasized Bank of America's refusal to provide HUD with copies of its "written foreclosure policies and procedures in effect during the review period" or adequate access to "employees and information," necessitating HUD's assistance from the U.S. Department of Justice to issue civil investigative demands. The HUD report stated that because it had "identified potential False Claims Act violations, in February 2011, we provided DOJ with our analyses and preliminary conclusions as to

180

whether BAC engaged in the alleged foreclosure practices."   The HUD report continued: "DOJ used our review and analysis in negotiating a settlement agreement with BAC.  On February 9, 2012, DOJ and 49 State attorneys general announced a proposed settlement of $25 billion with BAC and four other mortgage servicers for their reported violations of foreclosure requirements."

394.   The HUD report also found that:

Bank of America did not establish an effective control environment to ensure the integrity of its foreclosure process.  Because it failed to establish proper policies and procedures that fostered compliance with laws and regulations, its affiants robosigned foreclosure  documents,  its notaries failed to authenticate signatures, and it used law firms that may have falsified legal foreclosure documents. As a result of its flawed control environment, Bank of America engaged in improper practices by not fully complying with applicable foreclosure procedures when processing foreclosures on FHA-insured loans, thereby misrepresenting its claims to HUD.

395. On March 14, 2012, the Department of Justice, forty-nine state Attorneys General, and the Attorney General for the District of Columbia sued Bank of America and Countrywide (and several other major financial institutions) for, among other things, unfair and deceptive practices in their mortgage origination, loan servicing, loan modification, and loss mitigation (*e.g.*, foreclosure) activities, particularly regarding Federal Housing Administration (FHA) insured mortgage loans ("Robosigning Complaint").

396.   As to Defendants' mortgage loan originations, the Robosigning Complaint alleged that Defendants "engaged in a pattern of unfair and deceptive practices" that "caused borrowers in the Plaintiff States to enter into unaffordable mortgage loans that led to increased foreclosures in the States."

397.   The Robosigning Complaint alleged, which allegations Plaintiffs specifically incorporate and make herein, that Bank of America and Countrywide unfairly, deceptively, and unlawfully discharged its mortgage loan servicing activities by, among other things:

- failing to apply payments made by borrowers and failing to maintain accurate account statements timely and accurately;

- charging excessive or improper fees for default-related services;

- failing to identify properly third party vendors involved in servicing activities on behalf of the Banks;

- imposing force-placed insurance without properly notifying the borrowers and when borrowers already had adequate coverage;

- providing borrowers false or misleading information in response to borrower complaints; and

- failing to maintain appropriate staffing, training, and quality control systems.

398.   The Robosigning Complaint also alleged, which allegations Plaintiffs specifically incorporate and make herein, that Defendants unfairly, deceptively, and unlawfully failed to "engage in loss-mitigation efforts to avoid the foreclosure

of HUD-insured single family residential mortgages . . . where a default could be addressed by modifying the terms of the mortgage or other less-costly alternatives to foreclosure were available." For example, Defendants:

- failed to perform proper loan modification underwriting;

- failed to gather, or lost, loan modification application documentation and other paper work;

- failed to provide adequate staffing to implement programs;

- failed to conduct adequate training of staff responsible for loan modifications;

- failed to establish adequate processes for loan modifications;

- allowed borrowers to stay in trial modifications for excessive time periods;

- wrongfully denied modification applications;

- failed to respond to borrower inquiries;

- provided false or misleading information to consumers while referring loans to foreclosure during the loan modification application process;

- provided false or misleading information to consumers while initiating foreclosures where the borrower was in good faith actively pursuing a loss mitigation alternative offered by the Bank;

- provided false or misleading information to consumers while scheduling and conducting foreclosure sales during the loan application process and during trial loan modification periods;

- misrepresented to borrowers that loss mitigation programs would provide relief from the initiation of foreclosure or further foreclosure efforts;

- failed to provide accurate and timely information to borrowers who are in need of, and eligible for, loss mitigation services, including loan modifications;

- falsely advised borrowers that they must be at least 60 days delinquent in loan payments to qualify for a loan modification;

- miscalculated borrowers' eligibility for loan modification programs and improperly denied loan modification relief to eligible borrowers;

- misled borrowers by representing that loan modification applications would be handled promptly when it regularly failed to act on loan modifications in a timely manner;

- failed to process borrowers' applications for loan modifications properly, including failing to account for documents submitted by borrowers and failing to respond to borrowers' reasonable requests for information and assistance;

- failed to assign adequate staff resources with sufficient training to handle the demand from distressed borrowers; and

- misled borrowers by providing false or deceptive reasons for denial of loan modifications.

399. The Robosigning Complaint further alleged, which allegations Plaintiff specifically incorporates and makes herein, that Defendants "engaged in a pattern of unfair and deceptive" foreclosure practices including:

- failing to identify the foreclosing party properly;

- charging improper fees related to foreclosures;

184

• preparing, executing, notarizing, or presenting false and misleading documents, filing false and misleading documents with courts and government agencies, or otherwise using false or misleading documents as part of the foreclosure process (including, but not limited to, affidavits, declarations, certifications, substitutions of trustees, and assignments);

• preparing, executing, or filing affidavits in foreclosure proceedings without personal knowledge of the assertions in the affidavits and without review of any information or documentation to verify the assertions in such affidavits. This practice of repeated false attestation of information in affidavits is popularly known as "robosigning." Where third parties engaged in robosigning on behalf of Defendants, they did so with the knowledge and approval of Defendants;

• executing and filing affidavits in foreclosure proceedings that were not notarized properly in accordance with applicable state law;

• misrepresenting the identity, office, or legal status of the affiant executing foreclosure-related documents;

• inappropriately charging servicing, document creation, recordation, and other costs and expenses related to foreclosures; and

• inappropriately dual-tracking foreclosure and loan modification activities, and failing to communicate with borrowers with respect to foreclosure activities.

400.  Perhaps most disturbing, the Robosigning Complaint highlights the duplicity in Defendants' unfair, deceptive, and illegal treatment of borrowers defaulting on its mortgage loan products while in receipt of an investment of tens of billions of dollars of U.S. taxpayer funds to help bail it out of the very same

financial disaster it helped create through its predatory and discriminatory non-prime mortgage lending activities at issue here.[9]

401.   In a supplemental consent judgment and order filed on March 22, 2012, the FTC alleged that from June 17, 2010 through June 30, 2011, BAC had violated the June 2010 FTC Consent Order.  Among other things, the supplemental consent judgment found that BAC Home Loans had, among other things: (1) misrepresented amounts borrowers owed on loans, including for improper fees; (2) improperly assessed and/or collected fees not permitted in loan instruments or in

---

[9] On or about October 28, 2008, Bank of America received a $25 billion cash investment from the United States Treasury pursuant to the Troubled Asset Relief Program ("TARP") and a second investment of $20 billion in January 2009. TARP was created through the Emergency Economic Stabilization Act of 2008 ("EESA") to help prevent a deepening of the liquidity and financial crisis (which resulted from Defendants' subprime mortgage lending conduct alleged herein and the conduct of other industry participants), to stabilize the housing market, and to assist troubled homeowners.  As alleged in the Robosigning Complaint, that investment was conditioned in part on Defendants' commitment to modify defaulting borrowers' single family residential mortgages pursuant to a variety of federal programs created in conjunction with EESA and TARP, including the Making Home Affordable Program, the Home Affordable Modification Program, The Home Price Decline Protection Incentives initiative, The Principal Reduction Alternative, The Home Affordable Unemployment Program, The Home Affordable Foreclosure Alternatives Program, The Second Lien Modification Program, The FHA-HAMP Program, The Treasury/FHA Second-Lien Program, The FHA Refinance for Borrowers with Negative Equity Program, and the Housing Finance Agency Hardest Hit Fund.

excess of fee schedules; and (3) failed to timely provide all necessary information to the FTC to determine the identities of consumers entitled to redress and the amounts necessary to compensate those consumers.

402.  On April 4, 2012, Bank of America and Countrywide entered into a Consent Judgment with the Department of Justice and the States Attorneys General ("April 2012 Consent Judgment"), agreeing to remediation and restitution totaling approximately ***$10 billion***, and agreeing to make a variety of modifications to its mortgage servicing and foreclosure practices.  In particular, the settlement required Bank of America to make direct civil penalty payments to the plaintiff governments in the amount of $2,382,415,075; to provide billions of dollars in mortgage loan consumer relief to distressed borrowers, including principal forgiveness, refinancing, and other forms of relief; and to change its mortgage servicing practices by complying with certain mortgage servicing standards.

403.  Notwithstanding its entry into the June 2010 FTC Consent Order, the March 2012 supplemental FTC consent order, and the April 2012 Consent Judgment, Bank of America ***still did not timely comply*** with all of its obligations to implement the mortgage servicing and foreclosure standards it had promised to make.

187

404. For example, as of December 2013, Bank of America had failed to comply timely with the servicing standards set forth in the settlement requiring: (1) that loans must be delinquent at the time foreclosures are initiated and that account information must be accurate in pre-foreclosure notification (PFN) letters sent to borrowers; (2) that borrowers seeking loan modifications be timely notified of any missing or incomplete documents in connection with their loan modification applications; and (3) that any amounts Bank of America claims are due from borrowers are accurately stated in any motions for relief from borrower bankruptcies.

405. As part of Defendants' predatory, equity stripping, mortgage lending and servicing scheme, Bank of America (which had acquired the Countrywide and Merrill Defendants by this time) also failed to modify the predatory, high cost and subprime mortgage loans for which it was responsible under the Home Affordable Modification Program ("HAMP"), which was implemented in March of 2009 to assist the millions of American homeowners facing foreclosure.

406. Instead of abiding by the spirit (and the letter) of HAMP, however, Defendant Bank of America largely ignored or exploited HAMP to further its own financial interests. Though mindful it needed to permit some number of HAMP modifications to avoid government action against it, Bank of America developed

an elaborate scheme to force down the number of successful HAMP modifications. It has done so by deliberately and unlawfully denying scores of otherwise qualified homeowners, including minority borrowers in Plaintiffs' communities and neighborhoods, the ability to qualify successfully for HAMP modifications, while lying to both those homeowners persistent enough to escalate complaints and to the regulatory bodies inquiring on behalf of homeowners.

407.   Bank of America concluded that it was far more lucrative to deliberately force otherwise qualified homeowners outside of HAMP so that it could either profit from foreclosure proceedings, force the homeowner into a more costly proprietary mortgage "modification" than HAMP would permit, or otherwise profit from continuing to service the defaulting and defaulted mortgages.

408.   A July 29, 2009, *New York Times* article, "*Lucrative Fees May Deter Efforts to Alter Loans*," by Peter S. Goodman, J. Emilio Flores, reported the rationale for Bank of America's failure to modify loans:

> Even when borrowers stop paying, mortgage companies that service the loans collect fees out of the proceeds when homes are ultimately sold in foreclosure. So the longer borrowers remain delinquent, the greater the opportunities for these mortgage companies to extract revenue — fees for insurance, appraisals, title searches and legal services.
>
> Mortgage companies, some of which are affiliated with the nation's largest banks, are paid to manage pools of loans owned by investors. The companies typically collect a percentage of the value of the loans they

service. They extract their share regardless of whether borrowers are current on their payments. Indeed, their percentage often increases on delinquent loans.

Legal experts say the opportunities for additional revenue in delinquency are considerable, confronting mortgage companies with a conflict between their own financial interest in collecting fees and their responsibility to recoup money for investors who own most mortgages.

409. Thus, in a *qui tam* action brought against Defendants Bank of America and BAC Home Loans Servicing, LP, Relator Gregory Mackler directly and independently observed that Bank of America accomplished this fraud since the inception of HAMP, in knowing violation of the express terms of the HAMP "Program Documentation" through a variety of mechanisms, including the following: (a) developing and maintaining a fraudulently concealed document image repository of homeowner HAMP documentation so that Bank of America or its agents could falsely deny receiving homeowner documents or claim incompleteness even after satisfactory receipt of them; (b) deliberately deceiving homeowners who complain about Bank of America 's handling of their HAMP inquiries and submissions, with efforts to keep them from HAMP eligibility; (c) intentionally forcing homeowners to wait months before a response to HAMP eligibility determinations (such delay resulting in HAMP "ineligibility") and failing, by design, to communicate HAMP concerns to homeowners, including

deadlines, purportedly incomplete records, modification status, risk of losing eligible status, or other eligibility concerns; (d) unlawfully proceeding with foreclosure actions (under "dual track" protocols) while homeowners are reviewed for HAMP eligibility or during a payment period; (e) failing to credit homeowner HAMP payments properly during the Trial Period, resulting in improper denials of permanent HAMP modifications and other improper costs to homeowners; (f) failing to "waterfall" homeowners properly under HAMP requirements, including by pushing proprietary modifications on homeowners as a predatory foist; (g) failing to convert eligible HAMP homeowners properly from Trial Period status to permanent modification status; (h) failing to evaluate homeowners properly and in good faith for HAMP, including failing, by design, to develop and maintain a proper quality control operation; and (i) failing to give actual authority to Bank of America employees and contractors to properly resolve escalated complaints. *See Complaint, United States of America, ex. rel. Gregory Mackler v. Bank of America, NA and BAC Home Loans Servicing, LP*, Civ. No. 11-cv-03270 (E.D.N.Y.).

410.   As a result of its activities in violation of the terms of its participation in HAMP, in June 2011 the federal government cut off Bank of America's ability to receive payments from the federal government under HAMP until it had made "substantial improvements" in its program.

411.   Defendants' predatory mortgage servicing and foreclosure practices have occurred both on a direct discriminatory basis and, necessarily, on a disparate impact basis as a result of the relatively greater numbers of predatory and discriminatory mortgage loans Defendants made to FHA protected minority homeowners.   Empirical and statistical data, which Plaintiffs allege below, evidence that Defendants have originated non-prime mortgages and initiated mortgage foreclosure proceedings in minority communities to a far greater extent than in non-minority communities.

412.   Regardless of whether its mortgage servicing processes may have improved as a result of any consent order it has entered into, Bank of America is still servicing the predatory and discriminatory high cost mortgage loans at issue here by accepting and processing each loan payment on such loans or engaging in loss mitigation activities, including foreclosures, on such loans.   As such, Bank of America's loan servicing activities continue the equity stripping activities in which each of the Defendants in this litigation have engaged.

413.   These actions, individually and/or collectively with Defendants' other practices Plaintiffs allege herein, have further led to foreseeably disproportionate rates of delinquencies, defaults, home vacancies, and/or foreclosures on loans

Defendants originated, purchased, and/or serviced that were made to FHA protected minority borrowers.

414.   As the direct and foreseeable result of the unfair, deceptive, and predatory manner in which Defendants have serviced and/or foreclosed upon the predatory and discriminatory mortgage loan products disproportionately made to minority borrowers who reside in Plaintiffs' communities and neighborhoods, these borrowers have experienced higher rates of mortgage loan delinquencies, defaults, foreclosures, and/or home vacancies than non-minority borrowers.

415.   As the direct and foreseeable result of the unfair, deceptive, and predatory manner in which Defendants (and their agents) have serviced and/or foreclosed upon the predatory and discriminatory mortgage loan products disproportionately made to minority borrowers who reside in Plaintiffs' communities and neighborhoods, those borrowers will face higher rates of mortgage loan delinquencies, defaults, foreclosures, and/or home vacancies than non-minority borrowers on loans that have not yet defaulted or been foreclosed on.

416.   Each of the Defendants' (and their agents') discriminatory non-prime mortgage servicing and/or foreclosure policies, practices, and/or procedures have made and/or continue to make housing unavailable on the basis of race, color, national origin or sex.

417.   Each of the Defendants' (and their agents')  discriminatory non-prime mortgage servicing and/or foreclosure policies, practices, and/or procedures have provided and/or continue to provide different terms, conditions, and privileges of sale of housing, as well as different services and facilities in connection therewith, on the basis of race, color, national origin or sex.

418.   Each of the Defendants' (and their agents') discriminatory non-prime mortgage servicing and/or foreclosure policies, practices, and/or procedures have provided and/or continue to provide different terms, conditions, and privileges on the basis of race, color, national origin or sex in connection with the making of residential real estate-related transactions.

419.   Each of the Defendants' (and their agents')  published policies and statements relating to their discriminatory non-prime mortgage servicing and/or foreclosure policies, practices, and/or procedures alleged above have expressed and/or continue to express a preference on the basis of race, color, national origin or sex.

420.   As Plaintiffs further allege below, Plaintiffs have been damaged and will continue to be damaged in the future as a direct and foreseeable result of the unfair, deceptive, and predatory manner in which Defendants have serviced and/or foreclosed upon the predatory and discriminatory mortgage loan products

disproportionately made to minority borrowers who reside in Plaintiffs' communities and neighborhoods.

421. Defendants have continued to strip equity on each outstanding predatory and discriminatory loan at issue here and will continue to do so until the last predatory and discriminatory mortgage loan Defendants originate, purchase or otherwise acquire, and/or service has been repaid or has been foreclosed upon. Defendants' predatory and discriminatory loans at issue will continue to become delinquent and will be defaulted on for at least several more years into the future, leading to further property vacancies and foreclosures. Thus, Defendants' discriminatory housing practices in violation of the FHA continue such that the statute of limitations on Defendants' scheme has not yet begun to run.

## F. Empirical Data Evidences Defendants' Intentional Targeting of, and the Discriminatory Impact on, Minority Borrowers in Plaintiffs' Communities

422. Plaintiffs' allegations of Defendants' mortgage lending and foreclosure patterns below reflect, on their face, Defendants' discriminatory housing practice of equity stripping, conducted by Defendants through discriminatory housing practices of targeting FHA protected minority borrowers, and reverse redlining minority communities, for the extension of credit on unfavorable terms, and/or steering minority borrowers into higher cost or non-

prime mortgage loans on terms more unfavorable than loans made to non-minority borrowers.

423.   While discovery of non-publicly available loan level data contained in Defendants' Loan Application Registry (LAR) and mortgage servicing/foreclosure platforms will be necessary to prove at trial certain of Defendants' discriminatory actions alleged herein, publicly available HMDA loan origination data that Defendants and their affiliates themselves collect and report evidence Defendants' intentional targeting, reverse redlining, and steering of FHA protected minority borrowers in Plaintiffs' communities for higher cost and non-prime mortgage loans, as well as the discriminatory impact on those borrowers of such lending policies and practices.   Indeed, this is precisely the purpose for which the Home Mortgage Disclosure Act required this data to be collected, maintained, and reported by mortgage lenders such as Defendants here.

424.   Publicly available HMDA data regarding the numbers and census tract locations of Defendants' mortgage loan origination, purchase, funding, and acquisition activity provides direct and *prima facie* evidence of Defendants' disparate treatment of minority borrowers in Plaintiffs' neighborhoods and communities, particularly in those neighborhoods with higher concentrations of minority homeowners, as well as the disparate impact on them.

425.   In addition, information on the numbers and census tract locations of Defendants' foreclosure activities in Plaintiffs' communities provides further direct and *prima facie* evidence of Defendants' disparate treatment of minority borrowers in Plaintiffs' neighborhoods and communities, particularly in those neighborhoods with higher concentrations of minority homeowners, as well as the disparate impact on them.

426.   Defendants' mortgage lending, funding, purchasing, and foreclosure patterns alleged below exist even after correcting for differences in objective borrower underwriting criteria.

**1.    <u>Defendants' Discrimination is Evidenced by Their Lending & Funding Activities on Mortgages to Minority Borrowers in Plaintiffs' Neighborhoods & Communities</u>**

427.   As Plaintiffs allege, and as the empirical evidence demonstrates below, the increased percentages and numbers of non-prime mortgage loans that Defendants made to ethnic/racial minorities in Plaintiffs' communities, when compared to the actual demographics of ethnic/minority homeownership in Plaintiffs' communities, provides direct evidence of Defendants' targeting, reverse redlining, and marketing penetration into minority communities.

428.   U.S. Census owner-occupied housing unit data provides the best measure of each of the Plaintiff County's minority homeownership demographics

to compare to Defendants' reported HMDA loan data.  This is because the mortgage loans at issue here were secured on borrowers' single family (1-4 unit) owner-occupied residences.

429.  Each of the Defendants is responsible for a disproportionately larger number of their total mortgage loans to FHA protected ethnic/racial minority homeowners in Plaintiffs' communities and neighborhoods than to non-minorities in light of the key comparative demographic—single family, owner-occupied housing units—in Plaintiffs' communities and neighborhoods. This evidences Defendants' disparate treatment of minorities through reverse redlining and targeting, and the disparate impact on Plaintiffs' minorities and minority communities and neighborhoods.

430.  Each of the Defendants also is responsible for a disproportionately larger number of their "high cost" and, more importantly, their higher cost, and/or higher leveraged, non-prime mortgage loans to FHA protected ethnic/racial minority homeowners in Plaintiffs' communities and neighborhoods than to non-minorities.  This also evidences Defendants' disparate treatment of minorities through reverse redlining and targeting, and the disparate impact on Plaintiffs' minorities and minority communities and neighborhoods.

431.   If Defendants had not intentionally targeted minority borrowers for their mortgage lending activity, minorities in Plaintiffs' communities would not have received significantly greater numbers and percentages of Defendants' mortgage loan products than the percentages of minority homeownership as reflected in the demographics.

### a.   Defendants' Minority Lending & Funding Activity in Cobb County

432.   Over the entire period of 2000 to 2013, Defendants are responsible for originating, funding, purchasing or otherwise acquiring at least 14,190 mortgage loans made to minorities in Cobb County that are discriminatorily suspect.

433.   The total percentage of Cobb County housing units owned and occupied by minorities in 2000 was approximately 24%, according to data from the 2000 Census conducted by the United States Census Bureau.

434.   Between 2000 and 2013 Defendants and their affiliates collectively originated at least 33,284 mortgage loans in Plaintiff Cobb County in which Defendants also reported the minority borrower status in their HMDA data.   At least 10,651 of those loans (32% of the total) were reported as made to minority borrowers, notwithstanding Cobb County's demographics of only 24% minority homeownership as of the 2000 Census.   Defendant Bank of America alone was

responsible for at least 4,464 such loans to minorities, constituting approximately 29% of its total 15,574 loans in which it reported minority status.   Countrywide was responsible for at least another 3,746 such loans to minorities, constituting over 31% of its total 11,977 loans in which it reported minority status.   Merrill Lynch affiliate Accredited Home Lenders originated 394 mortgage loans to minorities (over 55%) of its total 710 Cobb County, minority status reported, mortgage loans. AmeriQuest originated approximately 34% of its 213 status reported loans to minorities in Cobb County.   First Franklin originated 356 mortgage loans (over 48%) to minorities of its total 741 HMDA minority status reported loans in Cobb County.   New Century originated 766 mortgage loans to minorities (over 59%) of its total 1,293 Cobb County, minority status reported, mortgage loans.   Option One originated 453 of its loans to minorities (over 48%) of its total 936 minority status HMDA reported Cobb County loans.   Ownit originated approximately 77% of its 82 status reported loans to minorities in Cobb County.

435.   Over the same period of 2000 to 2013, Defendants and their affiliates collectively reported purchases of at least another 4,006 mortgage loans that were originated to minority borrowers in Cobb County. While many of the Defendants and their affiliates did not report minority borrower status on a tremendous

percentage of the loans they purchased, funded or otherwise acquired, Merrill Lynch Affiliate New Century reported minority status on 373 loans it had purchased.   129 of those loans (nearly 35%) had been originated to minority borrowers.  In addition, 100% of the loans purchased by Merrill Lynch Mortgage Lending in which minority status was reported, had been originated to minority borrowers.

436.   Over the same period between 2000 and 2013 Defendants and their affiliates collectively originated at least 4,710 "high cost" mortgage loans in Plaintiff Cobb County in which they also reported the minority borrower status in their HMDA data.  At least 2,658 of those high cost loans (over 56% of the total) were originated to minority borrowers notwithstanding Cobb County's demographics of only 24% minority homeownership as of the 2000 Census. Approximately 46% of such loans made by Bank of America were originated to minorities in Cobb County.  Countrywide alone reported minority status on at least 1,684 of these high cost loans, 977 of which (58%) were made to minority borrowers.  Merrill Lynch affiliate Accredited Home Lenders originated 547 of the high cost loans, 318 of which (58%) were made to minorities.   AmeriQuest originated 405 of the high cost loans, 154 of which (38%) were made to minorities. First Franklin originated at least 204 of the high cost loans, 111 of which (over

54%) were made to minorities.   New Century originated 868 of the high cost mortgage loans, 578 of which (about 67%) were made to minorities.   Option One originated 656 of the high cost loans, 458 of which (nearly 70%) were made to minorities.   Finally, 78% of Ownit's minority status reported high cost loans in Cobb County were originated to minorities.

437.   The intentional discriminatory nature of Defendants' and their affiliates' loan origination activity in Cobb County is even more pronounced during the 2006 to 2008 high point in Defendants' non-prime mortgage lending. During that period alone, Defendants and their affiliates increased their targeting, reverse redlining and discriminatory lending, having collectively originated at least 8,726 mortgage loans in Cobb County in that period in which they reported the minority status of the borrower.   At least 3,352 of those loans (over 38%) were originated to minority borrowers.   Defendant Bank of America originated 1,419 such loans to minorities, representing approximately 40% of its total 3,557 mortgage loans in Cobb County during that period.   Nearly 52% of Bank of America's minority status reported "high cost" loans were originated to minorities during the same period. Countrywide originated 1,505 mortgage loans to minorities, representing nearly 36% of the total 4,222 loans it reported the minority borrower status during that period.   Nearly 58% of Countrywide's high cost loans

(520 of 896 in total) were originated to minorities. Most of those were originated by Countrywide Home Loans, an unregulated Countrywide entity, reflecting an internal transfer of such loans among Countrywide affiliates to remove them from regulatory oversight of Countrywide Bank, N.A. and Countrywide Bank, FSB. The HMDA data reported by Merrill Lynch affiliated lenders shows similar increases in the percentages of their minority lending activities in Cobb County during this period, reflecting heightened targeting and reverse redlining of minorities for non-prime mortgage loans during this same period.

438.   Defendants' purchases, funding and acquisition of mortgage loans originated in Cobb County during this same boom period of 2006 through 2008 similarly reflect that Defendants and their affiliates increased their targeting, reverse redlining and disproportionate marketing penetration of non-prime mortgage loans into minority communities in Cobb County during the period. In total Defendants and their affiliates reported the minority status on 5303 loans they had purchased, funded or otherwise acquired during this period in Cobb County. 1,722 of those loans (over 32%) had been originated to minority borrowers.  Bank of America and Countrywide Bank, N.A. both did not report the minority status on any of the 1,925 loans they collectively acquired, a fact alleged below as part of these entities' efforts to conceal their activities, Countrywide Home Loans (an non-

bank and unregulated entity) reported the minority status on 3,623 of the total 4,400 loans it had acquired.  Over 33% of its minority status reported loans had been originated to minority borrowers.  Countrywide Bank, FSB, reported that 484 of its total 1649 (over 29%) of the mortgages it had acquired in Cobb County had been originated to minority borrowers.  This further reflects an internal transfer of such loans among Countrywide affiliates to remove them from regulatory oversight of Countrywide Bank, N.A. and Countrywide Bank, FSB.  While Merrill Lynch Credit Corp. did not disclose the minority status on any of the loans it acquired, Merrill Lynch Mortgage Lending disclosed that 100% of the loans it acquired and reported minority status on had been originated to minority borrowers.  This similarly reflects an internal transfer of such loans among Merrill Lynch affiliates.

439.  This empirical loan data – reported by the lenders themselves - evidences their respective targeting, reverse redlining and disproportionate marketing penetration of mortgage loans into minority communities in Cobb County because they originated substantially more mortgage loans to minorities, and a greater percentage of their total loans to minorities, than what Cobb County's 24% minority homeownership demographics would otherwise support as appropriate in the absence of such misconduct.  This empirical data also supports

204

the allegations regarding Defendants marketing, underwriting, and compensation policies and practices that were designed to, and in fact did, generate disproportionate numbers and percentages of non-prime mortgage loans to minorities in Cobb County.  As Plaintiffs further allege herein, the financial and other terms of such non-prime loans that Defendants and their affiliates made to minorities, and the manner Defendants underwrote such loans, were more unfavorable to minority borrowers than to non-minority borrowers making them more likely to default.  Defendants continue to service and foreclose on many such loans as they default.

      **b.**    **Defendants' Minority Lending & Funding Activity in DeKalb County**

440.   Over the entire period of 2000 to 2013, Defendants are responsible for originating, funding, purchasing, or otherwise acquiring at least 23,559 mortgage loans made to minorities in DeKalb County that are discriminatorily suspect.

441.   The total percentage of DeKalb County housing units owned and occupied by minorities in 2000 was approximately 56% according to data from the 2000 Census conducted by the United States Census Bureau.

442.   Between 2000 and 2013 Defendants and their affiliates collectively originated at least 34,174 mortgage loans in Plaintiff DeKalb County in which they

also reported the minority borrower status in their HMDA data. At least 20,360 of those loans (approximately 60% of the total) were reported as made to minority borrowers, notwithstanding DeKalb County's demographics of only 56% minority homeownership as of the 2000 Census.  Defendant Countrywide was responsible for originating at least 6,638 loans to minorities in DeKalb County, constituting approximately 59% of its total 11,283 loans in DeKalb County in which it reported minority status.  Merrill Lynch affiliate Accredited Home Lenders originated 1,014 mortgage loans to minorities (over 85%) of its total 1,192 DeKalb County, minority status reported, mortgage loans.   AmeriQuest originated 505 loans, approximately 68% of its 745 status reported loans, to minorities in DeKalb County.  First Franklin originated 588 mortgage loans (over 76%) to minorities of its total 770 HMDA minority status reported loans in DeKalb County.   New Century originated 1,679 mortgage loans to minorities (over 85%) of its total 1,968 DeKalb County, minority status reported, mortgage loans.  Option One originated 1,627 of its loans to minorities (approximately 84%) of its total 1,941 minority status HMDA reported loans.  Ownit originated 89 loans, 99% of its 90 status reported loans, to minorities in DeKalb County.

443.  Over the same period between 2000 and 2013 Defendants and their affiliates collectively originated at least 6,990 "high cost" mortgage loans in

Plaintiff DeKalb County in which they also reported the minority borrower status in their HMDA data.  At least 5,965 of those high cost loans (over 85% of the total) were originated to minority borrowers notwithstanding DeKalb County's demographics of only 56% minority homeownership as of the 2000 Census. Countrywide alone reported minority status on at least 2,400 of these high cost loans, 2,085 of which (87%) were made to minority borrowers.  Merrill Lynch affiliate Accredited Home Lenders originated 895 of the high cost loans, 779 of which (87%) were made to minorities.  AmeriQuest originated 408 of the high cost loans, 268 of which (approximately 66%) were made to minorities.  First Franklin originated at least 213 of the high cost loans, 180 of which (nearly 85%) were made to minorities.  New Century originated 1,376 of the high cost mortgage loans, 1,221 of which (nearly 89%) were made to minorities.  Option One originated 1,169 of the high cost loans, 993 of which (nearly 85%) were made to minorities.  Finally, 144 high cost loans, approximately 95% of Ownit's 152 minority status reported high cost loans in DeKalb County, were originated to minorities.

444.   Over the same period of 2000 to 2013, Defendants and their affiliates collectively reported purchases of at least another 5,822 mortgage loans that were originated to minority borrowers in DeKalb County.  While many of the

Defendants and their affiliates did not report minority borrower status on a tremendous percentage of the loans they purchased, funded or otherwise acquired, Merrill Lynch Affiliate New Century reported minority status on 528 loans it had purchased.   418 of those loans (over 79%) had been originated to minority borrowers.  In addition, 100% of the loans purchased by Merrill Lynch Mortgage Lending in which minority status was reported, had been originated to minority borrowers. And, over 64% of the loans purchased by Option One Mortgage Corp in which minority status was reported, had been originated to minority borrowers.

445.  The intentional discriminatory nature of Defendants' and their affiliates' loan origination activity in DeKalb County is even more pronounced during the 2006 to 2008 high point in Defendants' non-prime mortgage lending. During that period alone, Defendants and their affiliates increased their targeting, reverse redlining, and discriminatory lending, having collectively originated at least 10,576 mortgage loans in DeKalb County in which they reported the minority status of the borrower in that period.   At least 7,350 of those loans (over 69%) were originated to minority borrowers.   Defendant Bank of America originated 2,322 such loans to minorities, representing approximately 64% of its total 3,633 minority status reported mortgage loans in DeKalb County during that period.  187 of Bank of America's total 231 minority status reported "high cost" loans (nearly

81%) were originated to minorities during the same period. Countrywide originated 2,441 mortgage loans to minorities, representing over 65% of the total 3,744 loans it reported the minority borrower status during that period. Nearly 86% of Countrywide's "high cost" loans (1,118 loans of 1,306 in total) were originated to minorities. Most of those were originated by Countrywide's' unregulated, non-bank, entity Countrywide Home Loans. The HMDA data reported by Merrill Lynch affiliated lenders shows similar increases in the percentages of their minority lending activities in DeKalb County during this period, reflecting heightened targeting and reverse redlining of minorities for non-prime mortgage loans during this same period.

446. Defendants' purchases, funding, and acquisition of mortgage loans originated in DeKalb County during this same boom period of 2006 through 2008 similarly reflect that Defendants and their affiliates increased their targeting, reverse redlining and disproportionate marketing penetration of non-prime mortgage loans into minority communities in DeKalb County during that period. In total Defendants and their affiliates reported the minority status on 5,279 loans they had purchased, funded or otherwise acquired during this period in DeKalb County. Bank of America and Countrywide Bank, N.A. both did not report the minority status on any of the 1,457 loans they collectively acquired, a fact alleged

below as part of these entities' efforts to conceal their activities. While Merrill Lynch Credit Corp. did not disclose the minority status on any of the loans it acquired, Merrill Lynch Mortgage Lending disclosed that 100% of the loans it acquired and reported minority status on had been originated to minority borrowers. This further reflects an internal transfer of such loans among Merrill Lynch entities.

447. This empirical loan data – reported by the lenders themselves - evidences their respective targeting, reverse redlining, and disproportionate marketing penetration of mortgage loans into minority communities in DeKalb County because they originated substantially more mortgage loans to minorities, and a greater percentage of their total loans to minorities, than what DeKalb County's 56% minority homeownership demographics would otherwise support as appropriate in the absence of such misconduct. This empirical data also supports the allegations regarding Defendants marketing, underwriting and compensation policies and practices that were designed to, and in fact did, generate disproportionate numbers and percentages of non-prime mortgage loans to minorities in DeKalb County. As Plaintiffs further allege herein, the financial and other terms of such non-prime loans that Defendants and their affiliates made to minorities, and the manner Defendants underwrote such loans, were more

unfavorable to minority borrowers than to non-minority borrowers making them more likely to default.  Defendants continue to service and foreclose on many such loans as they default.

     **c.**       **Defendants' Minority Lending & Funding Activity in Fulton County**

448.   Over the entire period of 2000 to 2013, Defendants are responsible for originating, funding, purchasing, or otherwise acquiring at least 29,638 mortgage loans made to minorities in Fulton County that are discriminatorily suspect.

449.   The total percentage of Fulton County housing units owned and occupied by minorities in 2000 was approximately 45% according to data from the 2000 Census conducted by the United States Census Bureau.

450.   Notwithstanding Fulton County's demographics of only 45% minority homeownership as of the 2000 Census, Defendant Countrywide affiliate Countrywide KB Home Loans originated nearly 87% of its minority status reported loans to minority borrowers in Fulton County.  Similarly, Merrill Lynch affiliate Accredited Home Lenders originated 1,202 mortgage loans to minorities, nearly 80% of its total 1,503 minority status reported mortgage loans in Fulton County.  AmeriQuest originated 618 loans, approximately 70% of its 910 status reported loans, to minorities in Fulton County.  First Franklin originated 629

mortgage loans (nearly 64%) to minorities of its total 983 HMDA minority status reported loans in Fulton County.  New Century originated 2,124 mortgage loans to minorities (over 80%) of its total 2,650 Fulton County, minority status reported, mortgage loans.  Option One originated 1,783 of its loans to minorities (approximately 77%) of its total 2,327 minority status HMDA reported loans. Ownit originated 121 loans, 87% of its 139 status reported loans, to minorities in Fulton County.

451.   Over the same period between 2000 and 2013 Defendants and their affiliates collectively originated at least a total of 9,066 "high cost" mortgage loans in Plaintiff Fulton County in which they also reported the minority borrower status in their HMDA data.  At least 7,184 of those high cost loans (over 79% of the total) were originated to minority borrowers notwithstanding Fulton County's demographics of only 45% minority homeownership as of the 2000 Census.  Over 72% of Bank of America's high cost loans were originated to minorities. Countrywide alone was responsible for at least 2,951 of the total minority status reported high cost loans, 2,347 of which (nearly 80%) were made to minority borrowers.  Merrill Lynch affiliate Accredited Home Lenders originated 1,214 of the reported high cost loans, 990 of which (nearly 82%) were made to minorities. AmeriQuest originated 407 of the reported high cost loans, 272 of which

(approximately 67%) were made to minorities.  First Franklin originated at least 333 of the high cost loans, 232 of which (nearly 70%) were made to minorities. New Century originated 1,955 of the high cost mortgage loans, 1,656 of which (nearly 85%) were made to minorities.  Option One originated 1,492 of the high cost loans, 1,165 of which (78%) were made to minorities.  Finally, 98 high cost loans, over 88% of Ownit's 111 minority status reported high cost loans in Fulton County, were originated to minorities.

452.   Over the same period of 2000 to 2013, Defendants and their affiliates collectively reported purchases of at least another 5,807 mortgage loans that were originated to minority borrowers in Fulton County. While many of the Defendants and their affiliates did not report minority borrower status on a tremendous percentage of the loans they purchased, funded or otherwise acquired, Merrill Lynch Affiliate New Century reported minority status on 471 loans it had purchased.   339 of those loans (nearly 72%) had been originated to minority borrowers.  In addition, 100% of the loans purchased by Merrill Lynch Mortgage Lending in which minority status was reported, had been originated to minority borrowers. And, over 70% of the loans purchased by Option One Mortgage Corp in which minority status was reported, had been originated to minority borrowers.

453.   The intentional discriminatory nature of Defendants' and their affiliates' loan origination activity in Fulton County is even more pronounced during the 2006 to 2008 high point in Defendants' non-prime mortgage lending. During that period alone, Defendants and their affiliates increased their targeting, reverse redlining, and discriminatory lending, having collectively originated at least 14,044 mortgage loans in Fulton County in which they reported the minority status of the borrower in that period.   At least 7,899 of those loans (over 56%) were originated to minority borrowers.   Defendant Bank of America originated 3,571 such loans to minorities, representing approximately 57% of its total 6,316 minority status reported mortgage loans in Fulton County during that period.   303 of Bank of America's total 392 minority status reported "high cost" loans (over 77%) were originated to minorities during the same period. Countrywide originated 3,146 mortgage loans to minorities, representing over 55% of the total 5,714 loans it reported the minority borrower status during that period.   Nearly 80% of Countrywide's "high cost" loans (1,368 loans of 1,717 in total) were originated to minorities. Most of those were originated by Countrywide's unregulated, non-bank, entity Countrywide Home Loans. The HMDA data reported by Merrill Lynch affiliated lenders shows similar increases in the percentages of their minority lending activities in Fulton County during this period,

reflecting heightened targeting and reverse redlining of minorities for non-prime mortgage loans during this same period.

454.   Defendants' purchases, funding, and acquisition of mortgage loans originated in Fulton County during this same boom period of 2006 through 2008 similarly reflect that Defendants and their affiliates increased their targeting, reverse redlining, and disproportionate marketing penetration of non-prime mortgage loans into minority communities in Fulton County during that period. In total Defendants and their affiliates reported the minority status on 7,484 loans they had purchased, funded or otherwise acquired during this period in Fulton County.  While Bank of America and Countrywide Bank, N.A. both did not report the minority status on any of the 2,851 loans they collectively acquired, a fact alleged below as part of these entities' efforts to conceal their activities, over 50% of Countrywide Home Loans' purchases of loans in which minority borrower status was reported were originated to minority borrowers (2,587 loans of a total 5,138 loans) and constitute the majority of such purchased loans.  While Merrill Lynch Credit Corp. did not disclose the minority status on any of the loans it acquired, Merrill Lynch Mortgage Lending disclosed that 100% of the loans it acquired and reported minority status on had been originated to minority

borrowers.  This further reflects an internal transfer of such loans among Merrill Lynch entities.

455.  This empirical loan data – reported by the lenders themselves - evidences their respective targeting, reverse redlining, and disproportionate marketing penetration of mortgage loans into minority communities in Fulton County because they originated substantially more mortgage loans to minorities, and a greater percentage of their total loans to minorities, than what Fulton County's 45% minority homeownership demographics would otherwise support as appropriate in the absence of such misconduct.  This empirical data also supports the allegations regarding Defendants marketing, underwriting, and compensation policies and practices that were designed to, and in fact did, generate disproportionate numbers and percentages of non-prime mortgage loans to minorities in Fulton County.  As Plaintiffs further allege herein, the financial and other terms of such non-prime loans that Defendants and their affiliates made to minorities, and the manner Defendants underwrote such loans, were more unfavorable to minority borrowers than to non-minority borrowers making them more likely to default.  Defendants continue to service and foreclose on many such loans as they default.

### 2.     Defendants' Discrimination is Evidenced by the Concentration of Their Lending & Funding Activities in Plaintiffs' Neighborhoods With the Highest Foreclosure Risk ("HFR") - Plaintiffs' Higher Minority Neighborhoods

456.   Defendants' discriminatory conduct is evidenced by the concentration of Defendants' non-prime mortgage lending activity within the highest foreclosure risk areas in Plaintiffs' communities and neighborhoods and in the numbers of mortgage loans they made to minority borrowers within those high foreclosure risk areas.

457.   "High foreclosure risk" ("HFR") census tracts/neighborhoods designated by the U.S. Department of Housing & Urban Development ("HUD"), reflect characteristics that HUD estimates to have a high level of risk for foreclosure.  This includes neighborhoods with a relatively high concentration of non-prime mortgage loans with higher costs and/or higher LTV or DTI leverage ratios.

458.   As Plaintiffs allege above, because of Defendants' and their affiliates' discriminatory targeting and reverse redlining of minorities for non-prime mortgage loans since the early 2000s, Defendants are responsible for both the disproportionately larger numbers of mortgage loans to minority borrowers in Plaintiffs' communities and the concentrations of such loans in Plaintiffs'

217

neighborhoods with higher percentages of FHA protected minority homeowner/borrowers.

459. As a direct and foreseeable result of the increased and disproportionate numbers of non-prime loans to minorities, the predatory and discriminatory terms and underwriting of such loans, and the concentration of such loans in minority communities, Plaintiffs' neighborhoods (reflected in census tracts) with higher percentages of FHA protected minority borrowers have experienced tremendously greater numbers of loan defaults and foreclosures than Plaintiffs' neighborhoods and communities with lower percentages of minority homeowners. Thus, Plaintiffs' neighborhoods/census tracts with higher concentrations of minority homeowners directly coincide with the highest foreclosure risk areas (HFRs) designated by HUD.

460. Indeed, as Plaintiffs further allege below, empirical data shows that Defendants' mortgage lending, funding, and purchasing activities were concentrated in Plaintiffs' communities and neighborhoods that eventually received the highest HUD designated foreclosure risk (HFRs). And, as the empirical evidence alleged below further reflects, Plaintiffs' neighborhoods with the highest HUD designated foreclosure risk typically have the highest percentages of FHA protected minority homeowners, and it is where Defendants made the

largest numbers of non-prime mortgage loans to minority borrowers. Thus, empirical information alleged below provides additional direct and *prima facie* evidence of targeting and disparate treatment, as well as the disparate impact, of Defendants' predatory mortgage lending activities in Plaintiffs' communities and neighborhoods.

        a.    **Defendants' Lending & Funding Activities in Cobb County's HFR Areas**

461. Of the total 33,284 mortgage loans Defendants and their affiliates collectively originated in Cobb County between 2000 and 2013 and reported the minority status of borrowers, 29,454 such loans (over 88%) were originated within Cobb County's highest HUD designated foreclosure risk census tracts (*e.g.*, HFR scores of "19" or "20").[10]  9,781 of these 29,454 HFR loans (33%) were originated to minorities, constituting nearly 92% of the total 10,651 mortgage loans

_____

[10] As a result of a massive increase in the number of defaults on non-prime mortgage loans that Defendants' (and other industry participants') made – which defaults primarily were caused by the higher cost terms and adjustable rates on many such loans, the higher LTV and DTI leverage on such loans, and Defendants' (and other industry participants') reduced underwriting on such loans (particularly during the boom years of 2006 to 2008) -- the severity of the risk of foreclosures in Plaintiffs' communities and neighborhoods (and across the nation) became so great that HUD changed its original HFR ranking system from a scale of 1-10 (10 formerly being the highest foreclosure risk areas) to a scale of 1-20 (doubling the prior risk designation and designating 20 as the highest foreclosure risk areas).

Defendants and their affiliates collectively originated to minorities over the entire 13-year period and in which they reported minority status of the borrower.

462.  As between each of the Defendants, of the total 15,574 mortgage loans Bank of America originated in Cobb County between 2000 and 2013 and reported the minority status of borrowers, 13,601 such loans (over 87%) were originated within Cobb County's highest HUD designated foreclosure risk census tracts.   4,017 of these 13,601 HFR loans (nearly 30%) were originated to minorities, constituting nearly 90% of the total 4,464 mortgage loans Bank of America originated to minorities over the entire 13-year period and in which they reported minority status of the borrower.

463.  Of the total 11,997 mortgage loans Countrywide originated in Cobb County between 2000 and 2013 and reported the minority status of borrowers, 10,678 such loans (over 89%) were originated within Cobb County's highest HUD designated foreclosure risk census tracts.  3,485 of these 10,678 HFR loans (nearly 33%) were originated to minorities, constituting over 93% of the total 3,476 mortgage loans Countrywide originated to minorities over the entire 13-year period and in which they reported minority status of the borrower.

464.  Merrill affiliate Accredited Home Lenders originated a total of 710 loans in Cobb County between 2000 and 2013 and reported the minority status of

borrowers, 659 of which (nearly 93%) were originated within Cobb County's highest HUD designated foreclosure risk census tracts.  369 of these 659 HFR loans (nearly 56%) were originated to minorities, constituting nearly 94% of the total 394 mortgage loans that Accredited originated to minorities over the entire 13-year period and in which they reported minority status of the borrower. Similarly, of the total of 739 loans Ameriquest originated in Cobb County between 2000 and 2013 and reported the minority status of borrowers, 670 of which (nearly 91%) were originated within Cobb County's highest HUD designated foreclosure risk census tracts.  235 of these 670 HFR loans (over 35%) were originated to minorities, constituting nearly 94% of the total 251 mortgage loans that Accredited originated to minorities over the entire 13-year period and in which they reported minority status of the borrower.  Of the total 741 mortgage loans First Franklin originated in Cobb County during this period and reported the minority status of borrowers, 695 such loans (nearly 94%) were originated within Cobb County's highest HUD designated foreclosure risk census tracts.  331 of these 695 HFR loans (nearly 48%) were originated to minorities, constituting nearly 96% of the total 346 minority status reported mortgage loans that First Franklin originated to minorities over the entire 13-year period.  Of the total 1,293 mortgage loans New Century originated in Cobb County during this period and reported the minority

status of borrowers, 1,188 such loans (nearly 92%) were originated within Cobb County's highest HUD designated foreclosure risk census tracts.   717 of these 1,188 HFR loans (over 60%) were originated to minorities, constituting over 94% of the total 766 minority status reported mortgage loans that New Century originated to minorities during the period. Of the total 936 mortgage loans Option One originated in Cobb County during this period and reported the minority status of borrowers, 861 such loans (nearly 92%) were originated within Cobb County's highest HUD designated foreclosure risk census tracts.   428 of these 861 HFR loans (nearly 50%) were originated to minorities, constituting over 94% of the total 453 minority status reported mortgage loans that Option One originated to minorities over the entire 13-year period.   The loans made by Ownit in Cobb County during this period in Cobb County reflect similar percentages.

465.   Of the total 15,444 mortgage loans Defendants and their affiliates collectively funded, purchased, or otherwise acquired during the same period that were originated in Cobb County, and which Defendants reported the minority status of borrowers, 13,737 such loans (nearly 89%) were originated within Cobb County's highest HUD designated HFR census tracts.   Although just 3,495 of these 13,737 HFR loans (over 25%) were made to minorities, they constituted nearly 93% of the total 3,762 mortgage loans Defendants and their affiliates collectively

funded, purchased or otherwise acquired in Cobb that had been originated to minorities over the entire 13-year period.

466. As standouts among the Defendants responsible for most of these loans, Countrywide Bank, FSB and Countrywide Home Loans purchased, funded or otherwise acquired 13,025 mortgage loans since 2000 in Cobb County and reported the minority status of borrowers. 11,630 of such loans (over 89%) were made within Cobb County's highest HUD designated HFR census tracts.  While 3,074 of those 11,630 loans HFR loans (over 26%) were originated to minority borrowers, these represented nearly 94% of the total 3,288 reported minority loans that Countrywide Bank, FSB and Countrywide Home Loans funded, purchased or otherwise acquired in Cobb County during the period.

467. During the 2006 to 2008 boom period of Defendants' and their affiliates' heightened non-prime mortgage purchasing, funding, and acquisition activities, these entities collectively acquired over 5,303 mortgage loans in Cobb County in which they reported minority borrower status.  4,747 of those loans (nearly 90%) were originated with Cobb's highest HFR census tracts and 1,599 (about 34%) were originated to minority borrowers. These 1,599 minority borrower HFR loans represented nearly 93% of all reported mortgage loans

originated to minority borrowers that the Defendants and their affiliates acquired in Cobb County during the period.

468. Of the 520 mortgage loans that Bank of America funded, purchased, or otherwise acquired in 2013 in Cobb County and reported the minority status, 426 of such loans (nearly 82%) were originated within Cobb County's highest HFR census tracts. While 121 (about 28%) of such loans had been originated to minority borrowers, these 121 loans constituted over 84% of all 144 minority status reported loans made to minorities that Bank of America funded, purchased, or otherwise acquired in Cobb County during 2013. This further reflects that to a certain -- albeit lesser – degree, Defendants' discriminatory lending practices continue to this very day in Cobb County.

469. This empirical loan data – reported by the lenders themselves – further evidences their respective targeting, reverse redlining, and disproportionate marketing penetration of mortgage loans into minority communities in Cobb County because they originated, purchased, or acquired substantially more mortgage loans to minorities and such loans were concentrated in Cobb County's highest HFR census tracts, which census tracts have higher concentrations of minority homeowners. This empirical data also supports the causation of increased foreclosures in Cobb County's higher minority areas resulting from Defendants'

marketing, underwriting and compensation policies and practices that were designed to, and in fact did, generate disproportionate numbers and percentages of non-prime mortgage loans to minorities in Cobb County and concentrated those loans in Cobb's highest HFR areas.  Defendants continue to service and foreclose on many such loans as they default.

   b.   **Defendants' Lending & Funding Activities in DeKalb County's HFR Areas**

470.  Of the total 34,178 mortgage loans Defendants and their affiliates collectively originated in DeKalb County between 2000 and 2013 and reported the minority status of borrowers, 24,114 such loans (approximately 71%) were originated within DeKalb County's highest HUD designated foreclosure risk census tracts (*e.g.*, HFR scores of "19" or "20").  18,046 of these 24,114 HFR loans (nearly 75%) were originated to minorities, representing nearly 89% of the total 20,360 mortgage loans Defendants collectively originated to minorities over the entire 13-year period and in which they reported the minority status of the borrower.

471.  As between each of the Defendants, of the total 15,031 mortgage loans Bank of America originated in DeKalb County between 2000 and 2013 and reported the minority status of borrowers, 9,717 such loans (nearly 65%) were

originated within DeKalb County's highest HUD designated foreclosure risk census tracts. 6,786 of these 9,717 HFR loans (nearly 70%) were originated to minorities, constituting nearly 86% of the total 7,908 mortgage loans Bank of America originated to minorities over the entire 13-year period and in which they reported minority status of the borrower.

472.   Of the total 11,283 mortgage loans Countrywide originated in DeKalb County between 2000 and 2013 and reported the minority status of borrowers, 7,808 such loans (over 69%) were originated within DeKalb County's highest HUD designated foreclosure risk census tracts. 5,807 of these 7,808 HFR loans (over 74%) were originated to minorities, constituting over 87% of the total 6,638 mortgage loans Countrywide originated to minorities over the entire 13-year period and in which they reported minority status of the borrower.

473.   Merrill affiliate Accredited Home Lenders originated a total of 1,192 loans in DeKalb County between 2000 and 2013 and reported the minority status of borrowers, 1,102 of which (nearly 85%) were originated within DeKalb County's highest HUD designated foreclosure risk census tracts. 952 of these 1,102 HFR loans (over 86%) were originated to minorities, constituting nearly 94% of the total 1,014 mortgage loans that Accredited originated to minorities over the entire 13-year period and in which they reported minority status of the

borrower.  Similarly, of the total of 745 loans Ameriquest originated in DeKalb County between 2000 and 2013 and reported the minority status of borrowers, 660 of which (nearly 89%) were originated within DeKalb County's highest HUD designated foreclosure risk census tracts.  465 of these 660 HFR loans (over 70%) were originated to minorities, constituting over 92% of the total 505 mortgage loans that Accredited originated to minorities over the entire 13-year period and in which they reported minority status of the borrower.  Of the total 770 mortgage loans First Franklin originated in DeKalb County during this period and reported the minority status of borrowers, 669 such loans (nearly 87%) were originated within DeKalb County's highest HUD designated foreclosure risk census tracts.  563 of these 669 HFR loans (over 84%) were originated to minorities, constituting nearly 96% of the total 588 minority status reported mortgage loans that First Franklin originated to minorities over the entire 13-year period.  Of the total 1,968 mortgage loans New Century originated in DeKalb County during this period and reported the minority status of borrowers, 1,780 such loans (over 90%) were originated within DeKalb County's highest HUD designated foreclosure risk census tracts.  1,583 of these 1,780 HFR loans (nearly 89%) were originated to minorities, constituting over 94% of the total 1,679 minority status reported mortgage loans that New Century originated to minorities during the period. Of the

total 1,941 mortgage loans Option One originated in DeKalb County during this period and reported the minority status of borrowers, 1,749 such loans (over 90%) were originated within DeKalb County's highest HUD designated foreclosure risk census tracts. 1,540 of these 1,749 HFR loans (over 88%) were originated to minorities, constituting nearly over 95% of the total 1,627 minority status reported mortgage loans that Option One originated to minorities over the entire 13-year period. Similarly, 180 of the total 184 loans (nearly 98%) made by Ownit in DeKalb County during this period were made within DeKalb County's highest HUD designated foreclosure risk census tracts. Of those, 174 (about 97%) were made to minorities, representing 100% of the reported minority status loans Ownit made to minorities during the period in DeKalb County.

474.   Of the total 12,701 mortgage loans Defendants and their affiliates collectively funded, purchased, or otherwise acquired during the same period that were originated in DeKalb County, and which Defendants reported the minority status of borrowers, 8,196 such loans (approximately 65%) were originated within DeKalb County's highest HUD designated HFR census tracts.   5,159 of these 8,196 HFR loans (nearly 63%) were made to minorities, they constituted nearly 89% of the total 5,826 mortgage loans Defendants and their affiliates collectively

funded, purchased or otherwise acquired in DeKalb that had been originated to minorities over the entire 13-year period.

475.  Collectively, Countrywide Bank, FSB, and Countrywide Home Loans purchased, funded, or otherwise acquired 10,556 loans since 2000 in DeKalb County and reported the minority status of borrowers.  6,985 of those loans (over 66%) were made within DeKalb County's highest HUD designated HFR census tracts.  4,462 of those 6,985 loans HFR loans (nearly 64%) were originated to minority borrowers and these represented over 89% of the total 4,994 reported minority loans that Countrywide Bank, FSB and Countrywide Home Loans funded, purchased or otherwise acquired in DeKalb County during the period.

476.  During the 2006 to 2008 boom period of Defendants' and their affiliates' heightened non-prime mortgage purchasing, funding, and acquisition activities, these entities collectively acquired over 4,751 mortgage loans in DeKalb County in which they reported minority borrower status.  3,304 of those loans (nearly 70%) were originated with DeKalb's highest HFR census tracts and 2,282 of those (about 69%) were originated to minority borrowers. These 2,282 minority borrower HFR loans represented nearly 90% of all 2,539 reported mortgage loans originated to minority borrowers that the Defendants and their affiliates purchased or otherwise acquired in DeKalb County during that period.

477.   Of the 529 mortgage loans that Bank of America funded, purchased, or otherwise acquired in 2013 in DeKalb County and reported the minority status, 282 of such loans (over 53%) were originated within DeKalb County's highest HFR census tracts.  While 166 (about 59%) of such loans had been originated to minority borrowers, these 166 loans constituted over about 77% of all 216 minority status reported loans made to minorities that Bank of America funded, purchased, or otherwise acquired in DeKalb County during 2013.  This further reflects that to a certain -- albeit lesser – degree, Defendants' discriminatory lending practices continue to this very day in DeKalb County.

478.   This empirical loan data – reported by the lenders themselves – further evidences their respective targeting, reverse redlining, and disproportionate marketing penetration of mortgage loans into minority communities in DeKalb County because they originated, purchased, or acquired substantially more mortgage loans to minorities and such loans were concentrated in DeKalb County's highest HFR census tracts, which census tracts have higher concentrations of minority homeowners. This empirical data also supports the causation of increased foreclosures in DeKalb County's higher minority areas resulting from Defendants' marketing, underwriting, and compensation policies and practices that were designed to, and in fact did, generate disproportionate

230

numbers and percentages of non-prime mortgage loans to minorities in DeKalb County and concentrated those loans in DeKalb's highest HFR areas.  Defendants continue to service and foreclose on many such loans as they default.

        c.        **Defendants' Lending & Funding Activities in Fulton County's HFR Areas**

479.   Of the total 51,896 mortgage loans Defendants collectively originated in Fulton County between 2000 and 2013 and reported the minority status of borrowers, 39,911 of such loans (nearly 77%) were originated within Fulton County's highest HUD designated foreclosure risk census tracks (*e.g.*, HFR scores of "19" or "20").  21,402 of these 39,911 HFR loans (nearly 54%) were originated to minorities, constituting nearly 90% of the total 23,831 mortgage loans Defendants collectively originated to minorities over the entire 13-year period and in which they reported minority status of the borrower.

480.   As between each of the Defendants, of the total 23,375 mortgage loans Bank of America originated in Fulton County between 2000 and 2013 and reported the minority status of borrowers, 17,179 such loans (over 73%) were originated within Fulton County's highest HUD designated foreclosure risk census tracts.  8,459 of these 17,179 HFR loans (over 49%) were originated to minorities, constituting nearly 88% of the total 9,660 mortgage loans Bank of America

originated to minorities over the entire 13-year period and in which they reported minority status of the borrower.

481.   Of the total 17,100 mortgage loans Countrywide originated in Fulton County between 2000 and 2013 and reported the minority status of borrowers, 13,082 such loans (about 77%) were originated within Fulton County's highest HUD designated foreclosure risk census tracts.  6,538 of these 13,082 HFR loans (about 50%) were originated to minorities, constituting over 89% of the total 7,313 mortgage loans Countrywide originated to minorities over the entire 13-year period and in which they reported minority status of the borrower.

482.   Merrill affiliate Accredited Home Lenders originated a total of 1,503 loans in Fulton County between 2000 and 2013 and reported the minority status of borrowers, 1,397 of which (nearly 93%) were originated within Fulton County's highest HUD designated foreclosure risk census tracts.  1,145 of these 1,397 HFR loans (over 82%) were originated to minorities, constituting over 95% of the total 1,202 mortgage loans that Accredited originated to minorities over the entire 13-year period and in which they reported minority status of the borrower.  Similarly, of the total of 910 loans Ameriquest originated in Fulton County between 2000 and 2013 and reported the minority status of borrowers, 865 of which (over 95%) were originated within Fulton County's highest HUD designated foreclosure risk census

232

tracts.  602 of these 865 HFR loans (nearly 70%) were originated to minorities, constituting over 97% of the total 618 mortgage loans that Accredited originated to minorities over the entire 13-year period and in which they reported minority status of the borrower.  Of the total 983 mortgage loans First Franklin originated in Fulton County during this period and reported the minority status of borrowers, 855 such loans (nearly 87%) were originated within Fulton County's highest HUD designated foreclosure risk census tracts.  587 of these 855 HFR loans (nearly 69%) were originated to minorities, constituting over 93% of the total 629 minority status reported mortgage loans that First Franklin originated to minorities over the entire 13-year period.  Of the total 2,650 mortgage loans New Century originated in Fulton County during this period and reported the minority status of borrowers, 2,384 such loans (nearly 90%) were originated within Fulton County's highest HUD designated foreclosure risk census tracts.  1,968 of these 2,384 HFR loans (nearly 83%) were originated to minorities, constituting nearly over 93% of the total 2,124 minority status reported mortgage loans that New Century originated to minorities during the period.  Of the total 2,327 mortgage loans Option One originated in Fulton County during this period and reported the minority status of borrowers, 2,110 such loans (over 90%) were originated within Fulton County's highest HUD designated foreclosure risk census tracts. 1,676 of these 2,110 HFR

233

loans (over 79%) were originated to minorities, constituting nearly over 96% of the total 1,738 minority status reported mortgage loans that Option One originated to minorities over the entire 13-year period.   Similarly, 131 of the total 139 loans (over 94%) made by Ownit in Fulton County during this period were made within Fulton County's highest HUD designated foreclosure risk census tracts. Of those, 118 (90%) were made to minorities, representing about 98% of the reported minority status loans Ownit made to minorities during the period in Fulton County.

483.   Of the total 15,715 mortgage loans Defendants and their affiliates collectively funded, purchased, or otherwise acquired during the same period that were originated in Fulton County, and which Defendants reported the minority status of borrowers, 12,500 such loans (nearly 80%) were originated within Fulton County's highest HUD designated HFR census tracts.   5,807 of these 12,500 HFR loans (over 46%) were made to minorities, and they constituted nearly 91% of the total 6,407 mortgage loans Defendants and their affiliates collectively funded, purchased or otherwise acquired in Fulton that had been originated to minorities over the entire 13-year period.

484.   Collectively, Countrywide Bank, FSB and Countrywide Home Loans purchased, funded, or otherwise acquired 14,957 loans since 2000 in Fulton County and reported the minority status of borrowers.   11,853 of those loans (over

79%) were made within Fulton County's highest HUD designated HFR census tracts.  5,370 of those 11,853 loans HFR loans (over 45%) were originated to minority borrowers and these represented nearly 91% of the total 5,933 reported minority loans that Countrywide Bank, FSB and Countrywide Home Loans funded, purchased, or otherwise acquired in Fulton County during the period.

485.   During the 2006 to 2008 boom period of Defendants' and their affiliates' heightened non-prime mortgage purchasing, funding, and acquisition activities, these entities collectively acquired over 7,484 mortgage loans in Fulton County in which they reported minority borrower status.  6,069 of those loans (over 81%) were originated with Fulton's highest HFR census tracts and 3,244 of those (over 53%) were originated to minority borrowers. These 3,244 minority borrower HFR loans represented nearly 90% of all 3,609 reported mortgage loans originated to minority borrowers that the Defendants and their affiliates purchased or otherwise acquired in Fulton County during that period.

486.   Of the 67 mortgage loans that Bank of America funded, purchased, or otherwise acquired in 2013 in Fulton County and reported the minority status, 56 of such loans (nearly 84%) were originated within Fulton County's highest HFR census tracts.  While 49 (about 88%) of such loans had been originated to minority borrowers, these 49 loans constituted over about 96% of all 51 minority status

235

reported loans made to minorities that Bank of America funded, purchased, or otherwise acquired in Fulton County during 2013. This further reflects that to a certain -- albeit lesser – degree, Defendants' discriminatory lending practices continue to this very day in Fulton County.

487. This empirical loan data – reported by the lenders themselves – further evidences their respective targeting, reverse redlining, and disproportionate marketing penetration of mortgage loans into minority communities in Fulton County because they originated, purchased, or acquired substantially more mortgage loans to minorities and such loans were concentrated in Fulton County's highest HFR census tracts, which census tracts have higher concentrations of minority homeowners. This empirical data also supports the causation of increased foreclosures in Fulton County's higher minority areas resulting from Defendants' marketing, underwriting, and compensation policies and practices that were designed to, and in fact did, generate disproportionate numbers and percentages of non-prime mortgage loans to minorities in Fulton County and concentrated those loans in Fulton's highest HFR areas. Defendants continue to service and foreclose on many such loans as they default.

### 3. **Defendants' Discrimination is Evidenced by Their Foreclosure Activity**

488.   Defendants' discriminatory conduct in Plaintiffs' neighborhoods and communities is further evidenced by the increased foreclosure rates, numbers of foreclosures, and clustering of foreclosures on mortgage loans made to minority borrowers for which Defendants are responsible.

489.   As Plaintiffs allege below, publicly reported foreclosure data reflects the discriminatory treatment of minorities through Defendants' foreclosure activity in Plaintiffs' communities and neighborhoods, evidences that such activity is disproportionately increased for minorities and is concentrated in Plaintiffs' minority communities, and evidences the disparate impact of Defendants' discriminatory mortgage lending and mortgage servicing/foreclosure practices, all as part of Defendants' equity stripping scheme.

490.   In the early 2000s, prior to the boom years of Defendants' predatory and discriminatory non-prime mortgage lending Plaintiffs allege herein, Plaintiffs' historical annual foreclosure rates averaged approximately 1% to 2%, as did national averages.  Plaintiffs had few, if any, of the high foreclosure risk ("HFR") areas alleged in the previous section above where Defendants' lending activity was concentrated through reverse redlining and targeting.

491. Reflective of Defendants' targeting and redlining of minority borrowers for higher risk non-prime mortgage loans – *i.e.*, higher cost and/or

higher leveraged mortgage loans -- immediately following the beginning of the boom years in Defendants' (and other industry participants) discriminatory non-prime mortgage lending, Plaintiffs' communities with the highest percentages of minority borrowers experienced higher initial foreclosure rates on such newly originated mortgage loans. At that time, unemployment levels were low and the economy was growing.

492. For example, in Cobb County, the initial foreclosure rates on loans made from 2004 through 2006 in census tracts with demographics of less than 40% FHA protected minority homeowners jumped from the historical 1% to approximately 8%. However, the average foreclosure rates in census tracts with demographics of 40%-59%, 60%-79% and 80%-100% protected minority homeowners over the same period was 11%, 11% and 13%, respectively, reflecting nearly a 62% increase in foreclosure rates between census tracts with demographics of less than 40% minority homeowners and 80%-100% minority homeowners.

493. In DeKalb County, the initial foreclosure rates from 2004 through 2006 in census tracts with demographics of less than 40% FHA protected minority homeowners increased from the historical 1% to approximately 6%. However, the initial foreclosure rates in census tracts with demographics of 40%-59%, 60%-79%

and 80%-100% protected minority homeowners over the same period was over 9%, 12% and 18%, respectively, reflecting nearly a 300% increase in foreclosure rates between census tracts with demographics of less than 40% FHA protected minority homeowners and 80%-100% FHA protected minority homeowners.

494.   Similarly, in Fulton County, the initial foreclosure rates from 2004 through 2006 in census tracts with demographics of less than 40% FHA protected minority homeowners had jumped from the historical 1% to approximately 7%. However, the initial foreclosure rates in census tracts with demographics of 40%-59%, 60%-79% and 80%-100% protected minority homeowners over the same period was approximately 11%, 13% and 18%, respectively, reflecting nearly a 275% increase in foreclosure rates between census tracts with demographics of less than 40% minority homeowners and 80%-100% minority homeowners.

495.   If Defendants had not targeted minority borrowers for non-prime mortgages, minorities in Plaintiffs' communities (and Plaintiffs' higher minority neighborhoods) would not have suffered significantly greater numbers and percentages of loan defaults and foreclosures on Defendants' mortgage loan products than the percentages of minority homeownership reflected in Plaintiffs' demographic data.

496.   But for Defendants' predatory and discriminatory actions alleged herein, the number and concentration of predatory non-prime mortgage loans and the number and concentration of corresponding defaults, vacancies, and foreclosures experienced by FHA protected minority borrowers in Plaintiffs' communities and neighborhoods would have been far lower and Plaintiffs' alleged injuries would not have occurred to the extent they did occur.

497.   According to Foreclosure-Response.org and the Center for Housing Policy, foreclosure rates in the Atlanta MSA on non-prime mortgage loans peaked at about 21.1% as of September 2011. Similarly, the foreclosure rates on non-prime mortgage loans in many of Plaintiffs' communities with the highest percentages of minority borrowers well exceeded 21%.   These high foreclosure levels relate primarily to foreclosures and defaults on non-prime mortgage loans Defendants (and other industry participants) made in Plaintiffs' neighborhoods and communities, particularly to minority borrowers and particularly in Plaintiffs' higher minority neighborhoods.

498.   Moreover, as the empirical foreclosure data evidences, the mortgage loans Defendants originated to FHA protected minority borrowers in Plaintiffs' communities were more likely to result in delinquency, default, and foreclosure than the loans Defendants made to non-minority borrowers, with

240

disproportionately larger numbers of foreclosures in higher minority neighborhoods/census tracts. This empirical information provides additional direct and *prima facie* evidence of targeting and disparate treatment, as well as the disparate impact, of Defendants' predatory mortgage lending activities in Plaintiffs' communities and neighborhoods. In short, this empirical data further reflects Defendants' policies and patterns of its discriminatory housing practice of foreclosing on homes in minority communities and homes owned by minority borrowers to a far greater extent than it forecloses on homes owned by non-minority borrowers.

499. Plaintiffs can provide a list of the addresses of each of the approximate 19,870 unique foreclosure proceedings Defendants have initiated (on mortgage loans originated on or after January 2000) between January 2006 and mid-September 2014 in Plaintiffs' neighborhoods and communities that are further alleged below. However, Defendants already know which of their loans were made to minorities in Plaintiffs' communities, and know the location of their foreclosures on such loans, because Defendants are required to maintain this information pursuant to HMDA and to conduct their mortgage servicing operations in the ordinary course of their business.

500.   Discovery of Defendants' LAR data and mortgage loan servicing information since January 2000 will enable Plaintiffs to prove the linkage between each of Defendants' discriminatory mortgage loans, the terms of each loan, and Defendants' servicing and foreclosure activities related to each such loan through the entire period.

### a.   Defendants' Foreclosures in Cobb County

501.   According to data from the 2010 Census conducted by the United States Census Bureau, the total percentage of Cobb County housing units owned and occupied by minorities in 2010 was approximately 26%.

502.   Since January 2006 Defendants have initiated foreclosure proceedings on approximately 4,960 unique mortgage loans in Cobb County, at least 2,560 of which are concentrated in Cobb County communities with higher percentages of minority homeowners. Thus, notwithstanding that only 26% of Cobb's housing units are owned and occupied by minority borrowers, Cobb's neighborhoods with demographics of more than 30% minority homeownership sustained more than half of all foreclosures in Cobb County since 2006.

503.   Defendants' foreclosure filing activity in Cobb County from January 29, 2006 to September 12, 2014 is numerically, geographically and

demographically depicted in the following map created by Plaintiff Cobb County's

GIS Department:

REMAINDER OF PAGE INTENTIONALLY BLANK

TO ACCOMMODATE IMAGE



Bank of America/ Countrywide/ Merrill Lynch Foreclosure Filings
in High Minority Census Tracts in Cobb County, Georgia,
Jan 29, 2006 to Sept 12, 2014

Legend

🌲 Bank of America/ Countrywide/ Merrill Lynch Foreclosure Filings

**Percent of Owner-Occupied Housing Units with Minority Householder**

☐ 0 - 30%   ( 2,400 foreclosures, not shown on map )
■ 31 - 50%   ( 1,300 foreclosures )
■ 51 - 70%   ( 1,096 foreclosures )
■ 71 - 90%   ( 123 foreclosures )
■ 91 - 100%  ( 41 foreclosures )

* Percent minority householder mapped by census tract.
Source: U.S. Census Bureau 2010 Census of Population

Date: 11/4/2014

0   3.5   7
Miles

244

504.   Defendants' discriminatory foreclosure practices continue to this very day in Cobb County.   Indeed, of the total 4,960 unique foreclosure filings Defendants have initiated in Cobb County since January 1, 2006, 564 of them have occurred between January 2013 and September 2014.   Of that total, 333 foreclosure filings (over 59%) were initiated in higher minority census tracts as compared to just the 231 foreclosure filings (about 41%) in low minority census tracts.

505.   Defendants' foreclosure filing activity in Cobb County from January 11, 2013 to September 12, 2014 is numerically, geographically and demographically depicted in the following map created by Plaintiff Cobb County's GIS Department:

REMAINDER OF PAGE INTENTIONALLY BLANK

TO ACCOMMODATE IMAGE



**Bank of America/ Countrywide/ Merrill Lynch Foreclosure Filings in High Minority Census Tracts in Cobb County, Georgia, Jan 11, 2013 to Sept 12, 2014**

Date: 11/4/2014

0    3.5    7
Miles

Legend

🟢  Bank of America/ Countrywide/ Merrill Lynch Foreclosure Filings

**Percent of Owner-Occupied Housing Units with Minority Householder**

☐  0 - 30%    ( 231 foreclosures, not shown on map )
■  31 - 50%    ( 153 foreclosures )
■  51 - 70%    ( 166 foreclosures )
■  71 - 90%    ( 12 foreclosures )
■  91 - 100%    ( 2 foreclosures )

* Percent minority householder mapped by census tract.
Source: U.S. Census Bureau 2010 Census of Population

Prepared by:
Cobb County
Community Development
1150 Powder Springs Street
Suite 400
Marietta, GA 30064

246

### b.  Defendants' Foreclosures in DeKalb County

506.   According to data from the 2010 Census conducted by the United States Census Bureau, the total percentage of DeKalb County housing units owned and occupied by minorities in 2010 was approximately 59%.

507.   Since January 2006 Defendants have initiated foreclosure proceedings on approximately 6,558 unique mortgage loans in DeKalb County, at least 5,683 of which are concentrated in DeKalb County communities with higher percentages of minority homeowners. Thus, notwithstanding that only 59% of DeKalb's housing units are owned and occupied by minority borrowers, DeKalb's neighborhoods with demographics of more than 30% minority homeownership sustained approximately 87% of all foreclosures in DeKalb County since 2006.

508. Moreover, Defendants initiated a disproportionate number of foreclosure proceedings in DeKalb County in those census tracts with higher populations of FHA protected borrowers compared to census tracts with lower populations of minority borrowers. For example, from the period March 2006 to mid-September 2014, Defendants initiated at least 4,829 unique foreclosure filings (approximately 74% of the total filings) in DeKalb County high minority census tracts (i.e., where at least 71% of owner-occupied housing units had minority household members).   In contrast, Defendants initiated only about 875 unique

foreclosure proceedings in low minority DeKalb County census tracts (*i.e.*, where 30% or less of the owner-occupied housing units contained minority household members).

509. Defendants' foreclosure filing activity in DeKalb County from March 10, 2006 to September 10, 2014 is numerically, geographically and demographically depicted in the following map created by Plaintiff DeKalb County's GIS Department:

REMAINDER OF PAGE INTENTIONALLY BLANK

TO ACCOMMODATE IMAGE



249

510.   Defendants' discriminatory foreclosure practices continue to this very day in DeKalb County.   Indeed, of the total 6,558 unique foreclosure filings Defendants have initiated in DeKalb County since January 1, 2006, 2,141 of them have occurred between January 2013 and September 2014.   Of that total, 1,875 foreclosure filings (over 86%) were initiated in higher minority census tracts (i.e., 31% or more minority owner-occupied housing units) as compared to just the 266 foreclosure filings (about 14%) in low minority census tracts (*i.e.*, 30% or less minority owner-occupied housing units).   In stark contrast, during this recent time period Defendants have initiated 1,654 foreclosure filings in DeKalb County high minority census tracts (*i.e.*, 71% or more minority owner-occupied housing units). The largest number of foreclosures Defendants initiated in DeKalb County during this period have occurred in the highest minority census tracts (*i.e.*, 91% or more minority owner-occupied housing units), where Defendants have initiated 1,152 unique foreclosures.

511.   Defendants' foreclosure filing activity in DeKalb County from January 1, 2012 to September 10, 2014 is numerically, geographically and demographically depicted in the following map created by Plaintiff DeKalb County's GIS Department:



c.      **Defendants' Foreclosures in Fulton County**

512.   According to data from the 2010 Census conducted by the United States Census Bureau, the total percentage of Fulton County housing units owned and occupied by minorities in 2010 was approximately 43%.

513.   Since January 2006 Defendants have initiated foreclosure proceedings on approximately 8,355 unique mortgage loans in Fulton County, at least 6,062 of which are concentrated in Fulton County communities with higher percentages of minority homeowners. Thus, notwithstanding that only 43% of Fulton's housing units are owned and occupied by minority borrowers, Fulton's neighborhoods with demographics of more than 30% minority homeownership sustained approximately 73% of all foreclosures in Fulton County since 2006.

514.   Moreover, Defendants initiated a disproportionate number of foreclosure proceedings in Fulton County in those census tracts with higher populations of FHA protected borrowers compared to census tracts with lower populations of minority borrowers. For example, from the period January 2006 to mid-September 2014, Defendants initiated at least 4,753 unique foreclosure filings (approximately 57% of the total filings) in Fulton County high minority census tracts (*i.e.*, where at least 71% of owner-occupied housing units had minority household members).   In contrast, Defendants initiated only about 2,293 unique

foreclosure proceedings in low minority Fulton County census tracts (*i.e.*, where 30% or less of the owner-occupied housing units contained minority household members).

515. Defendants' foreclosure filing activity in Fulton County from 2006 to 2014 is numerically, geographically and demographically depicted in the following map created by Plaintiff Fulton County's GIS Department:

REMAINDER OF PAGE INTENTIONALLY BLANK

TO ACCOMMODATE IMAGE



**Bank of America/Countrywide/Merrill Lynch Foreclosure Filings in High Minority Census Tracts in Fulton County, Georgia, 2006 to 2014**

Legend

Bank of America/Countrywide/Merrill Lynch Foreclosure Filing

Percent of Owner-Occupied Housing Units with Minority Householder

- 0 - 30%    (2293 foreclosures, not shown on map)
- 31 - 50%   (957 foreclosures)
- 51 - 70%   (352 foreclosures)
- 71 - 90%   (1852 foreclosures)
- 91 - 100%  (2901 foreclosures)

* Percent minority householder mapped by census tract.
Source: U.S. Census Bureau 2010 Census of Population

Date: 10/30/2014

516.   Defendants' discriminatory foreclosure practices continue to this very day in Fulton County.   Indeed, of the total 8,355 unique foreclosure filings Defendants have initiated in Fulton County since January 1, 2006, 2,587 of them have occurred between January 2013 and September 2014.   Of that total, 1,959 foreclosure filings (nearly 76%) were initiated in higher minority census tracts (*i.e.*, 31% or more minority owner-occupied housing units) as compared to just the 628 foreclosure filings (about 24%) in low minority census tracts (*i.e.*, 30% or less minority owner-occupied housing units).   In stark contrast, during this recent time period Defendants have initiated 1,608 foreclosure filings in Fulton County high minority census tracts (*i.e.*, 71% or more minority owner-occupied housing units). The largest number of foreclosures Defendants initiated in Fulton County during this period have occurred in the highest minority census tracts (*i.e.*, 91% or more minority owner-occupied housing units), where Defendants have initiated 936 unique foreclosures.

517.   Defendants' foreclosure filing activity in Fulton County from 2012 to 2014 is numerically, geographically and demographically depicted in the following map created by Plaintiff Fulton County's GIS Department:

REMAINDER OF PAGE INTENTIONALLY BLANK

TO ACCOMMODATE IMAGE

255



Bank of America/Countrywide/Merrill Lynch
Foreclosure Filings in High Minority
Census Tracts in Fulton County, Georgia,
2012 to 2014

Legend

⚑   Bank of America/Countrywide/Merrill Lynch  Foreclosure Filing

**Percent of Owner-Occupied Housing Units with Minority Householder**

☐ 0 - 30%      (628 foreclosures, not shown on map)
■ 31 - 50%   (274 foreclosures)
■ 51 - 70%   (77 foreclosures)
■ 71 - 90%   (672 foreclosures)
■ 91 - 100%  (936 foreclosures)

* Percent minority householder mapped by census tract.
Source: U.S. Census Bureau 2010 Census of Population

Date: 10/30/2014

**G.**      **The Full Extent of Defendants' Discriminatory Housing Practices are Concealed Through Defendants' Underreporting of Minority Status in HMDA Data, Manipulation of Reporting Entities, and Through MERS**

518.   Defendants have underreported or misreported race and ethnicity HMDA data on the mortgage loans they originated, funded, purchased or otherwise acquired and have concealed their lending and foreclosure activity through Mortgage Electronic Registration Systems, Inc. ("MERS").   This skews the discriminatory effect of Defendants' predatory and discriminatory lending and servicing practices at issue here in Defendants' favor.   Thus, only discovery of Defendants' entire loan level LAR data and mortgage servicing data will reveal the full extent of Defendants' discriminatory housing practices at issue here and the full extent of Plaintiffs' resulting damages.

519.   First, by not adequately reporting or otherwise manipulating minority borrower race and ethnicity HMDA data on mortgage loan originations, fundings, purchases, and acquisitions, Defendants have skewed such data in their favor. This has the effect of concealing the full extent of Defendants' discriminatory lending patterns from their banking regulators, and further necessitates discovery of all of Defendants' LAR data and mortgage servicing and foreclosure data they created or

maintain in connection with their mortgage lending, securitization, and servicing activities at issue here.

520.  For example, between 2000 through 2013, Bank of America, N.A. originated, funded, purchased, or otherwise acquired a total of 4,887 mortgage loans in Cobb County for which it did not report borrower race and ethnicity data, 4,208 (over 86%) of which were made in Cobb County's highest HFR areas. Bank of America originated, funded, purchased, or otherwise acquired a total of at least 4,576 mortgage loans in DeKalb County for which it did not report race and ethnicity data. 2,601 (nearly 57%) of those loans were made in the highest HFR census tracts in DeKalb County. In Fulton County, Bank of America originated, funded, purchased, or otherwise acquired a total of at least 8,575 mortgage loans for which it did not report borrower race and ethnicity data. 5,681 (over 66%) of those loans were made in the highest HFR census tracts in Fulton County.

521.  Bank of America's underreporting of borrower ethnicity and race information on the mortgage loans it originated, funded, purchased, or otherwise acquired in Plaintiffs' communities reflects Bank of America's concealment or other manipulation of the true levels of its discriminatory non-prime mortgage lending to minorities from its primary bank regulators.  It also reflects Bank of America's concealment or other manipulation of borrower ethnicity and race

258

information from its HMDA reporting that causes such data to falsely skew in favor of Bank of America.

522.  During the same period of 2000 to 2013, Countrywide originated, funded, purchased, or otherwise acquired 6,634 loans in Cobb County that it did not report borrower race and ethnicity data.  5,914 (over 89%) of those loans were made in Cobb's highest HFR areas, which also correspond to the census tracts with the highest rate of minority homeownership. Countrywide originated, funded, purchased, or otherwise acquired a total of at least 6,164 mortgage loans in DeKalb County for which it did not report borrower race and ethnicity data.  4,419 (nearly 72%) of those loans were made in the highest HFR census tracts in DeKalb County, which also correspond to the census tracts with the highest rate of minority homeownership.   In Fulton County, Countrywide originated, funded, purchased, or otherwise acquired at least another 9,457 loans for which it did not report such data.  7,369 (nearly 78%) of those loans were made in the highest HFR census tracts in Fulton County, which also correspond to the census tracts with the highest rate of minority homeownership.

523.  In each of the Plaintiff Counties, Countrywide's mortgage loans with unreported minority status were primarily concentrated in its non-regulated banking entity, "Countrywide Home Loans" notwithstanding that Countrywide

reported loan originations and acquired mortgage loans through multiple reporting entities with similar and dissimilar names.   Moreover, none of the loans reported as purchased or otherwise acquired by Countrywide Bank, N.A., a regulated banking entity, reported minority borrower status in any of the Plaintiff Counties over the entire period.

524.   This reflects Countrywide's movement of such loans throughout its organization to reduce or otherwise manipulate the levels of non-prime discriminatory minority loans from its primary regulated banking entities, thereby concealing or otherwise manipulating such loans from regulatory oversight. It also reflects Countrywide's concealment or other manipulation of borrower ethnicity and race information from its HMDA reporting that causes such data to falsely skew in favor of Countrywide.

525.   Similarly, between 2000 and 2013 Merrill Lynch Bank USA, Merrill Lynch Credit Corp., and Merrill Lynch Mortgage Lending originated, funded, purchased, or otherwise acquired a total of at least 1,342 mortgage loans in Cobb County, 1,268 of which (over 94%) it did not report race and ethnicity data. 1,170 of those loans (over 92%) were made in the highest HFR census tracts in Cobb County.  In DeKalb County these Merrill entities collectively originated, funded, purchased, or otherwise acquired a total of at least another 1,586 mortgage loans

over the same period.  For 1,482 (over 93%) of those loans, Merrill did not report race and ethnicity data, while 1,212 of them (nearly 82%) were made in the highest HFR census tracts in DeKalb County.   Merrill entities also originated, funded, purchased, or otherwise acquired a total of at least 2,156 mortgage loans in Fulton County over this period but did report the race and ethnicity data for 1,922 of those loans (over 89%).  1,585 of these unreported minority status loans (over 82%) were made in Fulton County's highest HFR areas.   Moreover, in each of the Plaintiff Counties, Merrill's originated, funded, purchased, or otherwise acquired mortgage loans with unreported minority status were primarily concentrated in and reported by "Merrill Lynch Credit Corp" and "Merrill Lynch Mortgage Lending," both non-regulated banking entities.

526.   The foregoing reflects the movement of mortgage loans throughout Merrill's organization to reduce or otherwise manipulate the levels of non-prime discriminatory minority loans from these Defendants' regulated banking entities, thereby concealing such loans from regulatory oversight.   It also reflects these Defendants' concealment and manipulation of borrower ethnicity and race information from their HMDA reporting that causes such data to falsely skew in favor of such Defendants.

527. Defendants also have used the MERS system to conceal their discriminatory activities.

528. Defendant Bank of America was one of the founding members and shareholders of MERSCORP Holdings, Inc., the parent company of Mortgage Electronic Registration Systems, Inc. which operates the MERS System.

529. As such, Defendant Bank of America helped fund the development and initial start-up of MERS to act as a nominee for mortgage lenders and lenders' successors and assigns (*e.g.*, securitization trusts) to originate, track, assign, and/or trade mortgage loans privately, through a confidential computer registry (containing over 70 million mortgage loan records) thereby enabling mortgage lenders to circumvent public lien assignment recording processes.

530. Defendant Bank of America, N.A. is a current member of MERS. Bank of America, N.A.'s Managing Director and Servicing Portfolio Strategy Executive, Lawrence P. Washington, serves as a board member of MERSCORP Holdings, Inc.  In addition, Countrywide Bank, FSB, and several Merrill Lynch entities were members of MERS, prior to their merger into Bank of America, N.A.

531. MERS previously publicly described itself on its website as "an innovative process that simplifies the way mortgage ownership and servicing rights are originated, sold and tracked. Created by the real estate finance industry, MERS

eliminates the need to prepare and record assignments when trading residential and commercial mortgage loans." MERS has touted that its operations are "a national electronic registry system that tracts the changes in servicing rights and beneficial ownership interests in mortgage loans that are registered on the registry."

532.   According to MERS' prior public website disclosures, it also provides money savings to lenders by eliminating assignment costs, document correction costs, and tracking fees - "Once the loan is assigned to MERS . . . tracking servicing and beneficial rights can occur electronically for all future transfers. The need for any additional assignments after this point will be eliminated unless the servicing rights are sold to a non-MERS member."   MERS has saved industry participants – and denied public recording systems operated by County and municipal governments such as Plaintiffs here – a total of over $2 billion in public recording fees.

533.   MERS obscures the extent of Defendants' mortgage loan origination, ownership, assignment, securitization, and servicing activities.   Plaintiffs face extreme difficulty in determining ownership interests in vacant or abandoned properties that have not yet been foreclosed upon to cure building code deficiencies, ensure compliance with building codes, obtain unpaid taxes and/or utility bills, and/or determine the ownership or lien holders to enable *in rem* or tax

foreclosure sales with regard to loans Defendants originated, purchased, or acquired that were originally closed in the name of MERS or subsequently assigned to MERS.

534.   Because Plaintiffs do not have access to MERS there was virtually no way for Plaintiffs to identify parties – *e.g.*, mortgage note holders or securitization trustees – legally and financially obligated to pay the costs of maintaining abandoned or vacant properties in the MERS System within their jurisdiction.  As such, MERS' admittedly deliberate circumvention of the public recording process has damaged, and continues to damage, Plaintiffs including by denying Plaintiffs the revenue from recording fees and related taxes that Plaintiffs otherwise would have received had the various assignments and other changes in title been properly recorded.

535.   More importantly, however, by circumventing public lien holder recording processes by design, MERS obscured Defendants' mortgage foreclosure processes, making it extremely difficult for Plaintiffs – and other interested parties – to identify the predatory lenders "whose practices led to the high foreclosure rates that have blighted some neighborhoods."  Mike McIntire, *Tracking Loans Through a Firm That Holds Millions*, <u>N.Y. Times</u> (April 24, 2009).  It effectively

"removes transparency over what's happening to these mortgage obligations and sows confusion, which can only benefit the banks." *Id.*

536.  Mortgage loans foreclosed in the name of MERS, as agent or assignee, may conceal the identity of the loan originator, assignees, and/or loan servicer, making it extremely difficult for Plaintiffs to determine the party responsible for originating or servicing a predatory or discriminatory mortgage loan that has resulted in foreclosure.

537.  The majority of foreclosures (estimated at 60% nationwide) have been conducted in the name of MERS as designee, assignee, or title holder of Defendants as originator or securitization trustee making it virtually impossible to determine from publicly available data which Defendants hold all the mortgages to, are in possession of, and/or are or may be foreclosing on all the properties in Plaintiffs' communities and neighborhoods, further obfuscating the predatory and discriminatory lending practices of Defendants and other industry participants.

538.  Complicating the issue, it has been widely reported, investigated, litigated, and publicly acknowledged that the Defendants' and MERS' electronic mortgage lien and assignment records contain errors.  It also has been widely reported, investigated, litigated, and publicly acknowledged that this has been

exacerbated by and/or led to Defendants' "robosigning" and other predatory mortgage servicing and foreclosure practices.

539.   Finally, Defendants also used their bank holding company corporate structure to conceal their discriminatory lending practices by shifting loans and loan applications between their mortgage lending operations at their regulated banking entities and their non-regulated mortgage lending subsidiaries and affiliates.

540.   The only realistically feasible way to determine precisely all the minority owned properties possessed by, in the control of, or foreclosed upon at the direction, or for the benefit, of Defendants, is through electronic discovery of Defendants' LAR and mortgage servicing and foreclosure data that Defendants specifically collect, track, and utilize for their HMDA reporting obligations and their operational activities.  This discovery is necessary to determine the full extent of the Defendants' discriminatory conduct Plaintiffs allege, including through Defendants' continuing servicing of, and foreclosures on, each such non-prime mortgage loan made on a discriminatory basis.

## VI.   DEFENDANTS' PREDATORY & DISCRIMINATORY MORTGAGE LENDING, SERVICING AND FORECLOSURE PRACTICES HAVE HARMED PLAINTIFFS

541.   Defendants' discriminatory housing practices of equity stripping – conducted through Defendants' interrelated predatory and discriminatory mortgage lending, servicing, and foreclosure activities - have seriously harmed Plaintiffs' communities and neighborhoods by effectively diluting - or completely eliminating - the equity of minority borrowers' homes.  This has placed those borrowers in far greater jeopardy of loan default and foreclosure, has reduced monies available for home upkeep and maintenance, and has dramatically increased the numbers and rates of home vacancies and foreclosures that Plaintiffs' communities and neighborhoods are currently experiencing (and will continue to experience into the future).

542.   As Plaintiffs further allege below, this has caused and will continue to cause both extensive non-monetary harm, including an increasing segregative effect on Plaintiffs' communities and neighborhoods where Defendants have concentrated their equity stripping activities, and financial damages to Plaintiffs. Indeed, Brian Moynihan, CEO of Bank of America, admitted in his testimony to the FCIC:  "Over the course of the [subprime] crisis, we, as an industry, caused a lot of damage.  Never has it been clearer how poor business judgments we have made have affected Main Street."

543. Home foreclosures disproportionately occur in predominantly minority neighborhoods. *See, e.g.*, Juliana Barbassa, "Report: Minorities Hit By Foreclosures," The Associated Press (March 6, 2008), available at http://www3.nd.edu/~jwarlick/documents/MinoritiesHitbyForeclosures.pdf. The concentration and harmful impact of such foreclosures is increased in highly segregated neighborhoods and communities, such as those in Cobb, DeKalb and Fulton Counties. *See, e.g.,* Written Testimony of South Suburban Housing Center, before The National Commission on Fair Housing and Equal Opportunity Hearing, "Still Separate and Unequal: The State of Fair Housing in America," at 5 (July 15, 2008), available at http://www.prrac.org/projects/fair_housing_commission/ chicago/petruszak.pdf. As reflected in the empirical data and allegations above, defaults and foreclosures on mortgage loans at issue in this complaint for which Defendants are responsible have occurred to a greater extent in Plaintiffs' higher minority communities and neighborhoods than compared to Plaintiffs' lower and non-minority communities and neighborhoods.

544. As alleged above, Defendants discriminatorily originated, or funded, purchased, or otherwise acquired predatory, higher cost and/or higher leveraged, non-prime mortgage loans on a discriminatory basis in Plaintiffs' communities and neighborhoods, and continue to service, refinance and/or foreclosure on such loans

on a predatory and/or discriminatory basis.  Thus, the loan default, home vacancy, and foreclosure rates in Plaintiffs' communities with increased ethnic and racial minorities are greater than in comparable white communities.  And, because single African American women generally received a greater share of such loans than male borrowers, the loan default, home vacancy, and foreclosure rates in Plaintiffs' communities is particularly high among female African American borrowers of Defendants' predatory mortgage loan products.

545.  Minority neighborhoods suffer severe deleterious effects from increased foreclosures. A Woodstock Institute Study has demonstrated that "foreclosures, particularly in lower-income neighborhoods, can lead to vacant, boarded-up, or abandoned properties. These properties, in turn, contribute to the stock of 'physical disorder' in a community that can create a haven for criminal activity, discourage social capital formation, and lead to further disinvestment…and lower property values for existing residential homeowners." Dan Immergluck & Geoff Smith, There Goes the Neighborhood: The Effect of Single-Family Mortgage Foreclosures on Property Values, Woodstock Institute Study (June 2005) available at http://www.nw.org/foreclosuresolutions/ reports/documents/TGTN_Report.pdf.

546.   Plaintiffs, which are the embodiment of their respective residents, neighborhoods, and communities, suffer from the segregative effects of the increased foreclosures and vacant properties, securing predatory and discriminatory mortgage loans for which Defendants are responsible, through increased blight, urban decay, and the perpetuation and increase in racial slum formation including from "white flight," all of which is concentrated in Plaintiffs' neighborhoods and communities with higher percentages of minority homeowners.

547.   By stripping away equity and harming borrower finances through increased mortgage payments and costs, Defendants' unfair, higher cost, and/or higher leveraged mortgage loans themselves—even if they do not result in a loan default and foreclosure—reduce or limit each impacted minority borrower's ability to use and enjoy their housing, accumulate wealth related to their housing, and deplete or eliminate borrower savings, thereby restricting borrowers' ability to maintain or improve their property (thereby contributing to neighborhood blight) and/or increasing the threat of default and foreclosure.

548.   Plaintiffs also suffer from the combined racial and gender segregative effect resulting from an increased number of defaults and foreclosures on "high cost" and other non-prime mortgage loans Defendants targeted on female borrowers, particularly African American female borrowers, many of which also

270

are concentrated in Plaintiffs' high minority neighborhoods. Plaintiffs have a legitimate interest under the FHA in promoting fair and equal housing opportunities on both a racial and a gender neutral basis in its communities.

549. Plaintiffs are harmed even if Defendants' non-prime mortgage loans don't result in foreclosure. Defendants' equity stripping mortgage loans increase minority borrower borrowing costs, reduce or limit impacted minority borrower's ability to accumulate wealth from the equity in their homes, deplete or eliminate borrower savings, and thereby restrict or reduce an impacted borrower's ability or desire to maintain and/or improve their property. This further leads to deterioration of such property and surrounding property values and results in increased vacancy rates as borrowers with negative home equity are more likely simply to abandon their homes.

550. As a result, injuries to Plaintiffs will continue to occur long after the last wrongful act in the Defendants' equity stripping practice, which has not yet occurred – the inevitable, if not intended, vacancy and/or foreclosure on minority borrowers' homes secured by a predatory, higher cost, and/or higher leveraged, non-prime mortgage loan product Defendants sold to minority borrowers in Plaintiffs' neighborhoods and communities and which loans Defendants continue to service and foreclose upon.

271

551. Defendants' illegal discriminatory conduct also has caused substantial, measurable damages to Plaintiffs' communities and neighborhoods including, but not limited to:

- out-of pocket costs in providing governmental services (*e.g.* necessary building code inspections and repairs, police and fire protection, and significant administrative, court and legal costs) related to various affected properties and neighborhoods;

- reduced property values on foreclosed properties and surrounding properties;

- lost property tax revenue on vacant or abandoned properties, and on foreclosed and surrounding properties as a result of lower home values;

- lost utility and other tax revenues;

- lost recording fees as a result of the use of MERS to avoid such fees; and

- various other injuries resulting from the deterioration and blight to the hardest hit minority neighborhoods and communities.

552.  Such injuries foreseeably arise from both the effect of the foreclosure process itself (lower home values and tax revenues) and from vacant or abandoned properties that either already have been foreclosed upon or are facing foreclosure (i.e., the shadow inventory of foreclosures) as a result of borrower defaults.  Not surprisingly, Plaintiffs' communities and neighborhoods with relatively higher FHA protected minority borrowers have disproportionately suffered the brunt of this injury.  The harm has spread, however, throughout Plaintiffs' communities.

553.  As Plaintiffs allege herein, Defendants disproportionately made, or funded and purchased, predatory mortgage loans on a discriminatory basis in Plaintiffs' communities and neighborhoods, and continue to service, refinance, and/or foreclose on such loans on a predatory and discriminatory basis.  Thus, the loan default, home vacancy, and foreclosure rates in Plaintiffs' communities with increased ethnic and racial minorities are greater than in comparable white communities.

554.  Relying on data supplied by the Mortgage Bankers Association – a mortgage industry business association - the GAO found in November 2011 that high foreclosure rates correlate to increased numbers of home vacancies.  *Vacant Properties, Growing Number Increases Communities' Costs and Challenges*, Report to the Ranking Member, Subcommittee on Regulatory Affairs, Stimulus Oversight, and Government Spending, Committee on Oversight and Government Reform, House of Representatives, GAO-12-34 (November 2011).  For example, the GAO found that Georgia experienced over an 87% increase in non-seasonal home vacancies between 2000 and 2010, and a 125% increase in other vacant housing units over the same period.  In comparison, on a nationwide basis, non-season vacancies over the same period increased only 51% and other vacancies increased only 59%.

273

555.   Indeed, DeKalb County's overall vacancy rate increased from 4.60% in 2000 to 10.9% in 2010, peaking at 11.70% in 2007.  Similarly, Cobb County's overall vacancy rate has steadily increased from 4.20% in 2000 to 10.6% in 2010.  Fulton County's vacancy rate has similarly increased from 7.9% in 2000 to 15.6% in 2010.

556.   The GAO also found in November 2011 that vacant and/or foreclosed properties have reduced prices of nearby homes between $8,600 to $17,000 per property, specifically citing a study estimating that "one foreclosed, demolished property may have reduced the values of 13 surrounding properties by $17,000 per property compared with the median house price . . . ."  GAO 12-34, at 45.

557.   Plaintiffs have incurred out-of-pocket costs with respect to specific vacant foreclosure and pre-foreclosure properties secured by predatory, non-prime mortgage loans originated and/or acquired by Defendants on a discriminatory basis because, among other reasons, Plaintiffs have been required to provide a variety of governmental services relating to such properties that would not have been necessary if such properties were occupied.

558.  In addition, Plaintiffs have been required to shift their already overburdened personnel and operating resources (due to losses of property tax revenue also caused by Defendants' actions) to address problems created by the

vacancies and foreclosures on properties that have secured Defendants' predatory and discriminatory loans. Defendants' predatory servicing and foreclosure activity occurring on a discriminatorily disproportionate level in Plaintiffs' minority communities has further exacerbated this.

559. For example Plaintiffs have sustained forseeable financial injuries for providing governmental services to such vacant homes that have not been cared for, have been vandalized, and/or have provided a location for illegal activities, all leading to violations of Plaintiffs' housing code, including the creation of physically unsafe structures that threaten public safety. This, in turn, has led to Plaintiffs' housing, code enforcement, and law departments expending substantial personnel time and out-of-pocket costs to inspect, investigate, and respond to violations at such vacant properties, including boarding up or tearing down vacant properties that are open to casual entry; making structural repairs to stabilize vacant properties that threaten public safety or to address public health concerns; and/or taking legal action to investigate and prosecute building code violations at the vacant properties.

560. The task of Plaintiffs' Law Departments in identifying responsible parties to take legal action have been made all the more difficult, causing greater financial injury to Plaintiffs, because of the difficulty in determining the identity of

the correct owner of such non-prime mortgage loans. This is because Defendants (including their transferees, assignees, agents, and/or trustees of the pools of loans that issued MBS secured by such non-prime loans) failed to record transfers and assignments of such loans with Plaintiffs' lien recording systems.

561.  As another example, police and fire departments within Plaintiffs' communities have had to send personnel and equipment to such vacant properties to respond to public health and safety threats that arise at these properties because the properties are vacant.

562.  Using foreclosure property addresses, and Defendants' loan application registry, loan servicing and loan default and foreclosure information obtained from Defendants in discovery, Plaintiffs can isolate out-of-pocket and lost revenue damages attributable to each individual property secured by a higher cost, and/or higher leveraged, non-prime mortgage loan Defendants made on the discriminatory bases alleged herein.

563.  A primary source of Plaintiffs' revenue is taxes on real property, particularly residential real estate. Such tax revenue depends on the valuation of the residential real estate in Plaintiffs' jurisdiction. For example, O.C.G.A. 48-5-2(3)(B)(iv) (fair market value of real property) requires county tax assessors to consider bank sales (*i.e.*, foreclosure sales) when determining the fair market value

of real property for determining the tax digests. Thus, the fair market value of the residential real estate in Plaintiffs' jurisdiction has been adversely impacted by home vacancies and foreclosures on predatory and discriminatory mortgage loans, particularly including those loans originated, funded, and/or or purchased by Defendants at issue here.

564.   As a result of the predatory loan terms, higher loan costs, and reduced home equity resulting from Defendants' discriminatory policies and practices, Plaintiffs' communities and neighborhoods with higher percentages of FHA protected minority borrowers have foreseeably experienced a greater rate of mortgage delinquencies, defaults, and home foreclosures on the loans Defendants were responsible for.   This in turn caused a foreseeable downward spiral of additional mortgage delinquencies, defaults, and home foreclosures in Plaintiffs' communities and neighborhoods both with higher percentages of FHA protected minority borrowers and in surrounding areas that have lower percentages of FHA protected minority borrowers.

565.   As a primary result of Defendants' (and other industry participants') predatory lending and discriminatory equity stripping activities, Plaintiffs' residential real property tax digests – representing the value of all residential real property subject to tax – have declined by a total of approximately $18 billion from

their high points in 2008/2009.  For example, DeKalb County's real property tax digest has declined $6.4 billion between its high point in 2009 of $23.6 billion and its 2012 value of $17.2 billion.  Cobb County's real property tax digest has declined $4.8 billion between its high point in 2008 of approximately $30.9 billion and its 2012 value of $26.1 billion.  Fulton County's real property tax digest has declined $6.8 billion between its high point in 2009 of $50.1 billion and its approximate 2012 value of $43.3 billion.

566.  Much of this decline is due to the decline in the value of the residential real estate located in Plaintiffs' communities as a result of the foreclosure crisis Defendants (and other industry participants) caused.  The declines in Plaintiffs' tax digests reflect a corresponding reduction in Plaintiffs' tax receipts and budgets and related reductions in Plaintiffs' ability to provide critical services within Plaintiffs' communities or an offsetting tax increase incurred throughout Plaintiffs' communities at large.

567.  Routinely maintained property tax and other financial data allow precise calculation of the property tax revenues Plaintiffs have lost as a direct and foreseeable result of Defendants' discriminatory equity stripping activities and the resulting property vacancies and foreclosures.

278

568.   Using well-established GPS mapping techniques that locate specific properties within census tracts, property addresses and mortgage lien and foreclosure data, and well-established statistical regression techniques, Plaintiffs' damages attributable to lost property tax revenue (as a result of the drop in home value) on properties surrounding foreclosed properties attributable to Defendants' discriminatory and predatory lending practices also can be calculated.

569.   Defendants are responsible for the percentage of Plaintiffs' damages equal to Defendants' percentage share of predatory, discriminatory mortgage lending and foreclosure activity in both its retail and wholesale operations in Plaintiffs' communities.   That share equates to the number of predatory and discriminatory mortgage loans Defendants are responsible for in Plaintiffs' communities and neighborhoods, and such loans Defendants have foreclosed upon or will foreclose upon in the future.

570.   Plaintiffs also have been injured as a result of the frustration of the various purposes and missions of their departments and authorities that foster equality and opportunity for affordable housing, revitalize neighborhoods, foster economic development and prosperity in the community, and provide support services for its residents at large.  Plaintiffs' authorities and departments also have been injured as a result of having to reallocate their human and financial resources

away from their missions and purposes in order to address the foreclosure and home vacancy crisis that Defendants caused.  For example, Plaintiffs' missions and purposes include promoting and providing for stable, integrated housing, thereby ensuring the economic and social sustainability of their neighborhoods and communities.  This is reflected in Plaintiffs' respective local ordinances, which seek to further the Plaintiffs' purposes and missions by minimizing or eliminating the public nuisance of vacant homes and other buildings that can lead to urban blight, public health and safety issues, and an even greater financial strain on Plaintiffs' local governmental agencies.  Indeed, as recipients of community development grants and other federal funds, Plaintiffs have the affirmative duty to further the interests of fair housing under the FHA.

571.  Plaintiffs further their integrated and sustainable community missions and related local ordinances through a variety of agencies and departments empowered to, among other things:

     **a.**     preserving and expanding the supply of safe, decent, and affordable housing;

     **b.**     fostering the creation of economic opportunities and business development in economically challenged, higher minority, areas;

     **c.**     facilitating infrastructure improvements;

**d.**     promoting fair housing and conducting fair housing planning/administration, housing development, and related services;

**e.**     supporting social services and programs that address the problem of homelessness in efforts to further homeless prevention/intervention;

**f.**     promoting stable, integrated housing and the sustainability of Plaintiffs' neighborhoods and communities through, among other things, demolishing, repairing, or enclosing vacant properties and removing garbage, debris, and other hazards from them; and

**g.**     providing general social services.

572.   In addition, Plaintiffs' respective court systems are autonomous units whose goals and missions include serving Plaintiffs' citizens and the participants within those judicial systems in a timely, efficient, and ethical manner.   These court systems' financial resources greatly depend on allocations from Plaintiffs' budget processes.

573.   Plaintiffs' respective law enforcement departments provide a variety of services to fulfill Plaintiffs' and their respective court systems' missions and purposes, including the efficient and expeditious service of summons and eviction notices, and to provide policing to certain of Plaintiffs' neighborhoods and communities.

574.   Foreseeable injuries directly sustained by Plaintiffs' organizations, and which they would not have sustained but for, Defendants' discriminatory equity stripping scheme, include but are not limited to:

a. ***A drain on Plaintiffs' scarce financial resources***, including increased and additional out-of-pocket costs (including employee compensation) arising from an increase in the demand for, and the Plaintiffs' provision of, its services including: (i) certain mortgage foreclosure, housing and homelessness programs, which assist displaced minority residents who could not maintain payments on predatory and discriminatory mortgage loans for which Defendants are responsible; (ii) code enforcement actions, repair and/or demolition of vacant properties resulting from such borrowers' abandonment or eviction from such properties; (iii) the foreclosure summons and eviction process, particularly resulting from the increased numbers of foreclosures; (iv) policing services in areas where crime rates have increased due to increased home vacancies; (v) the foreclosure process and the enormous increase in foreclosure filings by Defendants that have overburdened Plaintiffs' respective court systems;

b. As a result of their resources being expended for the increased costs alleged in subsection (a) of this paragraph, ***several of Plaintiffs' agencies, departments, and/or autonomous units have been forced to reduce, divert, or forego resources*** necessary to perform the services specific to their purposes and missions, particularly in promoting and providing for stable, integrated housing, including, for example: (i) time and grant money or other financial resources spent counseling, referring, and educating Defendants' mortgage borrowers who have been discriminated against or assisting such borrowers in finding alternative housing and/or trying to resolve their default status, instead of providing these services to other minority residents who have been displaced for reasons unrelated to Defendants' misconduct alleged here; (ii) time and other resources spent cleaning, repairing, securing,

acquiring, or demolishing vacant or abandoned properties secured by Defendants' predatory and discriminatory mortgage loans that Defendants' borrowers could not repay, rather than undertaking such cleaning, repairs, acquisitions, or demolitions to other properties unrelated to Defendants' alleged misconduct; (iii) tremendous law enforcement resources expended to serve summons and evict those borrowers unable to maintain payments on Defendants' discriminatory and predatory mortgage loans, rather than provide policing, security, and public education services to others; (iv) time and financial resources expended in processing Defendants' foreclosure proceedings to the detriment of the expedience and efficiency of other judicial proceedings utilized by Plaintiffs' residents, business, and criminal justice function; and (v) the deprivation of funds that could have been allocated for the promotion of economic development that would help sustain Plaintiffs' minority communities and neighborhoods that were instead diverted for other purposes to address the harms inflicted by Defendants' discriminatory equity stripping scheme as alleged herein;

c. There has been a ***shift and reallocation of Plaintiffs' scarce financial and human staffing resources that have impaired the ability*** of several of Plaintiffs' agencies, departments, and autonomous units ***to perform, adequately and timely, other services*** they are required to perform due to the increase in the demand for services arising from evictions, property vacancies, and foreclosures on residences secured by predatory and discriminatory mortgage loans for which Defendants are responsible, including, for example: (i) Plaintiffs' and their agencies' and departments' efforts to promote and develop stable, integrated neighborhoods, and to investigate and enforce violations of Plaintiffs' housing and credit transaction discrimination ordinances unrelated to the specific activities of the Defendants at issue in this Complaint; (ii) the ability of the court systems' to timely and efficiently administer the judicial system because of the tremendous increase in the number of Defendants' foreclosure filings related to Defendants' specific activities

283

alleged in this Complaint; and (iii) the law enforcement departments' ability to police Plaintiffs' unincorporated areas efficiently and effectively and to serve, efficiently and effectively, summonses and eviction notices unrelated to the specific activities of the Defendants at issue in this Complaint;

**d.** There is a ***frustration of the missions and purposes of Plaintiffs*** alleged in paragraphs 570-573 as a result of Plaintiffs' various efforts to address the effects of Defendants' discriminatory housing and related credit transactions at the expense of Plaintiffs' other efforts needed to fulfill their primary missions and purposes, including those effects alleged in subsections (b) and (c) of this paragraph; and

**e.** There is a ***destabilization of Plaintiffs' minority communities and neighborhoods*** that has robbed Plaintiffs of their racial balance and stability, ***thereby*** further frustrating Plaintiffs' purposes and missions.  This destabilization of Plaintiffs' minority communities has also increased the burden on Plaintiffs, *inter alia*, due to crime and the associated costs of providing necessary services and programs to address it while hindering Plaintiffs' integration goals and damaging their reputations.

575.  Plaintiffs will continue to incur all of the above types of damages on properties that fall into disrepair, will become vacant, and/or will be foreclosed upon that are secured by a non-prime loan for which Defendants are responsible.

576.  Although nationally there have been well over 5 million foreclosures since 2007, the foreclosure cycle relating to the bulk of the non-prime lending activity is far from complete, with millions more foreclosures likely to come nationwide and tens of thousands more foreclosures locally.

577.   In March 2010, CRL estimated that there were still "5.7 million borrowers . . . at imminent risk of foreclosure. . . . African American and Latino borrowers continue to be disproportionately at risk relative to non-Hispanic white borrowers."   D. Gruenstein, Bocian, W. Li and K. Ernst, "*Foreclosures by Race and Ethnicity: The Demographics of a Crisis*" (June 18, 2010) at 10.   CRL's data reflects such disparate impact across all income ranges for African American and Latino borrowers.  *See id.*

578.   Many of these homes are in the "shadow inventory," *i.e.*, are vacant or are occupied with the homeowner seriously delinquent or in default of their mortgage, but foreclosure proceedings have not yet begun.   As reported in a November 2011 *Wall Street Journal* article, "*How Many Homes Are In Trouble?,*" industry estimates of housing units in the shadow inventory range up to 10.3 million (Laurie Goldman, Amherst Securities) with the low end of the range of 1.6 million housing units by CoreLogic (which relies on a lagging indicator of credit score to estimate loan performance and the probability of default).

579.   Nationally, home prices hit a near-decade low in February 2012, declining approximately 23% since 2007.   In Atlanta, home prices fell over 46% from their peak, making the Atlanta area one of the hardest hit regions in the nation.  As of January 2014, however, Standard & Poor's Rating Service estimated

that nationally, the level of shadow inventory had increased slightly, with approximately 51 months of shadow inventory housing supply.   In November 2013, CoreLogic's shadow inventory analysis revealed that at that time, although levels were the lowest since 2008, there remained 1.7 million properties in the shadow inventory, almost half of which were delinquent but had not yet begun foreclosure proceedings.   Additional predatory mortgage loans continue to go into default, and will continue to do so, particularly with respect to adjustable rate mortgage loans.

580.   Consequently, numerous additional delinquencies, defaults, and foreclosures on Defendants' equity stripping non-prime mortgage loans likely will occur and Plaintiffs are entitled to injunctive relief and the recovery of damages that are about to occur from Defendants' actions.   Moreover, injuries to Plaintiffs will continue to occur long after the last wrongful act in the Defendants' discriminatory housing practice—the inevitable, if not intended, vacancy and/or foreclosure on the predatory and discriminatory non-prime mortgage loan products Defendants sold to minority homeowners in Plaintiffs' neighborhoods and communities and which Defendants continue to service and foreclose upon.

581.   Academic studies -- prepared prior to the collapse in U.S. housing prices -- of the financial impact of foreclosures on communities such as Atlanta

reflect up to $34,000 in community wide damages resulting from *each foreclosure*. This includes actual governmental expenditures in the form of additional costs of services (police, fire, code enforcement, trash removal, property boarding up, inspections, etc.), losses of revenue (foregone property taxes and utility taxes), and losses in property value.

582.  Based on recent, related academic studies, the average cost to Plaintiffs for each foreclosure on a loan made by Defendants is approximately $19,000, with additional damages accruing as a result of deteriorated property values and harm to Plaintiffs' communities and neighborhoods. As such, compensatory damages alone in this case may exceed hundreds of millions of dollars given that Defendants are responsible – through direct originations or their wholesale channel of correspondent lenders – for scores of thousands of higher cost, and/or higher leveraged, predatory and discriminatory mortgage loans made within Plaintiffs' communities and neighborhoods to minorities and approximately 60% of those loans already have or can be expected to become delinquent, default, and eventually be foreclosed upon.

583.  Because the total number of discriminatory, equity stripping, non-prime mortgages originated by Defendants, or for which Defendants are otherwise responsible, as well as the number of foreclosures related to such mortgages have

been obfuscated and concealed through the securitization process and the use of MERS, discovery of all of Defendants' loan level data for loans made or purchased in Plaintiffs' neighborhoods and communities may be necessary before a precise damages calculation can be made.

584. Plaintiffs' damages resulting from their out-of pocket costs in providing additional governmental services and their lost tax and utility revenue relating to those properties secured by the predatory and discriminatory non-prime mortgage loans, originated, acquired, and/or serviced by Defendants can be established from Plaintiffs' records once the locations of the homes upon which such loans were made can be identified from discovery of Defendants.

585. Plaintiffs' damages, resulting from lower home values and other injuries resulting from the deterioration and blight to the hardest hit neighborhoods and communities, can be established with statistical evidence and expert testimony.

## VII.   BANK OF AMERICA DEFENDANTS ARE LIABLE FOR, AND SUCCESSORS IN INTEREST TO, COUNTRYWIDE AND MERRILL LYNCH

586. On January 11, 2008, Countrywide merged into Bank of America with Bank of America surviving the merger.

587. In the merger, Bank of America exchanged .1822 shares of its common stock for each outstanding share of Countrywide common stock.

588.   Based upon its merger with Countrywide, as the surviving entity Bank of America is liable for the wrongful acts of Countrywide and its subsidiaries and affiliates as Plaintiffs allege herein.

589.   By virtue of the steps Bank of America took to consummate its acquisition of Countrywide, Bank of America also became the successor-in-interest to Countrywide and its subsidiaries and affiliates as Plaintiffs allege herein.

590.   Countrywide ceased ordinary business on its own account soon after the transaction was completed.

591.   Bank of America assumed the liabilities ordinarily necessary for the uninterrupted continuation of Countrywide's business.

592.   Bank of America assumed Countrywide's liabilities for violations of the Fair Housing Act, Countrywide's predatory and discriminatory lending, and for any other matter relating to Countrywide's and its predecessors' mortgage lending, securitization, and servicing practices.

593.   There has been a continuity of ownership of Countrywide's assets between Bank of America and Countrywide, and Bank of America has continued Countrywide's management, personnel, physical location, and general business operations.

594. Indeed, Bank of America became the successor in interest to Countrywide because Bank of America entered into a series of transactions between July 1, 2008 and November 7, 2008, with Countrywide and its various subsidiaries, which Bank of America then controlled. The transactions were not at arm's length, and gave inadequate consideration to Countrywide. Moreover, the transactions were structured in such a way as to leave Countrywide unable to satisfy its massive contingent liabilities arising from Countrywide's mortgage origination, securitization, and servicing practices.

595. For example, by transferring to itself Countrywide Bank, FSB, along with substantially all of the assets of Countrywide Home Loans, Bank of America left the remaining Countrywide entities with only illiquid assets, no ongoing business, no ability to generate revenue, and insufficient assets to satisfy their contingent liabilities.

596. As a result of numerous mergers between various Countrywide and Bank of America subsidiaries, Bank of America, N.A. also assumed all of the liabilities of Countrywide Bank, NA and BAC Home Loans Servicing, L.P. (f/k/a Countrywide Home Loans Servicing, L.P.).

597. There is no question that Bank of America in fact merged with Countrywide while at the same time ending Countrywide's ongoing operations.

On April 27, 2009, Bank of America rebranded Countrywide Home Loans as "Bank of America Home Loans." Many former Countrywide locations, employees, assets, and business operations now continue under the Bank of America Home Loans brand. On the Form 10-K Bank of America filed with the SEC on February 26, 2010, it listed both Countrywide Capital Markets, LLC and Countrywide Securities Corporation as Bank of America subsidiaries.

598. Countrywide's former website now redirects to the Bank of America website. Bank of America has assumed Countrywide's liabilities, having paid to resolve other litigation arising from misconduct such as predatory lending Countrywide allegedly committed.

599. As is customary in large corporate mergers, at least some of the Countrywide Defendants retained their pre-merger corporate names following their merger with Bank of America. Countrywide's operations are fully consolidated into Bank of America's, however, and the Countrywide entities have lost any independent identity they have maintained following the merger.

600. On April 27, 2009, Bank of America announced in a press release that "[t]he Countrywide brand has been retired." Bank of America announced that it would operate its home loan and mortgage business through a new division named Bank of America Home Loans, which "represents the combined operations of

291

Bank of America's mortgage and home equity business and Countrywide Home Loans." The press release made clear that Bank of America planned to complete its integration of Countrywide Financial into Bank of America "later this year."  The press release explained that Bank of America was in the process of rebranding former Countrywide "locations, account statements, marketing materials and advertising" as Bank of America Home Loans, and stated that "the full systems conversion" to Bank of America Home Loans would occur later in 2009.  "Bank of America Home Loans" is thus a direct continuation of Countrywide's operations, although the Bank of America Defendants have represented that Bank of America Home Loans is a "trade name" rather than a separate legal entity.  It is a Bank of America trade name or brand and thus a part of Bank of America.

601.   Mortgage contracts and legal documents state that BAC Home Loans Servicing, LP is the entity "formerly known as" Countrywide Home Loans Servicing, LP, a Countrywide subsidiary, which clearly shows that BAC Home Loans Servicing, LP is the direct successor to Countrywide Home Loans, because it is a mere continuation of Countrywide's business.

602.   Countrywide ceased filing its own financial statements with the SEC in November 2008, and Bank of America has consolidated and included Countrywide's assets and liabilities in Bank of America's publicly filed financial

statements.  Bank of America also has paid to restructure certain of Countrywide's loans on its behalf.

603.   Former Bank of America CEO Ken Lewis was quoted in a January 23, 2008 New York Times article reporting on the acquisition of Countrywide Financial and its subsidiaries, in which he acknowledged that Bank of America knew of the legal liabilities of Countrywide and its subsidiaries and impliedly accepted them as part of the cost of the acquisition

604.   Bank of America has also reached various settlement agreements in which it has directly taken responsibility for Countrywide's liabilities.   For example, as part of a settlement agreement with certain state attorneys general, Bank of America agreed to forgive up to 30 percent of the outstanding mortgage balances owed by former Countrywide customers. The loans were made before Bank of America acquired Countrywide.  Moreover, Bank of America permitted Countrywide Financial and Countrywide Home Loans to settle another predatory-lending lawsuit brought by state attorneys general and agree to modify up to 390,000 Countrywide loans, an agreement valued at up to $8.4 billion.

605.   During its acquisition of Countrywide, Bank of America performed due diligence on Countrywide, which informed Bank of America as to Countrywide's conduct Plaintiffs allege herein.  In addition, Bank of America and

Countrywide had longstanding business relationships and numerous transactions relating to both entities' non-prime mortgage lending, securitization and servicing activities.  Thus, Bank of America acquired Countrywide (including its assets and liabilities) with full knowledge of Countrywide's discriminatory housing practices that Plaintiffs allege here.

606.  Bank of America continues to service the predatory and discriminatory mortgage loans that Countrywide made, thereby further continuing Countrywide's misconduct alleged herein.

607.  Moreover, addressing investor demands for refunds on faulty loans Countrywide sold, Moynihan stated: "There's a lot of people out there with a lot of thoughts about how we should solve this, but at the end of the day, we'll pay for the things that Countrywide did."  And, in a *New York Times* article published in December 2010, Moynihan, speaking about Countrywide, again confirmed: "Our company bought it and we'll stand up; we'll clean it up."

608.  Based on these facts, the Supreme Court of the State of New York in *MBIA Ins. Corp. v. Countrywide Home Loans, et al.*, Index No. 602825/08, held that MBIA sufficiently alleged a de facto merger "in which Bank of America intended to absorb and continue the operation of Countrywide." *Id.*, Order on Motion to Dismiss, at 15 (Apr. 29, 2010).

294

609.   On or about December 31, 2008, Merrill Lynch merged into Bank of America with Bank of America surviving the merger.

610.   In the merger, Bank of America exchanged .8595 shares of its common stock for each outstanding share of Merrill Lynch common stock.

611.   Based upon its merger with Merrill Lynch, as the surviving entity Bank of America is liable for the wrongful acts of Merrill Lynch and its subsidiaries and affiliates as alleged herein, including First Franklin Financial (and its affiliates), which Merrill Lynch had previously acquired.

612.   By virtue of the steps taken by Bank of America to complete its acquisition of Merrill Lynch, Bank of America also became the successor-in-interest to Merrill Lynch and its subsidiaries and affiliates alleged herein.

613.   Merrill Lynch ceased ordinary business on its own account soon after the transaction was consummated.

614.   Bank of America assumed the liabilities ordinarily necessary for the uninterrupted continuation of Merrill Lynch's business.

615.   Bank of America assumed Merrill Lynch's liabilities for violations of the Fair Housing Act, Merrill Lynch's predatory and discriminatory lending, and for any other matter relating to Merrill Lynch's and its predecessors' mortgage lending, securitization and servicing practices.

616.   There has been a continuity of ownership of Merrill Lynch's assets between Bank of America and Merrill Lynch and Merrill Lynch's management, personnel, physical location, and general business operations have been continued by Bank of America.

617.   Merrill Lynch ceased filing its own financial statements with the SEC in December 2008, and Bank of America has consolidated and included Merrill Lynch's assets and liabilities in Bank of America's publicly filed financial statements.  Bank of America also has paid to restructure certain of Merrill Lynch's loans on its behalf.

618.   While some of the Merrill Lynch Defendants and related entities retained their pre-merger corporate names following their merger with Bank of America, Merrill Lynch's operations are fully consolidated into Bank of America and Merrill Lynch has lost any independent identity following the merger.  For example, Merrill Lynch is not branded on its website as "Merrill Lynch. Bank of America Corporation."

619.   During its acquisition of Merrill Lynch, Bank of America performed due diligence on Merrill Lynch, which informed Bank of America as to Merrill Lynch's conduct Plaintiffs allege herein.   In addition, Bank of America and Merrill Lynch had longstanding business relationships and numerous transactions

296

relating to both entities' non-prime mortgage lending, securitization and servicing activities.  Thus, Bank of America acquired Merrill Lynch (including its assets and liabilities) with full knowledge of Merrill Lynch's discriminatory housing practices that Plaintiffs allege here.

620.   Bank of America continues to service predatory and discriminatory mortgage loans that Merrill Lynch is responsible for, thereby further continuing Merrill Lynch's misconduct alleged herein.

## VIII. CAUSE OF ACTION
### (Federal Fair Housing Act)

621.   Plaintiff repeats and incorporates by reference all allegations contained in paragraphs 1 through 620 as if fully set forth herein.

622.   Defendants' acts, policies, and/or practices alleged above constitute intentional discrimination (including through reverse redlining and steering) on the basis of race, color, national origin, and/or sex by intentionally targeting FHA protected minority borrowers (predominantly African-American and Hispanic borrowers) in Plaintiffs' communities and neighborhoods for non-prime mortgage loans made on terms more unfavorable than similar loans made to non-minority borrowers and/or without regard to such minority borrowers' ability to repay such

loans and through Defendants' refusal to modify such loans and/or through Defendants' continued servicing of such loans.

623.   Defendants' acts, policies, and practices as alleged above constitute intentional discrimination or disparate treatment on the basis of race, color, national origin and/or sex by intentionally targeting FHA protected minority borrowers (predominantly African-American, Hispanic, and female borrowers) in Plaintiffs' communities and neighborhoods for foreclosure activity on the non-prime mortgage loans Defendants' made on a discriminatory or predatory basis to minority borrowers.

624.   Defendants' acts, policies, and practices as alleged above also have had an adverse, disproportionate, and/or disparate impact on FHA protected minority borrowers in Plaintiffs' communities and neighborhoods because of, among other things: (1) the relatively higher numbers and percentage of equity stripping, non-prime mortgage loans made to them; (2) the more unfavorable and higher cost terms, and/or higher leverage, of such loans; and/or (3) the resulting increased relative numbers of loan defaults, home vacancies, and foreclosures incurred by them; all as compared to the loans made to similarly situated non-minority borrowers and the numbers of foreclosures on such non-minority borrowers' homes.

625.   Defendants' discriminatory acts, policies, and practices as alleged above cannot be justified by business necessity and could have been avoided through the use of alternative business policies, practices, or procedures that precluded the discriminatory treatment and discriminatory impact.

626.   The predatory and discriminatory discretionary pricing policies, underwriting practices, and foreclosure activities described herein individually and/or in combination with one another constitute patterns or practices of discrimination because, as an integral part of the Defendants' equity stripping activities and mortgage banking business models, it was the standard operating procedure of Defendants that constituted the discriminatory treatment of, and/or had a disparate impact on, minority borrowers.

627.   Defendants' discriminatory acts, policies, and practices as alleged above are continuing and will continue until the last discriminatory, equity stripping, non-prime mortgage loan that Defendants originate, fund, purchase, and/or service is repaid and closed and/or is foreclosed upon.

628.   Individually, and/or collectively, Defendants' acts, policies, and practices as alleged above violate the Fair Housing Act, as amended, 42 U.S.C. §3613(a), including for Defendants' violations of 42 U.S.C. §§ 3604 and 3605, in so far as they have:

- made and/or continue to make housing unavailable on the basis of race, color, national origin or sex in violation of 42 U.S.C. § 3604(a);

- provided and/or continue to provide different terms, conditions, and privileges of sale of housing, as well as different services and facilities in connection therewith, on the basis of race, color, national origin or sex in violation of 42 U.S.C. § 3604(b); and/or

- provided and/or continue to provide different terms, conditions and privileges on the basis of race, color, national origin or sex in connection with the making of residential real estate-related transactions, in violation of 42 U.S.C. § 3605.

629.   Defendants' published policies and statements relating to their acts, policies, and practices as alleged above also violate §3604(c) of the Fair Housing Act in so far as they have expressed and/or continue to express a preference on the basis of race, color, national origin or sex.

630.   Plaintiffs are "aggrieved persons" as defined by 42 U.S.C. §3602(i) because Plaintiffs, as organizations themselves subject to the provisions of the FHA, have been injured by Defendants' discriminatory housing practices alleged above and also because Plaintiffs believe that they will continue to be injured by Defendants' discriminatory housing practices that are about to occur through the continuation of Defendants' discriminatory housing practices, also as alleged above.   Thus, Plaintiffs expressly bring this Count as aggrieved persons in their own right pursuant to the private persons civil enforcement provisions of 42 U.S.C.

§3613(a) for their own damages and organizational injuries arising from Defendants' discriminatory housing practices that violate the FHA.

631.   Plaintiffs' organizational harm and other injuries are continuing and will increase unless and until Defendants cease their equity stripping activities, including through their continuing discriminatory and predatory mortgage servicing and foreclosure activities.   Injunctive relief is therefore necessary to prevent further financial and irreparable non-financial harm to Plaintiffs.

632.   Defendants' discriminatory acts, policies, and practices as alleged above were, and are, intentional and willful, and/or have been, and are, implemented with reckless disregard for Plaintiffs' federally protected rights.

## IX.   DEMAND FOR JURY TRIAL

633.   Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury on all issues triable as of right.

## X.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that the Court grant them the following relief:

(1) enter a declaratory judgment that the foregoing acts, policies, and practices of Defendants violate the FHA, including 42 U.S.C. §§ 3604 and 3605;

(2) enter a permanent injunction enjoining Defendants and their directors, officers, agents, and employees from continuing to publish, implement, and enforce their illegal, discriminatory conduct described herein through the foreclosure process and directing Defendants and their directors, officers, agents, and employees to take all affirmative steps necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent additional instances of such conduct or similar conduct from occurring in the future;

(3) award compensatory damages to Plaintiffs in an amount to be determined by the jury that would fully compensate Plaintiffs for its injuries caused by the conduct of Defendants alleged herein;

(4) award punitive damages to Plaintiffs in an amount to be determined by the jury that would punish Defendants for the willful, wanton, and reckless conduct alleged herein and that would effectively deter similar conduct in the future;

(5) award Plaintiffs reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 3613(c)(2); and

(6) order such other relief as this Court deems just and equitable.

Dated:  November 20, 2015

By:   /s/ James M. Evangelista
James M. Evangelista (GA Bar 707807)
David J. Worley (GA Bar 776665)

302

HARRIS PENN LOWRY, LLP
400 Colony Square, Suite 900
1201 Peachtree Street, NE
Atlanta, GA  30361
Phone: (404)961-7650
Fax: (404)961-7651

Hezekiah Sistrunk, Jr. (GA Bar 649413)
Shean D. Williams (GA Bar 764139)
COCHRAN, CHERRY, GIVENS, SMITH,
SISTRUNK and SAMS P.C.
127 Peachtree Street
Atlanta, GA 30303
Phone: (404) 222-9922
Fax: (404) 222-0170
*Co-Counsel for Plaintiffs DeKalb County, Fulton County & Cobb County, Georgia*

Thomas G. Sampson, Sr. (GA Bar 623600)
Jeffrey E. Tompkins (GA Bar 714608)
THOMAS KENNEDY SAMPSON &
TOMPKINS LLP
3355 Main Street
Atlanta, Georgia 30337
Phone: (404) 688-4503
Fax: (404) 761-3224
*Additional Co-Counsel for Plaintiff Fulton County, Georgia*