UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| COBB COUNTY, DEKALB COUNTY, and FULTON COUNTY, GEORGIA,<br><br>        Plaintiffs,<br><br>v.<br><br>BANK OF AMERICA CORPORATION, BANK OF AMERICA, N.A., COUNTRYWIDE FINANCIAL CORPORATION, COUNTRYWIDE HOME LOANS, INC., COUNTRYWIDE BANK, FSB, COUNTRYWIDE WAREHOUSE LENDING, LLC, BAC HOME LOANS SERVICING, LP, MERRILL LYNCH & CO., INC., MERRILL LYNCH MORTGAGE CAPITAL INC., and MERRILL LYNCH MORTGAGE LENDING, INC.,<br><br>        Defendants. | Civil Action No. 1:15-CV-04081-LMM |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ................................................................ 1

SUMMARY OF ALLEGATIONS IN COMPLAINT ............................ 4

ARGUMENT ................................................................... 6

I.   The Counties Are Not "Persons" Entitled to Sue Under the FHA. ......... 6

II.  The Counties' Complaint Is Time-Barred. ............................ 10

    A.   The Complaint Fails the Eleventh Circuit's Requirement That the Counties Identify Specific Instances of Timely Discrimination. ............................................. 10

    B.   The Continuing Violation Doctrine Is Irrelevant to the Time Bar. ............................................................ 15

    C.   Defendants Not Alleged to Have Done Anything Within the Limitations Period Must Be Dismissed. ...................... 17

    D.   The Complaint Is at Least Partially Time-Barred Because the Counties Were on Notice of Their Claims More Than Two Years Before Filing Suit. ................................... 19

III. The Counties Do Not State a Disparate Impact Claim Under *Inclusive Communities*. ....................................... 21

    A.   The Counties Do Not Identify a Facially-Neutral Policy. ........... 22

    B.   The Counties Do Not Identify How Any Policy Is an "Artificial, Arbitrary, and Unnecessary Barrier." ............... 25

    C.   The Complaint Fails *Inclusive Communities'* "Robust Causality" Test. ........................................... 26

    D.   The Complaint Does Not Plead Timely Disparate Impact. ......... 27

IV.  The Free Public Services Doctrine Bars Recovery of Governmental Services Damages. ..................................... 29

CONCLUSION ................................................................ 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ..................................................................... 13

*In re ATM Fee Antitrust Litig.,*
    768 F. Supp. 2d 984 (N.D. Cal. 2009) ......................................... 18

*Beazley v. De Kalb Cty.,*
    210 Ga. 41 (1953) ......................................................................... 29

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ................................................................. 16, 17

*City of Los Angeles v. Bank of Am. Corp.,*
    No. 12-cv-9046, 2015 WL 4880511 (May 11, 2015) ..................... 19

*City of Miami v. Bank of Am. Corp.,*
    800 F.3d 1262 (11th Cir. 2015) ..........................................*passim*

*Ctr. For Biological Diversity v. Hamilton,*
    453 F.3d 1331 (11th Cir. 2006) .................................................... 12

*Davis v. Countrywide Fin. Corp.,*
    No. 09-cv-10228, 2009 WL 2922896 (E.D. Mich. Sept. 9, 2009) ................. 14

*Davis v. Wells Fargo Bank,*
    685 F. Supp. 2d 838 (N.D. Ill. 2010), *aff'd sub nom. Estate of*
    *Davis v. Wells Fargo Bank*, 633 F.3d 529 (7th Cir. 2011) ......................... 14

*Dir., Office of Workers' Comp. Programs v. Newport News*
    *Shipbuilding & Dry Dock Co.,*
    514 U.S. 122 (1995) ........................................................................9

*EEOC v. Joe's Stone Crab, Inc.,*
    220 F.3d 1263 (11th Cir. 2000) .................................................... 22

*Ellis v. City of Minneapolis*,
No. 14-cv-3045, 2015 WL 5009341 (D. Minn. Aug. 24, 2015)................... 27

*Estvanko v. City of Perry*,
No. 5:09-cv-137, 2011 WL 1750232 (M.D. Ga. May 6, 2011).................. 10

*Federer v. Midland Mortg. Co.*,
No. 1:12-cv-2492, 2012 WL 5880916 (N.D. Ga. Nov. 21, 2012)................ 11

*Garcia v. Brockway*,
526 F.3d 456 (9th Cir. 2008)..................................................... 25

*Greenwich Fin. Servs. Distressed Mortg. Fund 3 LLC v.
Countrywide Fin. Corp.*,
603 F.3d 23 (2d Cir. 2010) ...................................................... 18

*Gumbus v. United Food & Commercial Workers Int'l Union*,
47 F.3d 1168 (6th Cir. 1995)..................................................... 21

*Hanrahan v. Blank Rome LLP*,
Nos. 14-06562, 14-06563, 14-06564, 2015 WL 5783676 (E.D.
Pa. Oct. 5, 2015) ................................................................. 27

*Harvick v. Oak Hammock Preserve Cmty. Owners Ass'n*,
No. 6:14-cv-937, 2015 WL 667984 (M.D. Fla. Feb. 17, 2015) ................... 16

*Havens Realty Corp. v. Coleman*,
455 U.S. 363 (1982) .............................................................. 15

*Hines v. Etheridge*,
173 Ga. 870 (1931) ................................................................7

*Hipp v. Liberty Nat'l Life Ins. Co.*,
252 F.3d 1208 (11th Cir. 2001)............................................. 15, 20

*Lewis v. City of Chicago*,
560 U.S. 205 (2010) .............................................................. 27

*Loyd v. Huntington Nat'l Bank*,
No. 1:08-cv-2301, 2009 WL 1767585 (N.D. Ohio 2009)............................. 21

*Lozman v. City of Riviera Beach,*
   713 F.3d 1066 (11th Cir. 2013)................................................................... 20

*Matarese v. Archstone Pentagon City,*
   761 F. Supp. 2d 346 (E.D. Va. 2011) ........................................................ 19

*McReynolds v. Merrill Lynch & Co.,*
   No. 08-cv-6105, 2011 WL 1196859 (N.D. Ill. Mar. 29, 2011),
   *aff'd,* 694 F.3d 873 (7th Cir. 2012) ............................................................ 19

*Mejia v. EMC Mortg. Corp.,*
   No. 09-cv-4701, 2011 WL 2470060 (C.D. Cal. June 16, 2011).................... 19

*Mobley v. Polk Cty.,*
   242 Ga. 798 (1979) ...................................................................................... 30

*Molina v. Aurora Loan Servs., LLC,*
   No. 15-10456, 2015 WL 7753215 (11th Cir. Dec. 2, 2015).......................... 14

*In re New York City Mun. Sec. Litig.,*
   507 F. Supp. 169 (S.D.N.Y. 1980) ................................................................9

*Pike Cty. v. Matthews,*
   49 Ga. App. 152, 174 S.E. 642 (1934) ..........................................................8

*Ramos v. Baxter Healthcare Corp. of Puerto Rico, Inc.,*
   256 F. Supp. 2d 127 (D.P.R. 2003), *aff'd,* 360 F.3d 53 (1st Cir.
   2004) ............................................................................................................ 24

*Renaldi v. Mfrs. & Traders Trust Co.,*
   954 F. Supp. 614 (W.D.N.Y. 1997) ............................................................. 24

*Rivera-Andreu v. Pall Life Scis. PR, LLC,*
   No. 14-cv-1029, 2014 WL 5488409 (D.P.R. Oct. 29, 2014)........................ 24

*Roberts v. Gadsden Mem'l Hosp.,*
   850 F.2d 1549 (11th Cir. 1988).................................................................... 19

*Russello v. United States,*
   464 U.S. 16 (1983) ........................................................................................8

*Scales v. Ordinary,*
   41 Ga. 225, 227 (1870) ............................................................................7

*Sims v. Tex. Dep't of Hous. & Cmty. Affairs,*
   No. 07-cv-4511, 2008 WL 4552784 (S.D. Tex. Oct. 7, 2008) .........................8

*Smith v. Farmers & Merchs. Bank,*
   No. 5:14-cv-140, 2014 WL 1774119 (M.D. Ga. May 2, 2015) ....................... 16

*Southend Neighborhood Improvement Ass'n v. St. Clair Cty.,*
   743 F.2d 1207 (7th Cir. 1984) .................................................................... 14

*Stokes v. JPMorgan Chase Bank, NA,*
   No. 8:11-cv-02620, 2012 WL 527600 (D. Md. Feb. 16, 2012) ...................... 15

*Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Communities*
   *Project, Inc.,*
   135 S. Ct. 2507 (2015) .......................................................................*passim*

*Torres v. Putnam Cty.,*
   246 Ga. App. 544 (2000) ..................................................................... 29, 30

*Troup Cty. Elec. Membership Corp. v. Georgia Power Co.,*
   229 Ga. 348 (1972) ....................................................................................7

*Twiggs Cty. v. Atlanta Gas Light Co.,*
   262 Ga. 276 (1992) ................................................................................... 29

*United States v. McLymont,*
   45 F.3d 400 (11th Cir. 1995).......................................................................8

*Walker Cty. v. Tri-State Crematory,*
   284 Ga. App. 34 (2007) ............................................................................. 29

*Watson v. Fort Worth Bank & Trust,*
   487 U.S. 977 (1988)................................................................................... 25

*Wojcik v. State,*
   260 Ga. 260 (1990) ....................................................................................8

*Wood v. Briarwinds Condo. Ass'n Bd. of Dirs.,*
   369 F. App'x 1 (11th Cir. 2010) ................................................................. 20

**Statutes**

15 U.S.C. § 1691a(f) ................................................................9

42 U.S.C. § 2000e(a) ..............................................................9

42 U.S.C. § 3602 .............................................................. 7, 8

42 U.S.C. § 3604 ............................................... 1, 10, 13, 14

42 U.S.C. § 3605 .................................................................. 14

42 U.S.C. § 3613 ........................................... 6, 10, 11, 15

42 U.S.C. § 3616 .................................................................. 10

Pub. L. 92-261, § 2(1), Mar. 24, 1972, 86 Stat. 103 ............................9

Pub. L. 95-598, Title III, § 331, Nov. 6, 1978, 92 Stat. 2549 ............................9

**Other Authorities**

Fed. R. Civ. P. 8 ....................................................................4

Fed. R. Civ. P. 12(b)(6) .........................................................1

Ga. Const. art. IX, § 1, ¶ I ............................................ 29

Ga. Op. Att'y Gen. No. 04-10 (Nov. 1, 2004) ..........................7

Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the above-captioned Defendants hereby move to dismiss the Complaint filed by the counties of Cobb, DeKalb, and Fulton ("the Counties").[1]

## INTRODUCTION

The Counties bring a single count under the Fair Housing Act, 42 U.S.C. §§ 3604 *et seq.*, accusing Defendants of engaging in different (and mutually exclusive) types of mortgage lending discrimination in making loans to minority borrowers within their borders during a period dating back over 15 years. The Counties claim they were harmed indirectly—because allegedly discriminatory loans made in the years leading up to the 2008 financial crisis made it more likely some minorities would default, making it more likely some of those loans would be foreclosed, making it more likely some of those foreclosures would result in vacancies and blight in local communities, which all supposedly resulted in the Counties spending extra money for governmental services to address the blight and suffering a decrease in property tax assessments and collection. To focus on more recent

_____

[1] Defendants are three "Bank of America" named companies—Bank of America Corporation, Bank of America, N.A., and BAC Home Loans Servicing, L.P. ("Servicing")—four "Countrywide" named companies—Countrywide Financial Corporation, Countrywide Home Loans, Inc., Countrywide Bank, FSB ("CWB"), and Countrywide Warehouse Lending, LLC ("CWL")—and three "Merrill Lynch" named companies—Merrill Lynch & Co., Inc., Merrill Lynch Mortgage Capital Inc., and Merrill Lynch Mortgage Lending, Inc. Though not relevant to this Motion, Defendants point out that the Counties' allegations as to these parties is often inaccurate, including in even naming some of them, as Servicing and CWB previously de jure merged into Bank of America, N.A. and CWL no longer exists as an entity.

conduct, the Counties also throw in conclusory allegations of discriminatory servicing and foreclosure practices with respect to these pre-2009 loans, and then pronounce that all of their allegations show that Defendants engaged in a decades-long "equity stripping" scheme that has not even concluded. The alleged violations of the FHA that lie at the heart of the Complaint are two dissimilar theories of discrimination: (1) that Defendants engaged in *intentional* discrimination ("disparate treatment"), and (2) that Defendants engaged in unintentional discrimination, in the form of a race-neutral policy that resulted in an adverse effect falling disproportionately on minorities ("disparate impact").

The Complaint's "equity stripping" conspiracy theory is a complete fabrication; Defendants did not engage in discrimination and are proud of their long history of fair and responsible lending throughout the diverse Atlanta-metro area. But even setting aside the Complaint's lack of merit, the suit can be quickly dispatched because it fails to state a claim for a number of independent reasons.

As a threshold matter, the Counties have no right to sue under the FHA. States cannot sue under the statute and, in Georgia, counties are mere "political subdivisions" of the State. Just as Georgia could not bring an FHA suit directly, neither can an arm of the Georgia government like the Counties.

Turning to the allegations, the Counties' one-count FHA claim is barred by the statute's two-year limitations period. While the Counties make

literally hundreds of pages of allegations about events of the last decade, they fail to allege that any Defendant committed even a single, specific act of discrimination within the two years prior to suit. In a similar case brought by the city of Miami, the Eleventh Circuit recently agreed that Miami's complaint was properly dismissed as time-barred where Miami had failed to identify how any specific loan originated within the FHA's two-year limitations period was discriminatory. *City of Miami v. Bank of Am. Corp.*, 800 F.3d 1262, 1283-84 (11th Cir. 2015). This failure requires dismissal here too. Relatedly, most of the named Defendants must be dismissed because they are not alleged to have done *anything*—lending or servicing, discriminatory or not—within the FHA's limitations period.

Even if a timely claim was pled, the Counties' disparate impact claim for recovery must be dismissed under the recently-articulated pleading standard in *Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc.*, 135 S. Ct. 2507 (2015) ("*Inclusive Communities*"). *See also Miami*, 800 F.3d at 1286 (government FHA claims must meet *Inclusive Communities* pleading standard). The Complaint does not meet this standard because it does not single out and identify any facially-neutral policy used by Defendants, does not allege that any such policy was "artificial, arbitrary, and unnecessary," and does not factually demonstrate that the policy caused any disparity, which the Court referred to as the "robust causality requirement." *Inclusive Communities*, 135 S. Ct. at 2522-24. That the Counties do not allege even the most basic outlines of a disparate

impact claim is not surprising, perhaps, given their prolix allegations in hundreds of paragraphs that Defendants *intentionally* discriminated against minority borrowers. But, whatever the reason, there is nothing in the Complaint to support a disparate impact recovery.

Finally, the Counties' claim for recovery of their governmental service expenses must be dismissed because it is barred by Georgia's "free public services" doctrine, which does not allow counties to seek payment for services they are legally required to provide.

The Counties have attempted to mask all of these deficiencies through a staggering 633 paragraph, 300+ page Complaint. The obvious violation of Rule 8—which still requires "a short, plain statement"—is frustrating and wasteful, but it need not detain this case. The Court should ignore this obfuscation and dismiss the Complaint.

## SUMMARY OF ALLEGATIONS IN COMPLAINT

Despite its sprawling allegations, the Complaint asserts only a single cause of action under the FHA based on residential mortgage loans provided to minority borrowers. The allegations are directed to the mortgage origination and servicing practices of three groups of entities: Bank of America, Countrywide and Merrill Lynch, the latter two being families of companies Bank of America Corp. acquired in separate transactions in 2008.[2]

---

[2] The County erroneously asserts that the three "Bank of America defendants" are successors in interest to the three "Countrywide defendants" and to the three "Merrill Lynch defendants." Compl. ¶¶ 589-620. Since the Complaint fails on multiple levels, this Motion does not address those

The Complaint in this action is substantially identical to (and often copied verbatim from) an FHA action filed by the Counties against a different lender more than three years earlier. *DeKalb County v. HSBC N. Am. Holdings Inc.*, No. 12-cv-03640 (N.D. Ga.) [Dkt. 1] ("HSBC Complaint").

Though the Complaint concerns both loan origination and servicing, these separate practices are treated as part of the same "equity stripping" scheme in an attempt to evade the statute of limitations. The Counties allege the at-issue loan origination practices started in 2000, peaked in 2004-2008, but then do not allege that any discriminatory lending conduct occurred after 2008. *E.g.*, Compl. ¶¶ 87, 121-22, 132, 154-55, 189, 209, 213-14, 221, 256-383. For the more recent time period, the Counties allege two different things: first, that defaults and foreclosures occurred post-2008 on these loans and, second, that unidentified Defendants engaged in "discriminatory" servicing practices in this latter period with respect to the same set of loans. *Id.* ¶¶ 385-421, 550.[3]

---

allegations in detail. Suffice it to say, however, that the broad and sweeping allegations are wrong. Moreover, they are fundamentally irrelevant since successor liability is a remedy and not pertinent to direct liability under the FHA.

[3] While largely devoid of relevant details, the Complaint is rife with extraneous material concerning allegations of wrongdoing by a variety of mortgage lenders, servicers, or related entities over the past decade or more. *See, e.g., id.* ¶¶ 38-67 (alleging trends and findings within the subprime mortgage industry); ¶¶ 68-84 (alleging subprime lending caused the nationwide economic recession); ¶¶ 211, 227 (alleging that the securitization process allowed industry participants to lend irresponsibly); ¶ 390 (allegations of robo-signing). These distractions, while adorned with charged

As noted above, the Counties announce, without specific foundation, that all of this conduct concerning borrowers within their communities was a vast "equity stripping" scheme which ultimately harmed the Counties. *Id.* ¶¶ 550, 552. They identify two forms of alleged injury: (1) diminution in property values and tax assessments for foreclosed homes and neighboring homes; and (2) an alleged increase in the cost of governmental services provided to foreclosed, vacant, or abandoned properties. *Id.* ¶¶ 11, 551; *see also id.* ¶¶ 541-554, 562, 575-582, 584-585 (general injury allegations); ¶¶ 556, 563-569 (reduced-value theory); ¶¶ 557-559, 561, 570 (governmental services theory). The Counties concede that their economic losses are a result of conduct by many other lenders and securitizers (*id.* ¶¶ 84, 566), but contend that Defendants are responsible for the percentage of damages "equal to Defendants' percentage share of predatory, discriminatory mortgage lending and foreclosure activity." *Id.* ¶ 569.

## ARGUMENT

### I.   The Counties Are Not "Persons" Entitled to Sue Under the FHA.

This Court can shortcut the Counties' protracted Complaint because the Counties are not entitled to sue under the FHA. To bring an FHA claim the Counties must first show they qualify as "aggrieved person[s]," as defined by the statue. 42 U.S.C. § 3613. "Person" has a very specific meaning under

---

language, lack any connection to the Counties' FHA claim. For the sake of judicial efficiency, Defendants do not move to strike this vast array of impertinent material. Defendants do not concede that any of those allegations are true.

the FHA, and is defined as "one or more individuals, corporations, partnerships, associations, labor organizations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in cases under Title 11, receivers, and fiduciaries." 42 U.S.C. § 3602(d). The Counties are none of these. Dismissal is required, with prejudice, because a county cannot sue for injuries under the FHA.

The limited statutory grant of an FHA cause of action to "aggrieved persons" cannot be stretched to include the Counties because of the nature of county government in Georgia. Georgia counties are mere "subdivisions" of the State of Georgia. *See*, *e.g.*, *Troup Cty. Elec. Membership Corp. v. Georgia Power Co.*, 229 Ga. 348, 352 (1972) (counties "are local, legal, political subdivisions of the state, created out of its territory, and are arms of the state, created, organized, and existing for civil and political purposes, particularly for the purpose of administering locally the general powers and policies of the state" (quoting *Hines v. Etheridge*, 173 Ga. 870, 876 (1931))). The fact that counties and the state of Georgia are one and the same is the conclusion of not just the Georgia Supreme Court, but also of the Georgia Attorney General. *See* Ga. Op. Att'y Gen. No. 04-10 (Nov. 1, 2004) (counties "are subdivisions of the State Government - mere modes by which the State parcels out its duties of governing the people" (citing *Scales v. Ordinary*, 41 Ga. 225, 227 (1870))).

But States cannot sue under the FHA. States are not listed among the definition of "persons"; rather, they are specifically defined by a separate

term for "State" in that same section. 42 U.S.C. § 3602(g).[4] This reflects a choice by Congress not to include a State within the definition of "person" but instead to define it separately. By defining the term "State" in one context, yet excluding that term from the definition of "person," Congress indicated its clear intent that the term "person" does not include a State or any State subdivisions. *See e.g. Sims v. Tex. Dep't of Hous. & Cmty. Affairs*, No. 07-cv-4511, 2008 WL 4552784, at *1 (S.D. Tex. Oct. 7, 2008) ("States were not made 'persons' potentially liable for FHA violations." (citing 42 U.S.C. § 3602(d))); *see also Russello v. United States*, 464 U.S. 16, 23 (1983) (where "Congress includes particular language in one section of a statute but omits it in another," the Court "presume[s]" that Congress intended a difference in meaning) (citation omitted).[5]

This plain language in the FHA is, by itself, the end of the necessary analysis as "the plain meaning of the statute controls unless the language is ambiguous or leads to absurd results." *United States v. McLymont*, 45 F.3d

---

[4] States are defined as "any of the several States, the District of Columbia, the Commonwealth of Puerto Rico, or any of the territories and possessions of the United States." 42 U.S.C. § 3602(g).

[5] Although it is true that a county is sometimes referred to as "a corporation for certain specified purposes", that does not change its well-established status as a state subdivision. *Pike Cty. v. Matthews,* 49 Ga. App. 152, 174 S.E. 642 (1934). Georgia courts have consistently recognized counties are not municipal corporations, such as, for instance, cities like Miami, but that they instead stand in a different relation to the state government. *See, e.g., Wojcik v. State*, 260 Ga. 260, 261 (1990) ("[A]s a political subdivision of the state, a county functions as an instrumentality of state government at a more rudimentary level than does a municipal corporation.").

400, 401 (11th Cir. 1995). But other sources only further confirm that the Counties are not "persons" entitled to sue under the FHA.

First, unlike the FHA, Congress has in other civil rights statutes explicitly granted state subdivisions "person" standing. For example, in Title VII of the Civil Rights Act, Congress amended the definition of the term "person" in 1972 to explicitly add "governments, governmental agencies, [and] political subdivisions." *See* 42 U.S.C. § 2000e(a); *see* Pub. L. 92-261, § 2(1), Mar. 24, 1972, 86 Stat. 103. Then again, in 1974, Congress enacted the Equal Credit Opportunity Act to explicitly define "person" to include "government or government subdivision or agency." 15 U.S.C. § 1691a(f). But when Congress amended the FHA's definition of "person" in 1978 it still excluded from the term any reference to "State" or "government agencies." *See* Pub. L. 95-598, Title III, § 331, Nov. 6, 1978, 92 Stat. 2549. This omission is telling, and is further evidence that the Counties lack standing to sue. *See e.g., Dir., Office of Workers' Comp. Programs v. Newport News Shipbuilding & Dry Dock Co.,* 514 U.S. 122, 129 (1995) ("[T]he United States Code displays throughout that when an agency in its governmental capacity *is* meant to have standing, Congress says so."); *In re New York City Mun. Sec. Litig.*, 507 F. Supp. 169, 180-81 (S.D.N.Y. 1980) (holding "person" does not include governmental entities based on comparison to a similar statute that expressly included "governmental entities").

Second, "States" *are* expressly assigned a limited role under the FHA, but that role does not include bringing civil suits—either for their own

9

injuries or for injuries suffered by others. Specifically, qualified state agencies may be referred administrative complaints, and the Secretary of Housing and Urban Development is authorized to "cooperate with State and local agencies charged with the administration of *State and local* fair housing laws." 42 U.S.C. § 3616 (emphasis added); *id*. § 3616a (authorizing State fair housing initiatives); § 3613(a)(2) (barring action where a "State" agency has obtained a conciliation agreement). That States have been expressly afforded a limited role, and were not therein also expressly authorized to bring civil suits, weighs heavily in favor of the conclusion that Congress did not intend State entities to be "persons" entitled to sue under the Act.[6]

## II.     The Counties' Complaint Is Time-Barred.

### A.     The Complaint Fails the Eleventh Circuit's Requirement That the Counties Identify Specific Instances of Timely Discrimination.

The Complaint, focusing almost exclusively on conduct occurring nearly a decade ago and offering nothing of substance as having occurred within the two years prior to suit, is barred by the two-year statute of limitations in the

---

[6] In the context of the FHA's separate protections for "persons" living with foster children, § 3604(f)(3)B), the Middle District of Georgia has held that the Georgia Department of Family and Children Services may qualify as such a "person" by being an "unincorporated organization" that is acting in the stead of the minor children in its care. *Estvanko v. City of Perry*, No. 5:09-cv-137, 2011 WL 1750232, at *5 (M.D. Ga. May 6, 2011). That decision is distinguishable and not persuasive, both because it was effectively a finding that the agency was standing in for a statutory "person," and because it never discussed the conflicting definition of the term "States," the plain meaning of the statute or the additional supporting sources discussed above. The issue was also never briefed by the parties, but instead decided *sua sponte*.

FHA. The statute requires the Counties to "commence a civil action...not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice." 42 U.S.C. § 3613(a)(1)(A). As *Miami* highlighted, when faced with a suit such as this alleging discriminatory conduct spanning over a decade, the threshold inquiry for a district court is to examine what the plaintiff alleges occurred within the FHA's two-year limitations period. 800 F.3d at 1283-84; 42 U.S.C. § 3613(a)(1)(A).[7] Only if the government plaintiff sufficiently alleges *facts* showing that the defendants actually violated the FHA within that period can the complaint survive dismissal. *Miami*, 800 F.3d at 1283-84 (noting the city "provided no specific information (e.g., the type of loan, the characteristics that made it predatory or discriminatory, when the loan closed, when [and if] the property went into foreclosure, etc.) for each address"). This is simply a straightforward outgrowth of the time bar, which requires that a suit be brought within two years of the act or of the termination of an ongoing discriminatory housing practice. *Federer v. Midland Mortg. Co.*, No. 1:12-cv-2492, 2012 WL 5880916, at *4 (N.D. Ga. Nov. 21, 2012) (holding plaintiff must allege specific acts of discrimination within the limitations period to show a continuing discriminatory housing practice that had not ceased before the period).

---

[7] Defendants note that although some similar FHA cases have survived motions to dismiss in recent years, none have been tested since the benefit of the Eleventh Circuit's express guidance in *Miami* or the Supreme Court's guidance in *Inclusive Communities*. Also, none of the other government FHA cases involved the Georgia law arguments raised in this brief at Sections I & IV.

Despite its length and over-heated rhetoric, the Complaint completely fails this test. The Complaint was filed on November 20, 2015, so to state a timely FHA claim the Counties must plead specific, wrongful conduct by Defendants in violation of the FHA that occurred on or after November 20, 2013. The Counties allege no such thing. They do not identify a single act of making a discriminatory loan (either intentionally or as a product of a misguided neutral policy) on or after November 20, 2013. They do not identify a single affected property address. And, they certainly do not do so for *each* County, as they must in order for each to sustain its own claim—since each County's alleged right to relief must rise or fall on its own merits, not by relying on anything that may have taken place in another County. As noted, the Complaint is conspicuously silent as to any lending conduct after the financial crisis hit in 2008.

The Counties' allegations about foreclosures and loan servicing do not carry the Counties over the time bar either. The Counties actually allege only two things that even arguably occurred within the two years prior to suit. First, they allege that some loans that preceded 2009 were foreclosed on thereafter, even up to the day suit was filed. *E.g.*, Compl. ¶ 499, 504, 550, 576-80. But even if true, the foreclosures are not new acts of discrimination, they are at worst trailing consequences of past discrimination. *Ctr. For Biological Diversity v. Hamilton*, 453 F.3d 1331, 1335 (11th Cir. 2006) ("[T]his Court has distinguished between the continuing effects of a discrete violation and continuing violation[s]...."). Those consequential losses are not a

12

"discriminatory housing practice" and so such events do not make the suit timely. *See* 42 U.S.C. § 3604 (specifying actions, not injuries, that can constitute "prohibited practices" under the FHA). And even if they counted, the allegations are too broad and conclusory to support the pleading. *Ashcroft v. Iqbal*, 556 U.S. 662, 681 (2009).

Second, the Counties separately allege that Defendants engaged in acts of "discriminatory servicing," that is, acts in singling out minority debtors for adverse treatment based on their race or ethnicity. But the allegations are much too threadbare to support the claim, alleging, without detail, only that the "foreclosures themselves are conducted in a discriminatory manner." Compl. ¶¶ 9, 162; *see also id.* ¶¶ 411, 414-15, 459, 469, 478, 487, 489, 492-494, 497, 510, 516, 541, 564 (alleging minority borrowers of Defendants suffer increased rates of foreclosure). The Complaint also contains a litany of alleged misdeeds in loan servicing (*e.g.*, upcharging fees), but none of these are alleged to be visited upon minorities rather than on everyone. Compl. ¶¶ 177, 385, 386. And, even if they had alleged such things broadly, the Counties do not identify a single instance of a single minority borrower whose loan was serviced by Defendants as having been targeted for poor servicing or foreclosed upon in a discriminatory way after November 20, 2013. As such, the Counties, again, have not alleged any actual violation of the FHA since November 20, 2013.

The "discriminatory servicing" allegations fail to save this suit for the separate and independent reason that loan servicing is not conduct that is

13

even covered by the FHA. In relevant part, the FHA bans discrimination that affects the "availabil[ity]" or "terms" of "residential real estate-related transactions." 42 U.S.C. § 3605(a). A "residential real estate-related transaction" is defined as the "making or purchasing of loans or providing other financial assistance." 42 U.S.C. § 3605(b).[8] Loan servicing, by definition, involves the taking of actions with respect to existing mortgages and so does not involve the "making or purchasing" of loans or "providing other financial assistance." This plain meaning has been recognized by numerous courts in rejecting attempts to file FHA claims against loan servicers.[9] So, even if this Court was willing to credit the Counties' vague allegations of "discriminatory servicing," they still would not state a claim under the FHA.

---

[8] Though irrelevant to a case against a lender, Section 3604 has a similarly limited focus. *See Southend Neighborhood Improvement Ass'n v. St. Clair Cty.*, 743 F.2d 1207, 1210 (7th Cir. 1984) ("Section 3604(a) is designed to ensure that no one is denied the right to live where they choose for discriminatory reasons, but it does not protect the intangible interests in the already-owned property raised by the plaintiffs allegations.").

[9] *See*, *e.g.*, *Davis v. Wells Fargo Bank,* 685 F. Supp. 2d 838, 844 (N.D. Ill. 2010), *aff'd sub nom. Estate of Davis v. Wells Fargo Bank*, 633 F.3d 529 (7th Cir. 2011) (dismissing FHA claim because defendants were not alleged to have originated plaintiff's loan); *Davis v. Countrywide Fin. Corp.*, No. 09-cv-10228, 2009 WL 2922896, at *3 (E.D. Mich. Sept. 9, 2009) (same); *see also Molina v. Aurora Loan Servs., LLC*, No. 15-10456, 2015 WL 7753215, at *5 (11th Cir. Dec. 2, 2015) (assuming without deciding that a borrower could bring a post-origination focused FHA claim because borrower sued over discrimination in attempts to qualify for new, modified loan).

B.    The Continuing Violation Doctrine Is Irrelevant to the Time Bar.

The Counties will presumably contend that they have avoided the time bar by sprinkling in conclusory allegations of "continuing" conduct, such as that Defendants' purported wrongful "equity stripping" schemes "continue to this very day and have not terminated...." Compl. ¶ 9; *see also id.* at ¶¶ 89, 95, 160-62, 186, 194-97, 283-86, 367-69, 385-86, 412, 416-21, 436, 455, 468, 477, 486, 504, 510, 516, 550, 553. Under the continuing violation doctrine, if there is a continuing pattern of the same type of discrimination, an FHA plaintiff may wait to sue until "not later than 2 years after the...termination of an alleged discriminatory housing practice...." 42 U.S.C. § 3613(a)(1)(A). But that doctrine has no role here because the Counties must first allege a timely violation *before* they can invoke a continuing violation theory.

Federal courts at every level have universally recognized that the first step a court must take to determine if the continuing violation doctrine *may* apply, is determining whether a plaintiff has pled a cognizable FHA violation *within* the limitations period. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 381 (1982) ("continuing violation" of the FHA is only implicated by "an unlawful practice that continues into the limitations period"); *Miami*, 800 F.3d at 1285 (suggesting in *dicta* that continuing violation doctrine might apply "*if* the City is able to identify FHA violations within the limitations period") (emphasis added); *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1221 (11th Cir. 2001) (continuing violation doctrine requires "some acts of discrimination...within the statutory period"); *accord Stokes v. JPMorgan*

15

*Chase Bank, NA*, No. 8:11-cv-02620, 2012 WL 527600, at *8 (D. Md. Feb. 16, 2012). Only if that first step is satisfied can the doctrine then be examined for whether it is also pled sufficiently to potentially make any untimely claims relevant. As demonstrated above, the Counties do not plead a timely FHA violation, so the continuing violation doctrine is entirely irrelevant.

The continuing violation doctrine also has not even been implicated by the conclusory allegations made by the Counties, which do not provide this Court with any concrete information about what has occurred since November 20, 2013 (let alone what "continued" from a prior period). *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Courts in this Circuit universally require directly affected FHA plaintiffs alleging discrimination to meet a much higher standard in pleading a violation of the FHA than the Counties have even attempted. *See*, *e.g.*, *Harvick v. Oak Hammock Preserve Cmty. Owners Ass'n*, No. 6:14-cv-937, 2015 WL 667984 (M.D. Fla. Feb. 17, 2015); *Smith v. Farmers & Merchs. Bank*, No. 5:14-cv-140, 2014 WL 1774119, at *5 (M.D. Ga. May 2, 2015) (requiring allegation specifying membership in protected class, that plaintiff was qualified, and that others obtained loans that plaintiff did not). The Counties have come nowhere close to meeting these standards.

The Counties appear to believe they can evade the limitations bar through a naked—and endlessly repeated—assertion that each of the Defendants engaged in a grandiose scheme of "equity stripping" and that every single action they took, policy they had, and decision they made was in

service of that imaginary plan. Notably absent from the sprawling Complaint is any particular allegation of the substance of this internal conspiracy or the type of detailed allegations that the Supreme Court in *Twombly* required of any alleged conspiracy. 550 U.S. at 555. Nor is there any reason given for why this Court should find plausible that these independent conspiracies allegedly hatched at three different competitors (Bank of America, Merrill Lynch, and Countrywide) were somehow seamlessly merged and adopted by the collective group of Defendants when Bank of America separately acquired Countrywide and Merrill Lynch in 2008. No one is identified as having met and agreed with anyone else that the combined company would "equity strip" from each of their respective minority borrowers. Yet the fanciful allegations of this hazily described 15-year scheme are all the Counties offer to defeat the limitations bar. For all the Complaint's length, the Counties have not shown that any discriminatory practice from earlier years somehow was "continuing" as of November 2013.

C. **Defendants Not Alleged to Have Done Anything Within the Limitations Period Must Be Dismissed.**

Although the pleading deficiencies discussed above warrant the suit being entirely dismissed based on the FHA's statute of limitations, dismissal is at least required for the Defendants where there is simply no allegation that the entities did anything within the FHA's two-year period. Indeed, for certain entities, the Counties' allegations *affirmatively* demonstrate that those entities did not violate the FHA within the two-year period.

First, there are no specific allegations that any of the Countrywide or

17

Merrill Lynch Defendants did *anything* after November 20, 2013. At a minimum, the Countrywide and Merrill Lynch defendants must be dismissed based on this dearth of allegations.

Second, one Countrywide Defendant—Countywide Home Loans, Inc., ("CHL")—is only alleged to have engaged in "residential mortgage lending activity" prior to 2008. Compl. ¶ 24. *See also id*. ¶¶ 437 (only identifying loans from "2006 to 2008" as CHL loans); 438 (same); 453 (same). Instead of ongoing conduct, the Complaint alleges that CHL was acquired by Bank of America in 2008 (*id*. ¶ 24), and that this acquisition left CHL "with only illiquid assets, no ongoing business, [and] no ability to generate revenue" (*id*. ¶ 595). Accepting these allegations as true, the Complaint can only be interpreted as alleging that CHL has done nothing since 2008 that could violate the FHA.

Third, three Defendants—Bank of America Corporation ("BAC"), Countrywide Financial Corporation ("CFC"), and Merrill Lynch & Co., Inc. ("MLC")—must be dismissed because the Complaint not only does not claim the entities made or serviced any loans since November 20, 2013, it affirmatively identifies them as the type of entities who could not violate the FHA through such conduct. These three entities are holding companies—not mortgage lenders or loan servicers—and have never extended any loans or foreclosed on any borrowers. *See* Compl. ¶¶ 19, 23, 31.[10] Because the Counties

---

[10] *See also*, *e.g.*, *In re ATM Fee Antitrust Litig.*, 768 F. Supp. 2d 984, 999 (N.D. Cal. 2009) ("BAC is a bank holding company, not a bank."); *Greenwich Fin. Servs. Distressed Mortg. Fund 3 LLC v. Countrywide Fin. Corp.*, 603 F.3d 23,

do not allege that these entities engaged in any of the conduct challenged in the Complaint, they are all entitled to dismissal. *See*, *e.g.*, *City of Los Angeles v. Bank of Am. Corp.*, No. 12-cv-9046, 2015 WL 4880511, at *5-6 (May 11, 2015) (granting summary judgment because "Countrywide Financial Corporation and Countrywide Home Loans, Inc. did not make any loans, discriminatory or otherwise, during the limitations period"); *Matarese v. Archstone Pentagon City*, 761 F. Supp. 2d 346, 366 (E.D. Va. 2011) (granting motion for summary judgment on FHA claim against "corporate entity…that merely served as a holding company"); *accord Mejia v. EMC Mortg. Corp.*, No. 09-cv-4701, 2011 WL 2470060, at *3 (C.D. Cal. June 16, 2011) (similar 12(b)(6) dismissal).

> D.    The Complaint Is at Least Partially Time-Barred Because the Counties Were on Notice of Their Claims More Than Two Years Before Filing Suit.

Even if the Counties had pled a timely FHA claim (and they have not), their Complaint must still be dismissed to the extent it seeks to challenge conduct prior to the FHA's two-year limitations period. As noted above, the Counties' only possible basis for pursuing a claim further back in time is through invoking the continuing violation doctrine, as reflected in the FHA's statute of limitations. But, the continuing violation doctrine does not apply where a plaintiff was aware of her claim more than two years before filing

---

24 (2d Cir. 2010) (same as to Countrywide Financial Corporation); *McReynolds v. Merrill Lynch & Co.*, No. 08-cv-6105, 2011 WL 1196859, at *1 (N.D. Ill. Mar. 29, 2011) (same as to Merrill Lynch & Co.), *aff'd*, 694 F.3d 873 (7th Cir. 2012).

suit, but chose not to assert it. *Roberts v. Gadsden Mem'l Hosp.*, 850 F.2d 1549, 1550-51 (11th Cir. 1988); *see also Wood v. Briarwinds Condo. Ass'n Bd. of Dirs.*, 369 F. App'x 1, 4 (11th Cir. 2010) (same as to FHA claim); *Hipp*, 252 F.3d at 1221-22 (same as to FHA claim; collecting cases).

The Counties' own prior filings in this Court evidence that this bar applies here. On October 18, 2012, the exact same Counties filed the same lawsuit, with the same FHA claims, with the only meaningful difference being the identity of the bank defendants. *See generally* HSBC Complaint. In fact, the two complaints are so similar that the Counties have cut-and-pasted some of their HSBC allegations into their Complaint here. *Compare*, *e.g.*, HSBC Complaint ¶ 295, *with* Compl. ¶ 551 (identical allegations). The two complaints even contain the same allegations as to the nature of the supporting facts. *Compare* HSBC Complaint ¶ 52 (language about reliance on HSBC's "HMDA data"), *with* Compl. ¶ 38 (same). Further, the HSBC Complaint specifically disclosed the Counties' knowledge that "other industry participants" allegedly "targeted minority borrowers" for "riskier mortgage loan products with predatory features" and engaged in "discriminatory mortgage lending and servicing practices." HSBC Complaint ¶¶ 3, 9, 17, 187, 189-91, 207-08, 292.[11]

This, by itself, is sufficient to prove that the Counties were aware of

---

[11] This Court may take judicial notice of the HSBC Complaint. *Lozman v. City of Riviera Beach*, 713 F.3d 1066, 1075 n.9 (11th Cir. 2013) (taking judicial notice of "court documents" from an earlier "state eviction action").

their claims at least by October 2012, which was more than three years before filing this suit in November 2015, and simply chose not to bring them. Indeed, other courts have held that the filing of a similar lawsuit outside the limitations period can put a plaintiff on notice of her claims such that a subsequent suit may be time-barred. *See Gumbus v. United Food & Commercial Workers Int'l Union*, 47 F.3d 1168 (6th Cir. 1995); *Loyd v. Huntington Nat'l Bank*, No. 1:08-cv-2301, 2009 WL 1767585, at *10 n.24 (N.D. Ohio 2009).

The Counties may contend that somehow they were on notice of claims against HSBC at the time they sued that company but were not aware of claims against Bank of America, Merrill Lynch and Countrywide. If the Court has any doubt on this issue, it should order each of the Counties to add to the Complaint the allegation that they were not aware of their claims prior to November 2013.

## III.   The Counties Do Not State a Disparate Impact Claim Under *Inclusive Communities*.

In *Miami*, the Eleventh Circuit instructed that a suit like this one must meet the rigorous pleadings-stage test for disparate impact claims, which is set forth in *Inclusive Communities*, 135 S. Ct. at 2524. Specifically, *Inclusive Communities* requires that disparate impact claims in a case like this one pass at least four hurdles: the plaintiff must (i) show statistically imbalanced lending patterns which adversely impact a minority group; (ii) identify a "facially-neutral" policy followed by the defendant during the same period of time; (iii) show how that policy is "artificial, arbitrary, and unnecessary;" and

21

(iv) allege how that policy was a substantial cause of the adverse lending patterns. *Inclusive Communities*, 135 S. Ct. at 2524, 2550. *See also EEOC v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1274-1275, 1278 (11th Cir. 2000) (analyzing "facially-neutral" policy requirement). The Counties have not adequately alleged any of the last three requirements.

> A.    The Counties Do Not Identify a Facially-Neutral Policy.

Unlike an intentional discrimination claim, a disparate impact claim is premised on *un*intended discriminatory consequences of a race-*neutral* policy. *Inclusive Communities*, 135 S. Ct. at 2523. As part of "examin[ing] with care whether a plaintiff has made out a *prima facie* case of disparate impact," courts must determine whether the plaintiff has offered tangible factual allegations that a specific "facially-neutral" policy was adopted by a defendant and is the cause of the identified statistical disparity. *Id.*; *Joe's Stone Crab*, 220 F.3d at 1278-79 (disparate impact plaintiff "required to show a causal link between some *facially-neutral* employment practice [] and the statistical disparity").

Unlike the single, clear policy at issue in *Inclusive Communities*, the Counties have not identified any specific lending or servicing policy of Defendants at all, much less a "facially-neutral" one, on which any disparate impact claim could rest. Instead, the proffered examples of Defendants' so-called "policies" focus on things like (i) "directly *targeting* minority African American and Latino mortgage borrowers" for "non-prime loans," and (ii) "granting employees, brokers, and managers the discretion both to *steer*

minority borrowers into more costly loans and to set loan pricing above published rate sheets (to maximize yield spreads)." Compl. ¶ 6 (emphasis added). Indeed, the repeated drumbeat in the Complaint is that the alleged disparities were caused by *intentional* discrimination through "steering" of minorities. *E.g.*, Compl. ¶¶ 6, 49, 59-60, 93, 98, 282-86, 373, 622-24. Throughout the Complaint, the Counties allege that Defendants "*intentionally* steered FHA protected minority borrowers into higher cost, and/or higher leveraged, non-prime mortgage loan products" and "*intentionally* underwrote and originated to FHA protected minority borrowers higher cost and/or higher leveraged, non-prime mortgage loans...." *Id.* at ¶ 373 (emphasis added). The Counties go to great lengths to demonize the Defendants' alleged lending practices as both intentional and racially motivated. *E.g.*, *id.* at ¶¶ 49, 199, 202, 226, 373, 422, 437, 445, 453, 622-24. All of this is, as discussed in detail above, part and parcel of a grand "equity stripping" scheme. *E.g.*, Compl. ¶¶ 9, 89, 160-62, 283-86, 367-69, 416-21, 553.

These are all allegations of disparate *treatment*, not disparate *impact*. There is nothing neutral about policies to "steer," "target," or "strip." Even if the Counties could somehow prove any of this (never mind all of it), they would not have proven a *neutral* practice, so they cannot establish a disparate impact claim. As *Inclusive Communities* emphasized, disparate impact claims are different than intentional discrimination claims and are subject to unique "safeguards at the prima facie stage...." *Inclusive Communities*, 135 S. Ct. at 2523. When plaintiffs "conflate[]" allegations of

disparate treatment and disparate impact, as the Counties have done here, then they "may not prevail under both theories." *Rivera-Andreu v. Pall Life Scis. PR, LLC*, No. 14-cv-1029, 2014 WL 5488409, at *4 (D.P.R. Oct. 29, 2014) (plaintiff's specific intentional discrimination claims doom disparate impact theory); *accord Ramos v. Baxter Healthcare Corp. of Puerto Rico, Inc.*, 256 F. Supp. 2d 127, 149 (D.P.R. 2003), *aff'd*, 360 F.3d 53 (1st Cir. 2004); *Renaldi v. Mfrs. & Traders Trust Co.*, 954 F. Supp. 614, 620 (W.D.N.Y. 1997).

The Counties' over-arching FHA theory is also infirm on a larger level to the extent they claim the actionable "discriminatory housing practice" in this case is a grandiose "equity stripping" scheme. *See*, *e.g.*, Compl. ¶¶ 3-13. As best as the Complaint can be interpreted, the outline of the Counties' theory is that every action Defendants have ever taken in metro-Atlanta to originate, service or, when necessary, foreclose a loan has been done in pursuit of a furtive plan to dilute equity value in minority neighborhoods and put minority borrowers out on the street. On its face, this theory is utterly implausible. But even accepting it as true, this kind of shotgun approach in identifying every single act ever taken by Defendants as the offending "policy" is flatly inconsistent with the Supreme Court's cautionary guidance in *Inclusive Communities*; lower courts must ensure that disparate impact claims are precisely pled and "properly limited" to "avoid the serious constitutional questions that might arise" without such protections. *Inclusive Communities*, 135 S. Ct. at 2522-23 ("[A] disparate-impact claim that relies on a statistical disparity must fail if the plaintiff cannot point to a

24

defendant's policy or policies causing that disparity."); *see also Garcia v. Brockway*, 526 F.3d 456, 462 (9th Cir. 2008) (noting that "[t]he Supreme Court has stressed the need to identify with care the specific [discriminatory] practice that is at issue") (quotation omitted).

The pleading at issue here violates *Inclusive Communities'* guideposts by attempting to bring a generalized suit challenging everything Defendants have ever done in originating or servicing loans, without identifying any single policy in particular. The requirement to "identify[] the specific [] practice that is challenged," *Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 944 (1988) (plurality op.), is, of course, not a new one, although *Inclusive Communities* has now re-emphasized it. *See also id.* at 944 ("[T]he plaintiff is in our view responsible for isolating and identifying the *specific* [] practices that are allegedly responsible for any observed statistical disparities.") (emphasis added). The Counties' generalized disparate impact allegations here cannot survive even the loosest application of this pleading standard.

As the Counties have not alleged any facially-neutral policy, their disparate impact claim must be dismissed.

B.     The Counties Do Not Identify How Any Policy Is an "Artificial, Arbitrary, and Unnecessary Barrier."

The Counties' failure to identify a facially-neutral policy also prevents them from meeting the related requirement that any complaint identify how a challenged policy is an "artificial, arbitrary, and unnecessary barrier." *Inclusive Communities,* 135 S. Ct. at 2524. The Supreme Court made clear in *Inclusive Communities* that only policies that are alleged (and later proven)

25

to be "artificial, arbitrary, and unnecessary barriers" can be subject to a disparate impact recovery. *Id.* at 2524. The requirement is a common sense one, cabining the FHA theory of unintentional discrimination into a limited scope of conduct that concerns behavior that on its face really has no good justification.

On this point, the Complaint is entirely silent. Without allegations—with supporting facts—why a challenged policy is "artificial, arbitrary, and unnecessary," the Counties' disparate impact claim cannot proceed.

C.     The Complaint Fails *Inclusive Communities'* "Robust Causality" Test.

"A plaintiff who fails to allege facts at the pleading stage or produce evidence demonstrating a causal connection cannot make out a prima facie case of disparate impact." *Id.* at 2523. To meet this pleadings-stage causality requirement, the Counties must allege facts showing that a specific policy *caused* a statistically significant disparity alleged in the complaint. *Id.*

On this point, the Counties' failure to identify a specific policy at issue obviously dooms their ability to demonstrate any resulting causation and the Counties make no real effort to even explain their causal theory. Instead, they throw together their laundry list of potential "policies" (all being of an intentionally discriminatory nature, as noted above) and, separately, allege that their "statistics" identify certain racial imbalances. *E.g.*, Compl. ¶¶ 455, 469, 487, 489, 498, 543. But the Counties' allegations that minority borrowers were more likely than non-minority borrowers to receive certain loan types that the Counties view as undesirable, or to suffer foreclosure at higher rates,

may satisfy the first prong of the four-part disparate impact test, but that is all they do. "Racial imbalance...does not, without more, establish a prima facie case of disparate impact." *Inclusive Communities*, 135 S. Ct. at 2523 (quotation omitted). Without any suggestion, let alone concrete factual allegations, of which facially-neutral policy or policies allegedly caused these alleged disparities and how, the Counties have failed to state a disparate impact theory of recovery.[12]

D.     The Complaint Does Not Plead Timely Disparate Impact.

The Counties' failure to plead a disparate impact recovery is magnified when viewing the allegations as to conduct within the limitations period. *See supra* § II.

As to the lending allegations, the focus of the Complaint is that predatory loans were originated from 2000-2008. Compl. ¶¶ 87, 121-22, 132, 154-55, 189, 209, 213-14, 221. There is no allegation of a specific lending policy in place after November 2013 that led to any disparate impact, and there is certainly no identification of any loan that was impacted in that time period. *See Lewis v. City of Chicago*, 560 U.S. 205, 208, 214-15 (2010) (limitations period focused on when the subject policy is applied or implemented). Their servicing theory of disparate impact is similarly ill-pled

---

[12] Without this level of pleading, the Counties cannot establish a prima facie disparate impact claim. *E.g., Ellis v. City of Minneapolis*, No. 14-cv-3045, 2015 WL 5009341, at *10 (D. Minn. Aug. 24, 2015) (general allegations that defendant's policies eventually led to harm insufficient to survive 12(b)(6) dismissal); *Hanrahan v. Blank Rome LLP*, Nos. 14-06562, 14-06563, 14-06564, 2015 WL 5783676, at *4-5 (E.D. Pa. Oct. 5, 2015) (same).

as to any specific policy allegedly in place during the limitations period which is said to have caused a disparity.

The "statistics" cited in the Complaint also do not support a timely claim that could meet the first part of the *Inclusive Communities* test, *i.e.* that a policy within the two years prior to filing caused a disparate impact within that time period. Most notably, the data cited in the Complaint almost entirely concerns loans and foreclosures from *outside* the limitations period. The loan origination statistics combine the thirteen year period from 2000-2013, as well as the loans made in all three Counties, without breaking out the numbers for the two years before suit. Compl. ¶¶ 432, 440, 448.[13] Similarly, the loan servicing/foreclosure data combines the roughly seven-and-one-half-year period from January 2006 to mid-September 2014. Compl. ¶¶ 501-17. The majority of the two-year limitations period is not even the subject of an allegation. The Counties presumably resort to this obfuscation and sleight of hand because the data solely within the limitations period does not support their case. But that deficiency does not allow them to escape basic pleading and plausibility standards.

Since the Complaint does not answer the critical question of what actually occurred during the limitations period, it does not state a timely

---

[13] Out of this 13-year period, at most, only 41 days are relevant to the time period here (Nov. 20, 2013 – Dec. 31, 2013). It is also notable that the Complaint does not even allege it has identified loans that were actually discriminatory, only "discriminatorily suspect" mortgage loans (*E.g.* Compl. ¶ 432), and leaves it to the reader's imagination what this vague term means.

disparate impact claim.

## IV. The Free Public Services Doctrine Bars Recovery of Governmental Services Damages.

As discussed above, one of the Counties' two damages theories is that they seek to recover the cost of "governmental services" they allegedly provided in connection with addressing blight at properties on which Defendants made or serviced loans. Compl. ¶ 557. While this theory was raised by the city in *Miami*, its repetition here ignores the critical distinction that Georgia has adopted the "free public services" doctrine, which does not allow a county to sue for money spent "enforcing its laws and protecting its citizens." *Torres v. Putnam Cty.*, 246 Ga. App. 544, 548 (2000). At least a partial dismissal on this ground is warranted and will significantly streamline this case to focus on the narrower issue of whether there is causal proof of any injury to the Counties' tax base.

It is hornbook law that Georgia counties are limited to the "powers and limitations" expressly provided for them in the Georgia Constitution or Georgia statutes. *See* Ga. Const. art. IX, § 1, ¶ I; *Twiggs Cty. v. Atlanta Gas Light Co.*, 262 Ga. 276, 277 (1992); *see also Beazley v. De Kalb Cty.*, 210 Ga. 41, 43-47 (1953) (grant of power to counties must be "strictly construed"). In defining these limits, Georgia courts have unequivocally held that Counties do not have the power to recover for "expenditure of public funds in performing a public duty required by law" in civil lawsuits. *Torres*, 246 Ga. App. at 548; *Walker Cty. v. Tri-State Crematory*, 284 Ga. App. 34, 37 (2007)

29

("[A] county cannot recover the costs of carrying out public services from a tortfeasor whose conduct caused the need for the services."). In *Torres*, the court expressly rejected an attempt by a County to seek "compensatory damages for all the money the defendants' actions allegedly caused it to spend in '[s]ending the Building Inspector...[and] the Sheriff out' to the property." 246 Ga. App. at 548.

Yet, this is exactly the type of damages the Counties seek to recover in this suit. The Counties allege that Defendants must reimburse them for "governmental services" incurred "to address problems created by the vacancies and foreclosures on properties that have secured Defendants' predatory and discriminatory loans." Compl. ¶¶ 557-59. They claim that, as a result of Defendants' actions, the Counties' "housing, code enforcement, and law departments expend[ed] substantial personnel time and out-of-pocket costs" to address vacant properties and "public safety" and "public health concerns." *Id.* But it is clear that all of these "services" for which the Counties seek reimbursement are public services that the Counties are *required* to provide under Georgia law. There is no doubt that the *Torres* court foreclosed this exact theory but, even if one assumes "there is reasonable doubt of the existence of [this] particular [county] power, the doubt is to be resolved in the negative." *Mobley v. Polk Cty.*, 242 Ga. 798, 802 (1979).

## CONCLUSION

For all of the foregoing reasons, Defendants respectfully request that this Court grant their Motion to Dismiss and dismiss this case with prejudice.

Respectfully submitted this 29th day of January, 2016.

By: /s/ William V. Custer

WILLIAM V. CUSTER (Ga. Bar No. 202910)
*Bill.Custer@BryanCave.com*
EDWIN M. COOK (Ga. Bar No. 154203)
*Edwin.Cook@BryanCave.com*

BRYAN CAVE LLP
One Atlantic Center, 14th Floor
1201 W. Peachtree St., NW
Atlanta, GA 30309
Tel.: 404-572-6600
Fax: 404-572-6999

THOMAS M. HEFFERON (D.C. Bar No.
461750) (pro hac vice application pending)
*thefferon@goodwinprocter.com*
MATHEW S. SHELDON (D.C. Bar No. 998754)
(pro hac vice application pending)
*msheldon@goodwinprocter.com*
GOODWIN PROCTER LLP
901 New York Avenue NW
Washington, DC 20001
Tel.: 202-346-4000
Fax: 202-346-4444

Attorneys for BANK OF AMERICA
CORPORATION, BANK OF AMERICA, N.A.,
COUNTRYWIDE FINANCIAL
CORPORATION, COUNTRYWIDE HOME
LOANS, INC., COUNTRYWIDE BANK, FSB,
COUNTRYWIDE WAREHOUSE LENDING,
LLC, BAC HOME LOANS SERVICING, LP,
MERRILL LYNCH & CO., INC., MERRILL
LYNCH MORTGAGE CAPITAL INC., and
MERRILL LYNCH MORTGAGE LENDING,
INC.

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this document was prepared in compliance with Northern District of Georgia Local Rule 5.1C using Century Schoolbook 13-point font.

Dated: January 29, 2016    <u>/s/ William V. Custer        </u>
                            William V. Custer

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to the non-registered participants.

Dated: January 29, 2016          /s/ William V. Custer
                                 William V. Custer