IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

COBB COUNTY, DEKALB COUNTY, :
and FULTON COUNTY, :
:
   Plaintiffs, :
: CIVIL ACTION NO.
: 1:15-CV-04081-LMM
v. :
:
BANK OF AMERICA :
CORPORATION, BANK OF :
AMERICA, N.A., COUNTRYWIDE :
FINANCIAL CORPORATION, :
COUNTRYWIDE HOME LOANS, :
INC., COUNTRYWIDE BANK, FSB, :
COUNTRYWIDE WAREHOUSE :
LENDING, LLC, BAC HOME LOANS :
SERVICING, LP, MERRILL LYNCH :
& CO., INC., MERRILL LYNCH :
MORTGAGE CAPITAL INC., and :
MERRILL LYNCH MORTGAGE :
LENDING, INC., :
:
   Defendants. :

## **<u>ORDER</u>**

     This case comes before the Court on Defendants' Motion to Dismiss [21].

After due consideration and a hearing held on March 31, 2016, the Court enters

the following Order:

## I.    BACKGROUND[1]

Plaintiffs filed this case on November 20, 2015. Dkt. No. [1]. In their Complaint, Plaintiffs assert a single count under the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3604 *et seq.*, alleging that, over the last 15 years, Defendants have engaged in mortgage lending discrimination directed at minority borrowers within the Counties' borders. See generally id. Specifically, Plaintiffs allege that Defendants engaged in, and continue to engage in a discriminatory equity stripping scheme, and/or discriminatory loan servicing and foreclosures in violation of both §§ 3604 and 3605 of the FHA. Id. ¶ 3.

Plaintiffs posit that equity stripping occurs when mortgage lenders create expensive mortgage loans with onerous terms that are based on the value of the borrower's home rather than the borrower's ability to repay the loan. Id. Plaintiffs contend that these types of loans were designed to "maximize lender profits through loan pre-payment penalties, higher loan interest rates, increased mortgage servicing charges over the life of the loan and, most importantly, expensive added fees and increased interest rates charged to late-paying or defaulting borrowers." Id. In other words, Plaintiffs allege predatory loan origination coupled with predatory loan servicing and foreclosures.

Plaintiffs contend that this scheme creates both an intentional and disparate impact on minority borrowers, causing foreclosure. Id.  ¶¶ 9, 60.

---

[1] All facts are construed in a light most favorable to Plaintiffs as the non-moving parties.

Plaintiffs further allege that Defendants' scheme has harmed the Counties. Plaintiffs contend that Defendants' actions have caused and will continue to cause: (1) a reduction in the rate of minority homeownership in Plaintiffs' communities and neighborhoods, robbing those communities of their integrated racial character and injuring Plaintiffs through the segregative effect of Defendants' actions leading to urban blight; (2) organizational harm to Plaintiffs' departments and authorities because Defendants' conduct forced and continues to force reallocation of Plaintiffs' limited financial and human resources to address the harms Defendants' actions have caused; and (3) direct and indirect financial harm to Plaintiffs including the erosion of Plaintiffs' tax base, the loss of property tax revenue, out-of-pocket costs relating to abandoned or vacant properties, the loss of certain intangible property recording fee income, and other financial harm due to urban blight. Id. ¶ 11.

Plaintiffs ask for compensatory damages and punitive damages based on Defendants' allegedly "deliberate, egregious and widespread . . . predatory and discriminatory mortgage lending and servicing practices and policies." Id. ¶ 12. Defendants, however, ask the Court to dismiss Plaintiffs' action for failure to state a claim. Dkt. No. [21].

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). While this pleading standard does not require

"detailed factual allegations," the Supreme Court has held that "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

To withstand a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570). A complaint is plausible on its face when the plaintiff pleads factual content necessary for the court to draw the reasonable inference that the defendant is liable for the conduct alleged. Id.

At the motion to dismiss stage, "all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1273 n.1 (11th Cir. 1999) (citing Hawthorne v. Mac Adjustment, Inc., 140 F.3d 1367, 1370 (11th Cir. 1998)). However, the same does not apply to legal conclusion set forth in the complaint. Iqbal, 556 U.S. at 678.

## III.  DISCUSSION

Defendants make three arguments as to why the Court must dismiss Plaintiffs' claims. The Court will analyze each in turn.

### a.  Plaintiffs' Right of Action

As an initial matter, Defendants argue that Plaintiffs cannot bring this cause of action because they are not "persons" with a cause of action as defined

4

by the FHA.[2] The FHA defines "person" as "one or more individuals, corporations, partnerships, associations, labor organizations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in cases under Title 11, receivers, and fiduciaries." 42 U.S.C. § 3602(d). Defendants conclude that, because counties are not listed in that definition, they cannot bring suit as an aggrieved person.

To bolster that argument, Defendants discuss how counties in Georgia are considered political subdivisions of the State. The FHA defines "state" separately from its definition of "person." Defendants argue that Congress must have intended to limit who could bring suit as an aggrieved person only to those defined as "persons" and certainly not entities defined as "states." If it had intended otherwise, Defendants assert Congress would not have defined state separately and fail to include it in its definition of person.

Defendants contend this interpretation is supported by other civil rights statutes that specifically include "state" in their definition of "persons" capable of bringing suit. For example, in Title VII, Congress specifically amended the statute to include governments, their agencies, and their subdivisions as "persons" under the statute. The Equal Credit Opportunity Act also includes governments and their agencies and subdivisions as "persons" capable of bringing suit.

---

[2] Only aggrieved "persons" may sue under the FHA. 42 U.S.C. § 3613(a)(1)(A) ("An aggrieved person may commence a civil action.").

Defendants then argue that because states are assigned a very specific role under the FHA, Congress intended to limit their role. Under § 3616, qualified state agencies may be referred complaints and the secretary of the Department of Housing and Urban Development ("HUD") is authorized to "cooperate with State and local agencies charged with the administration of State and local fair housing laws." 42 U.S.C. § 3616. According to Defendants, this specific role of working with the HUD secretary and addressing specifically referred complaints means counties, as subdivisions of the state, cannot be considered persons under the statute.

Plaintiffs counter that Congress intended the FHA to have broad reach such that counties, as divisions of the state, can enforce the statute. As support, Plaintiffs rely on an Eleventh Circuit case, City of Miami v. Bank of America, 800 F.3d 1262 (11th Cir. 2015).

In that case, the city of Miami attempted to sue Bank of America and several other defendants for alleged FHA violations. Miami, 800 F.3d at 1266. The city alleged that the defendants had engaged in "a decade-long pattern of discriminatory lending in the residential housing market that caused the city economic harm." Id. The lower court granted the defendants' motion to dismiss, finding that the city lacked statutory standing because it fell outside the FHA's "zone of interests."[3] Id. at 1269-70.

---

[3] The lower court dismissed the claim on two other grounds that the Court need not discuss at this point in the Court's analysis.

6

According to the lower court, the city may have had Article III standing because it experienced some harm from the defendant's alleged actions. However, the lower court found that, to bring a cause of action under the FHA, the claimant must also be an "aggrieved person." Id.  See 42 U.S.C. § 3613 ("An aggrieved person may commence a civil action . . ."). The FHA defines an aggrieved person as "any person who . . . (1) claims to have been injured by a discriminatory housing practice; or (2) believes that such person will be injured by a discriminatory housing practice that is about to occur." 42 U.S.C. § 3602.

The lower court held that the city was not an aggrieved person under the statute, and therefore not within the statute's "zone of interest" because it had "merely economic injuries" unaffected by "racial interest." Miami, 800 F.3d at 1270. Consequently, the lower court found that the city lacked so-called "statutory standing."

The Eleventh Circuit rejected this finding and held that under relevant Supreme Court precedent, FHA "statutory standing" is co-extensive with Article III standing. Id. at 1277 (citing Gladstone Realtors v. Village of Bellwood, 441 U.S. 91, 98 (1979)). The city of Miami could be an aggrieved person under the statute even if it only suffered economic harm. Id. at 1278.

Plaintiffs claim Miami shows that the Counties can also be aggrieved persons so long as they have suffered economic harm caused by Defendants' discriminatory actions. Defendants counter that (1) cities and counties are different under Georgia law such that cities are not subdivisions of the state

7

whereas counties are, and (2) <u>Miami</u> had nothing to do with what or who constitutes a "person" under the statute. Defendants argue that the case only dealt with what types of harms create standing, not who is permitted to sue.

Plaintiffs respond to the first argument by suggesting that because cities are considered subdivisions of the state under Florida law the same way counties are considered subdivisions of the state under Georgia law, then by simply allowing the City of Miami to go forward with the cause of action, the Eleventh Circuit was concluding that subdivisions of a state may sue under the FHA. However, Plaintiffs' argument, equating cities with states, is contrary to Florida law.

When applying state law the Court is bound by the precedent of the highest court in the state. <u>See</u> <u>Molinos Valle Del Cibao, C. por A. v. Lama</u>, 633 F.3d 1330, 1348 (11th Cir. 2011) ("Where the highest court—in this case, the Florida Supreme Court—has spoken on the topic, we follow its rule."). As such, the Court is bound by the precedent set out by the Florida Supreme Court in both <u>Kaulakis v. Boyd</u>, 138 So.2d 505, 507 (Fla. 1962), and <u>City of Miami v. Rosen</u>, 10 So.2d 307, 309 (Fla. 1942), where it stated municipalities are not organized as political subdivisions of the state. Plaintiffs' argument that the Eleventh Circuit in <u>Miami</u> had already determined that state subdivisions could bring suit under the FHA is unpersuasive because the city of Miami is not a political subdivision of the state under Florida law. <u>See</u> <u>Rosen</u>, 10 So.2d at 309.

8

As to Defendants' second argument, the Court agrees that the parties in Miami never raised an argument about what or who is a "person" under the FHA. Instead, the case determined which types of *harm* create aggrieved persons—a different issue. And while there are a number of FHA cases with county-plaintiffs, none of those cases dealt with this specific question either. See DeKalb Cty. v. HSBC, No. 1:12-cv-03640-ELR, 2015 WL 8699229 (N.D. Ga. Nov. 16, 2015); Cty. of Cook v. Wells Fargo & Co., 115 F. Supp. 3d 909, 913 (N.D. Ill. 2015).

While the Eleventh Circuit has not specifically addressed this issue, the Tenth Circuit has addressed a similar issue. In Housing Authority of Kaw Tribe of Indians of Oklahoma v. City of Ponca City, 952 F.2d 1183, 1194 (10th Cir. 1991), the defendant argued that governmental agencies, as political subdivisions of the state of Oklahoma, could not bring suit under the FHA because they are not specifically defined as "persons." Kaw Tribe, 952 F.2d at 1194. As support, the defendant made many of the same arguments as the Defendants in this case. Specifically, the defendant argued that other Civil Rights acts specifically include states and their political subdivisions in the definition of persons. Id. at 1193-94. Additionally, the parties discussed the way in which the FHA purposely confers enforcement power to certified state agencies to which HUD specifically refers a complaint. Id. at 1195.

The Tenth Circuit rejected the defendant's argument, holding that the limited interpretation of "persons" under the FHA "would substantially thwart the goal of Congress when it enacted the Fair Housing Act." Id. at 1195. As

support, the court first turned to Supreme Court precedent in <u>Trafficante v. Metro. Life Insurance Co.</u>, 409 U.S. 205 (1972), and <u>Village of Bellwood</u>. While <u>Trafficante</u> and <u>Bellwood</u> focused primarily on who was an "aggrieved person" under the Act, the court found "they also provided some assistance in determining who is a 'person' under the Act." <u>Id.</u> at 1194. "As the Court in <u>Trafficante</u> recognized, 'the proponents of the legislation emphasized that those who were not the direct objects of discrimination had an interest in ensuring fair housing as they too suffered.'" <u>Id.</u> (quoting <u>Trafficante</u>, 409 U.S. at 210).

Turning to the legislative history, the court discussed how Congress "recognize[d] the valuable role state and local agencies play in the enforcement process." <u>Id.</u> (quoting H.R. Rep. No. 100-711, 100th Cong., 2d sess., <u>reprinted in</u> 1988 U.S. Code Cong. & Admin. News 2173, 2184) (alteration in original). The court held that, if it were to follow the defendant's interpretation of "person," it would completely exclude all state and local agencies from bringing suit and "thereby completely exclude from the Act's protection those agencies not 'certified' by HUD."[4] <u>Id.</u>

The Tenth Circuit did not "share the [defendant's] belief that by not specifically including within the definition of 'person' the terms 'governments, governmental agencies and political subdivisions' Congress meant to exclude

---

[4] In other words, the Tenth Circuit found that if it prevented state and local agencies from bringing a civil suit under § 3613, then only those few agencies certified by HUD to receive complaints under § 3610 would be protected from housing discrimination.

those entities from filing suit under 42 U.S.C. § 3613." Id. According to the court, "[i]t is clear that Congress intended to summon all available forces to 'vindicat[e] a policy that Congress considered to be of the highest priority.'" Id. (quoting Trafficante, 409 U.S. at 209.

The Court agrees with the Tenth Circuit's logic. Applying Supreme Court precedent, it is clear that Congress intended the FHA to be enforced broadly. See id. See also Estvanko v. City of Perry, No. 5:09-CV-137-CAR, 2011 WL 1750232, at *4-5 (M.D. Ga. May 6, 2011) (citing Kaw Tribe for the notion that Congress intended to include state agencies in the definition of "persons."). As a result, the Court rejects Defendants' argument that Plaintiffs are not persons capable of bringing suit. Instead, the Court finds that the County Plaintiffs are persons with a cause of action under the FHA.

### b. Statute of Limitations

Defendants next argue that, even if Plaintiffs can bring an FHA claim, their claims are completely barred by the statute of limitations. Section 3613(a)(1)(A) states, "An aggrieved person may commence a civil action . . . not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice." 42 U.S.C. § 3613(a)(1)(A). If they are not completely barred, Defendants contend they are at least partially barred as to specific, now-defunct Defendants.

### *i.  Are Plaintiffs' claims <u>completely</u> barred?*

Because Plaintiffs filed this cause of action on November 20, 2015, Defendants assert that Plaintiffs must allege acts of discriminatory housing practices within the two-year statute of limitations, on or after November 20, 2013. Defendants assert that Plaintiffs only allege FHA violations committed prior to the November 20, 2013, deadline. Defendants contend that all the allegations made after November 20, 2013 either lack specificity, are not acts which or prohibited by the FHA, or both.

As to specificity, Defendants rely on <u>Miami</u> where the Eleventh Circuit required the plaintiffs to allege specific facts supporting their allegations of discrimination. <u>Miami</u>, 800 F.3d at 1283-84. In <u>Miami</u>, the Eleventh Circuit noted that the FHA claimants "provided no specific information (e.g., the type of loan, the characteristics that made it predatory or discriminatory, when the loan closed, when the property went into foreclosure, etc.) for each address." <u>Id.</u> It remanded the case to the lower court so the plaintiff could amend to include more specific allegations. <u>Id.</u> <u>See also</u> <u>Federer v. Midland Mortg. Co.</u>, No 1:12-cv-2492-TWT, 2012 WL 5880916, at *4 (N.D. Ga. Nov. 21, 2012) (requiring plaintiff to allege specific acts of discrimination within the limitations period to show a continuing discriminatory housing practice that had not ceased before the period).

Defendants contend that Plaintiffs fail the Eleventh Circuit's specificity requirement because they fail to identify a single act of discriminatory loan

*origination* on or after November 20, 2013. According to Defendants, the Complaint is "conspicuously silent as to any lending conduct after the financial crisis hit in 2008." Dkt. No. [21-1] at 19. As a result, Defendants assert that the Court should dismiss Plaintiffs' claim.

Defendants further contend that, while Plaintiffs do allege foreclosures and loan servicing within the statutory period, those acts are (1) not contemplated by the FHA, and (2) similarly unspecific under <u>Miami</u>. As to their first contention, Defendants argue that the FHA only prohibits discriminatory loan origination such that any foreclosure, loan servicing, or general equity stripping[5] on an allegedly discriminatory loan is not a new act of discrimination but, at worst, "trailing consequences of past discrimination." <u>Id.</u> (citing <u>Ctr. for Biological Diversity v. Hamilton</u>, 453 F.3d 1331, 1335 (11th Cir. 2006)).

As support, Defendants cite § 3605 of the FHA. Section 3605 prohibits a business engaging in "residential real estate-related transactions to discriminate against any person in *making available such a transaction*, or in the terms or conditions of such a transaction, because of race . . ." 42 U.S.C. § 3605(a) (emphasis added). The statute defines a residential real estate-related transaction as "[t]he *making or purchasing* of loans or providing other financial assistance."

---

[5] Equity stripping often refers to stripping "the equity in the borrower's home by making a loan based solely on the amount of equity in the home rather than on the borrower's ability to repay the loan." Tania Davenport, *An American Nightmare: Predatory Lending in the Subprime Home Mortgage Industry*, 36 Suffolk U. L. Rev. 531, 542 (2003) (citing U.S. Dep't of Treasure & U.S Dep't of Hous. & Urban Dev., *Curbing Predatory Home Mortgage Lending*, 2 (2000)).

42 U.S.C. § 3605(b) (emphasis added). According to Defendants, the plain language of the statute clearly indicates that the FHA only prohibits discriminatory loan origination, not discriminatory foreclosures/loan servicing.[6]

Defendants argue that, even if the FHA contemplated discriminatory loan servicing and foreclosures, Plaintiffs' allegations still fail the Eleventh Circuit's specificity requirement in Miami. Defendants contend that Plaintiffs have not described how the foreclosures/loan services operated in a discriminatory manner or whether these acts are even exclusively visited upon minority groups.

In analyzing this equity stripping statute of limitations issue, the first question for the Court is whether the FHA allows claims for discriminatory equity stripping. If so, the Court will then answer whether the statute of limitations prevents Plaintiffs' equity stripping claims from going forward. If the claims are not barred by the statute of limitations, the Court must then determine what level of specificity is required for Plaintiffs' allegations

> 1. *Does the FHA contemplate discriminatory equity stripping?*

Plaintiffs assert that both § 3605 and § 3604(a)-(b) allow claims for discriminatory equity stripping. As discussed above, § 3605 prohibits an entity from discriminating against minority borrowers in making loans available. 42 U.S.C. § 3605. Section 3604(a) prohibits entities from refusing to sell, rent, or

---

[6] Importantly, Defendants fail to discuss whether § 3604 might contemplate foreclosures/loan servicing and simply reject Plaintiffs' use of the provision. See Dkt. No. [25] at 10.

make otherwise unavailable a dwelling to any person on the basis of race, color, religion, sex, familial status, or national origin. 42 U.S.C. § 3604(a). Section 3604(b) prohibits entities from discriminating against a person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith. 42 U.S.C. § 3604(b).

Plaintiffs contend that courts generally construe §§ 3605 and 3604 broadly to keep with the FHA's remedial purpose such that the Court should include equity stripping within the ambit of those provisions. As support, Plaintiffs cite a number of cases in which the courts relied on an expansive scope of §§ 3605 and 3604.

As to § 3605, Plaintiffs cite Rodriguez v. Bear Stearns Cos., Inc., No. 07-cv-1816, 2009 WL 995865 (D. Conn. April 14, 2009).[7] In that case, the plaintiffs alleged that the defendants violated § 3605 when they engaged in discriminatory writing and residential loan servicing practices that disparately impacted minorities.[8] Rodriguez, 2009 WL 995865 at *2. According to the facts, the

---

[7] Plaintiffs cite several other cases related to § 3605, however, those cases are unpersuasive because they contemplate *who* might be held liable under the FHA for issues surrounding loan origination, not what other actions might be actionable under the FHA. See Eva v. Midwest Nat'l Mortg. Bank, Inc., 143 F. Supp. 2d 862, 889 (N.D. Ohio 2001) (holding that § 3605 does not require a defendant to be a mortgage lender, banker, mortgage arranger, or creditor); Adkins v. Morgan Stanley, No. 12-CV-7667-HB, 2013 WL 3835198, at *9 (S.D.N.Y. July 25, 2013) (holding that the defendant, which was not the loan originator, was liable under § 3605 for its policy of only buying discriminatory loans which in turn caused the loan originator to sell discriminatory loans).

[8] The plaintiffs' intentional discrimination claims in Rodriguez were dismissed for lack of specific factual allegations. Id. at *10.

defendants often charged the plaintiffs with erroneous fees or wrongly placed them in delinquent status such that, when attempting to get subsequent loans or to refinance their loans, the claimants were either denied or made to pay higher interest rates. Id. at *4-5. Based on those facts, the court found that the defendants were making loan unavailable to the plaintiffs and thus denied the motion to dismiss. Id. at *7. See also Hargraves v. Capital City Mortg. Corp., 140 F. Supp. 2d 7, 18 (D.D.C. 2000) (denying summary judgment on claims for discriminatory loan servicing when claimants had presented facts to show, among other things, that the defendants enacted fraudulent fees and penalties on the loans they serviced). While the court in Rodriguez did not explicitly discuss whether § 3605 applied to discriminatory loan servicing, the issue seems not to have been disputed. See generally id.

Defendants contend that § 3605's plain language clearly limits its application to the entity actually engaging in *lending* conduct rather than an entity engaging in related servicing. However, nothing in the language specifically says that only the lenders are liable for making loans unavailable. See 42 U.S.C. § 3605. Instead, the provision states, "It shall be unlawful for *any* person or other entity . . . to discriminate against any person *in making available* such a transaction." Id. (emphasis added). Thus, it is clear to the Court that § 3605 applies to any entity that makes any loan unavailable to minority borrowers either directly or indirectly through its actions.

16

For instance, in <u>Rodriguez</u>, the defendants were not accused of making their own loans unavailable to minority borrowers. <u>See generally</u> <u>Rodriguez</u>, 2009 WL 995865 at *2. Instead, they were accused of making other entities' loans unavailable to minority borrowers indirectly by erroneously affecting their credit. <u>Id.</u> at *4 ("The Roriguezes elected to refinance their loan with another mortgage company to escape EMC's predatory practices. [] As a result [of the defendants' actions], the Rodriguezes incurred over $10,000 in expenses and continue to have derogatory information on their credit histories, which has led to the denial of financing on other attempted purchases.") (internal citations omitted). Such an interpretation of § 3605 fits both the plain language of the statute and the FHA's broad remedial purpose.[9]

As to § 3604, Plaintiffs cite a number of cases that demonstrate why courts should apply the provision to any discriminatory practice that decreases housing availability or services on the basis of race. For instance, in <u>Laufman v. Oakley Building & Loan Co.</u>, 408 F. Supp. 489, 492 (S.D. Ohio 1976), the district court considered the scope of § 3604 as it related to discriminatory redlining practices.[10] <u>Laufman</u>, 408 F. Supp. at 492. The plaintiffs argued that by engaging

---

[9] Importantly, Defendants fail to address this case or explain why discriminatory loan servicing and foreclosures would *not* create a barrier to future refinancing or future loans in violation of § 3605.

[10] It was undisputed that § 3605 applied as redlining is the practice of denying or limiting financial services to certain neighborhoods based on racial or ethnic composition regardless of an applicant's qualifications or creditworthiness. <u>Id.</u>

in discriminatory redlining, the defendants were causing housing to be "otherwise unavailable" in violation of the FHA.

The defendants argued that the plain language of the statute clearly indicates that § 3604 only concerns the discriminatory actions of sellers and/or renters—not the actions of a loan association not actively involved in the sale or rental of housing. However, the court found that an "examination of [section] 3604 reveals that it not only deals with discrimination in the sale or rental of housing in the broadest possible manner, but also has explicit application to other situations as well, so that coverage clearly extends beyond the usual purview of the terms 'sale or rental.'" Id.[11]

---

[11] Plaintiffs cite a number of other cases. In U.S. v. Mitchell, 580 F.2d 789, 791 (5th Cir. 1978) superseded on other grounds by statute as stated in U.S v. City of Jackson, Miss., 359 F.3d 727 (5th Cir. 2004), the Fifth Circuit found that, in steering minorities "to a particular group of apartments in a complex effectively denie[d] access to equal housing opportunities" in violation of § 3604(a). Mitchell, F.2d at 791. Such activity "evidence[d] an intent to influence the choice of the renter on an impermissible racial basis." Id.

In Hanson v. Veterans Administration, 800 F.2d 1381, 1386 (5th Cir. 1986), the same circuit found that discriminatory appraisal practices also violated § 3604 as they effectively prevented minorities "from purchasing or selling a home for its fair market value." Hanson, 800 F.2d at 1386. According to the court, "[t]his interferes with the exercise of rights granted by the Fair Housing Act." Id.

In Reeves v. Carrollsburg Condo. Association, No. CIV. A. 96-2495RMU, 1997 WL 1877201 (D. D.C. Dec. 18, 1997), the claimant alleged that her condo association engaged in discriminatory housing practices in violation of § 3604 when it failed to stop other condo owners from harassing the claimant on the basis of her sex and race. Reeves, 1997 WL 1877201 at *1 n. 1. See also id. at *5 n. 7. While the court did not explicitly discuss whether failing to prevent discrimination in a housing context amounts to decreasing housing availability in violation of § 3604, the court denied the defendant's motion for summary judgment, stating, "the record contains sufficient factual basis for a jury to find

The Court agrees with Plaintiffs' contention that pleading a discriminatory practice causing a decrease in housing availability or services to minorities, either directly or indirectly, states a claim for a violation § 3604 of the FHA. Again, Defendants ignore these § 3604 cases and simply state that discriminatory equity stripping schemes do not fall under § 3605. Dkt. No. [25] at 13. Because Defendants fail to provide a reason why the Court should not interpret § 3604 broadly in light of these cases, the Court declines to dismiss Plaintiffs' § 3604 claims.

### 2. *Does the statute of limitations prevent Plaintiffs' equity stripping claims?*

Now that the Court has determined Defendants failed to show that Plaintiffs' claims should be dismissed because the FHA does not apply to discriminatory equity stripping, the Court must decide whether Plaintiffs' claims are barred by the statute of limitations.

Plaintiffs contend that the statutory period has not begun to run. According to Plaintiffs, the two-year limitations period does not commence until "after the

---

that the Association knew or should have known of the incidents and took little, if any, action to correct the situation." Id. at *8. It appears that the issue of applicability was undisputed. See generally id.

And lastly, in NAACP v. American Family Mutual Insurance Co., 978 F.2d 287 (7th Cir. 1992), the claimants alleged that, by refusing to write policies or by setting the insurance prices too high for minorities, the defendant insurers where denying housing in violation § 3604. NAACP, 978 F.2d at 297 ("No insurance, no loan; no loan, no house; lack of insurance thus makes housing unavailable."). The court held, "[n]othing in the text of the statute permits us to reject these proposed readings," and "[s]ection 3604 applies to discriminatory denials of insurance[] and discriminatory pricing." Id. at 298, 301.

occurrence or the termination of an alleged discriminatory housing practice . . . whichever occurs last." Dkt. No. [23] at 6-7 (quoting 42 U.S.C. § 3613(a)(1)(A)). Plaintiffs argue that "termination" means the limitations period does not begin to run until the loan is either paid in full or foreclosed upon. Therefore, Plaintiffs argue, because they have alleged an ongoing discriminatory equity stripping scheme with loans still outstanding, the discriminatory acts have not terminated and the limitations period has not begun.

Plaintiffs argue that because the limitations period has not begun, they need not specifically identify a single act of discrimination within the last two years. Dkt. No. [23] at 11 ("In fact, the Counties are under no duty to 'identify a single instance of a single minority borrower whose loan was serviced by Defendants.'"). Plaintiffs contend that because Defendants have engaged in a "pattern and practice of violat[ing] the FHA through a multifaceted scheme continu[ing] beyond the filing of the Complaint," Plaintiffs' statistical data demonstrating foreclosure rates, devoid of specificity, is sufficient at this stage in the litigation. Id. at 12-13.

However, the Court disagrees with Plaintiffs' arguments on this issue. While it is true that the language of § 3613(a)(1)(A) suggests the limitations period only begins after the loan is paid in full or foreclosed upon, a look at case law shows that "termination" was intended to codify the continuing violation doctrine discussed in Havens Realty Corp. v. Coleman, 455 U.S. 363, 380-81 (1982). See Cty. of Cook v. Bank of Am. Corp., No. 14 C 2280, 2015 WL 1303313,

at *5 (N.D. Ill. Mar. 19, 2015) ("[The termination] language was added to the FHA in 1988 to codify the continuing violation doctrine recognized in <u>Havens</u>.");

<u>Moseke v. Miller and Smith, Inc.</u>, 202 F. Supp. 2d 492, 504 (E.D. Va. 2002) ("It is this latter phrase, that is 'the termination of a discriminatory housing practice,' that supports the continuing violation doctrine."); H.R.REP. No. 100-711, at 33 (1988), <u>reprinted in</u> 1998 U.S.C.C.A.N. 2173, 2194 ("A complaint must be filed within one year from the time the alleged discrimination occurred or terminated. The latter term is intended to reaffirm the concept of continuing violations, under which the statute of limitations is measured from the date of the asserted occurrence of the unlawful practice.") (citing <u>Havens</u>, 455 U.S. at 380-81).[12]

In <u>Havens</u>, the Supreme Court found that the continuing violation doctrine applies when a plaintiff "challenges not just one incident of conduct violative of the [FHA], but an unlawful practice that continues into the limitations period." <u>Havens</u>, 455 U.S. at 380-81. The Supreme Court found that a complaint is deemed timely, even if it contains ostensibly untimely claims, "when it is filed within 180 days of the last asserted occurrence of that practice."[13] <u>Id.</u> at 381.

At the time of the <u>Havens</u> decision, the FHA did not include "termination" in its statute of limitations provision. However, after the <u>Havens</u> decision, Congress amended the Act to include the phrase specifically to allow continuing

---

[12] Congress has since amended the limitations period from one year to two years. 42 U.S.C. § 3613(a)(1)(A).

[13] Congress has since amended the limitations period from 180 days to two years. 42 U.S.C. § 3613(a)(1)(A).

violation theories. See Cty. of Cook, 2015 WL 1303313 at *5; Moseke, 202 F. Supp. 2d at 504; H.R.REP. No. 100-711, at 33 (1988), reprinted in 1998 U.S.C.C.A.N. 2173, 2194.

Importantly, the continuing violation doctrine does not prevent the limitations period from commencing. Rather, it merely tolls the statute of limitations for a claim "that otherwise would be time-barred." Nat'l Parks & Conservation Ass'n v. Tenn. Valley Auth., 502 F.3d 1316, 1322 (11th Cir. 2007) (citing Havens, 455 U.S. at 380-81). Therefore, the Court declines to find that, in this case, the limitations period does not begin to run until all discriminatory loans are paid in full or foreclosed upon. Instead, the Court finds that the limitations period has begun to run on any and all prohibited actions that occurred before the start of this suit.

Because the period has commenced, Plaintiffs must allege at least one FHA violation within the statutory period if it wishes to maintain its claims. Miami, 800 F.3d at 1284. As to claims outside the limitations period, the Court finds they would then be actionable if the continuing violation doctrine applies. See id. The Eleventh Circuit has held that "the critical distinction in the continuing violation analysis is whether the plaintiff complains of the present consequence of a one time violation, which does not extend the limitations period, or the continuation of that violation into the present, which does." Porter v. Ray, 461 F.3d 1315, 1323 (11th Cir. 2006) (quotations omitted). Plaintiffs have not alleged claims based on isolated incidents, "but a continuing violation manifested in a number of

22

incidents." Havens, 455 U.S. at 381. Therefore, the Court finds that Plaintiffs' earlier claims are subject to the continuing violation doctrine because they are alleged to have continued into the statutory period. Id. at 380-81. See Miami, 800 F.3d at 1285.

Defendants contend that the doctrine cannot apply because Plaintiffs knew about the alleged violations when they filed a nearly identical suit in October of 2012. See Wood v. Briarwinds Condo. Ass'n Bd. of Directors, 369 F. App'x 1, 4-5 (11th Cir. 2010) ("In the case of a continuing violation [of the FHA], the statute of limitations will run from the moment the violation begins if the violation continues only because of the plaintiff's knowing failure to seek relief.") (citing Roberts v. Gadsen Mem'l Hosp., 850 F.2d 1549, 1550 (11th Cir. 1988) (finding a claim of a "continuing" injury was time-barred when the plaintiff knowingly failed to exercise his rights)). See Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1222 (11th Cir. 2001) (continuing violation doctrine does not apply in age discrimination cases if claimant knew about his or her claim before the statutory period but failed to act). Defendants contend that the only difference between that suit and the present suit is the named Defendants.

However, as Plaintiffs argue, their prior suit does not necessarily show that they would have been on notice of these exact claims against these exact defendants. While Defendants cite cases they claim show a prior suit puts a plaintiff on notice, those cases are distinguishable from the case at bar. Specifically, in each case, the prior suit was with the same defendants. See

generally <u>Gumbus, Jr. v. United Food & Commercial Workers Int'l Union</u>, Nos.
93–5113, 93–5235, 47 F.3d 1168, 1995 WL 5935 (6th Cir. Jan. 6, 1995)
(unpublished); <u>Loyd v. Huntington Nat'l Bank</u>, No. 1:08-CV-2301, 2009 WL
1767585, at *10 (N.D. Ohio June 18, 2009).

Additionally, Defendants' request that Plaintiffs amend their Complaint to
allege they did not know about the claims earlier is unnecessary. Defendants fail
to cite any authority supporting this requirement under the continuing violation
doctrine. The only cited case requiring such an allegation dealt with equitable
tolling for fraudulent concealment which necessarily requires heightened
allegations. <u>Gumbus</u>, 1995 WL 5935 at *3. As such, the Court rejects Defendants'
arguments for dismissal at this stage but finds the continuing violation doctrine
does apply.

### 3.  What level of specificity is required?

The next question for the Court is what level of specificity in the pleadings
is required for Plaintiffs' alleged FHA violations. Plaintiffs contend <u>Miami</u>'s
specificity requirement does not apply because the type of discrimination at issue
in this case is "multifaceted" while the discrimination at issue in <u>Miami</u> only
touched upon loan origination. Dkt. No. [23] at 19-20 n. 10. However, the Court
is unconvinced by this logic. Nothing in the language of <u>Miami</u> leads the Court to
believe that specific allegations are only required in loan origination cases and
not all FHA cases. While Plaintiffs argue that the language in <u>Miami</u> requiring
more specificity is merely *dicta*, the Court disagrees as the language instructed

the plaintiffs on what they needed to allege on remand. <u>Miami</u>, 800 F.3d at 1283-84.

Because the <u>Miami</u> specificity requirement applies, the Court, in applying that standard, finds that Plaintiffs' allegations are insufficient. Plaintiffs have not described "the type of loan, the characteristics that made it predatory or discriminatory, when the loan closed, when [and if] the property went into foreclosure, etc." <u>Id.</u> Instead, Plaintiffs point to statistical data devoid of any specific facts of a particular claim.

However, the Court will allow Plaintiffs to amend their Complaint to include more specific facts for each county's claim. Plaintiffs should note that, if they fail to allege a violation within the limitations period with the requisite specificity, the case cannot go forward. <u>See id.</u> at 1284. As to individual claims both inside and outside the limitations period, Plaintiffs must plead at least one FHA violation per Defendant. <u>Id.</u> (calling for specificity as to each claim even when the plaintiffs alleged a continuing scheme, policy, and/or practice).

### ii. Are Plaintiffs' claims <u>partially</u> barred?

Defendants argue that, even if Plaintiffs' claims are not completely barred by the statute of limitations, they are at least partially barred as to certain Defendants. First, Defendants contend that the Court must dismiss all claims against the Countrywide and Merrill Lynch Defendants because Plaintiffs have failed to allege that they committed any violations within the limitations period. Second, Defendants argue that because Bank of America Corporation ("BAC"),

Countrywide Financial Corporation ("CFC"), and Merrill Lynch & Co., Inc. ("MLC") are merely holding companies rather than loan servicers, they cannot legally violate the FHA—nor have Plaintiffs alleged as much. As a result, Defendants argue that all claims against these Defendants must be dismissed— leaving only Bank of America, N.A. ("BANA") and Bank of America Corporation Home Loans Servicing, LP ("BAC HLS").

As to whether they can hold the Countrywide and Merrill Lynch Defendants liable under the FHA, Plaintiffs contend that they are "entitled to pursue damages resulting from Defendants' entire equity stripping scheme, for the entire life of the scheme." Dkt. No. [23] at 26 (citing Tyus v. Urban Search Mgmt., 102 F.3d 256, 264-66 (7th Cir. 1996)). While Plaintiffs seem to concede that the Countrywide and Merrill Lynch Defendants did not participate in the scheme during the limitations period, they argue that Bank of America is the successor in liability such that the scheme continued even after Countrywide and Merrill Lynch ceased independent operations. According to Plaintiffs, it would be nonsensical for the Court to permit Plaintiffs to recoup damages for an entire scheme but allow wrongdoers who profited from the discriminatory scheme to cleanse themselves of liability via acquisition.

However, Plaintiffs' successor liability argument does not demonstrate why Merrill Lynch and Countrywide should be named Defendants. Instead, successor liability only relates to the liability of the acquiring entity, not the acquired company. See City of L.A. v. Wells Fargo & Co., 22 F. Supp. 3d 1047, 1062 (C.D.

Cal. 2014) (finding that the plaintiff properly alleged that the parent corporation was liable, through successor liability, for the loans it acquired through its acquisition of other lending entities). While Plaintiffs may have a claim for the earlier Countrywide and Merrill Lynch violations through Bank of America's alleged successor liability, if they wish to keep those Defendants in the case, Plaintiffs must allege specific facts showing at least one violation of the FHA within the limitations period per Defendant.[14] See generally Miami, 800 F.3d at 1284-85 ("[I]f the City is able to identify FHA violations within the limitations period—[it is] on all fours with Havens."). And while they have not done so, the Court will allow Plaintiffs to amend their Complaint to include allegations that might cure this deficiency, if such facts exist.

As to the second issue, Plaintiffs argue that the Court should not grant dismissal as to BAC, CFC, and MLC based solely on Defendants' characterization of them as holding companies. Instead, Plaintiffs contend that the FHA applies to "all participants in the process as a whole." Dkt. No. [23] at 23 (quoting United States v. Quality Built Const., Inc., 309 F. Supp. 2d 756, 762 (E.D.N.C. 2003)).

The Court agrees. While Defendants cite a number of cases dismissing FHA claims against holding companies, those cases were at the summary judgment stage, not the motion to dismiss stage. See City of L.A. v. Bank of Am. Corp., No. CV 13-9046 PA (AGRx), 2015 WL 4880511, at *1 (C.D. Cal. May 11, 2015);

---

[14]Plaintiffs contend, and Defendants do not contest, that they have successfully alleged Bank of America's successor liability as to Countrywide and Merrill Lynch. Dkt. No. [23] at 25 (citing Dkt. No. [1] ¶¶ 586-620).

<u>Matarese v. Archstone Pentagon City</u>, 761 F. Supp. 2d 346, 366 (E.D. Va. 2011).[15] Because this is a motion to dismiss, the Court must take Plaintiffs' well-pleaded allegations as true. <u>Bryant</u>, 187 F.3d at 1273 n.1. As such, the Court is not going to dismiss holding company Defendants merely because they are holding companies. Instead, the Court must determine whether Plaintiffs have properly alleged their participation.

A look at the allegations, however, shows that Plaintiffs have not properly alleged the holding companies' participation in the scheme. Plaintiffs' only allegation states, "Defendants also used their bank holding company corporate structure to conceal their discriminatory lending practices by shifting loans and loan applications between their mortgage lending operations at their regulated banking entities and their non-regulated mortgage lending subsidiaries and affiliates." Dkt. No. [1] ¶ 539. This allegation fails <u>Miami</u> as it does not identify the claims with enough specificity. <u>See</u> <u>Miami</u>, 800 F.3d at 1283-84. However, the Court will allow Plaintiffs to amend their Complaint to include more specific allegations as to these holding companies, if such facts exist.

### c. Remaining Issues

Defendants next argue two remaining issues. First, Defendants contend that Plaintiffs fail to properly allege a claim for disparate impact. Second,

---

[15] Defendants also cite <u>Mejia v. EMC Mortgage Corp.</u>, No. 09-CV-4701, 2011 WL 2470060, at *3 (C.D. Cal. June 16, 2011), which dealt with a motion to dismiss. However, that case never mentions holding companies or whether they must be dismissed at the motion to dismiss stage. <u>See generally</u> <u>Mejia</u>, 2011 WL 2470060 at *3.

Defendants contend that Plaintiffs cannot recover for governmental services damages.

### i. Disparate Impact

Defendants argue that Plaintiffs have failed to properly allege a claim for disparate impact in light of the recent Supreme Court ruling in Texas Department of Housing & Community Affairs v. Inclusive Communities Project, Inc., 135 S. Ct. 2507, 2513 (2015).[16] Defendants argue that Inclusive Communities requires a claimant to (1) show statistically imbalanced lending patterns which adversely impact a minority group; (2) identify a "facially neutral" policy followed by the defendant during the same period of time; (3) show how that policy is artificial, arbitrary, and unnecessary; and (4) allege how that policy was a substantial cause of the adverse lending patterns. Dkt. No. [21-1] at 22 (citing Inclusive Communities, 135 S. Ct. at 2524, 2550; EEOC v. Joe's Stone Crab, Inc., 220 F.3d 1263, 1274-78 (11th Cir. 2000)). According to Defendants, Plaintiffs fail to allege the last three requirements.

### 1. Facially Neutral Policy

Defendants argue that Plaintiffs' disparate impact claim fails because they only allege *intentional* discrimination rather than a facially neutral policy with a

---

[16] "[A] plaintiff bringing a disparate-impact claim challenges practices that have a 'disproportionately adverse effect on minorities' and are otherwise unjustified by a legitimate rationale." Id. (quoting Ricci v. DeStefano, 557 U.S. 557, 577 (2009)).

discriminatory effect. For instance, Plaintiffs allege that Defendants' policies "directly target[] minority African American and Latino mortgage borrowers" and "steer minority borrowers into more costly loans." Dkt. No. [1] ¶ 6. See also id. ¶¶ 49, 59-60, 93, 98, 282-86, 373, 622-24. According to Defendants, because these are allegations of disparate treatment rather than impact, Plaintiffs fail to show a facially neutral policy.[17]

Additionally, Defendants assert that Plaintiffs' overall disparate impact theory is defective on a larger level. Specifically, Defendants assert that Plaintiffs' attempt to lump every action Defendants have taken in the Metro Atlanta area into an all-encompassing discriminatory policy is inconsistent with Inclusive Communities. In Inclusive Communities, the Supreme Court cautioned that courts must ensure disparate impact claims are properly pled and properly limited to "avoid the serious constitutional questions that might arise." Inclusive Communities, 135 S. Ct. at 2522-23. According to Defendants, Plaintiffs' attempt

---

[17] Similarly, Defendants contend that even if Plaintiffs could allege a facially neutral policy with a disparate impact, such a claim would be doomed by Plaintiffs' disparate treatment theory as a claimant "may not prevail under both." Dkt. No. [21-1] at 31 (quoting Rivera-Andreu v. Pall Life Scis. PR, LLC, No. 14-CV01029, 2014 WL 5488409, at *4 (D.P.R. Oct. 29, 2014)). However, Defendants oversimplify the holding in Rivera-Andreu. In that case the court found "it is possible to bring both a disparate treatment and a disparate impact claim in the same litigation" if "the claims are conceptually and factually distinct." Rivera-Andreu, 2014 WL 588409 at *4. The case shows that a plaintiff may not bring both claims only when "the allegations have been conflated." Id.

While the Court agrees that Plaintiffs conflate the allegations of each claim, it is not willing to say that they cannot, as a matter of law, assert both claims. If Plaintiffs can show in their Amended Complaint that the claims are factually distinct, then the disparate impact claim may continue. See id.

to challenge everything Defendants have done violates the particularized standard in Inclusive Communities.

Plaintiffs' only response is that they have alleged a variety of practices that, depending on how they are implemented and the intent of the Defendants, can also be facially race neutral. And while that may be the case, it is not what Plaintiffs alleged in their Complaint. Instead, they continuously allege intentional decisions on the part of Defendants to discriminate against minorities rather than pleading a facially neutral policy as required.

### 2. Artificial, Arbitrary, and Unnecessary

Defendants next argue that Plaintiffs' failure to identify a facially neutral policy also prevents them from meeting the related requirement that any complaint identify how a challenged policy is an "artificial, arbitrary, and unnecessary barrier[]." Dkt. No. [21-1] at 25. In Inclusive Communities, the Supreme Court said, "Governmental or private policies are not contrary to the disparate-impact requirement unless they are 'artificial, arbitrary, and unnecessary barriers.'" Inclusive Communities, 135 S. Ct. at 2524 (quoting Griggs v. Duke Power Co., 401 U.S. 424, 431 (1971)). Again, this goes to the Supreme Court's priority in protecting "potential defendants against abusive disparate-impact claims" as those defendants may be "prevent[ed] from achieving legitimate objectives." Id.

Here, Plaintiffs have not alleged that the policy causing a disparate impact is artificial, arbitrary, and unnecessary. Nor have they given a reason why they

should not. Instead, Plaintiffs only argue that non-racial factors cannot account for the disparate impact. However, the Court finds that this is insufficient under Inclusive Communities as the Supreme Court has explicitly called for claimants to allege, and then eventually show, that a policy is artificial, arbitrary, and unnecessary. Id.

### 3.   Substantial Cause

Defendants assert that Plaintiffs' inability to identify a facially neutral policy "dooms their ability to demonstrate any resulting causation" as required in Inclusive Communities. Dkt. No. [21-1] at 26. While Plaintiffs have alleged that minority borrowers were more likely than non-minority borrowers to receive undesirable loans and loan servicing, their allegations only go to the first prong of a disparate impact claim (requiring a showing of statistically imbalanced lending patterns which adversely impact a minority group), leaving the fourth prong unsatisfied.

The Supreme Court held, "[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact." Inclusive Communities, 135 S. Ct. at 2523 (quoting Wards Cove Packaging Co. v. Atonio, 490 U.S. 642, 653 (1989)). Instead, claimants must demonstrate how the defendant's policy caused the racial imbalance, or else defendants might be "held liable for racial disparities they did not create." Id. Because Plaintiffs fail to allege exactly how Defendants' policies lead to the alleged statistical imbalance, they have failed to satisfy the fourth prong. Id.

However, because the Court is allowing Plaintiffs to amend their Complaint to address the statute of limitations deficiencies, it will also allow Plaintiffs to amend their Complaint to fix the issues identified in these sections (i.e. not alleging a facially neutral policy, not alleging that the policy is arbitrary, artificial, and unnecessary, and not properly alleging causation).[18]

### ii.  Governmental Services

The next issue is whether Plaintiffs are entitled to governmental services damages. Defendants argue that, under the Free Public Services Doctrine, Georgia law prevents governmental entities from suing for governmental services damages. Plaintiffs counter that the FHA preempts this doctrine because it conflicts with its broad remedial purpose.

However, the Court finds that it is not necessary to fully address this issue because the Court is dismissing Plaintiffs' claims for other reasons. Addressing issues of damages at this point could be futile as Plaintiffs may or may not have the necessary factual allegations to survive another motion to dismiss. Nonetheless, if Plaintiffs are able to sufficiently amend their Complaint and

---

[18] Defendants also argue that Plaintiffs' disparate impact claim is untimely as they fail to allege any policy implemented within the limitations period. However, like the disparate treatment claim, the Court will allow Plaintiffs to amend their Complaint to ensure that they allege a facially neutral policy that Defendants implemented within the limitations period. Lewis v. City of Chi., Ill., 560 U.S. 205, 214 (2010) (allowing a claim for disparate impact when the defendant implemented a discriminatory policy outside the limitations period but then implemented that policy again within the limitations period).

Defendants still wish to make this challenge, the Court asks that the parties provide more detailed briefing on this issue.

## IV.  CONCLUSION

In accordance with the foregoing, the Court **GRANTS** Defendants' Motion to Dismiss [21]. However, Plaintiffs are permitted to file an Amended Complaint as discussed in this Order if they so choose.

**IT IS SO ORDERED** this 2nd day of May, 2016

LEIGH MARTIN MAY
UNITED STATES DISTRICT JUDGE