UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| COBB COUNTY, DEKALB COUNTY, and FULTON COUNTY, GEORGIA,<br><br>          Plaintiffs,<br><br>v.<br><br>BANK OF AMERICA CORPORATION, et al.,<br><br>          Defendants. | CIVIL ACTION NO.: 1:15-CV-04081-LMM |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO COMPEL DEFENDANTS' LOAN DATA

Plaintiffs Cobb County, DeKalb County, and Fulton County, Georgia (collectively, "Plaintiffs" or the "Counties") move to compel Defendants to produce the loan data responsive to Plaintiffs' Requests for Production 57 - 60 for the period January 1, 2004, to the present.[1]

I. INTRODUCTION

This Court should compel Defendants to produce the requested information, consisting of the electronic loan data for the mortgage loans each Defendant made, purchased or acquired after January 1, 2004. This data is crucial to Plaintiffs' ability to prove liability and establish proximate cause between Defendants' discriminatory loans/foreclosures and Plaintiffs' damages. Plaintiffs would be highly prejudiced by a data set limited to only those loans still being serviced after November 2013. In addition, the resulting bifurcated process of forcing Plaintiffs' experts to analyze an inadequate set of data, subjecting the experts' analysis to a preliminary *Daubert* challenge, and then have the experts re-run that analysis on a larger set of data would be incredibly inefficient, much more costly to the

---

[1] This Court considered the parties' short position statements on the discovery of the mortgage loan data called for in the Requests and held a hearing with counsel on May 12, 2022, during which the Court authorized the filing of a motion to compel on or before May 26, 2022. Plaintiffs hereby revise the date for the requested loan data to begin as of January 1, 2004 (rather than January 1, 2003), to be consistent with the language in their discovery requests and the agreed loan data start date in the *Cook County* matter.

Plaintiffs, and would waste the Court's limited resources on duplicative motion practice.

The Court's decision on the limitations period (which limits Plaintiffs' claims to those loans foreclosed after November 2013) must not be conflated with an arbitrary barrier to cut off relevant and critical discovery necessary for Plaintiffs to prove their case. Here, much of Plaintiffs' proof turns on the information contained within Defendants' loan data – which directly reflects the discriminatory practices alleged in the Complaint.

To show that Defendants' loans serviced after November 2013 were discriminatory when originated – meaning that minorities disproportionately received more loans with predatory characteristics (and/or higher costs) than non-minorities – Plaintiffs' experts must compare and contrast the characteristics of those loans (and of the borrowers) to the full set of loans Defendants originated (and/or purchased) during a similar temporal period. This can be done through regression and other statistical analysis. Similarly, Plaintiffs' experts must compare and contrast Defendants' servicing/foreclosure outcomes across the full data set, regardless of whether such loans were serviced after November 2013.

As to proportionality, there is no additional burden on Defendants to produce the requested data for all the loans in the respective Counties beginning

January 1, 2004 as opposed to producing data for only some of those loans. On the contrary, a "phased" loan data production approach would be unnecessarily prejudicial to Plaintiffs and uninformative for Plaintiffs' experts. Indeed, requiring Plaintiffs' experts each to perform multiple expensive analytics on at least two sets of data, create separate reports, and potentially appear for multiple depositions and hearings would result in a waste of the Counties' (and Court's) limited resources.[2]

Finally, the erroneous decision to exclude expert testimony by the court in *County of Cook v. Bank of America* ("Cook County"),[3] constituting an abuse of discretion, should not be repeated here, particularly when Plaintiffs' experts are prepared, on a fully developed record, to address any issues raised in *Cook County* that could have been addressed had that court provided any opportunity to do so as

---

[2] The Court suggested at the May 12, 2022 hearing its initial inclination to: (1) require Defendants to produce data for only loans still being serviced after November 2013; (2) force Plaintiffs' experts to analyze this incomplete data; (3) hold an "early *Daubert* hearing"; and then (4) require Defendants to produce the full data set, so Plaintiffs' experts could re-analyze it, if Plaintiffs' experts survived the initial *Daubert* challenge. Putting aside that this would double the cost and length of the expert process in this case, it would be grossly unfair to Plaintiffs by hamstringing their experts and providing Defendants an opportunity to make a second round of *Daubert* challenges based on the new analysis. If the Court were to disqualify Plaintiffs' experts in the first round, the parties and the Court would expend significant resources on Plaintiffs' challenges to that decision because Plaintiffs' experts have made clear that they need the full data set to perform their analyses properly.

[3] *County of Cook v. Bank of America Corp. et. al.*, Case No. 14-cv-2280, in the United States District Court for the Northern District of Illinois.

was offered.

## II. ARGUMENT

A. <u>Because the loan data Plaintiffs request is relevant, the onus is on Defendants to establish that the requests are unduly burdensome and not proportional to Plaintiffs' needs.</u>

It is well-established that the burden of persuasion in a discovery dispute is placed squarely on the shoulders of the party opposing discovery once the relevance of the requested material has been established. *See generally Panola Land Buyers Association v Shuman*, 762 F.2d 1550, 1559-60 (11th Cir. 1985) (failure of producing party to address specifically the relevant Rule 26 factors made trial court's grant of protective order an abuse of discretion); *see Akridge v. ALFA Mut. Ins. Co.*, 1 F.4th 1271, 1276 (11th Cir. 2021) ("While we are mindful that 'district courts have broad discretion in fashioning discovery rulings,' we also note that this discretion is not absolute: courts are bound to adhere 'to the liberal spirit of the Federal Rules.'") (*quoting Adkins v. Christie*, 488 F.3d 1324, 1331 (11th Cir. 2007).[4]

---

[4] As many courts in this district have noted, there is a "heavy burden" placed upon the party opposing discovery to show why discovery should be denied. *Williams v. The Art Inst. of Atlanta*, 1:06 CV 0285 CC/AJB, 2006 WL 3694649, at *3 (N.D. Ga. Sept. 1, 2006) (citing *Roehrs v. Minn. Life Ins. Co.*, 228 F.R.D. 642, 644 (D.Ariz. 2005)). *See also Fed. Deposit Ins. Corp. v. Bryan*, 1:11-CV-2790-JEC-GGB, 2012 WL 12835873, at *9 (N.D. Ga. Nov. 28, 2012), *aff'd*, 1:11-CV-2790-JEC, 2014 WL 11517836 (N.D. Ga. Feb. 14, 2014).

The Court made clear at the May 12 hearing that the data requested by Plaintiffs is relevant. Accordingly, Defendants must show that the loan data requested is not proportional to the needs of this case based upon the factors identified in Fed.R.Civ.P. 26(b)(1): (1) the importance of the issues at stake in the action; (2) the amount in controversy; (3) the parties' relative access to relevant information; (4) the parties' resources; (5) the importance of the discovery in resolving the issues; and (6) whether the burden or expense of the proposed discovery outweighs its likely benefit.

B. <u>The issues at stake in this action – discriminatory mortgage practices – are of great importance.</u>

All six factors under Rule 26(b)(1) weigh in favor of finding that the production of the additional loan data is proportional. The amount in controversy in this action is in the excess of ten million dollars. The Counties do not have access to the relevant information, nor do they have the Defendants' resources. As discussed below, the loan data is critical to resolving the issues here and the benefit of the proposed discovery outweighs any purported burden. And of particular note, the issues at stake in this action – discriminatory mortgage practices – are of great public importance.

The advisory committee's notes to the 2015 amendment to Rule 26 caution that "the monetary stakes are only one fact, to be balanced against other factors."

Courts should measure "the significance of the substantive issues … in philosophical, social, or institutional terms." Fed. R. Civ. P. 26 advisory committee's note to 2015 amendment. The rule recognizes that "many cases in public policy spheres, such as employment practices, free speech, and other matters, may have importance far beyond the monetary amount involved." *Id*; *citing* Fed. R. Civ. P. 26 advisory committee's note to 1983 amendment. The issue of discrimination is in the public policy sphere such that it weighs heavily in favor of finding proportionality. *See, e.g., A.R. v. Dudek*, 12-60460-CIV, 2016 WL 3753705, at *4 (S.D. Fla. Feb. 18, 2016) (granting motion to compel additional discovery where the issues at stake related to the State of Florida's discrimination against disabled children in violation of Title II "are highly important," the discovery is relevant to the issues at stake, and relevance of additional information outweighs "the burden and expense of having to produce" the information); *U.S. Equal Empl. Opportunity Commn. v. Suntrust Bank*, 812CV01325T33MAP, 2013 WL 12157419, at *2-3 (M.D. Fla. Sept. 13, 2013) (granting motion to compel additional discovery because "the additional burden to produce the documents is warranted" where "damages could likely be high" and "courts have tried to avoid unnecessary limitations on Title VII cases" because discrimination is an important issue at stake and may require indirect or circumstantial evidence to prove).

C. <u>Defendants are not burdened by producing the full loan data set</u>.

Defendants cannot establish any significant burden in producing the data for all loans originated, purchased, or otherwise acquired in the Counties since January 1, 2004, as compared to producing only the data for those loans still being serviced after November 2013. The task to collect and produce loan data – regardless of the number of loans for which data is produced – merely requires Defendants to run a query on their electronic mortgage loan data platform that provides mortgage origination and servicing data throughout the life of the loans. The only difference is whether Defendants: (a) query their system for loans still being serviced after November 2013 in the Plaintiff Counties, or (b) query their system for loans originated, purchased or otherwise acquired (e.g., through a bank merger, acquisition or consolidation) after January 1, 2004.

Either way, Defendants will copy the electronic data for the loans selected in the query, save the data to a file and send the file to Plaintiffs. The only difference is whether Defendants select for loans being serviced after November 30, 2013 or select for loans originated after January 1, 2004. A simple modification of the loan data query they are already going to run (*i.e.*, for loans still serviced after November 2013) in order to instead capture loans originated since January 1, 2004 is not materially more burdensome.

Absent any material burden in producing the requested loan data, Defendants simply cannot show that the burden or expense of the producing the data outweighs its likely benefit to Plaintiffs as required to avoid production under Rule 26(b)(1).

D. <u>Even assuming Defendants are burdened, the prejudice to Plaintiffs' case if the full set of loan data is not produced far outweighs any such burden.</u>

Plaintiffs have three claims, summarized briefly as (i) discriminatory equity stripping, (ii) stand-alone foreclosure discrimination, and (iii) intentional discrimination. Essential to Plaintiffs' ability to prove each of these claims is evidence that minority loans made by Defendants were discriminatory when originated[5] and/or that Defendants serviced/foreclosed on those loans in a discriminatory manner. As alleged in the Complaint, the majority of the discriminatory/predatory mortgage loans were originated during the subprime crisis between 2003-2008 and the resulting foreclosure crisis peaked from 2010 to 2014. Accordingly, evidence of Defendants' mortgage lending and servicing actions between 2004 and 2013, which are directly reflected in the loan data itself,

---

[5] The initial discrimination inquiry under each of the Counties' three claims revolves around whether minority borrowers were targeted for, steered toward, or received, mortgage loans with "worse" terms than those made to non-minority borrowers.  In this context, "worse" means loans with an increased likelihood of default risk and foreclosure, such as loans with higher interest rates, riskier loan products, loans with pre-payment penalties, and loans in which the borrowers lacked the ability to repay or were made with exceptions to standard underwriting.

is crucial to analyzing whether the mortgage loans Defendants continued to service after November 2013 were discriminatory when originated and whether Defendants discriminatorily serviced those loans.

As Plaintiffs' expert Dr. Charles Cowan has testified:

A large quantity of loans originated from 2004 through 2008 were of low quality which subsequently led to a widespread foreclosure crisis.  According to the Complaint, disproportionate increases in foreclosures in communities of color were the result of defendants' discriminatory equity stripping activities and BOA's stand-alone discriminatory mortgage servicing and foreclosure practices. Therefore, it is crucial that my statistical investigation is based on unbiased data that includes defendant's lending and servicing/foreclosure activities during that earlier time frame, and for the period of increased foreclosures occurring before November 2013.

Declaration of Dr. Charles Cowan, ¶ 11, attached hereto as Exhibit A.  He also stated:

[E]xcluding loans that were originated and foreclosed prior to November 2013 is likely to eliminate any ability to detect equity stripping and other indicators of discrimination involving the post November 2013.  These results will clearly be biased in favor of the defendants.

*Id*. at ¶ 13. In addition, Dr. Cowan added:

Allowing the defendants to hide all records of their activities in the past, despite numerous sanctions against BOA and Countrywide by the federal government for activities that harmed borrowers, will make it impossible to correctly and reliably study how the activities of the defendants caused and continue to cause disparate impacts on minority borrowers and minority neighborhoods in the Plaintiff Counties.

*Id*. at ¶ 29.

In the context of his expert analysis, Plaintiffs' expert Dr. Gary Lacefield explained as follows:

> To determine whether Defendants engaged in discriminatory mortgage origination practices within the Plaintiff Counties on any loans originated after January 1, 2004 and still being serviced after November 2013, I must identify and evaluate statistically significant differences in the: (a) mortgage loan products and features originated to minority borrowers (as compared to white borrowers) in the Plaintiff Counties since January 2004, and (b) borrower characteristics on loans originated to minorities in the Plaintiff Counties (as compared to non-minorities) since January 1, 2004.

Declaration of Gary E. Lacefield, ¶ 5, attached hereto as Exhibit B; *see also id*. at ¶¶ 7-8 (discussing his servicing analysis). But to do so accurately, loans originated or serviced during a particular time period must be compared to all the other loans originated or serviced during such periods.  *Id*. at ¶¶ 6, 8.  Thus, Dr. Lacefield summed up the prejudicial effect to Plaintiffs of using a truncated loan data set:

> An analysis of only those loans still being serviced after November 2013 would have little use and would create an improper bias because it ignores the origination characteristics of all the other loans contemporaneously originated but which were either defaulted, refinanced or paid prior to November 2013.  The elimination of large numbers of loans from the data set, but not others, likely would improperly skew any analysis and would impede my ability to accurately analyze the data.

*Id.* at ¶ 6.

As further explained by Plaintiffs' expert Sean T. Malone, Ph.D., a senior

statistical research associate at Analytic Focus LLC, Defendants' failure to produce the loan data from 2004 through 2013 may have a detrimental impact upon Dr. Lacefield's analysis in three different ways.  Declaration of Sean T. Malone, Ph.D, ¶ 9, attached hereto as Exhibit C. For example, a "survivorship bias" may be created by using only the loans still being serviced after November 2013.  *Id*. at ¶¶ 9-11. Put simply, if discriminatory loans originated after January 2004 but foreclosed upon before 2013 are not part of the total data set analyzed by Dr. Lacefield, it would result in a bias towards better loans (*i.e.*, loans that were not foreclosed upon prior to November 2013) which could produce an inaccurately positive portrayal of Defendants' actions. *See id*. at ¶¶ 10-11.[6] Moreover, Dr. Lacefield's comparison of minority borrowers with loans having certain specific features to loans held by non-minority borrowers would also be affected by this survivorship bias. As Dr. Malone puts it, an "accurate estimate of the discriminatory effect requires a dataset inclusive of all loans originated, not just surviving loans." *Id*. at ¶ 12.

E. <u>Regardless of whether Plaintiffs are entitled to recover damages before November 2013, discovery is routinely allowed of conduct before the actionable period, especially in discrimination cases.</u>

---

[6] This is precisely why Defendants object to producing all of the loan data and instead insist on producing only a data set limited to loans less likely to foreclose, and indeed did not foreclose prior to November 2013 – *i.e.,* better loans.

Once the party propounding discovery has established the relevance of the data sought, "'the party opposing discovery has the burden of showing that the discovery should be prohibited, and the burden of clarifying, explaining or supporting its objections.'" *Gottesman v. Santana*, 2017 WL 5889765 at *3 (S.D. Cal. Nov. 29, 2017) (quoting *Bryant v. Ochoa*, 2009 WL 1390794, at *1 (S.D. Cal. May 14, 2009)).  The *Gottesman* court observed:

> ***The statute of limitations is not a rigid barrier separating discoverable information from information outside the scope of discovery.*** Santana Defendants cite no binding authority for the proposition that the statute of limitations provides a definitive boundary for discoverable information.... Information before the statute of limitations period may fall within the scope of discoverable information....

*Id.* at *5 (emphasis added, citations and parentheticals omitted).

Importantly, the Supreme Court has held that evidence of a history of racial discrimination is a factor to be considered in determining whether there is discriminatory intent. *See Vill. Of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 267 (1977); *Laramore v. Ill. Sports Facilities*, 1996 WL 153672, at *8 (N.D. Ill. Apr. 1, 1996) (listing *Arlington Heights* factors); *N.C. State Conf. of NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016) (citing *Arlington Heights* and finding District Court erred in minimizing history of race discrimination and recent patterns of discrimination as evidence of intent to discriminate); *Sylvia Dev. Corp.*

*v. Calvert Cty.*, 48 F.3d 810, 819 (4th Cir. 1995) (adding to the *Arlington Heights* factors evidence of a "consistent pattern" of actions of decisionmakers that have a much greater harm on minorities than on non- minorities). One Alabama federal district court has interpreted precedent, at least in Title VII pattern and practice cases, as holding "that the failure to allow a plaintiff to pursue discovery on historical statistical information warrants a reversal...." *Womack v. Dolgencorp., Inc.*, 2008 WL 11377663, at *3 (N.D. Ala. 2008) (*citing Burns v. Thiokol Chemical Corp.*, 483 F.2d 300 (5th Cir. 1973)). The Eleventh Circuit recently found the Fifth Circuit's decision in *Burns* to remain binding precedent. *See Akridge*, 1 F.4th at 1276, *supra* at 4.

If the Court has any lingering concern over the relevance, proportionality or admissibility of evidence of Defendants' conduct prior to November 2013, a similar issue was addressed in *McReynolds v. Sodexho Marriott Services, Inc.*, 349 F.Supp.2d 30 (D.D.C. 2004) in the context of a statistician's testimony in an employment discrimination case.  In *McReynolds*, the defendant objected to the expert's statistical analysis and related testimony because the expert used employment data pre-dating the class period. The court made quick work of the defendant's objection, holding that the "[d]efendant's argument is, however, wrong as a matter of law. Cases in this Circuit clearly permit analysis of employment data

13

that predates the class time frame." *McReynolds*, 349 F.Supp.2d at 42-43 (citations omitted) (*citing Bazemore v. Friday*, 478 U.S. 385, 402 n. 13 (1986))*; see also Nat'l Railroad Passenger Corp. v. Morgan*, 536 U.S. 113 (2002) (concluding, in employment discrimination case, that the limitations period does not "bar an employee from using the prior [i.e., time-barred] acts as background evidence in support of a timely claim."); *Bazemore*, 478 U.S. at 402 n. 13 (referring to evidence of continuing employment discrimination in salary data during a time period prior to the actionable period as "quite probative").[7]

F.  A "phased production and analysis" process would be prejudicial and highly burdensome to Plaintiffs.

As shown above, Plaintiffs' experts have explained that it would be improper, uninformative, inaccurate, and inefficient to conduct their discrimination analysis using data for only those loans still being serviced after November 2013. Accordingly, requiring Plaintiffs' experts to do so would plainly prejudice Plaintiffs' ability to prove their claims.

---

[7] *See also Coates v. Johnson & Johnson*, 756 F.2d 524, 540 (7th Cir. 1985) ("data on employment practices prior to liability period do have some probative value"); *Trout v. Lehman*, 652 F.Supp. 144, 146–47 (D.D.C.1986) ("The Supreme Court found the use of those salary figures to be proper [in *Bazemore*], distinguishing between giving legal effect to pre–1972 activities—which is not allowed—and the permissible use of such activities to support findings of discrimination on the basis that the existing pay structure represents a mere continuation of an earlier, discriminatory structure.").

Under any phased approach, Plaintiffs would be prejudiced, their limited resources would be wasted by requiring them to have to pay all these costs twice (receiving no value for the initial analysis because they were all based on an incomplete data set), and the entire expert discovery process would be unnecessarily protracted. Dr. Cowan summed it up by testifying that a phased production would be "both scientifically inappropriate and a waste of resources." Cowan Decl., Exhibit A, ¶ 24.  Moreover, any phased approach would provide Defendants with an opportunity for repetitive *Daubert* challenges, further adding to the cost and burden on the Plaintiff Counties and their experts, as well as the burden on the Court's resources.

G. Judge Bucklo erred in excluding the experts under *Daubert* in *Cook County*; but regardless, Plaintiffs' experts will modify their approach to eliminate any concerns.

The court in *Cook County* erred by excluding the testimony of Drs. Lacefield and Cowan under *Daubert*.  With respect to Dr. Lacefield,[8] the court held that his methodology of using ***basic statistics*** to identify proportional differences in racial outcomes of Defendants' loan products, features and borrower underwriting

---

[8] As reflected in his Declaration submitted in support hereof, Dr. Lacefield is a highly experienced mortgage industry expert and former fair lending discrimination investigator with the Department of Housing & Urban Development ("HUD") that has trained numerous federal agencies, law enforcement entities, and bank staff on the topic.

characteristics (the "focal points" of discrimination which he refers to as "delimiters") was not reliable, purportedly because there was nothing in the record other than his own testimony that his methodology was used by anyone other than himself. Among other errors in reaching this conclusion, and usurping the role of the jury to decide Dr. Lacefield's testimony on the use of his methodology as a credibility issue, the court:

- Ignored that the Interagency Fair Lending Examination Procedures (August 2009) ("the Guidelines") endorses Dr. Lacefield's methodology and use of statistics to show proportional differences in racial outcomes, indeed the Guidelines instruct fair lending investigators to do exactly what Dr. Lacefield did;
- Ignored or missed a declaration from Dr. Lacefield's former supervisor at HUD explaining that Dr. Lacefield's methodology was the methodology HUD developed, used and trained Dr. Lacefield on;[9] and
- Ignored Dr. Lacefield's many years of directly relevant experience as a HUD fair lending investigator, fair lending investigation instructor, and mortgage lending compliance officer, among other relevant experience.

Moreover, the Counties here provide a declaration by an additional expert, Dr. Malone, who did not provide an expert opinion in *Cook County*.

Regarding Dr. Cowan, a highly experienced expert statistician[10] who performed multivariant regressions on Defendants' Cook County loan data, neither

---

[9] A copy of the June 14, 2021, Declaration of John E. Eubanks, that was filed in the *Cook County* matter, is attached to the Declaration of James Evangelista in support hereof at Exhibit D.

[10] *See* Dr. Cowan's Declaration submitted in support hereof.

Bank of America nor the court took issue with Dr. Cowan's multivariant regression methodology. Rather, the court wrongly excluded his testimony on the improper basis that he aggregated certain data.  In doing so the court ignored the law that the adequacy of data inputs used by experts are questions of fact that go to the weight of an expert's testimony, not its admissibility or the reliability of the methodology itself. The court also ignored:

- the factual reasons alleged in the county's complaint for the aggregation of certain data (e.g., Bank of America's acquisition of Countrywide, and other Bank of America activities enabling Countrywide's predatory practices);
- the practical reason explained by Dr. Cowan for the aggregation of certain data (i.e., Defendants' data production was missing large amounts of critical information, such as the identity of the entity that originated the loans); and
- the fact that the Defendants' own expert also aggregated certain data.

Incredibly, while the court ignored the existence of the Guidelines that supported Dr. Lacefield's approach, it specifically referenced the Guidelines to level a misplaced criticism at Dr. Cowan regarding his methodology.

Finally, it should be noted that the court in *Cook County*: (i) failed to consider the allegations in Cook County's complaint;[11] (ii) decided the *Daubert*

---

[11] Indeed, ignoring Cook County's allegations that Defendants originated and purchased loans using their network of correspondent lenders, and concealed their identity through the MERS system, while also ignoring Dr. Cowan's stated concerns with the lack of lender information in large numbers of the Defendants' own loans, the court misguidedly concluded that: "[i]t does not take an expert to

17

issues solely on the submitted papers; (iii) provided no opportunity for Dr. Cowan or Dr. Lacefield to be heard and address any of the court's concerns, all of which could have been resolved prior to the ruling; and (iv) ignored Dr. Cowan's offer to rerun his analysis should the Court have concerns about the data sets he used.

Given the flaws in the *Daubert* rulings in *Cook County*, those rulings should have no bearing on the proportionality of Defendants' loan data to be produced in this action, particularly when Plaintiffs' experts are prepared, on a fully developed record, to address any issues raised in Cook County or any concerns this Court may have.

## III. CONCLUSION

Plaintiffs respectfully submit that they have established the proportionality of the data sought back to January 1, 2004, even in light of the Court's statute of limitations ruling. Plaintiffs have done so through the testimony of multiple expert witnesses who have explained their critical need for such data. As of now, no evidence of any significant burden has been offered by the Defendants. In any

---

understand that defendants could not have discriminated in the origination of loans they did not originate or in the foreclosure of loans they did not foreclose." *County of Cook v. Bank of America*, 2022 WL 408299, at *15 (N.D. Ill. Feb. 10, 2022). This statement, like other factual conclusions in the court's flawed summary judgment analysis, is unsupported by, if not contrary to, the evidence submitted in that case.

event, no matter the size and scope of the burden claimed by Defendants in the production of loan data from 2004 through 2013, no rational proportionality analysis should limit the scope of this loan data production. Plaintiffs should be allowed the opportunity to make their case and the Court's failure to grant this motion will deprive them of that opportunity.

Dated: May 26, 2022             By:    */s/ James M. Evangelista*
                                       James M. Evangelista
                                       Georgia Bar No. 707807
                                       Jim@ewlawllc.com
                                       David J. Worley
                                       Georgia Bar No. 776665
                                       David@ewlawllc.com
                                       Kristi Stahnke McGregor
                                       Georgia Bar No. 674012
                                       Kristi@ewlawllc.com
                                       Leslie G. Toran
                                       leslie@ewlawllc.com
                                       Georgia Bar No. 141637
                                       **Evangelista Worley LLC**
                                       500 Sugar Mill Road
                                       Suite 245A
                                       Atlanta, GA 30350
                                       Tel.: 404-205-8400
                                       Fax: 404-205-8395

                                       ***Counsel for Plaintiffs***

                                       Sanford P. Dumain (pro hac vice)
                                       Peggy J. Wedgworth (pro hac vice)

Jennifer S. Czeisler (pro hac vice)
Roy Shimon (pro hac vice)
Ryan McMillan (pro hac vice)
**Milberg Coleman Bryson Phillips Grossman LLP**
100 Garden City Plaza, Suite 500
Garden City, NY 11530
Tel: 212:594-5300

Mark E. Silvey
Georgia Bar No. 646837
msilvey@milberg.com
**Milberg Coleman Bryson Phillips Grossman, PLLC**
800 S. Gay Street, Suite 1100
Knoxville, TN 37929

***Additional Counsel for Plaintiffs***

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this document was prepared in compliance with Northern District of Georgia Local Rule 5.1C using Times New Roman 14-point font.

Dated: May 26, 2022                    <u>*/s/ James M. Evangelista*</u>
                                       James M. Evangelista
                                       Ga. Bar No. 707807

## CERTIFICATE OF SERVICE

I hereby certify that on this day I served the above and foregoing PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO COMPEL DEFENDANTS' LOAN DATA on all parties by causing a true and correct copy to be filed with the court's electronic filing system, which should automatically send a copy to all counsel of record.

Dated: May 26, 2022                    */s/ James M. Evangelista*
                                        James M. Evangelista