UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| COBB COUNTY, DEKALB COUNTY, and FULTON COUNTY, GEORGIA,<br><br>       Plaintiffs,<br><br>v.<br><br>BANK OF AMERICA CORPORATION, et al.,<br><br>       Defendants. | CIVIL ACTION<br>NO.: 1:15-CV-04081-LMM |

**PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL DEFENDANTS' LOAN DATA**

As shown below, Defendants' Response to the Counties' Motion to Compel does not warrant denial of the Counties' motion.  Indeed, it evades the core issue at hand: that Defendants' loan data is critical to analyze origination discrimination for those loans still being serviced after November 2013 – a showing necessary for the Counties' equity stripping claim as to those loans.  Moreover, the Counties further limit their loan data requests (as described herein) to eliminate or at least significantly reduce Defendants' alleged burden.

## I.   <u>The Data Sought Is of Critical Relevance</u>

Defendants misdirect this Court in their argument by ignoring that the initial component of the Counties' equity stripping claims – that the mortgage loans were predatory and discriminatory ***when made*** -- cannot be demonstrated unless the requested data for the Defendants' loans in the Counties are produced.  While the Counties' damages (and Defendants' liability for those damages) have been limited to those remaining loans still being serviced by Defendants after November 2013, in order for the Counties to show that any of those remaining loans were discriminatory ***at the time they were made*** requires a comparison of those loans with the data of all the other loans made at the same time (even if they are no longer being serviced).  Without that data, the Counties are prejudiced in their ability to show, pursuant to their equity

1

stripping allegations, that the loans were predatory and discriminatory in the first place.  It is that simple.

Accordingly, ***the issue of whether the remaining loans were discriminatory when they were made is an entirely separate issue from whether Defendants engaged in a discriminatory servicing act after the limitations period*** that would "continue" the discriminatory equity stripping practice, as this Court has ruled, on those loans that were discriminatory and predatory when they were made.  With respect to their equity stripping claim, the Counties need the ability to prove either aspect of discrimination – at origination and/or during the applicable servicing period – to recover damages for those loans still being serviced after November 2013.[1]

Defendants' expert, Dr. Marsha Courchane, argues that Defendants' origination data is not necessary to show that Defendants engaged in discriminatory origination or servicing/foreclosure practices after the limitations period. Declaration of Dr. Marsha Courchane, Ex. B to Response to Motion to Compel,

---

[1] As explained by Dr. Cowan in his Supplemental Declaration, in order to "evaluate claims of discriminatory equity stripping…regarding loans that were still serviced after November 20, 2013, data prior to November 20, 2013 for loans that are no longer serviced is needed as well."  *See* Ex. A, ¶ 10.  Put simply, to "perform an unbiased analysis of the Plaintiffs' equity stripping claim, data is needed for both periods before and after November 20, 2013."  *Id*. at ¶14.  *See also* Supplemental Declaration of Dr. Gary Lacefield, Ex. B, ¶ 2.

¶13 [ECF 195-2]. But that argument begs the question and evades the reason the Counties have explained to this Court why they need the earlier loan data: to show that Defendants' origination practices for the vast majority of their predatory loans were discriminatory when they were originated – a critical component of the Counties' equity stripping claim for those loans still being serviced after November 2013.

Notably, Dr. Courchane also served as Defendants' expert in the *Cook County* litigation. There, Defendants repeatedly took the position that the FHA's two-year statute of limitations prevented the County from recovering for any alleged conduct that occurred on or before March 31, 2012 (the two-year look back period prior to the filing of the complaint). *See* County of Cook v. Bank of America et al., Civil Action No. 14-CV-2280, ECF Doc. 572, Defendant's Motion for Summary Judgment at 3, 50. Yet in her expert report in *Cook County*, Dr. Courchane analyzed Defendants' loan data for the *entire period of 2004 to 2018* without once ever questioning the propriety of that time period or conducting her own analysis of just the post-March 2012 loan data to argue that Defendants did not discriminate against minorities. *See*, Ex. C, Decl. of James M. Evangelista, Ex.1, ¶131 and Tables A3.8-A3.11, ¶ 149, ¶ 153.

## II.   The Counties Will Further Limit Their Data Request To Eliminate Defendants' Alleged Burden.

Defendants concede that, in the *Cook County* matter, they already have done much of the necessary mapping for the Countrywide and Bank of America loan data, all of which was consolidated onto one platform, and that they would not be particularly burdened to obtain all of that data.  *See* Defendants' Response to Motion to Compel, at p. 10.   Instead, Defendants argue that they would be burdened to obtain the requested data because they would have to: (1) locate pre-2009 data relating to any Merrill Lynch loans, and (2) do additional mapping for additional data fields (which the parties already agreed to).  *Id*. at pp. 10-11; *see also* Declaration of Manohar Aedma, Ex. A to Response to Motion to Compel, ¶21[ECF 195-1].[2]

As to their burden of mapping additional data fields, this Court should know that Defendants ***agreed to obtain the data for the additional data fields*** even though they knew that the statute of limitations issue was unresolved. Defendants confirmed this agreement in an October 11, 2021 letter to Plaintiffs' counsel, a copy of which is attached to the Declaration of James Evangelista, (Ex A) submitted in support hereof, at Ex. 5.  Defendants cannot now claim they are too

---

[2] As pointed out by Dr. Lacefield, Defendants misrepresent the nature of this burden as "18 years of data" when in fact it was only 5 years of data for a limited number of loans that would be missing.  Supp. Lacefield Decl., ¶ 3, Ex.B.

burdened to produce the data fields they already agreed to produce.[3]

As to the Merrill Lynch loan data, Plaintiffs will agree not to ask the Court to require Defendants to locate and produce Merrill Lynch-related loan data that was not on-boarded (in about 2009) following Bank of America's acquisition of Merrill Lynch.  This should end any argument on Defendants' purported burden.

Finally, it is worth noting a few additional points.  First, Defendants' offer to provide loan data ***going back to only January 1, 2009*** is another ruse to avoid production of the vast bulk of their residential mortgage loan originations at issue here – particularly their predatory and discriminatory loans – made in the Plaintiff Counties during the period 2004 to late 2008, thereby impairing Plaintiffs' ability to show that loans being serviced after November 2013 were predatory and discriminatory when made.

---

[3] Should the Court disagree that such conduct is unfair and improper, the Counties will further limit their data request to only those data fields that Defendants produced in the Cook County matter, provided that, if the Counties show that any of the loans still being serviced after November 2013 were discriminatory when they were originated, Defendants must supplement the data they already produced with the data in the additional fields they have already agreed to produce.  The Court should be aware that those additional data fields are necessary to fill anticipated gaps in the Defendants' loan data based on their shoddy data production in the *Cook County* matter.  That production was of such poor quality and missing much information that, as Drs. Cowan and Lacefield both explained in their expert reports in the *Cook County* matter, their analysis had to be limited to those loans that had sufficient data to examine. Ex. C, Decl. James M. Evangelista, Ex. 3, 4.

Second, Defendants admit that any loans still being serviced by Bank of America (and Merrill Lynch) as of 2009 were onboarded to the Countrywide loan data system, AS400. Accordingly, the Bank of America, Merrill Lynch and Countrywide Defendants already have most of the relevant loan data readily accessible. To the extent Bank of America subsequently archived data for loans in the Plaintiff Counties after April 2011, but certainly no later than December 2011, the burden and cost of getting that data should fall squarely on the Defendants.

This Court ruled on the statute of limitations issue based on conversations between Plaintiffs' counsel and Defendants' in-house counsel in April and December 2011. ECF 177. Accordingly, Defendants also must have known of the Counties' claims no later than December 2011 and any failure by Defendants to maintain active access to their own loan data for loans in the Atlanta area is a choice Defendants made not to maintain that data notwithstanding the threat of potential litigation, particularly in light of Bank of America's massive settlement with the State Attorneys General and the Department of Justice. The Counties should not have to pay for Defendants to identify and produce data that they should have actively maintained in the first place.

### III.   **The Data Sought Is Not Disproportional To The Needs Of The Case.**

First, the Plaintiff Counties should have the origination data to show under their

6

equity stripping scheme that loans serviced after November 2013 were predatory and discriminatory at the time of origination.

Second, because the Counties have agreed not to seek loan data for Merrill Lynch and Defendants previously agreed to the loan data fields, Defendants have no viable burden argument, and the issue of proportionality cannot weigh in Defendants' favor in light of Plaintiffs' critical need for the requested data.

Third, it is instructive that Defendants have failed to address in any significant way the other factors set out in Rule 26(b)(1) that this Court should weigh when addressing proportionality, including but not limited to "the importance of the issues at stake in the action."

## IV.   <u>Judge Bucklo Ignored Extensive Evidence of Defendants' Equity Stripping Practices When Granting Summary Judgment.</u>

Defendants argue that the fact that "another federal judge has already thoroughly weighed a massive evidentiary record concerning effectively the same claims…and held them to be entirely unsupported, significantly factors into the proportionality analysis here."  Response to Motion to Compel, p. 15 (ECF 195). This is absurd.  Judge Bucklo referred to Cook County's evidence of equity-stripping as "scattershot," and incorrectly required that Cook County provide direct evidence of a "unified" or "integrated" equity-stripping scheme. Although acknowledging the extensive evidence the County provided that Defendants in fact

engaged in the practices comprising equity-stripping,[4] as well as the statistically

---

[4] This evidence included that the Defendants engaged in a pattern and practice of equity-stripping, resulting in increased foreclosures in minority neighborhoods, by:

- artificially inflating appraisals;
- referring to minority markets as "emerging markets' or "emerging opportunities";
- targeting minorities for loans by, for example, using data mining techniques and statistical models, creating maps of minority geographic areas, selecting radio stations based on African American listening demographics, and using proxies for race to target loan business;
- providing financial incentives to increase loan origination volume to minority, low-income borrowers, and low-FICO-score borrowers and to increase loan volume of specific high-risk loan products;
- providing discretion in loan pricing while providing higher compensation to originate higher-cost, subprime, and non-prime loans;
- loosening underwriting guidelines and increased underwriting exceptions to approve high-risk loans had been deemed too risky and "not allowed under standard guidelines";
- placing minority borrowers in high-risk loans products at higher rates than white borrowers;
- failing to follow risk mitigation and loan modification guidelines and denying minorities the opportunity to modify loans at statistically significant higher rates than whites.
- entering into broker agreements with third-party brokers, particularly in highly concentrated minority neighborhoods;
- steering borrowers to certain high-cost, high-risk subprime or nonprime loans based on race and ethnicity without consideration of a borrower's ability to repay that loan and doing so even when a borrower qualified for a prime loan;
- providing financial incentives to loan originators to increase the volume of high-risk loans originated specifically to minority, low-income, and low-FICO score borrowers;
- offering financial incentives to loan originators to originate loans to "multicultural" borrowers;
- knowing that the lower a borrower's FICO score the more likely they were

significant evidence and opinions provided by Cook County's experts (using both regression and bi-variate statistic techniques), Judge Bucklo erroneously concluded that a jury could not find that those practices amount to an "integrated equity-stripping scheme." This was plainly reversible error. *Lynch v. N.E. Regl. Commuter R.R. Corp.*, 700 F.3d 906, 914 (7th Cir. 2012) (reversing Judge Bucklo's grant of summary judgment for "demanding direct evidence of the

---

to default;

- compensating third-party brokers in the form of a "yield spread premium" resulting in higher compensation to the broker for negotiating a higher rate on the loan;
- not requiring or having policies in place to ensure that borrowers eligible for a prime loan were not placed in a subprime or nonprime loan;
- generating revenue by securitizing and selling residential mortgage loans in residential mortgage-backed security certificates;
- foreclosing on minorities at a disproportionately higher rate than non-minorities, even after controlling for other factors;
- providing financial incentives that made it more profitable for loan officers and brokers to originate a higher volume of loans specifically to minorities and borrowers with lower income and lower FICO scores, to originate subprime and nonprime loans over prime loans, and to originate loans with higher interest rates and "overages" above the wholesale price listed in Defendants' rate sheets;
- permitting and encouraging, through the above financial incentives and subjective discretion, the steering of minority borrowers to high-risk, high-cost loans even when they qualified for lower-cost, prime loans;
- taking race or ethnicity into consideration when evaluating borrowers' requests for loan modifications;
- determining whether a loan entered the foreclosure process and/or whether to commence foreclosure proceedings on defaulted loans; and
- acquiring, servicing, and securitizing subprime and nonprime loans that had been originated under discriminatory terms or with discriminatory features.

caus[ation]"… "in effect [holding] that the jury could not draw the most obvious conclusion as to the cause of the injury, because there is no direct evidence of that cause and no expert testimony supporting that conclusion.").

## V.   **Judge Bucklo's *Daubert* Ruling As To Dr. Lacefield Was Erroneous**

Defendants also spend a lot of effort in arguing that Judge Bucklo's exclusion of the expert opinion testimony of Drs. Lacefield and Cowan "strongly supports denying the Counties' attempt to get the same data here…."  Response to Motion to Compel, p. 16.  Judge Bucklo's rulings in this regard were riddled with errors. As an example, in concluding that Dr. Lacefield's opinions were unreliable, Judge Bucklo ignored the actual validity of his bivariate statistical methodology and the evidence that this methodology was in fact used by others, instead semantically focusing on Dr. Lacefield's his use of his term "delimiter" (which merely identified the particular loan characteristics and discriminatory focal points he was examining).  Dr. Lacefield's expert report and testimony in *Cook County* made clear that the "delimiter" methodology he utilized to evaluate Bank of America's and Countrywide's conduct:

- was first developed and used by the U.S. Department of Housing and Urban Development ("HUD") from HUD's lending audit criteria[5]; and

---

[5] This was confirmed by John E. Eubanks, Dr. Lacefield's former supervisor at HUD, whose sworn testimony Judge Bucklo overlooked. Indeed, Mr. Eubanks establishes that the delimiter-based statistical analysis employed by Dr. Lacefield

- uses the same statistical sampling and testing procedures recognized by the Interagency Fair Lending Examination Procedures ("Interagency Procedures") – which is the fair lending manual used by numerous federal financial agencies.

Indeed, Dr. Courchane, Defendants' expert in *Cook County* and here, explicitly acknowledged in her expert report in the *Cook County* matter that she was familiar with Dr. Lacefield's delimiter-based methodology and that it has been utilized in the past to conduct fair lending analyses. *See*, Ex. C, James M. Evangelista Decl, Ex. 1, ¶59. Accordingly, Judge Bucklo's assertion that Dr. Lacefield's delimiter-based methodology "has never been used, much less approved, by anyone else in the field of fair lending" was flatly incorrect.

That Dr. Lacefield chose to employ the same statistically reliable delimiter methodology that HUD and other governmental agencies have approved, and which he has previously used in conducting fair lending investigations for HUD, does *not* render his opinions unreliable under *Daubert* regardless of the perceived strength of his conclusions. *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431-33 (7th Cir. 2013) ("It is not the trial court's role to decide whether an expert's opinion is correct...Rule 702 does not require, or even permit, the district court to

---

is the same methodology used by HUD to evaluate potential lender discrimination in connection with FHA mortgage loans and in conducting disparate impact analyses of minority neighborhoods.

choose between competing studies at the gatekeeping stage. Both experts were entitled to present their views, and the merits and demerits of each study can be explored at trial.") (internal citation omitted). Rather, Dr. Lacefield's use of the delimiter methodology instead of a regression analysis (or some other statistical method) merely goes to the weight a jury will assign to his opinion testimony, not its admissibility. The district court clearly erred by supplanting the adversarial process with its own admissibility determination. *Schultz*, 721 F. 3d at 434 (admissibility of expert testimony and appropriateness of summary judgment collapsed into single issue).

Finally, Judge Bucklo also wrongly excluded Dr. Lacefield for purportedly not conducting a "similarly situated" analysis. Her conclusion flatly ignored the evidence submitted that Dr. Lacefield actually compared similarly situated borrowers using census tract location as the comparative variable.  And, putting aside that, as a matter of 7th Circuit law, a "similarly situated" analysis is not even required in a case alleging disparate treatment as Cook County did and as the County Plaintiffs do here, Dr. Lacefield conducted the appropriate similarly situated analysis in this reverse redlining case by comparing differentials across neighborhoods, not individuals. *Hazelwood School District v. United States*, 433 U.S. 299, 308 (1977) (by their nature, reverse redlining cases require a comparison

of similarly situated communities or neighborhoods, rather than individual borrowers). The distinction is critical because statistical evidence as Dr. Lacefield developed showed that the Bank of America Defendants' predatory loans were discriminatorily made to minority borrowers living in predominately minority neighborhoods compared to predominately non-minority neighborhoods. *See Hargraves v. Capital City Mortg. Corp.*, 140 F. Supp. 2d 7, 21 (D.D.C. 2000) (denying summary judgment where plaintiffs provided statistical evidence that defendant made disproportionate number of loans in neighborhoods that were over 90% black).

## VI.   Judge Bucklo's *Daubert* Ruling As to Dr. Cowan Was Also Erroneous

Judge Bucklo fixated on the fact that Dr. Cowan's analysis aggregated the Defendants' originated and purchased loans, tersely concluding that "[i]t does not take an expert to understand that the [Defendants] could not have discriminated in the origination of loans they did not originate or in the foreclosure of loans they did not foreclose."  But her conclusion ignored the allegations in the Cook County complaint, like the allegations here, and reflected a patent misunderstanding of the nature and purpose of Dr. Cowan's analysis to test those allegations that, among other things, Defendants:

- engaged in an equity-stripping scheme, including in which Defendants purchased predatory and discriminatory loans originated by third parties and subsequently foreclosed upon those loans; and

- engaged in (stand-alone) foreclosure discrimination by improperly servicing and foreclosing upon predatory and discriminatory loans originated by third parties that Defendants purchased.

First, to the extent Defendants and their respective predecessors purchased and/or serviced each loan in their produced data set (of which Bank of America is liable, as a matter of law, for having merged with Countrywide – a proposition that the Banks have not and cannot dispute), it was entirely appropriate for Dr. Cowan to aggregate all relevant loans together. Indeed, the complaint alleged that those purchased loans were originated pursuant to Defendants' pricing and underwriting guidelines and Defendants were supposed to conduct due diligence on the loan data for the purchased loans to make sure they were not predatory or discriminatory because the purchase of predatory/discriminatory mortgages is a risky, and regulatorily unsafe and unsound banking practice.  And, as the district court acknowledged in its ruling, Dr. Cowan chose to use an aggregated data set because much of the loan data produced by the Defendants was incomplete and inadequate. *See Mister v. Illinois Central Gulf Railroad Co.*, 832 F. 2d 1427, 1430 (7th Cir. 1987) (in ruling that plaintiff could rely upon statistical showing to prove disparate treatment, appellate court rejected criticism that plaintiff's evidence was

based upon inaccurate assumptions where expert used best available data that was produced by the defendant).

Second, and more importantly, in expressing her "doubts about the reliability of [Dr. Cowan's] conclusions" given his use of aggregated loan data, Judge Bucklo ignored Dr. Cowan's opinion that his regression analysis would *not* have differed materially had he analyzed Defendants' loan data on a segregated basis. As Dr. Cowan pointed out in his rebuttal report, "Courchane criticizes several aspects of my statistical analyses but never proves that, if any of her criticisms were correct, my results and conclusions would have changed." Ex. C, James M. Evangelista Decl, Ex. 3, ¶60. To the contrary, Dr. Cowan concluded that Courchane's statistical results "*are largely in line with my results*" and that "*my conclusion would not have changed*" had he performed his regression analysis utilizing segregated data sets instead of a single aggregated set. *Id.*

In short, it is clear that the gulf between the dueling expert's ultimate conclusions arises from their respective interpretations of the raw statistics, not the underlying methodologies and, Judge Bucklo's "concerns about the reliability of [Dr. Cowan's] methodology" were unwarranted and did not serve as a legitimate basis to exclude him as an expert.

Dated: June 13, 2022          By:   */s/ James M. Evangelista*
                                    James M. Evangelista

Georgia Bar No. 707807
Jim@ewlawllc.com
David J. Worley
Georgia Bar No. 776665
David@ewlawllc.com
Kristi Stahnke McGregor
Georgia Bar No. 674012
Kristi@ewlawllc.com
Leslie G. Toran
leslie@ewlawllc.com
Georgia Bar No. 141637
**Evangelista Worley LLC**
500 Sugar Mill Road
Suite 245A
Atlanta, GA 30350
Tel.: 404-205-8400
Fax: 404-205-8395

*Counsel for Plaintiffs*

Sanford P. Dumain (pro hac vice)
Peggy J. Wedgworth (pro hac vice)
Jennifer S. Czeisler (pro hac vice)
Jarret Raab (pro hac vice)
Roy Shimon (pro hac vice)
Ryan McMillan (pro hac vice)
**Milberg Coleman Bryson Phillips
Grossman LLP**
100 Garden City Plaza, Suite 500
Garden City, NY 11530
Tel: 212:594-5300

*Additional Counsel for Plaintiffs*

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this document was prepared in compliance with Northern District of Georgia Local Rule 5.1C using Times New Roman 14-point font.

Dated: June 13, 2022                    */s/ James M. Evangelista*

## CERTIFICATE OF SERVICE

I hereby certify that on this day I served the above and foregoing PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL DEFENDANTS' LOAN DATA on all parties by causing a true and correct copy to be filed with the court's electronic filing system, which should automatically send a copy to all counsel of record.

Dated: June 13, 2022                    */s/ James M. Evangelista*